UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
------------------------------x
LEONARD BRANDT,                :

        Plaintiff,           : Civil Action No.:
                              3:01-1889 (SRU)
      - against -           :

HOME DIAGNOSTICS, INC., GEORGE H. HOLLEY, :
AND JUDY CHENG SALEM, EXECUTRIX OF THE
ESTATE OF ROBERT J. SALEM,                :

        Defendants.          :
------------------------------x

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Home Diagnostics, Inc. ("HDI"), George H. Holley ("Holley") and the Estate of Robert J. Salem ("Salem") (collectively "defendants") by and through their attorneys Satterlee Stephens Burke & Burke LLP and Nuzzo & Roberts LLC, submit this memorandum of law in support of their motion for summary judgment as to all claims in the complaint of plaintiff Leonard Brandt ("Brandt")[1] other than the relief sought for plaintiff's alleged unpaid monthly consulting fees, and for an order denying plaintiff's claim for prejudgment and compound interest.

### PRELIMINARY STATEMENT

This action is premised on plaintiff's claim that a letter, dated March 2, 1994, (the "March 2nd Letter"), as well as various unspecified conversations he purportedly had with defendant Holley subsequent to that letter, somehow form the basis of a binding agreement

---

[1] Plaintiff entitled his current complaint, dated December 10, 2002, "Amended Complaint," however, it is in fact his third amended complaint.

593964_2

between the parties whereby Brandt would perform consulting services ultimately entitling him to over $10 million in damages.[2] Plaintiff's claim fails because the March 2nd Letter is materially incomplete and was <u>by it own terms</u> not intended to be a binding contract. Indeed, Brandt himself wrote in this letter: "I do plan to construct a more complete definition of our understanding, but I have not had the time to dig into it yet." Not only was a "more complete definition" never constructed, in May 1994, a few months after the March 2nd Letter, Brandt engaged counsel for all of the parties to try to draft a formal written agreement <u>without success</u> because the parties were not able to resolve the material terms of an agreement. In short, plaintiff admittedly has no formal written agreement, no written summary of when and what services were performed, added no material definable benefit to MIT or HDI, never invested <u>any</u> money in MIT or HDI, nor did he ever find a single investor for HDI – yet, somehow, despite the obvious lack of supporting evidence he claims entitlement to more than $10 million in damages.

Moreover, the March 2nd Letter, upon which plaintiff relies, refers only to Brandt's proposed compensation. Unbelievably, it does not even say what he was supposed to do for such compensation. Indeed, it addresses <u>none</u> of the other essential terms in any business contract. Brandt vaguely claims that he and Holley would discuss those terms as they arose, yet there is no indication that those conversations ever took place. He cannot provide a single document memorializing these alleged discussions nor has he provided a description of even one of those conversations. More importantly, plaintiff himself admits that the March 2nd Letter does not even resolve the compensation issue. Holley clearly wrote a counter-proposal at the bottom of this letter and asked Brandt "What do you think." After the parties' negotiations for more

---

[2] MIT was merged into HDI in October of 1999. On March 25, 2002, defendants moved to dismiss, <u>inter alia</u>, all of the claims against MIT, which was granted by this Court on November 20, 2002.

2

593964_2

substantial incentive compensation for Brandt failed, Holley continued to consult with Brandt from time to time, and for that, MIT paid Brandt $1000 per month for those months he submitted an invoice.

In the face of this fatally defective "contract" claim, Brandt argues in the alternative that Holley fraudulently induced him to perform work by claiming Salem had authorized him to negotiate with Brandt and that he was Brandt's "agent," when in fact he was not. It is clear that Holley was never Salem's agent nor does plaintiff provide any evidence that Holley ever claimed that he was. During his deposition plaintiff could provide no specific facts of any conversation he actually had with Holley during which the allegedly fraudulent statements were made, nor could he point to a single document in which Holley claimed to be Salem's agent.

