from Holley. Moreover, the compensation term described by plaintiff is so vague and ambiguous that there is no set of facts that could prove that the alleged agreement is enforceable.

    A.    *Under Connecticut Law There Is A Strong Presumption Against Finding an Agreement Under These Circumstances*

As a preliminary matter, plaintiff must overcome the strong presumption imposed by this Court that there is no binding obligation between the parties. The last letter reflecting the negotiations between Brandt and Holley, and therefore the only document upon which plaintiff can rely as evidence of the alleged agreement, is the March 2nd Letter, which contains <u>only</u> an incomplete compensation term. Moreover, when asked for the details of conversations during which Brandt allegedly agreed to the remaining terms with Holley, Brandt could provide none. <u>See</u> Brandt Dep., p. 157, lines 2-11; p. 196, lines 14-22; p. 289, lines 13-20. This Court has noted, "there is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of documents." <u>Dacourt Group, Inc. v. Babcock Industries, Inc. et al.</u>, 747 F.Supp. 157, 160 (D. Conn. 1990) (quoting <u>Teachers Ins. and Annuity Assoc. v. Tribune Co.</u>, 670 F.Supp. 491 (S.D.N.Y.1987)). Quite simply, the alleged agreement described by plaintiff engenders all of those things: (1) open terms; (2) a call for future approvals; and (3) expressly anticipates the future preparation of documents.

    (1)    <u>Open Terms</u>: The March 2nd Letter contains only a proposed incomplete compensation term, and Brandt took no notes during his supposed subsequent conversations with Holley, nor can he recall the dates or any details of those conversations. <u>See</u> Brandt Dep., p. 157, lines 2-11; p. 196, lines 14-22; p. 289, lines 13-20; p. 426, lines 2 – 5. Moreover, Brandt testified that as a result of his relationship with Holley he believed there was no need to expressly set forth all of the terms of the contract because they would be able to agree to various

15

items as issues came arose in the future. See Brandt Dep., p. 415, line 14 – p. 416, line 23; p. 427, lines 2 – 17. There are, therefore, numerous "open terms" to this alleged agreement.

(2)     Call for Future Approvals: Holley wrote at the bottom of the March 2nd Letter a counter-proposal regarding how to calculate the "bogey" aspect of the compensation and then asked, "what do you think." Holley Aff., Exh. G.

(3)     Future Preparation of Documents: In Brandt's own words, the March 2nd Letter expressly anticipates the preparation of "a more complete definition" of the parties' understanding. Holley Aff., Exh. G. The parties also clearly anticipated the future preparation of documents since they retained counsel to prepare the May 1994 draft a couple of months after this letter, which never reached final. Holley Aff., ¶ 24, Exh. H.

Since all of the elements set forth by this Court in Dacourt are present, plaintiff has the burden of overcoming a strong presumption that no agreement existed, which, as discussed below, he simply cannot do.

B.     *The March 2nd Letter Does Not Reflect An Unequivocal Acceptance*

Plaintiff cannot show that an agreement existed between the parties for the simple reason that Holley did not even accept the compensation term set forth by Brandt in the March 2nd Letter. Before a party may be subject to the terms of a contract, its acceptance must be unequivocal. Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1015 (3d Cir. 1980). Holley very clearly wrote "what do you think" at the bottom of the March 2nd Letter. Furthermore, Holley's handwritten comments offered a counter-proposal to Brandt's offer to set the "bogey" at $1 million. Specifically, Holley wrote: "The $1.0M level we can adjust to 50% of [illegible] receivables, perhaps on a running basis. What do you think." Holley Aff., Exh. G. Holley, therefore, did not unequivocally accept Brandt's proposal. Moreover, Brandt himself wrote in the March 2nd Letter: "I do plan to construct a more complete definition of our

16

593964_2

understanding, but I have not had the time to dig into it yet." Id. Therefore, Holley could not possibly have "unequivocally" accepted Brandt's proposal, because the proposal was indisputably not complete.