This Court should grant summary judgment because no reasonable jury could find that a valid, enforceable, or binding agreement exists as to more substantial incentive compensation for Brandt above the monthly consulting fee based on the facts alleged here. Since plaintiff has also failed to adduce any evidence whatsoever of fraud on the part of Holley, much less clear and convincing evidence, summary judgment should be entered as to plaintiff's claim for fraud in the inducement. Moreover, since Brandt was compensated $1000 per month for those months that he submitted an invoice, his two remaining equitable claims for estoppel (Count II) and unjust enrichment (Count III) should also fail. Finally, defendants seek a ruling that plaintiff's claim for prejudgment and compound interest is improper under Connecticut law, and therefore should be denied.

593964_2

## FACTS

The relevant facts, which are summarized below, are set forth in the Affidavits of George H. Holley, sworn to April 5, 2005 (the "Holley Aff."), and of Paul M. Brown, sworn to April 5, 2005, ("Brown Aff."), submitted herewith, and the exhibits annexed thereto.

I. Summary of Plaintiff's Claims

Pending before this Court are plaintiff's claims for breach of contract, estoppel, and unjust enrichment against all defendants, i.e. HDI, Holley and Salem, and for fraud in the inducement against Holley. Brandt claims that he entered into a consulting agreement with MIT and HDI, as well as with the individuals Holley and Salem, under which he would provide "business and strategic consulting services" for MIT and HDI. See Complaint, at ¶ 13, which is attached to the Brown Affidavit as Exhibit A (hereinafter, "Complaint, ¶ __"). Plaintiff alleges that he and the defendants made "various agreements;" however, it is undisputed that no formal written agreement exists between the parties. See Complaint, ¶¶ 19-20.

A. *Parties to the Alleged Agreement*

First, while the Complaint states that the alleged contract was between Brandt and Holley, Salem, MIT and HDI, during his deposition Brandt surprisingly changed his story. He pulled away from his contention that he had an agreement with HDI, suggesting instead that perhaps he "indirectly" had an agreement with HDI. See Brandt Dep., p. 203, lines 18-20. (The cited portions of the Brandt deposition transcript are attached to the Brown Affidavit as Exhibit B. All subsequent citations to the Brandt deposition transcript will be referred to as "Brandt Dep., p. __, lines __"). During the same deposition, he later conceded that he had an agreement only with MIT, but to provide services for HDI. See Brandt Dep., p. 433, line 9 – p. 435, line 5.[3]

---

[3] Brandt clearly realizes that his claim that he had an agreement with HDI is completely implausible. Perhaps this is because, being a Harvard MBA, Brandt knows that HDI, a private

4

593964_2

The issue of whether Brandt claims to have an agreement with HDI may be immaterial for the purposes of liability since MIT merged into HDI in 1999; however, it highlights the entirely ambiguous and amorphous nature of plaintiff's claims.[4]

B.  *The Compensation Term of the Alleged Agreement*

According to the Complaint, the compensation term of the alleged agreement was as follows:

> (a) A monthly consulting fee of $2,000, with the understanding that they [defendants] would not be responsible for more than $1,000 per month if HDI did not pay MIT under a management contract with MIT then in existence or in the process of being formed; and (b) <u>Incentive compensation</u> equal to ten percent (10%) of the value, interest, equity, collections, revenue and assets above $1,000,000 received from HDI by MIT; its affiliate company, Applied Sciences Corp. ("ASC"); and Messrs. Holley and Salem.

Complaint, ¶ 9 (emphasis added). This alleged "incentive compensation" term as quoted from the Complaint (subpart b) (sometimes referred to herein as the "10% Incentive Compensation" claim) <u>does not appear in a single document</u>. Moreover, the March 2nd Letter, upon which plaintiff relies, contains a different compensation term. <u>Compare</u> Complaint, at ¶ 9 <u>with</u> Holley Aff., Exh. G.

---

company made up of approximately 200 shareholders, would have required a Board vote on whether to hire him. See Holley Aff., ¶¶ 10, 32. Indeed, Brandt himself a former Board member of HDI, was present at an HDI Board meeting where the Board decided <u>not</u> to hire him. See Holley Aff., ¶¶ 11, 16, Exh. B. Finally, Brandt admits he received from Holley the December 7, 1993, letter from Ralph Lilore, an HDI Board member, in which Lilore objected to Brandt performing any services on behalf of HDI without a written agreement. See Holley Aff., ¶ 20, n. 4, ¶ 32, Exh. D; Brandt Dep., p. 200, line 11- 201, line 16.