### C. *There Are Essential Terms Missing from the Alleged Contract*

As noted above, there are numerous open or missing terms to the alleged contract. Since the only term set forth by plaintiff is the nebulous proposed compensation term, all the material terms are missing from the alleged contract, and as a result, this Court must find that no genuine issue of fact exists as to whether an actual agreement exists between the parties. The material terms of an agreement must be reasonably certain, otherwise, the agreement is void for indefiniteness. See Restatement Second, Contracts § 33; Geary v. Wentworth Laboratories, 760 A.2d 969 (Conn. App. 2000). "The Court can enforce an agreement 'if the missing terms can be ascertained, either from the express terms or by fair implication,'" however, essential matters must have been agreed upon in order to do this. Geary, at 973 (citing Presidential Capital Corp. v. Reale, 231 Conn. 500, 507-508, 652 A.2d 489 (1994)).[7]

Plaintiff points to no duration for the contract or time limit for the delivery of plaintiff's services. See Brandt Dep., 191, line 15 – p. 196, line 6. If plaintiff's allegations were to be believed, plaintiff could have a lifetime contract with defendants. In fact, when asked at his

---

[7] While plaintiff does not categorize the alleged agreement as an "employment agreement," Connecticut law regarding the material terms to employment agreement, nevertheless, may be instructive. See e.g., Adair v. Pfizer, Inc., 245 F.Supp.2d 437 (D.Conn., 2003) (finding that the essential terms of a valid employment contract would be required in order to find a contract between plaintiff and defendant, where defendant claimed that his role was one of an independent contractor or consultant). Under Connecticut law, material terms "essential to an employment contract" include terms regarding the duration and conditions of the plaintiff's employment, and salary and fringe benefits. D'Ulisse-Cupo v. Bd. of Directors of Notre Dame, 202 Conn. 206, 215, 520 A.2d 217 (1987). Plaintiff has provided none of the basic terms for an employment contract, such as the specific nature of the services, when or how frequently such services will be performed, or even the manner of delivery of the services.

17

593964_2

deposition whether he would be entitled to 10% of certain transactions occurring today, Brandt, unbelievably, claims that he would. See Brandt Dep., p. 503, line 17 – p. 506, line 9. It is as if plaintiff believes that he negotiated a lifetime deal where he would be a shareholder or an equity partner with Salem and Holley in MIT, without contributing a single dime or raising one cent for HDI. Surely, no jury would ever find this scenario plausible. This Court cannot allow plaintiff to go forward with a claim for damages that has not only such a vague beginning, but no discernable end.

Plaintiff would have this Court believe that Holley (and Salem) would agree to pay Brandt, indefinitely, 10% of every penny flowing through MIT for providing "consultation services" with no specified, intended or required result, no benchmark for his services. Brandt cannot provide any details about what he was actually supposed to do in exchange for this substantial incentive compensation, where it was already clear that he would be paid a monthly consulting fee. In short, the Court, and defendants, would have to engage in major speculation and sheer guesswork to understand the terms of this alleged agreement. To make the alleged agreement enforceable would not be a matter of simply providing further facts, or of determining factual issues, a jury would be required impermissibly to construct or furnish material terms of this alleged agreement to make it understandable. There are no facts that plaintiff can introduce which would cure the fatal indefiniteness and incoherent nature of this alleged agreement, and there are no genuine issues of material fact for a jury to decide, and therefore summary judgment as to plaintiff's breach of contract claim should be granted.

    D.    *Plaintiff's Testimony Regarding Conversations with Holley Does Not Provide the Missing Essential Terms*

Plaintiff cannot meet his burden of proof that a contract exists by making vague references to conversations he had with Holley regarding the essential terms of the alleged

contract. "A contractual promise cannot be created by plucking phrases out of context; there must be a meeting of minds between the parties ..." Burnham v. Karl & Gelb, P.C., 50 Conn.App. 385, 389, 717 A.2d 811, cert. granted on other grounds, 247 Conn. 944, 723 A.2d 320 (1998). Here, plaintiff has not even "plucked" phrases out of context – indeed, he has not offered any phrases at all. Rather, during his deposition, Brandt made vague suggestions that he and Holley planned to discuss the missing contractual terms as they came up, but he could not offer any details about those conversations. For example:

> Q   Did you have any discussions with Mr. Holley or Mr. Salem or anybody else prior to the time that you claim the agreement came into being as to what services you had to provide in order to earn 10 percent of the assets falling to MIT, Holley or Salem from HDI? What did you do for the percentage?
>
> A   I don't have an explicit recollection of a conversation that defined that.
> ...
>
> Q   In addition to the expectations you've testified he had for your services which was really to perform things at his direction from time to time, and in addition to whatever you testified to concerning the, quote, term, did you have a discussion with him as to whether or not this agreement could be cancelled?
>
> A   I don't recall having that discussion.
> ...
>
> Q.   Did you make any notes or memoranda of the telephone call where these other terms were allegedly agreed upon?
>
> A.   I don't have a recollection of whether I did or didn't. It would not be illogical that if there's any further points, that I would have but I can't tell you whether I did or didn't.

Brandt Dep., p. 157, lines 2-11; p. 196, lines 14-22; p. 289, lines 13-20.

More importantly, Brandt suggested that he and Holley had a sort of "agreement to agree" arrangement whereby he and Holley would discuss issues with their arrangement as they arose:

19

593964_2

Q. Fair enough. What did the agreement provide for how one or both parties could terminate the agreement?

A. I think we had an understanding that we would discuss that which could lead to that termination as other matters can be discussed.

Q. I'm not sure I understand your answer. You mean you would agree to that clause or provision later; sometime after March of '94 you come to some understanding of how it can be terminated?

A. I think we understood that there were many items that relied on our ability to reasonably reach a conclusion if they were not well understood because we didn't think about them at that moment.

Q. In other words, there were many items that were not fleshed out?

A. I don't know that.

Q. Well, when you just said there were many items, what, were you referring to, many items that were not agreed upon?

A. I meant to refer you to a potential that there might be items. Whether it be many or not, I don't know what I thought at that moment.

…

A. That there might be items we hadn't talked about but we had faith that if we were to consider it.

…

Q. Well, this agreement you're suing under was reached in March, right?

A. I believe the understanding, the compensation -- there was a compensation component that was reached in March. Like many other things that I tried to describe, <u>both of us recognize that there may be issues to further discuss that would include further aspects of the agreement</u>. I don't know and I don't think it was in March that our agreement, that there is no further discussion necessary on the receivable amount that was reached in March. I think that may have been later.

Q. When?

A. I'm not sure.

Brandt Dep., p. 415, line 14 – p. 416, line 23; p. 427, lines 2 – 17. Plaintiff's failure to provide any details whatsoever about the details of the conversations during which he and Holley

20

593964_2

allegedly agreed to the essential terms of their contract demonstrates that there can be no material issue of fact as to the existence of a contract and defendants motion should be granted as a matter of law.

E.  *The Compensation Term Relied Upon Is Incomprehensible*

Even if the Court, arguendo, were persuaded that the parties could have had a legally enforceable agreement of the kind alleged by plaintiff, the crucial compensation term relied upon by plaintiff is so ambiguous and incomprehensible, the Court would be unable to calculate the compensation plaintiff claims he is allegedly owed. Defendants made a Motion to Dismiss on the basis of this argument early in the case; however, the Court denied this aspect of defendants' motion in the interest of seeing what clarification discovery would provide. Three years of discovery has provided no clarification on this point. An agreement must be sufficiently definite before a court can enforce it. "Under established principles of contract law, an agreement must be definite and certain as to its terms and requirements," Manley v. Blue Cross/Blue Shield of Connecticut, 1996 WL 532506 (Conn. Super. Ct. 1996) (citing Dunham v. Dunham, 204 Conn. 303, 313 (1987) and D'Ulise v. Board of Directors of Notre Dame High School, 202 Conn. 206, 214 (1987)).