[4] What's more, Brandt's November 10, 1993 letter makes reference to an agreement with MIT and HDI. Holley Aff., Exh. C. Brandt also notes in this letter: "My further thoughts are that there are really two agreements here. One with MIT and one with HDI." <u>Id.</u> The later March 2nd Letter, however, makes no reference to an agreement with HDI, though his Complaint certainly does. <u>Id.</u> at Exh. G; Complaint, at ¶ 13.

5

The extent of Brandt's documentary evidence of an agreement as to the 10% Incentive Compensation claim is the March 2nd Letter, which has virtually no essential terms at all, and at the bottom has Holley's handwritten counter-proposal with the question, "What do you think." Holley Aff., ¶ 22, Exh. G. Plaintiff simply cannot explain why he should be entitled to such an enormous sum where the parties clearly tried, without success, either simply to have a meeting of the minds on basic terms or to enter into a formal written agreement. He also cannot explain why he should be entitled to $10 million in damages where he was already being compensated $1000 per month for his occasional monthly consulting services. Finally, plaintiff's 10% Incentive Compensation claim is also so ambiguous, inconsistent and patently unclear as to be unenforceable.

C.   *The Remaining Terms of the Alleged Agreement*

This compensation term is the <u>only</u> term of the alleged agreement recited by plaintiff, either in the Complaint or elsewhere. At his deposition, plaintiff could provide not one other term of this alleged agreement: no duration, no specification of what would constitute "consulting services," no precise explanation of how the ambiguously written 10% Incentive Compensation claim would be calculated, no termination provision, no statement of how he would earn the 10% Incentive Compensation fees, and none of the other essential, basic terms that would be found in any business agreement. See Brandt Dep., p. 157, lines 2-11; p. 196, lines 14-22; p. 289, lines 13-20. During his deposition, plaintiff could point to no other document that contains the remaining material terms of the alleged agreement. See Brandt Dep., p. 426, lines 2 – 5. He explained that he and Holley planned to discuss the remaining terms as they arose, yet as discussed below, he could not provide a single detail of any conversation during which these alleged discussions took place. See Brandt Dep., p. 415, line 14 – p. 416, line 23; p. 427, lines 2 – 17.

6

593964_2

D.  *Plaintiff's Claim for Fraud in the Inducement Against Holley*

Plaintiff further broadly contends, in the alternative, that Holley fraudulently represented himself as the "agent" for Salem, with the authority to bind him in contract negotiations. See Complaint, ¶ 32. There are no facts supporting Brandt's contention that Holley held himself out as Salem's agent. Brandt cannot recall a single specific detail about any conversation during which Holley claimed to act on Salem's behalf, nor can he recall a single document in which Holley purports to act on Salem's behalf. See Brandt Dep., p. 150, line 8 – p. 154, line 10. This is because Holley was not Salem's agent, nor did he ever hold himself out to be. Holley Aff., ¶ 33. Out of the thousands of documents exchanged in discovery in this matter there is not a single document in which Holley purports to speak on behalf of Salem.

II. The Negotiations

During HDI's financial crisis in the early 1990s, Holley wanted Brandt to obtain immediate equity financing for HDI so that it would have the capital to repay its indebtedness to MIT. Holley Aff., ¶¶ 12-13. MIT was willing to pay Brandt a monthly consulting fee for his advice to Holley during this period, however, Brandt wanted something more. Holley Aff., ¶¶ 16-17. During negotiations for more substantial incentive compensation sought by Brandt, Holley proposed the possibility of paying Brandt a percentage of the equity funds that he raised over and above a certain "bogey," which would be a substantial amount of the receivables HDI owed to MIT. Id., ¶ 19. On the other hand, Brandt wanted the bogey "capped" at $1,000,000. Id. Brandt himself admits that he has no recollection of whether this crucial issue for his compensation was ever resolved, but that perhaps it was resolved "subject to review." See Brandt Dep., p. 428, line 25 – p. 430, line 17. Pin-pointing the amount of the receivables would be a very important figure if, as claimed by plaintiff, it was to be a benchmark for Brandt's incentive-based compensation. However, the parties had too much difficulty in defining the

7

593964_2

amount of the "bogey" since the number increased over time. Holley Aff., ¶ 19. In fact, the receivables grew to over $5 million only a few years later. Id. ¶ 23. Brandt also continued to insist that his fee should not be tied in to actual funds that he raised from investors for HDI, which was completely unacceptable to Holley and to Salem – Brandt was not an investor in MIT, so there was no reason that he should be entitled to compensation that was unrelated to any funds he actually brought in. Holley Aff., ¶ 22, 25, 26-27.