Plaintiff's self-contradictory and internally inconsistent 10% Incentive Compensation claim is ambiguously defined as "10% of the value, interest, equity, collections, revenue and assets above $1,000,000 received from HDI by MIT; its affiliate company, Applied Sciences Corp. ("ASC"); and Messrs. Holley and Salem." Complaint, ¶ 11(b). As noted above, the March 2nd Letter offers a slightly different variation on the compensation term: "I will receive compensation equal to 10% of any assets received above $1,000,000 by the collective group of MIT, ASC, Bob Salem and yourself." Holley Aff., Exh. G (emphasis added). Various

21

593964_2

evident reasons exist why either of these alleged compensation terms are too vague to provide this Court with enforceable contractual terms.

It is impossible to determine from which parameters or values the 10% Incentive Compensation claim should be calculated, and therefore, this Court can not enforce this term. Plaintiff claims he is entitled to a number based on 10% of "value" and/or "interest" and/or "equity" and/or "collections" and/or "revenues" and/or "assets." The question therefore becomes, which is it? Plaintiff can not list six potentially enormously inconsistent terms as the basis upon which his incentive compensation or "success" fee is to be calculated and have a court or jury select one or two. "Equity," for example, can be loosely defined as the amount of the assets minus the liabilities. Apparently, as alleged by plaintiff, he would be entitled to 10% of both assets, as well as the assets minus the liabilities, i.e. the equity. Similarly, "revenues" can be loosely defined as total gross income or receipts. Does "value" mean market value or book value? To what "collections" does this term refer and with whose "interest" are we concerned? Over three years of discovery has not shed any light on how this Court could possibly enforce an alleged compensation term such as this. Because the alleged compensation term is so unintelligible as to be unenforceable, this Court should grant summary judgment as to plaintiff's breach of contract claim.

F.  *The May 1994 Draft Agreement Proves that No Agreement Was Formed*

Finally, plaintiff simply cannot prove that an agreement existed where he and Holley attempted to prepare a formal written agreement but failed. "[B]usiness entities ordinarily do not enter into multi-million dollar transactions in the absence of a comprehensive writing." Phoenix Mutual Life Ins., 734 F. Supp. 1181, 1187-88 (D. Md. 1990) (strong presumption against finding a binding agreement when parties contemplated a comprehensive contract document). Here, we have an <u>attempt</u> to create a comprehensive writing, however, this

22

593964_2

draft never reached final form. Surely, if the parties felt the need to reduce their proposed arrangement to writing and were unable to define their arrangement, this provides conclusive proof that no such agreement was ever reached. Accordingly, this Court should grant summary judgment as to plaintiff's breach of contract claim.

POINT II

SINCE BRANDT WAS PAID HIS MONTHLY CONSULTING FEE,
THERE CAN BE NO CLAIM FOR UNJUST ENRICHMENT OR ESTOPPEL

Plaintiff was compensated for his occasional consulting services at a rate of $1,000 per month for those months that he submitted a monthly invoice. Plaintiff's equitable claims are <u>alternative</u> claims that are not appropriate where he and Holley already had an agreement to pay a monthly consulting fee. Unjust enrichment is a quasi-contractual doctrine that applies only in the absence of a valid and enforceable contract. See <u>ESI, Inc. v. Coastal Power Production Co.</u>, 995 F.Supp. 419 (S.D.N.Y., 1998). When Brandt sought additional compensation, he and Holley attempted, without success, to agree to the terms of an agreement that would result in incentive compensation for Brandt. As discussed above, however, the record is clear that they were never able to reach an agreement of that kind. MIT continued, however, to pay Brandt under the initial loose arrangement to pay a monthly consulting fee, and therefore, Brandt cannot claim that he has an equitable claim to additional money where he already was compensated for his services.