During their negotiations, Brandt submitted several proposals to Holley on the subject of obtaining more substantial incentive-based compensation. Holley Aff., ¶ 17. On November 10, 1993, Brandt initially sent Holley a memorandum in which he proposed a variety of compensation terms, none of which were acceptable to Holley or to Salem. Id. ¶ 20, Exh. C. Salem's response to Brandt's proposal is reflected in his handwritten notations on the memo: "No way," "I'd rather pay a fee," and "George I don't like this at all." Id.

A few months later, Holley wrote a letter, dated January 18, 1994, in a further attempt to articulate a possible compensation proposal for Brandt. Holley Aff., ¶ 21, Exh. E and F. Brandt returned the letter to Holley with his handwritten comments, such as "How long" next to the paragraph about a possible $2,000 monthly retainer for Brandt. Id., Exh. E. On a different copy of the same letter, Holley added his own handwritten comments, the most important appearing at the bottom, where he writes: "Len – How do we insure [sic] you don't walk away in three months ... do little if anything ... and myself or others do all the work and you still get 10%?" Id., Exh. F. No document dated either before or after this January 18, 1994, reflects a resolution of this very important issue – that is, exactly what was Brandt <u>required to do</u> in exchange for this substantial incentive compensation he sought, where he was already seeking to

be compensated $1,000 or $2,000 per month in exchange for his consulting services to Holley? In fact, the parties never resolved this issue. Holley Aff., ¶ 21.

In the March 2, 1994 memo, Brandt and Holley once again unsuccessfully tried to articulate the terms of an agreement concerning incentive compensation beyond the monthly consulting fee for Brandt. Holley Aff., ¶ 22, Exh. G. On this fax from Brandt, Holley wrote: "Len, this is generally what we agreed ....," and goes on to point out that the amount of the "bogey" was still unclear: "The $1.0M level we can adjust to 50% of [illegible] receivables, perhaps on a running basis. What do you think." Holley also wrote: "Yes – OK subject to fine tuning of rec'b [receivable] amt [amount]." Id. It is thus clear from this letter that not only were the parties never able to agree to what services Brandt would perform in exchange for the 10% (because such a description appears nowhere in this letter) they were also never able to agree to the amount of the bogey. In short, plaintiff can point to <u>no document</u> that reflects a resolution of these two critical issues related to Brandt's proposed compensation. In fact, during his deposition Brandt conceded that he has no recollection of whether the "bogey" issue was ever resolved. See Brandt. Dep. p. 428, line 22 – p. 430, line 17.

Subsequent to the March 2, 1994 letter, Holley and Brandt engaged legal counsel (the prestigious firm of Faegre & Benson in Minneapolis) to try to create a formal, written agreement, which would reflect the compensation terms but also all of the many remaining essential terms of any contract. Holley Aff., ¶ 24.[5] The resulting draft letter agreement, dated

---

[5] Plaintiff has withheld two documents: (1) notes written by the Faegre & Benson attorney regarding the "May ___, 1994" draft; and (2) a letter from the Faegre & Benson attorney regarding the "May ___, 1994" draft, both on the basis of the attorney-client privilege. Defendants contend that these documents are not privileged because Brandt intended to have this attorney represent both him and Holley in this effort. The parties are currently trying to work out this dispute without Court intervention. Accordingly, defendants reserve the right to amend this motion, or to introduce these documents in their reply if necessary.