Moreover, the record clearly demonstrates that plaintiff cannot sustain a claim for estoppel. Under Connecticut law, "[a] fundamental element of promissory estoppel ... is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all." <u>D'Ulisse-Cupo</u>,

23

593964_2

202 Conn. at 213, 520 A.2d 217 (citing E. Farnsworth, Contracts (1982) § 2.19, p. 95). By this action, plaintiff is making the absurd claim that he was not required to do any additional work in order to earn the 10% Incentive Compensation, which amounts to a windfall of millions of dollars for plaintiff.[8] See Brandt Dep., p. 157, lines 2-21. By any objective standard, no reasonable jury could believe that defendants would ever agree to such an arrangement that was lacking in any consideration whatsoever. It defies logic that defendants would ever agree to pay Brandt, who never invested a single cent in HDI or MIT, 10% of practically every dollar flowing through MIT from HDI from 1993 until the present, particularly where Brandt was already being reasonably compensated for his services. Since plaintiff already agreed to a monthly consulting fee arrangement, his equitable claims should be denied.

## POINT III

### PLAINTIFF HAS OFFERED ONLY CONCLUSORY ASSERTIONS IN SUPPORT OF HIS FRAUD CLAIM AND THEREFORE SUMMARY JUDGMENT SHOULD BE GRANTED

Plaintiff concedes that he has no recollection of any specific details of conversations during which Holley allegedly fraudulently represented himself to be Salem's agent, and therefore, he cannot possibly meet his burden of proof for his claim for fraudulent inducement against Holley. Under Connecticut law, "[t]he essential elements of an action in fraud ... are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." Miller v. Appleby, 183 Conn. 51, 54-55, 438 A.2d 811 (1981). Moreover, a claim of fraud must be proven by clear and

---

[8] Not surprisingly, plaintiff apparently has no records of what hours, days or weeks he allegedly worked and he is unable to provide an estimate of how much time he spent. See Brandt Dep., p. 612, lines 5 – p. 613, line 4; p. 772, line 24 – p. 776, line 21.

24

593964_2

satisfactory evidence. Id. at 55, 438 A.2d 811; Regis v. Connecticut Real Estate Investors Balanced Fund, Inc., 28 Conn.App. 760, 768, 613 A.2d 321 (1992).

When asked for the basis of his contention that Holley claimed to be Salem's agent, i.e. the false representation of a statement of fact, plaintiff could not provide a single detail of Holley's alleged fraudulent statements:

> Q   When you felt that there was an understanding with Mr. Holley, you also said that you felt there was at the same time an understanding with Mr. Salem; is that correct?
>
> A   Yes.
>
> Q   What led you to believe that Mr. Salem was also in agreement?
>
> A   I can't explicitly tell you something that was said in a conversation I can't remember so well. What I can tell you generally is I had come to understand that Mr. Salem was involved in the dialogue because of the dialogue changing purportedly based on his views, and that I had come to believe, is all I can say, that those views are now the agreement that we had reached that was also acceptable to Mr. Salem.
>
> Q   Did Mr. Salem ever tell you that agreement that you came to was acceptable to him?
>
> A   I cannot recall talking to Bob Salem about that agreement in that timeframe.
>
> Q   Did Mr. Holley tell you that the agreement was acceptable to Mr. Salem?
>
> A   I can not pinpoint a specific conversation that I did. I can only tell you that I came to believe that, but I cannot recall the details of a conversation and tell you when it happened and what he said.
>
> Q   Are you saying it was your impression -- you understand I'm trying to understand -- is it your impression that he was on board with the agreement?
>
> A   It is.
>
> Q   And when I've asked you to tell me what the basis of that impression was, you can't recall; is that correct?
>
> A   No. <u>What I told you is I can't tell you the specific details of the conversations</u>. The basis was communication from George Holley.

25

593964_2

Q   To what effect?

A   To that effect.

Q   What effect?

A   That he was on board.

Q   That Bob Salem was in agreement with what he was agreeable to?

A   Yes.

Q   In those words –

A   Basically a note that had been drawn up that accurately, with the exception of a note that was made back on that letter that I had drawn up, <u>that George was now speaking for -- representing that Bob was agreeing to. I had come to that understanding. But what I also want to testify is that I can't tell you explicitly what he said or why I had exactly that impression, other than that course of events.</u>

Q   Have you ever seen anything in writing from George Holley saying he represents Mr. Salem's interests in negotiations with you?