"May ___, 1994," clearly demonstrates that there was little they had resolved, or indeed had even discussed regarding the terms of their relationship. Id., ¶ 24, Exh. H. This draft is replete with bracketed questions the attorney needed to answer in order to prepare an actual agreement, such as "[Want more definition of services to rendered?] ** [Want more regarding time commitment from Brandt?] **[Want to specify a term?]." Holley Aff., Exh. H. Of course, the Faegre & Benson attorney could answer none of these questions even after speaking with Brandt because these crucial elements to the formation of any business agreement had never been agreed to by the parties. Holley Aff., ¶ 24. Brandt's handwritten comments also appear on this draft letter agreement. In response to the attorney's question of whether they wanted more definition of the services to be rendered, Brandt wrote: "No more definition necessary." This draft letter agreement never remotely reached final form because it was clear at this point to Holley, that the effort to define a mutually acceptable arrangement had failed. Holley Aff., ¶ 24.

In one last ditch effort, in or about June 1994, Salem and Holley met in person with Brandt at MIT's offices to discuss the terms of a potential agreement with Brandt once more. Holley Aff., ¶ 26. Brandt always knew that, as a 50% shareholder in MIT, Salem would be required to sign on to any agreement involving MIT's interests. Id., ¶ 27. He also knew that Salem was particularly unwilling to agree to any deal that would allow Brandt to participate in equity growth not created by Brandt's own work in attracting new investments in HDI. Id., An opinionated man, with a tendency towards having a quick temper, Salem grew furious when Brandt proposed his vague arrangement whereby he would get 10% of essentially any consideration received by MIT through or from HDI. Id., ¶ 26. Salem, like Holley, always believed that Brandt should be entitled to an incentive "success" fee for any money that he actually raised for HDI, however, he was vehemently opposed to any other arrangement with

10

Brandt. Id. An upset Brandt walked out of that meeting and, with the exception of later settlement related correspondence, the parties never discussed any additional compensation for Brandt thereafter. Id.

### III. No Formal Written Agreement Completed and No Agreement Entered

In short, Brandt and Holley were never able to come up with an acceptable formula for Brandt's compensation, and indeed, never even had detailed discussions on any particular terms beyond that. Holley Aff., ¶¶ 24-25. Nevertheless, Holley continued to consult with him from time to time. Id., ¶ 28. In exchange for those services, MIT paid Brandt a monthly consulting fee of $1,000 per month for those months that he submitted an invoice. Id. Holley even recognizes that it is possible that MIT might owe Brandt for some months; however, Brandt never provided any invoices for those months, nor has he ever provided any specific written contemporaneous documentation for which months he allegedly provided any services. Id., ¶ 30. During this time, Brandt took various trips, including trips made in an effort to find financing for HDI, for which HDI reimbursed his travel expenses. Id., ¶ 29.[6]

Brandt relies on the March 2, 1994 letter as his documentary evidence of an agreement between the parties. See Brandt Dep., p. 286 – p. 290, line 7; p. 426, lines 2 – 5; see also Brown Aff. at Exh. C, p. 5 (Plaintiff's Answers to Defendants' First Set of Interrogatories) and Complaint, ¶ 12(f). Plaintiff concedes that this was the last written document he received that reflected the terms of this alleged agreement. See Brandt Dep., p. 426, lines 2 – 5. This letter does not reflect any sort of agreement, particularly where Holley wrote at the bottom "what do you think?" as well as a counter-proposal on how to measure the receivable amount -- a value that would be crucial for calculating the amount of Brandt's compensation had they ever come to

---

[6] Since Brandt had also indicated that through Norwest he still retained a "carried interest" in HDI's success, he presumably already had a strong personal interest in HDI's future.

11

593964_2

an agreement. Holley Aff., ¶ 23, Exh. G. On the contrary, a reasonable reading reflects that the parties were continuing to work on defining the compensation term of their arrangement. Brandt himself notes in this memo: "<u>I do plan to construct a more complete definition of our understanding, but I have not had the time to dig into it yet.</u>" Id.