A   I can't recall seeing anything in writing that said that.

Q   Did he ever tell you in words or substance, I am the authorized agent for Bob Salem?

A   In substance.

…

Q   And I take it that Bob did not use the words "Salem has authorized me to act as its agent." I take it those precise words were not used?

MR. DUNHAM:   Sorry. I think you misspoke. You said Bob. You meant George.

Q   George?

A   I know that he spoke them or didn't speak them. <u>I can't tell you exactly what he said</u>.

26

Brandt Dep., p. 150, line 8 – p. 152, line 24; p. 153, line 24 – p. 154, line 10 (emphasis added). By this testimony, plaintiff admits that he cannot provide a single detail of the allegedly fraudulent statements by which Holley purported to be Salem's agent, nor can he recall a single document in which Holley made such a claim.

The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, was similarly unimpressed with plaintiff's evidence that Holley purported to be Salem's agent. In order to assert personal jurisdiction over the Salem Estate in Minnesota, plaintiff there unsuccessfully attempted to prove: (a) personal jurisdiction existed over Holley in Minnesota; and, like here, that (b) Holley was Salem's agent, thereby conferring personal jurisdiction over the Estate in that District. In his Order, dated September 20, 2001, transferring this action to the District of Connecticut, Judge Kyle held: "Even viewing the record in the light most favorable to Brandt, there is insufficient evidence to give rise to a reasonable inference that Salem controlled Holley's actions. The fact that Holley consulted with Salem concerning Brandt's proposed compensation agreements does not make him Salem's agent ... The Court concludes that, from the record presently before it, no reasonable jury could infer that Holley acted as Salem's agent." See Brown Aff. ¶ 5, Exh. D, (Memorandum Opinion and Order of the Honorable Richard H. Kyle, dated September 20, 2001) (emphasis both added and in original). As demonstrated by plaintiff's deposition testimony above, plaintiff has since offered nothing more to support this entirely baseless claim. As a matter of law, therefore, plaintiff cannot sustain a claim for fraud against Holley and therefore this Court should grant summary judgment as to this claim.[9]

---

[9] The Salem Estate is likewise moving for summary judgment on the basis that Holley was not authorized to act as Salem's agent. If this Court finds, as defendants anticipate, that Holley was not an agent of Salem, it serves to confirm that without the participation of Salem, a

27

593964_2

### POINT IV

### PLAINTIFF'S CLAIM FOR PREJUDGMENT INTEREST IS IMPROPER AND SHOULD BE DENIED

Since this case clearly does not involve a sum certain, a liquidated debt or promissory note that defendants refused to pay, plaintiff's $4 million claim for prejudgment interest should be denied. "Prejudgment interest is awarded in the discretion of the trial court to compensate the prevailing party for a delay in obtaining money that rightfully belongs to him." Northrop v. Allstate Ins. Co., 247 Conn. 242, 254 (1998). As a matter of law, this case does not qualify under the traditional setting or the legal standard for pre-judgment interest and it should be denied.

In plaintiff's Supplemental Expert Report of John W. Wills, which is attached to the Brown Affidavit, plaintiff claims damages in excess of $10 million on an agreement the existence of which is in dispute, which claim is comprised of approximately $4 million in pre-judgment interest. Since there is clearly no liquidated amount of damages where the parties never agreed to more substantial incentive compensation for Brandt nor did the parties ever even agree to a formula for such compensation, there is no legal basis for pre-judgment interest. No reasonable jury could conclude otherwise. Moreover, it is clear that plaintiff's damages cannot possibly be for a sum certain where plaintiff did not even bring his claim until over six years after he claims the agreement was formed and, to date, defendants still await plaintiff's amended interrogatory response setting forth the precise amount of his claimed damages. Finally, this is clearly not a scenario where money has been wrongfully withheld from plaintiff. As noted above, plaintiff did not contribute a single dime to MIT or HDI, nor did he lend any money in

---

50% shareholder in MIT, this Court cannot possibly find that Holley could bind MIT, let alone HDI or Salem.

exchange for a promissory note or otherwise. Indeed, there is a dispute as to whether plaintiff is owed any money at all. Accordingly, as there remains no issue of material fact on this issue, this Court should grant summary judgment on plaintiff's interest claim.