During his deposition, plaintiff explained that the March 2nd Letter reflects only the compensation element to this alleged agreement, and that later, unspecified conversations with Holley provided the remaining terms for his $10 million claim. <u>See</u> Brandt Dep., p. 288, line 5 – p. 292, line 13; p. 415, line 14 – p. 416, line 23; p. 427, lines 2 – 17. Brandt took no notes during these conversations and cannot recall the dates or any details of those conversations, and therefore plaintiff can provide no evidence of the essential terms missing from the March 2nd Letter. <u>See</u> Brandt Dep., p. 289, lines 13-20. In short, since the March 2nd Letter is the only specific information provided by plaintiff about his alleged agreement, plaintiff has offered no evidence whatsoever regarding the other missing common and essential contractual terms such as: (1) duration of the agreement; (2) the services to be performed; (3) when, where and how the services would be performed; (4) precisely how the 10% Incentive Compensation would be calculated, and what would constitute "assets received,"; (5) how disputes would be resolved; (6) the manner of cancellation; and (7) who were the contracting parties.

However, even if this Court were persuaded by plaintiff's vague reference to various conversations with Holley during which they allegedly agreed to some essential terms missing from the March 2nd Letter, the compensation terms set forth in the Complaint and the March 2nd Letter are so incomprehensible as to be unenforceable. What does it mean to calculate 10% of the "value, interest, equity, collections, revenue and assets" received by defendants? How would those elements be valued and how would the compensation actually be calculated?

593964_2

Notably, the compensation term described in the March 2nd Letter also differs from the compensation term described in the Complaint. That is, the March 2nd Letter states: "I will receive compensation equal to 10% of <u>any assets</u> received above $1,000,000 by the collective group of MIT, ASC, Bob Salem and yourself." The March 2nd Letter does not provide that the 10% would be based on "value, interest, equity, collections, revenue and assets" received "from HDI" – the March 2nd Letter refers to "any assets," and it does not specify that those assets must be "from HDI." Brandt fails to explain the discrepancy between these two versions of the alleged compensation term.

## ARGUMENT

Brandt has failed to demonstrate that the parties ever entered into a binding agreement. Overwhelming, undisputed evidence compels a finding that the March 2nd Letter is not a manifestation of an agreement, but rather, at best, was an attempted memorialization of preliminary negotiations. Plaintiff has shown no evidence that the parties otherwise agreed to, or even discussed, the remaining essential terms missing from the March 2nd Letter. Moreover, Brandt has failed to offer any evidence that Holley represented himself as Salem's agent or that he fraudulently induced Brandt to enter into a contract. Brandt was reimbursed for his out of pocket expenses incurred in, among other things, trying without success to raise money for HDI and he was paid $1,000 per month for his occasional monthly consulting services, and therefore his equitable claims must also fail. Accordingly, summary judgment should be granted. Finally, consistent with the law of the State of Connecticut, this Court must find that plaintiff is not entitled to prejudgment or compound interest.

## THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record shows "that there is no genuine issue of material fact and the movant is

13

593964_2

entitled to judgment as a matter of law." F.R.C.P. 56(c). If plaintiff fails to make a sufficient showing on an essential element of his case, then summary judgment is appropriate. See Willis v. Anthem Blue Cross & Blue Shield of Connecticut, 193 F.Supp.2d 436 (D.Conn. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. 441 (quoting Celotex at 322-323). To defeat a properly supported motion for summary judgment, a factual issue must be both "genuine" and "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual issue is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A factual issue is not "material" unless it "might affect the outcome of the suit under the governing law." Id.

Where, as here, the evidence is such that no reasonable jury could find that a binding agreement had been made between parties, claims for breach of contract are subject to dismissal on the pleadings or summary judgment. See, e.g., Schulman v. J.P. Morgan Inv. Management, Inc., 35 F.3d 799 (2nd Cir. 1994); Banking & Trading Corp. v. Floete, 257 F.2d 765 (2d Cir. 1958).

POINT I

NO AGREEMENT REACHED AS TO INCENTIVE COMPENSATION FOR PLAINTIFF

Between the Complaint, and the documents revealed during over three years of discovery in this matter, only a single term of the alleged agreement between plaintiff and defendants has been revealed: the compensation term. Since virtually every single other essential term is missing from this alleged contract, it cannot possibly be a valid enforceable agreement. The one document offered by plaintiff as evidence of an agreement, the March 2nd Letter, does not even reflect defendants' unequivocal acceptance, but rather a counter-proposal

593964_2