  A. *Pre-Judgment Interest Is Not Due as the Parties Never Agreed to any Liquidated Sum and/or Method by which such Amount could be Calculated*

  Under Connecticut law, "[t]o award §37-3a interest, two components must be present. First, the claim to which the prejudgment interest attaches must be a claim for a <u>liquidated</u> sum of money wrongfully withheld and, second, the trier of fact must find, in its discretion, that equitable considerations warrant the payment of interest." <u>Ceci Brothers, Inc. v. Five Twenty-One Corporation</u>, 81 Conn.App. 419, 428 <u>cert. denied</u>, 268 Conn. 922 (2004) (emphasis added) (citation omitted); <u>see also</u> <u>Fitzpatrick v. Scalzi</u>, 72 Conn. App.779, 788 (2002). Thus, as a threshold matter, and before the question even gets to the trier of fact on the equities, plaintiff must first meet the requirement that there was an agreement for a "liquidated" sum. See <u>Pilato v. Kapur</u>, 22 Conn.App. 282, 283 (1990) (stating that "[w]hether the amount involved was <u>liquidated</u> was a conclusion of law...").

  As to this first and necessary element, the Connecticut courts have articulated that: "[p]rejudgment interest pursuant to §37-3a has been applied to breach of contract claims for <u>liquidated</u> damages, namely, where a party claims that a <u>specified</u> <u>sum</u> under the terms of a contract, or a sum to be determined by the terms of the contract, owed to that party has been detained by another party." <u>Foley v. Huntington Co.</u>, 42 Conn.App. 712, 740 <u>cert. denied</u>, 239 Conn. 931 (1996). (Emphasis added). Here, the parties were never able to agree to the crucial compensation term of an agreement (much less any of the other essential terms) and/or the method for calculating compensation. See Holley Aff. ¶ 19. Plaintiff even <u>concedes</u> he cannot

29

593964_2

recall whether the parties ever settled the crucial question of the amount of the "bogey." See Brandt Dep., p. 428, line 25 – p. 430, line 2.

> The Connecticut courts have also stated that:
>
> Prejudgment interest…is appropriate only where the essence of the action itself involves the wrongful withholding of money due and payable to the plaintiff… It ordinarily does not apply to contract actions in which the plaintiff is not seeking the recovery of <u>liquidated</u> <u>damages</u> or the recovery of <u>money</u> <u>advanced</u> under a contract and wrongfully withheld after a breach of that contract.

<u>Tang v. Bou-Fakhredine</u>, 75 Conn.App. 334, 349 (2003) (emphasis added). Notably, plaintiff still does not have a sum certain in mind for his damages 11 years after the alleged agreement was formed. To date defendants have asked for a revised interrogatory response regarding plaintiff's damages, however, to date, defendants still await plaintiff's final damages claim. If it has taken plaintiff 11 years to determine precisely how much he is allegedly owed by defendants, by definition plaintiff cannot possibly claim that there somehow existed a "liquidated" sum in order to support the interest claim.

Second, as discussed above, the parties never reached any agreement as to the "bogey" amount and/or the method for calculating the subject compensation. Finally, plaintiff rests his case on the March 2nd Letter, the document that plaintiff claims sets forth the subject compensation term – but even that differs from the compensation term in the Complaint. <u>Compare</u> Holley Aff., Exh. G <u>with</u> Complaint, ¶ 11(b) (Complaint). As the bogey and/or other method to calculate the compensation was never agreed to, there was never a sum certain and/or liquidated amount finalized. Thus, plaintiff fails in every way to meet the traditional and threshold requirement for pre-judgment interest.

Plaintiff's claim for prejudgment interest similarly fails where clearly no money was wrongfully withheld. "A plaintiff's burden of demonstrating that the retention of money is

30

593964_2

wrongful requires <u>more</u> than demonstrating that the opposing party detained money when it should not have done so." <u>Smithfield Associates, LLC v. Tolland Bank</u>, 86 Conn. App. 14 (2004). This is not a case about the "wrongful" retention of money, as there was never any agreement in the first place on the compensation amount. Plaintiff also did not invest any money in MIT or HDI, nor did he lend any money to defendants. Since the defendants dispute that any agreement as to incentive compensation was ever entered, there is a dispute as to whether plaintiff is owed any money at all. Accordingly, plaintiff's interest claim is simply not based on wrongfully withheld money and therefore summary judgment should be granted as to this claim.

B.   *Pre-Judgment Interest Should be Calculated on a "Simple Interest" Basis*

Under Connecticut law, pre-judgment interest must be calculated on a "simple interest" basis, or in other words, on a yearly/annual basis. <u>See</u> Conn.Gen.Stat. 37-3a (where statutory text reads "interest at the rate of ten per cent <u>a</u> year"); <u>See also</u> <u>Loomis and Loomis, Inc. v. Stecker and Colavecchio Architects, Inc.</u>, 6 Conn.App. 88, 94 (1986) (reasoning that interest is simple interest in the absence of contrary agreement). This is in contrast to "compound" or monthly interest. <u>See</u> <u>Solar Kinetics Corp. v. Ryerson & Son, Inc.</u>, 488 F.Supp. 1237 (D.Conn.1980) (stating that, under Conn.Gen. Stat. §37-3a, the method of calculation is "simple interest"); <u>See also</u> <u>Latex Foam Intern. Holdings, Inc. v. May</u>, 2003 WL 22205640 (Conn.Super.2003) (ruling, under Conn.Gen.Stat. §37-3a, that "defendant is entitled to <u>simple interest</u> on that award at the rate of 10% per annum"). Moreover, plaintiff's claim for prejudgment interest is unjustifiably set at the maximum ten percent rate. To the extent that any of plaintiff's Expert Reports seek to calculate pre-judgment interest on a compound basis, this is not the law. Under Conn.Gen.Stat. §37-3a, interest may only be calculated on an annual or "simple" basis.

31

593964_2

Accordingly, and as this issue is a pure question of law, defendants hereby seek a declaratory ruling on summary judgment that plaintiff's interest claim, if not struck in its entirety, be limited to, and calculated upon, a "simple interest" basis.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment as to all claims in the Complaint, plaintiff's claim for prejudgment interest should be denied, and attorneys' fees awarded to defendants along with such other and further relief as the Court deems just and proper.

Dated: New York, New York
April ___, 2005

SATTERLEE STEPHENS BURKE & BURKE LLP

By: /s/ Paul M. Brown (R-an)
Paul M. Brown (CT 23232)
230 Park Avenue
New York, New York 10169
(212) 818-9200
Attorneys for Defendants
HOME DIAGNOSTICS, INC. and
GEORGE H. HOLLEY

and

NUZZO & ROBERTS, LLC

By: /s/
Richard A. Roberts (CT 07665)
One Town Center, P.O. Box 747
Cheshire, CT 06410
(203) 250-2000
Attorneys for Defendants
HOME DIAGNOSTICS, INC., GEORGE H. HOLLEY
and THE ESTATE OF ROBERT J. SALEM

593964_2

This is to certify that on April 6, 2005, a true copy of the foregoing Memorandum in Support of Motion for Summary Judgment was mailed via first class, postage prepaid mail to:

Paul M. Brown, Esq, Esquire
Satterlee, Stephens, Burke & Burke
230 Park Avenue
New York, NY 10169

Edward Wood Dunham, Esquire
Wiggin & Dana, LLP
265 Church Street
PO Box 1832
New Haven, CT 06508-1832

Honorable Stefan R. Underhill
United States District Court
915 Lafayette Blvd
Bridgeport, CT 06604

_____
Richard A. Roberts

593964_2