# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| LEONARD BRANDT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action |
| v. | ) | Docket No. 3:01 CV 1889 (SRU) |
| | ) | |
| MIT DEVELOPMENT CORP., HOME | ) | |
| DIAGNOSTICS, INC. GEORGE H. | ) | |
| HOLLEY, AND JUDY CHENG SALEM, | ) | |
| EXECUTRIX OF THE ESTATE OF | ) | |
| ROBERT J. SALEM | ) | |
| | ) | |
| Defendants. | ) | July 1, 2005 |

## PLAINTIFF LEONARD BRANDT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Edward Wood Dunham (ct05429)
Jonathan M. Freiman (ct24248)
WIGGIN and DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 fax
edunham@wiggin.com
jfreiman@wiggin.com

Attorneys for Plaintiff

## TABLE OF CONTENTS

Table of Authorities ..................................................................................... iii

INTRODUCTION ............................................................................................ 1

COUNTER-STATEMENT OF FACTS ......................................................... 2

    The Parties ................................................................................................. 2

    HDI and MIT in Deep Trouble ................................................................ 4

    Turning to Len Brandt In a Time of Need .............................................. 6

    Compensation Discussions ....................................................................... 8

    Choosing Not to Formalize the Agreement ........................................... 14

    Len Brandt's Work .................................................................................. 16

    The Turnaround and the Turning Away ............................................... 21

    Defendants' Enormous Financial Proceeds ........................................... 22

ARGUMENT .................................................................................................. 23

    I.     Standard for Summary Judgment .................................................. 23

    II.    Summary Judgment on the Contract Claim Would Be Improper ................ 23

          A.    The Agreement Was Formed ......................................... 24

          B.    There Are No "Missing" Terms That Void the Agreement ............ 26

          C.    There Are No "Incomprehensible" Terms That Void the Agreement ................ 30

          D.    The May 1994 Attorney's Draft Contract Does Not Undermine the Agreement .......... 32

    III.   Summary Judgment on Unjust Enrichment and Estoppel Would Also Be Improper .......... 34

    IV.   Summary Judgment on Fraud Would Be Improper .................................. 35

    V.    Summary Judgment on the Prejudgment Interest Claim Is Not Appropriate ............. 38

    VI.   Summary Judgment for Salem Is Not Appropriate On Any Count .............. 42

          A.    There Are Disputed Material Facts Regarding Agency ................. 42

               1.    Holley Had Actual Implied Authority To Bind Salem ............ 43

a. Circumstantial evidence of actual agency at the time of negotiations.................................................44

b. Circumstantial evidence of actual agency after completion of agreement.........................................48

2. Holley Also Had Apparent Authority To Bind Salem.........................50

B. Neither Law Of The Case Nor Collateral Estoppel Requires This Court to Ignore Evidence Uncovered After the Minnesota Jurisdiction Decision.........................................................................53

C. Salem is Bound to the Agreement Through Equitable Ratification ................55

D. The Unjust Enrichment Claim Does Not Depend On Agency .......................56

**CONCLUSION** ..................................................................................................................59

**Certification**

# TABLE OF AUTHORITIES

## CASES

*Advanced Fin. Servs., Inc. v. Associated Appraisal Servs., Inc.*, 79 Conn. App. 22 (2003)..........40

*Associated Catalog Merchandisers, Inc. v. Chagnon*, 210 Conn. 734 (1989) .............................39

*Atlas v. Miller*, 20 Conn. App. 680 (1990) ................................................................................40

*Barasso v. Rear Still Hill Road, LLC*, 81 Conn. App. 798 (2004) ................................................42

*Breen v. Phelps*, 186 Conn. 86 (1982) .......................................................................................54

*Brandt v. MIT Dev. Corp.*, Mem. Op. and Order (D. Minn. Sept. 20, 2001) ...................37, 53, 54

*Cadle Co. v. D'Addario*, 268 Conn. 441 (2004) .........................................................................36

*Ceci Bros., Inc. v. Five Twenty-One Corp.*, 81 Conn. App. 419 (2004).......................................41

*Chris Constr. Co. v. May Ctrs., Inc.*, 23 Conn. App. 453 (1990) .................................................39

*Cohen v. Holloways', Inc.*, 158 Conn. 395 (1969) ......................................................................56

*Costello v. Hartford Inst. of Accounting, Inc.*, 193 Conn. 160 (1984) .........................................39

*D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.*, 202 Conn. 206 (1987) .........................35

*Driscoll v. City of New Haven*, 75 Conn. 92 (1902) ...................................................................55

*Edart Truck Rental Corp. v. B. Swirsky & Co., Inc.*, 23 Conn. App. 137 (1990).........................50

*Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 108 (2d Cir. 2001)...........................................55

*Ferrato v. Webster Bank*, 67 Conn. App. 588 (2002)..................................................................39

*Fitzpatrick v. Scalzi*, 72 Conn. App. 779 (2002) .......................................................................41

*Flynn v. Kaumeyer*, 67 Conn. App. 100 (2001) .........................................................................38

*Foley v. Huntington Co.*, 42 Conn. App. 712 (1996)..............................................................38, 41

*Fontaine v. Colt's Mfg. Co., Inc.*, 74 Conn. App. 730 (2003) .....................................................40

*Geary v. Wentworth Labs.*, 60 Conn. App. 622 (2000) ...............................................................29

*Gordon v. Tobias*, 262 Conn. 844 (Conn. 2003) ..................................................51, 54

*Matter of Hallahan*, 936 F.2d 1496 (7th Cir. 1991) ...................................................53

*Hartford Accident & Indem. Co. v. S. Windsor Bank & Trust Co.*, 171 Conn. 63 (1976) ............55

*Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276 (1994)..................................................................................34, 56, 57

*Jarvis v. Cunliffe*, 140 Conn. 297 (1953)..................................................24, 32

*Kuriakose v. City of Mount Vernon*, 41 F. Supp. 2d 460 (S.D.N.Y. 1999) ...................................53

*Kuss v. Kuss*, 2000 WL 1170911 (Conn. Super. Ct. July 19, 2000)...............................................41

*Leary v. Johnson*, 159 Conn. 101 (1970)..................................................43

*Lillbask v. State of Conn. Dep't of Ed.*, 397 F.3d 77 (2d Cir. 2005) ...............................................54

*Loomis & Loomis, Inc. v. Stecker & Colavecchio Architects, Inc.*, 6 Conn. App. 88 (1986)..................................................................................41

*Maharishi Sch. of Vedic Sciences, Inc. (Conn.) v. Conn. Constitution Assocs. L.P.*, 260 Conn. 598 (2002) ...........................................................42, 43, 50

*Montana v. United States*, 440 U.S. 147 (1979) ...........................................................53

*New London Housing Auth. v. State Bd. of Labor Relations*, 47 Conn. Supp. 624 (2001) .....50, 51

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736 (2d Cir. 1998) ..................................................................................29, 30, 33

*Northrop v. Allstate Ins. Co.*, 247 Conn. 242 (1998)..................................................41

*Paulus v. LaSala*, 56 Conn. App. 139 (1999) ...........................................38, 40, 41

*Pilato v. Kapur*, 22 Conn. App. 282 (1990)..................................................40, 41

*Presidential Capital Corp. v. Reale*, 231 Conn. 500 (1994) ...........................................29, 30, 33

*Royal Ins. Co. of Am. v. Zygo Corp.*, 349 F. Supp. 2d 295 (D. Conn. 2004) ...............................54

*Russell v. Dean Witter Reynolds, Inc.*, 200 Conn. 172 (1986) ...........................................55

*Satsky v. Paramount Communications, Inc.*, 7 F.3d 1464 (10th Cir. 1993) ...................................53

*Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77 (2d Cir. 2004) ................................................................................................................................23

*Sira v. Morton*, 380 F.3d 57 (2d Cir. 2004) ...................................................................2

*Smithfield Assocs., LLC v. Tolland Bank*, 86 Conn. App. 14 (2004)............................41

*Somers v. Statewide Grievance Comm.*, 245 Conn. 277 (1998) ....................................36

*Spector v. Konover*, 2001 WL 1132664 (Conn. Super. Ct. Aug. 15, 2001) ..................41

*State v. Diaz*, 237 Conn. 518 (1996)..............................................................................36

*Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96 (2003) ..................................35

*Tang v. Bou-Fakhreddine*, 75 Conn. App. 334 (2003) ..................................................41

*Tomlinson v. Bd. of Ed. of City Of Bristol*, 226 Conn. 704 (Conn. 1993) ...............43, 50

*Wagner v. Clark Equip. Co., Inc.*, 259 Conn. 114 (2002) .............................................54

*Wellington Sys., Inc. v. Redding Group, Inc.*, 49 Conn. App. 152 (1998).....................35

*Willow Funding Co. v. Grencom Assoc.*, 63 Conn. App. 832 (2001)..........................29, 30, 31, 33

## OTHER AUTHORITY

Fed. R. Civ. P. 56(c) .......................................................................................................2

Moore's Fed. Practice § 132.03[2][l][i] .........................................................................53

Restatement (Second), 1 Agency § 82 (1958) ...............................................................55

## INTRODUCTION

This case involves an agreement made in bad times and broken in good times. George H. Holley and Robert J. Salem were partners in a pair of medical device companies that they had long controlled. In 1993, both companies were, as Salem later put it, "crippled," by product quality problems, management turnover, board resignations and severe financial difficulties. Holley and Salem's large personal investments in both companies were seriously at risk.

Their response to this dire predicament was to seek help from Leonard Brandt, a successful venture capitalist, expert in the health care industry and former independent director of their larger company. Unable to pay Brandt any significant current compensation, Holley and Salem offered him a piece of their uncertain future in exchange for his current counsel. The companies were worth nearly nothing when Brandt arrived. In a few short years, he helped them make a dramatic recovery. In 1999, Holley and Salem received assets worth over $55,000,000 when they merged their two companies, and then reneged on their obligation to pay Brandt a portion of their gains.

Defendants now assert that Brandt did not "provide any tangible benefits and/or added value" to the companies. S.Br. 5.[1] The full discovery record emphatically refutes that contention, and shows that Brandt was an important part of the turnaround. But that is not the question at this juncture of the case. Because Defendants have moved for summary judgment, the only question now is whether they have proven that there is no genuine issue of any material fact on any of Brandt's claims. They have not met that burden.

Defendants admit that they entered an agreement with Brandt. They argue that the

---

[1] This brief refers to pages in the Memo. of Law in Support of Defs.' Mot. for Sum. J. as "Br.__" and to Def. Salem's Memo. of Law in Support of Mot. for Sum. J. as "S.Br.__."

contract provided less compensation than Brandt seeks here, a monthly retainer but not an incentive compensation arrangement. *See* S.Br. 4 ("Defendants do not dispute the existence of [a] Monthly Fee arrangement"); Br. 23 (acknowledging "an agreement to pay a monthly consulting fee"). Their position is starkly at odds with the record. It also makes plain that the two sides do not differ over the existence of an agreement, but rather over the compensation terms of that agreement.

At bottom, this is a case about a contract without an integration or merger clause, an agreement part written and part oral. There are disputed material facts at every turn, and it would be difficult to find a case in which summary judgment were less appropriate.

## COUNTER-STATEMENT OF FACTS

Defendants make no real effort to prove that "the evidence offered, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Sira v. Morton*, 380 F.3d 57, 68 (2d Cir. 2004) (citation omitted); *see* Fed. R. Civ. P. 56(c). Instead, they elect to weave partisan snippets into self-serving affidavits that they claim are "[t]he relevant facts." Br. 4. But those affidavits ignore the vast majority of the record evidence, including Holley's extensive deposition testimony and many contemporaneous documents that he wrote. Viewed in the light most favorable to the non-moving party, the relevant facts are these:

### The Parties

George H. Holley and Robert J. Salem were the founders of MIT Development Corp. ("MIT"), a medical device business that manufactured blood glucose meters through a

subsidiary, ASC. H28-31.[2] They were MIT's only directors, H54-55, and, since 1986, its only shareholders, H32-33. MIT held no regular board meetings and no regular shareholder meetings. H55-56.

Holley and Salem established Home Diagnostics, Inc. ("HDI") in 1985. H45-46. HDI manufactured strips for blood glucose testing, which it combined with blood glucose meters bought from MIT into a blood glucose testing kit sold under HDI's name. S59. During the period covered by this lawsuit, MIT sold almost everything it made to HDI, S32 (95-100%), and HDI received all its meters from MIT. S58-59 (100%). In addition, MIT conducted research and development for HDI, provided technical support and executive management services, and was a direct and indirect provider of capital to HDI. B38-39, B146-47; S115.

Holley and Salem were HDI's largest shareholders, H47-48, and during most of the relevant period were either the only HDI board members or two of the only three HDI board members. L40-41, L32. The third HDI board member – Ralph Lilore, also the company's patent attorney – was regularly concerned that Holley and Salem "might have a conflict of interest because of their simultaneous roles at HDI and at MIT, its large supplier and creditor." L69. Among other things, the concern was based on the fact that "MIT [c]ould charge HDI more for the meters, taking money out of HDI and putting it into MIT," which would allow Holley and Salem, as owners of MIT, to receive "economic benefit to the detriment of other shareholders of HDI." L70. Despite this obvious conflict, neither Holley nor Salem ever recused himself "from matters under discussion before the HDI board because those matters related to MIT." L74.

---

[2] For the Court's convenience, deposition testimony is arranged alphabetically by name of deponent in the appendix, chronologically within each name. Deposition citations follow the format "X_," where "X" is the first letter of the deponent's last name and "_" is the page number of the deposition transcript.

Leonard Brandt, a graduate of the Harvard Business School, was a partner of Norwest Venture Capital, a venture capital firm ("Norwest"). B8-10. Brandt originated, monitored and liquidated capital investments for Norwest. B16. He had particular expertise on investments in the health care industry, B17-20, where he worked at the level of a senior partner. *See* Revised Expert Report of Michael Holt at 3. At Norwest in the 1980s, Brandt researched HDI, analyzing industry trends in glucose monitoring and management as well as HDI's specific technology, product quality and offerings, senior management, business strategy and financial health. B21-25. Brandt recommended that Norwest invest in HDI, and Norwest did. B26. Brandt later served as an HDI Director, representing Norwest's interests. H74-75.[3] Brandt left Norwest in 1990 in order to devote more of his time to personal pursuits, including family. B9. Brandt's active role in HDI thus ended, but he retained an interest in a partnership that had an investment in HDI. B 88-89. As Jim Julian (who in 1996 introduced a new investor to HDI as a result of Brandt's efforts) testified at deposition, Brandt was known as a "solid performer in the private equity industry," and especially as "a player in the health care area." J17, J24.

### *HDI and MIT in Deep Trouble*

In 1993, HDI faced a grave combination of threats to its existence. Holley testified that the company was on the brink of failure:

> Q. And in -- your view in August of 1993 was that there was a chance that HDI was going to basically go bust in the next ten to 12 months?
> A. Yes.
> Q. Your expectation was that if you could keep HDI afloat for the next ten to 12 months
> things might get better . . .?
> A. Yes.

---

[3] Even Lilore, Brandt's biggest detractor, admitted that Brandt "was obviously intelligent about the business matters" involved in HDI, had "good experience" and was "knowledgeable in the venture capital" world. L96.

H235. That year, the Food and Drug Administration (FDA) raised concerns about the quality of HDI's blood glucose measuring strips. L37. The quality problems and HDI's inability to manage them were so severe that Robert Daley, a board member representing a venture capital firm, resigned from the board after concluding that board participation was no longer worth his time. L41. Timothy Maudlin and Ernest Parizeau, who represented other private equity investors, also resigned from the board. L42. That left only Holley, Salem, and company lawyer Lilore as HDI board members. B698.

HDI suffered not just a "[q]uality control problem" and "the FDA problem," but also a "tremendous money crunch problem." L46. As Holley testified, the company was "in terrible shape," H586, "effectively bankrupt," *id.*, with "dire" financial prospects, H230; *see also* L110 ("dire financial condition"); L46 ("in very dire financial straits"); L51 ("[T]he company was in really very bad financial condition."); S20 ("Limited cash flows, past due bills, significant amounts owed, poor banking relationships."). According to Salem, in 1993 "HDI was, to put it mildly, in terrible shape. All board members had resigned, as did most of HDI's senior management. HDI was crippled. Its products were weak and sales and marketing unfocused." HDI 100048.[4]

HDI's problems in hiring and retaining competent management were acute. The senior salesperson in the company not only "couldn't perform up to the standards required," L39, but also entered apparently unethical "contracts with third parties." L40. The president had resigned in Fall 1993 after only two years on the job (his predecessor having been fired for

---

[4] For the Court's convenience, documentary evidence is attached in the appendix, collected in a tab named for the party that produced it (Brandt or HDI) and then arranged numerically by Bates number. Deposition citations follow the format "HDI_" or "BRANDT_," where "_" is the assigned Bates number.

misappropriating company funds). H84, H89; L105.[5]  Holley decided to take the helm as CEO,

but he was nervous about the new challenge: "these were new shoes for him to wear and he had a

lot of issues." B161.  What hurt HDI hurt MIT as well.  Because MIT made nearly all its sales to

HDI, it too was facing impending disaster, and Salem and Holley were confronting the very real

likelihood that their assets in both businesses would soon be wiped out. H235.

### Turning to Len Brandt In a Time of Need

With both his companies in desperate straits, Holley sought guidance, counsel and

support from a trusted adviser – Len Brandt.  Holley made several unsolicited calls to Brandt in

the Spring of 1993 to discuss HDI's growing financial difficulties, and asked Brandt to review

HDI's problems with him in person. B97-99.

Holley was interested in Brandt's wide range of abilities, not just any capacity he might

have had to raise money.  B107.  Brandt's expertise was in venture capital, not investment

banking. B82.  As he explained in his deposition:

> I would describe my experience as having expertise in venture capital, but I would
> not describe . . . finding investors as [a] primary expertise of venture capital.  I
> would describe that as a primary expertise of investment bankers and a variety of
> other people.  Not venture capitalists.  Venture capitalists typically *had* the capital
> and, therefore, weren't trying to *raise* capital from lots of sources.

B82 (emphasis added).  From his career as a venture capitalist, Brandt knew the world of "small

businesses that had both financial pressures [and] human capital pressures," B324, and knew

what it was like to work with new CEOs. B324.

---

[5] HDI regularly experienced difficulties with senior personnel.  Aside from Holley, who served
as C.E.O. after the two presidents discussed in text, the next HDI C.E.O. was James Corbett, who
was fired for alleged financial improprieties, H120-21, which Corbett denied. C95.  The
company also had a protracted dispute with former director and company patent lawyer Ralph
Lilore. L48-54.

Brandt also had extensive knowledge of the "issues and people and business opportunities and historical strategies" of HDI. B322. He had a keen understanding of HDI's institutional investor and private equity investors, having educated many of them about HDI before they invested in the company. B323-24. As Jim Julian testified, Brandt's "background in the health care business" was significant to potential private equity investors, J22, who saw him as a "credible source of information" who had worked at a "premiere" venture capital firm where he "had done a number of profitable transactions in health care." J23-24.

In the summer of 1993, Brandt began consulting, traveling at Holley's request from Minnesota to New Jersey, where Brandt met with several HDI officers and employees. B100-01. Holley and Brandt spoke broadly about the business, its operations and financing – not just by phone, but also meeting in New Jersey and New York and traveling between them in Holley's car. B101-02.

By the end of the summer, Holley was sufficiently impressed with Brandt's contribution that he viewed Brandt as one of the four key players in HDI's future. In a letter to Lilore acknowledging HDI's precarious condition – "[w]e have to keep this ship from sinking" – Holley stressed the need to ensure "the proper utilization of the talent and experience embodied in [Lilore] and Len Brandt, and how we divide critical tasks." BRANDT 01681-83. To that end, Holley sought to create a de facto executive committee, comprised of himself, HDI's President Sam Martin (who later quit), Lilore (HDI's only remaining director other than Holley or Salem), and Len Brandt. BRANDT 01683. Holley described Brandt's expertise as "Strategy valuation, deal structure, V.C. [venture capital] and investment banker negotiations, funding options." *Id.*

In September 1993, HDI convened a board meeting at which department heads made presentations to Brandt "to provide background information on the company and its operations."

HDI 0413; *see also* L112-13. HDI was considering hiring Brandt, not to raise money, but "as a consultant to the Board to advise on financial matters, negotiate with preferred stockholders, negotiate with investors and bankers, and advise in general business matters." HDI 0413; *see also* BRANDT 1681-83.

**Compensation Discussions**

Around the same time, Brandt and Holley began to negotiate compensation. B136-37. Holley told Brandt that Holley but not Salem would participate in these conversations, because Salem's health was not good and because Salem generally agreed with Holley in any event. B138. Holley was negotiating for himself, Salem and MIT. "[T]hey didn't differentiate much between what was MIT and what was Bob [Salem] or George [Holley]." B139. It was important to Brandt that Salem and Holley be parties to any compensation agreement, because he did not know whether they owned their HDI shares directly or through MIT. B399-400. In fact, when discussing Brandt's compensation, Holley did not know whether he or MIT owned certain HDI securities. B139-40.

Holley and Salem's own confusion about these boundaries led to initial uncertainty about who the primary beneficiary of Brandt's services would be:

> George was not certain whether he wanted my best efforts . . . primarily for the benefit of himself, a creditor of the company, a shareholder of the company, and Bob Salem, a creditor shareholder of the company and MIT, a creditor of the company and contractor [or] for the best interests of HDI explicitly.

B293. Holley explored the possibility of Brandt serving as an HDI director, B461-62, but eventually Holley decided that he wanted Brandt's services directed towards "the best interests of MIT, himself and Bob . . . as opposed to the best interests of HDI." B293. In the Fall of 1993, Holley told Brandt that Salem wanted to restrict Brandt's consulting relationship to MIT activities related to HDI, carving out MIT's other business endeavors. B137-38. Brandt thought

8

the point reasonable, and they "began discussing making an arrangement focused solely on the HDI interests that MIT, George, and Bob had." B146.

As Salem's intervention in the negotiations showed, Holley kept Salem apprised of his discussions with Brandt concerning the potential compensation arrangements, doing his "best to keep Bob Salem fully informed and timely informed about . . . negotiations with Mr. Brandt." H208; *see also* H313-15 (Holley sent Salem copies of all documents received from Brandt and all documents sent to Brandt). In a November 10, 1993 memo to Holley, Brandt summarized the tentative conclusions that he and Holley had reached. HDI 100079-80. Reflecting the robust negotiations that would follow, Holley and Salem rejected these terms, with Salem making handwritten notes on the memo that he shared with Holley. H310. At this point, Lilore was also aware that Holley wanted to hire Brandt to consult for HDI, and Lilore told Holley that he thought Brandt was the wrong man for the job. L87; HDI 0131 (December 7, 1993 Memo from R. Lilore to G. Holley); *accord* L131. Holley disagreed. Though Lilore initially thought that Brandt would be hired only to raise money, he later found out that Holley "had a broader view of what Len Brandt's role should be and that he had involved Len Brandt in matters in addition to attempts to raise money." L90-91. Holley told Lilore that Brandt had "a broad range of experience," had "interfaced with a lot of companies," and could add value with "strategic planning," and "business advice, that sort of thing." L92. In short, "George Holley was seeking from Len Brandt and Len Brandt was providing Mr. Holley with business advice on matters beyond potential sources of new funding for HDI . . . [i.e.,] strategic advice, general business

advice." L94-95; *see also* L113 (Holley sought "financial advice and general business advice from Len Brandt").[6]

After the conflict with Lilore, Holley focused negotiations on an agreement exclusively with MIT, ASC, Salem and Holley. The objective of the compensation discussions thus became to align Brandt's activities and interests with those of "MIT and its major closely-held company shareholders," so that Brandt would benefit when MIT, Holley and Salem benefited. B136-37. Brandt saw this as "analogous" to venture capital compensation, B164:

> I related it to it being similar to the way I might look at an investment opportunity if I was at Norwest, in shepherding and monitoring and guiding the management team to typically being an active board member; and I suggested right as we set the value of all of George's and Bob's or MIT's assets that the contracts might have a certain liquidation value and we dialogued about what that might be in more than one meeting. And I suggested that when I was a venture capitalist I or my firm would have a relationship where we participated in the profit of the investment once the investment had returned its cost. So that, similarly, that principle would be a comfortable one for me to think about my activities, expectations, needs here, and what I have been compensated before in a similar manner to do those similar activities. Certainly it turned out – they turned out to be more active here than they would be in a typical investment. But that was the basis of the logic which made sense to both of us.

B162-63. At Norwest, Brandt received a share of the "profit on investments that returned more than their cost," even though he did not himself invest in the companies turning the profits. B167.

Negotiations did not conclude as quickly as Brandt would have liked. In January 1994, Brandt faxed Holley a letter stating

---

[6] Lilore knew nothing of the negotiations that eventually yielded the agreement in this case. When he learned about them (and about the March 2, 1994 memo discussed at length below) during his deposition, Lilore described the negotiations as inappropriate, L171-72, L177, because of the potential conflicts of interests inherent in Holley's dual roles at MIT and HDI, L173. The documentary evidence of the compensation negotiations between Defendants and Brandt, Lilore believes, "starts to look like a cozy relationship . . . it looks like they were getting ready to start dividing things up." L179.

> I have made [a resolution] regarding MIT / HDI. It requires us to reach a prompt conclusion. Just to[o] much going on and I can't any longer assume anything. So, as Dan Haggerty use[d] to like to say, Let[']s fish or cut bait.

BRANDT 01684. Shortly thereafter, Holley sent Brandt a proposed agreement to pay Brandt 10% "'net cash received' for value increases MIT shareholders receive," in addition to a $2000 monthly retainer. HDI 100265-266 (1/18/94 letter from Holley to Brandt). At the bottom of the letter, Holley wrote by hand "Len, how do we ensure you don't walk away in three months . . . [d]o little, if anything . . . and myself or others do all the work and you still get 10 percent." B309. Brandt and Holley discussed this question in a follow-up phone call, on which Brandt reminded Holley that Brandt had demonstrated his commitment in the six months or so that he had already been consulting. B310. Brandt believed that his willingness to work during that period without current pay or any agreement for future compensation gave Holley "ample reason to have good faith that [Brandt would] live up to [their] understanding." B310; *see also* B190 ("I explained to him, well, you actually know that by the work I've done, which is substantial, without any written understanding, where I've thought we would come to one, and that he ought to be able to gauge . . . what my energy, effort, time and availability was. And he was satisfied with that."); B534-35 ("that concern didn't exist after . . . the conversation").[7]

Following further conversations, Brandt responded on March 2, 1994 with a faxed letter (the "3/2/94 compensation letter") describing compensation terms between himself and the Defendants:

---

[7] Ten percent was a reasonable industry amount for the sort of service that Brandt was providing. W90 ("Based on my experience with troubled businesses, it is not unusual for the management to agree to a 10 percent fee for value or something else [be]cause there is nothing to lose. The down side is the business is gone and if it does survive, then it's reasonable to pay out 10 percent."). It would have been far too high a fee merely for raising money. As Jim Julian testified, the industry standard for bringing in money was about 3%. J67 (noting that this is what capital brokers were paid for raising money for HDI).

> To review the understanding that I have with MIT and its subsidiary ASC and Bob Salem and yourself I will receive compensation equal to 10% of any assets received above $1,000,000 by the collective group of MIT, ASC, Bob Salem and yourself.

HDI 100082. To mark the importance of the exchange, he then wrote: "Please sign this letter to indicate your agreement with the changes outlined above and return a copy to me as soon as possible." *Id.* Holley quickly responded, hand printing and underlining his name and then affixing a full signature. *Id.* He wrote "cc RJS" in the top right-hand corner and had a copy sent to Salem. H355-56. It was not surprising Holley and Salem would agree to make themselves personally responsible for Brandt's compensation since, as Holley testified, they had also "signed personal guarantees for a lot of the MIT debt which dramatically increased our risk." H604-05.

Holley added caveats to his signature on the 3/2/94 compensation letter. The first, written next to the text in the blocked quote above, said "Yes – OK subject to fine tuning of rec[eiva]'b[le] am[oun]t." HDI 100082. He repeated this caveat elsewhere on the page, noting that "The $1.0M level we can adjust to 50% of over[due] receivables, perhaps on a running basis. What do you think," and "[$1,000,000] based on receivables of approx[imately] $2.0 million most of which were over 90 days." *Id.*[8] As noted, Salem received a copy of the 3/2/94

---

[8] He also wrote that the $2000 monthly payment was contingent on MIT securing "offsetting management compensation from HDI"; absent that, the payment would drop to $1000. HDI 100082.

compensation letter, formally signed by Holley. H355-56.[9]

The liquidation value of MIT's HDI-related business determined the point above which Brandt would begin receiving his 10%. (I.e., if Defendants' HDI-related assets sold for $1,000,000, Brandt would receive no compensation, but if the assets sold for $2,000,000, Brandt would receive $100K (10% x ($2,000,000 - $1,000,000)).) B167-68. Given MIT's dire financial straits, the best measure of its value was its liquidation value, the great bulk of which came from its HDI receivable. B163, B223-26, B305-07. Brandt and Holley worked together to determine a fair liquidation value for the part of MIT related to its business with HDI. B307.

Brandt responded orally to Holley's handwritten notes in the 3/2/94 compensation letter, and Brandt agreed with Holley's proposal to fine tune the liquidation value in the event that a more thorough review of the records indicated that their receivable assumptions had been wrong. On the other hand, Brandt explained to Holley that the notion of adjusting the liquidation value "on a running basis" made no sense; Holley agreed. B228; *see also* B486-88 (Holley and Brandt spoke after Brandt received Holley's handwritten notes on 3/2/94 compensation letter; discussions formed part of agreement). They both recognized and agreed that "there would be an audit at some point that would be more accurate and there may need to be an adjustment based on that." B222; *see also* B429.

---

[9] Because the parties had already resolved other aspects of their agreement, evidenced by their many months of working closely together, "the only thing that was left that was being discussed or disputed was the compensation aspects. So, the goal of this [3/2/94 compensation letter] was to show we had reached a conclusion on that. It wasn't our goal to articulate any of the other aspects in this document." B198; *accord* B216 (the 3/2/94 compensation letter intended to articulate only "the points we had been debating on; amount of compensation, the nature of it, whether there would or would not be certain limits to it."); *see also* B651 (3/2/94 compensation letter is not "complete agreement with respect to compensation."); B649 (Letter "is not complete in representing other understandings that were part of [the] agreement.").

In sum, "George [Holley] now felt we had reached agreement on and also represented that Bob [Salem] had felt that, as well, and that we can now get on - we can stop our discussions, we have agreement, let's go forward." B152-53. And they did. Having reached this understanding, "we actually didn't talk about any compensation terms thereafter." B291; *see also* B154-55.

### *Choosing Not to Formalize the Agreement*

Though Brandt had marked the formality of the 3/2/94 compensation letter by asking Holley to "sign this letter to indicate your agreement with the changes outlined above and return a copy to me as soon as possible" (all of which Holley did), he also mentioned that he planned "to construct a more complete definition of our understanding." HDI 100082. That was his plan because he "thought it would be helpful to have an independent outsider flush out any issues that we hadn't talked about that maybe it would be beneficial to further talk about." B665. When Holley told Brandt that the defendants "didn't have any budget" for hiring a lawyer, B231, Brandt called Kris Sharpe, an attorney with whom he had a preexisting relationship. B231.

Sharpe prepared a draft contract. B232. But on review, Brandt and Holley both realized that Sharpe's draft did not accurately represent the agreement the parties had reached and "would take substantial work." B241; *see also* B249 (both Holley and Brandt "not satisfied" with Sharpe draft). Because Defendants thought themselves not to be "in a position to hire counsel separately," B241, B243 ("he didn't want to pay for a lawyer"), and because Sharpe represented only Brandt, B240-41, Holley and Brandt spoke by phone and decided that their "understanding, both orally and by what [they] agreed to on compensation notes and perhaps [their] faith in each other, was good enough and [they] didn't pursue this any further." B241; *see also* B242 (conversation occurred by phone); B779-80 ("we felt we had a good understanding between us

and because we had been working with each other pretty intensively up until that point, that we had good communication, good dialogue, so we had comfort in each other and our understanding.").

In April 1994, Brandt began submitting bills to Holley at MIT for the monthly retainer aspect of the compensation agreement. HDI 100227 (4/1/94 memo from Brandt to Holley). He was paid with HDI checks. B133. This reflected the fact that "HDI and MIT services and needs were often a bit blended by George [Holley]," a blending that sometimes extended to the services and needs of "George [Holley] himself." B133-34. The monthly retainer payments stopped late in the summer of 1994. B738. A year later, Brandt and Holley agreed that it made little sense for Brandt to continue sending monthly requests for payments that were not being made, B727-28, B737, and that the debt for the monthly retainer should simply accrue. B728-29. Brandt learned in discovery that HDI (not MIT) carried this obligation on its books, at Holley's direction, until mid-1999. L154; S64; HDI 3267-70; D80-81.[10]

Even though Brandt was not being paid, he continued to work. B739. He did so because he thought his efforts were (1) "useful to [Holley], his interests in MIT, his role as chairman of both companies, his conflicts that he had between both companies and many other matters"; (2) "contributing a lot to the turnaround" of MIT; and (3) "contributing to value being potentially created." B739. And under the terms of his agreement with Defendants, "if value was accomplished for MIT, George [Holley], ASC or Bob [Salem], [Brandt] stood to gain a significant reward." B739-40.

---

[10] That HDI, not MIT or ASC, booked this debt is further evidence that Holley and Salem ran both companies more as their personal domains than as distinct corporations. HDI 3267-70

***Len Brandt's Work***

Defendants would now have this Court believe that Brandt "dropped out of the picture after mid-1994," S.Br. 7; April 5, 2005 Affidavit of George H. Holley ¶ 26 ("Holley Aff."), yet Brandt's continuing involvement was so extensive that Holley referred to him as his "chief financial advisor." H21. That was one of Brandt's roles from the beginning, but he did much more. Holley "counseled [with] him extensively on . . . business issues, business strategy, financial issues, and financial strategy, . . . as well as his dealing with the challenging and motivation of other key employees." B741-42. As Holley testified at deposition, Brandt advised on "a whole range" of topics:

> Len was generous with his comments on – on all aspects of philosophy and life and business in general and HDI in particular. . . . [W]e talked about a wide range of topics and he'd have ideas, he'd call me up, I'd have ideas, I might bounce an idea off of him, would this be good or bad in – in relation to what we're trying to do.

H189. Holley had no difficulty remembering some of the areas on which Brandt provided guidance:

> Q. Did you ever seek advice from Mr. Brandt about day-to-day operational issues at HDI?
> A. Yes.
> Q. Okay. What sort of issues?
> A. How good a finance guy do you think T.J. Madison is, do you think -- how good a
> guy do you think – what's his name – Sam Martin is, do you think -- do you think Norwest would put more money into the deal, stuff like that. Much more practical, day-to-day, you know, things that I thought his background might be helpful in especially, especially in dealing with our investors and the venture capitalists because he understood that whole mental set. And things like where's the best place to go to money – for money and how do you think the banks will react to this or that, that kind of stuff.
> . . .
> Q. More specifically, what advice did you seek from Len or advice in what areas

(outside accountant questioning legitimacy of debt to *HDI*); *see also* D80-81 (testimony re same).

related to dealing with existing investors in HDI?

A. Well, I -- I think I'd ask him who do you think we can get some money out of. For instance, who would be responsive and what would be the appeal for current investors and

new investors to -- you know, to raise some money, get some money into the company.

Q. Did you ever seek advice from Len Brandt about ways to get venture capital investors out of HDI?

A. Yes.

Q. Did that involve seeking his advice about what I will characterize, perhaps inaccurately, as sources of potential take-out financing, new money that could buy out the

interest of the venture capitalists?

A. Yeah, I think -- I think we probably talked about that.

H195-98.

Brandt also provided guidance on Holley's inherent conflicts of interest and advised Holley when his actions risked violating his fiduciary obligations, B745; discussed "options for how MIT's specific position in HDI might be improved, through pressing [on HDI] the demand for payment" of debts, and including "considering reorganization under Chapter 11", B745; discussed Salem and Holley making additional personal investments into ASC, B759; "discussed various combinations and investment interests of a whole variety of companies," B743; advised on the implications on financing of pending lawsuits, B747; advised on extant "bank debt and [the] occasional needs of different bankers" to sell their loans, B755; discussed negotiations with accountants and attorneys who were company creditors, B756; analyzed the timing of proposals to convert outstanding receivables, B756-57; assessed the possibility of a merger with a public company, B757; "train[ed] individual managers on presentations for venture capitalists," B745; negotiated with potential venture capital investors, B746; edited and wrote outlines of shareholder documents, B750; counseled on financial statement presentation, B753; sought out senior officers, B743; "evaluated the potential" of managers and consultants, B744; advised on terms of employment for new senior management, B744; counseled Salem and

17

Holley on handling the alleged impropriety of an officer, B744; discussed "the performance of key executives," B749; and recruited potential board members and discussed their merits with Holley, B747. Brandt advised on "the marketing strategy of the company" and the "potential for distribution [of product] through various partners," B742-43; *see also* B748-55; counseled "on issues of sales policy," B746, "inventory policy," B746, "pricing policies," B749, and "production costs," B754; and analyzed the "comparative benefits of investment of the limited cash flow that the company had." B755.[11]

According to Defendants, Brandt undertook all of this work without an agreement – or with an agreement that required him to bring in money, which they say he never did. In fact, Brandt played a central role in attracting $1,000,000 in private equity financing through the transaction involving Jim Julian. *See* BRANDT 00069-70 (5/19/97 memo from Holley to Brandt re Julian financing funding describing investment as "your Julian deal"); BRANDT 00066 (3/24/97 J. Julian fax to L. Brandt & G. Holley with letter of intent for financing); *contra* S.Br. 7 (erroneously asserting that Brandt "dropped out of the picture after mid-1994"); Holley Aff. ¶ 26 (same).

Space does not permit anything approaching a full accounting of Brandt's contributions over the years to Holley, Salem, MIT and ASC. What follows in footnotes are merely highlights

---

[11] In December 1993, Brandt identified the transaction that would ultimately produce such huge returns for Holley and Salem, the possible merger of MIT and HDI. He directed the company's outside accountant to analyze the finances of a combined MIT-HDI. HDI 100198-99 (Nov. 9, 1993 memo from Brandt to Holley); BRANDT 01728-30; B376-77; *see also* D137-40. Brandt initiated conversations about the possible benefits of this merger – not just financial benefits, but also benefits accruing from the opportunity to remove Holley and Salem's conflicts of interest as directors of two closely related companies, neither of which had a majority of independent outside directors. B377.

of the documentary evidence showing Brandt's extensive (1) advice on officers, management

contracts, staffing;[12] (2) counsel on strategic and financial/budget planning;[13] (3) guidance on

---

[12] *E.g.*, HDI 100077-78 (Brandt involvement in preparing MIT management contract with HDI re: CEO/CFO/COO services); BRANDT 00607 (2/11/95 memo from Holley to Brandt re staffing levels, cash flow, new product, joint venture, debt conversion, bankruptcy); HDI 100136-37 (4/11/96 discussion of Jim Wiegley's qualifications as COO); BRANDT 00435 (10/18/94 letter from Holley to Martin re reduction in sales force, forwarded to Brandt with request for comments); BRANDT 01132 (6/2/93 document re Brandt advice on stock options in Sam Martin employment agreement); BRANDT 01205-07 (5/12/94 fax from Bob Grissom to Brandt re meetings with Brandt and Holley about HDI position); BRANDT 0703-07 (2/23/96 documents re firing of Joan Scala, VP of Sales and Marketing); BRANDT 01712-13 (8/19/94 letter from Brandt to S. Marcovich re hiring new legal counsel for HDI).

[13] *E.g.*, HDI 100050-51 (5/16/97 memo re Brandt providing Holley and Salem advice on Julian deal and overall company planning); HDI 100070 (11/11/93 letter from Brandt to Holley discussing strategic position); HDI 100097-98 (10/3/96 fax from Brandt to Holley re strategic options and not selling too quickly); HDI 100194-95, 100197-200 (11/9/93 memo from Brandt to Holley setting forth future strategy); BRANDT 00551 (11/3/93 memo from Holley to Brandt, Salem et al. re cash flow and budgeting issues); BRANDT 00590-600 (3/11/94 memo from Holley to Brandt enclosing 1994 forecast, to which Brandt provided comments); BRANDT 01695-96 (11/8/93 memo from Brandt to Holley advising on company business profile); BRANDT 01789-91 (3/16/95 fax from Brandt to Holley re draft shareholder letter for bankruptcy).

capital structure and investments;[14] and (4) consulting on the elimination of debt.[15]

Brandt's hard work contributed to the eventual turnaround of HDI and MIT. B758. All the tasks just described were significant. B763. But arguably "the most significant contribution to the turnaround" was the "enormous dedication and support" that Brandt provided to Holley. B762. Holley was deeply mired in a difficult challenge, and he was nearly alone. There was no real MIT board of directors: Lilore (a patent lawyer) was the only HDI director left besides Salem and Holley, and even he left the board in 1994. L32. Other than Brandt, Holley had no real counselors, B762, and HDI's managers did not have enough experience to understand the CEO's concerns or provide sophisticated advice and counsel. B763. Brandt did. And Holley

---

[14] *E.g.*, BRANDT 01099 (7/16/93 letter from Holley to Brandt) ("The deals on the table stink . . . I look forward to your advice."); BRANDT 01644-46, BRANDT 01648, BRANDT 01652; HDI 0112 (5/2/94 SelfCare deal proposal sent from R. Zwanziger to Brandt re Holley and Brandt working on Selfcare negotiations); BRANDT 01232 (2/10/94 memo from Holley to Brandt re Stanhope deal); BRANDT 00984-85, (8/15/94 letter from Brandt to R. Fine re Transworld negotiations); BRANDT 00917 (10/19/95 memo from Holley to Brandt re Chronimed deal with Brandt's handwritten notes of advice); BRANDT 00923 (10/4/95 letter from Chronimed to Holley, forwarded to Brandt and on which Brandt commented); BRANDT 00698-99 (4/8-9/96 Holley-Brandt correspondence re selling HDI for $8-10MM); HDI 100055 (1/16/96 memo from Holley to Brandt re possible auction sale of company, with Brandt notes re selling strategy); HDI 100104 (10/8/96 memo from Holley with handwritten note to Brandt asking for advice on buyout negotiations); HDI 100119 (11/16/94 memo from Brandt to Holley advising on conduct of financing negotiations); HDI 100114 (2/24/97 memo from Brandt to Holley re Dominion venture funding); BRANDT 00701 (12/26/95 fax from Brandt to D. Metz re recapitalizing $9MM venture preferred); BRANDT 00179 (3/17/97 memo from Holley to Brandt re Brandt part in Dominion deal); BRANDT 03196-201 (2/3/97 memo from Holley to Brandt re Brandt role in meeting with D. Metz and Dominion); BRANDT 02872 (2/3/97 memo from Holley to Schwartz re Brandt role in Metz financing options); HDI 100055 (1/16/96 memo from Holley to Brandt re selling HDI); HDI 100104 (10/8/96 Holley memo with blind copy to Brandt re potential MICI buyout); BRANDT 02668-70 (12/12/94 memo from Brandt to Holley re proposed structure of Perrigo deal).

[15] *E.g.*, BRANDT 01417 (11/9/93 memo from Brandt to Holley re negotiations with Norwest); BRANDT 01416 (12/6/93 memo from Holley to Brandt re Brandt idea of "MIT facing off with the VC's first"); BRANDT 01414-01415 (5/10/96 memo from Holley to Brandt; draft 6/17/96 letter Holley to TA Associates); BRANDT 01436 (9/26/94 memo from Holley to Brandt re consequence of IPO on venture capital debt); BRANDT 02840-42 (1/17/97 memo from Holley to Brandt re 1996 results, 1997 budget, discussions with possible equity purchasers).

highly valued that dedication and support. Back in April 1996 (years after Defendants now claim that Brandt "dropped out of the picture," S.Br. 7), with the turnaround underway, Holley sent Brandt a handwritten note thanking him for advice that was "very incisive (as usual)." In Holley's contemporaneous view, Brandt had "a great mind and a good gut. If you agree with me . . . . I have much stronger conviction." BRANDT 01100 (ellipses in original).

### The Turnaround and the Turning Away

By 1997, the business of HDI and MIT had "dramatically improved." BRANDT 00221 (4/29/97 memo from Holley to Brandt). Holley and Salem did not wait long to reward themselves. They had each received $99,000 in salary from MIT in 1996, S102-03, but earned more than ten times that in 1997. S103-05 (each earned $1,074,000 in salary, $20,000 in dividends, and additional "nonemployee compensation" of $355,000 for Holley and $438,039 for Salem).

That same year, a purchase of HDI appeared imminent. Holley told Brandt that if the deal went through, Brandt stood "to make a lot of money." B258. Brandt was concerned that the form of payment would trigger ordinary taxation, and Brandt and Holley then agreed to look for alternate ways to structure Brandt's compensation to garner capital gains tax treatment. B670-71.

Unfortunately, Defendants then began to backtrack from their agreement with Brandt. In a writing that he shared with Salem, Holley acknowledged the agreement with Brandt. HDI 100088-89 ("Believe it or not, we actually did have something in writing regarding our consulting agreement"). Indeed, Holley assumed that HDI's fortunes have improved "jointly through 50/50 effort of [Brandt] and myself/MIT (and MIT's cash)." Id. Nevertheless, he asserted that because the manner of HDI's turnaround "was not envisioned in our agreement,"

Brandt should no longer be entitled to the compensation to which they had earlier agreed. Salem and Holley then exchanged handwritten notes, with Holley telling Salem, "Bob—we are maybe stuck with the proposal or agreement that is subject to broad interpretation . . . I would much rather have him a stockholder than get 10% of some 'value' increases . . . that we can't specify." HDI 100117 (emphasis original). Despite Holley and Salem's correspondence, Defendants never paid Brandt a penny of the 10% due to him.

### Defendants' Enormous Financial Proceeds

In 1998, Holley earned $2,602,657.52 in salary from MIT; Salem earned $2,592,657.52, not counting dividends. S106. In 1999, Holley's salary from MIT was $1,059,589.04; Salem's was $1,130,008.59. HDI 3236-37. Also in 1999, Holley told Brandt that his counseling services would no longer be required. B414. Nevertheless, Holley continued to ask Brandt questions because he still had an interest in seeking and using Brandt's advice. *See* BRANDT 00900-15 (6/10/99 memo from Holley to Brandt re strategy vis-à-vis Chronimed); BRANDT 00105-13 (2/2/99 letter from Holley to Brandt thanking Brandt for introduction to Paul Harding and enclosing resume of James Corbett). And Brandt provided counsel and advice whenever asked, because he still had an interest in protecting his right to 10% of enhanced value that had occurred.

On November 12, 1999, HDI and MIT merged, and Holley and Salem each became enormously wealthy. At the time of the merger, Holley and Salem took $13,000,000 in cash, $6,500,000 in convertible debentures, and 817,000 shares of HDI stock, which the parties to the transaction valued at $17.50 per share. S83-84, S91-92. They also received 1,250,000 "earnout shares" of HDI stock, also valued at $17.50 per share, S93, for another $21,875,000 in deferred compensation. Thus, Holley and Salem received a total value exceeding $55,000,000 from the

MIT-HDI merger, without even counting the "consulting" and "employment" contracts that entitled them to millions more in the years after the merger. S111; *see also* BRANDT 03425, Expert Report and Supplemental Expert Report of John Wills.

Despite their considerable enrichment, Defendants withheld from Brandt not only the 10% of increased value, but even the small monthly payments to which they had agreed. HDI had carried this obligation on its books, at Holley's direction, but abruptly decided to write off the obligation just months before the merger.[16]

## ARGUMENT

### I.    Standard for Summary Judgment

The standard for summary judgment is well established:

> Summary judgment may be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper. The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.

*Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004) (quotation marks and citations omitted).

### II.    Summary Judgment on the Contract Claim Would Be Improper.

---

[16] HDI accrued a total of $96,000 for Brandt through the end of 1997, writing it off in April 1999. S68.

Brandt's contract cause of action arises out of an agreement formed from a series of conversations and letters. According to Defendants, the conversations and letters do not amount to an agreement. In short, this is a classic case of conflicting accounts of past interactions between the parties, many of them oral, precisely the sort of case that our system of justice properly leaves to the finder of fact.

### A.    The Agreement Was Formed.

Defendants claim that no agreement was formed because Holley made handwritten counter-proposals on Brandt's 3/2/94 compensation letter and because Brandt acknowledged in the letter that it was not a "complete definition of [their] understanding." Br. 16-17.[17] Neither fact undermines legal formation of the agreement.

It is hornbook law that a written contract must be regarded as a complete recitation of an agreement only if the contract contains a merger or integration clause. The Connecticut Supreme Court declared it "fundamental" more than half a century ago that "if the parties do not intend a writing to be the repository of all of the terms of their agreement, the terms not incorporated in the writing are still a part of the binding contract . . . ." *Jarvis v. Cunliffe*, 140 Conn. 297, 299 (1953) (citations omitted). That idea is so fundamental that it appears in the very first section of the Restatement (Second) of Contracts. *See id.* § 1 ("A contract is a promise or a set of promises . . . .") & *id.* § 1 cmt. c ("To constitute a set, promises need not be made simultaneously; it is enough that several promises are regarded by the parties as constituting a single contract, or are so related in subject matter that they may be considered and enforced together by a court.").

---

[17] Brandt does not claim that the agreement was formed with HDI, *see* B204 (agreement contemplated Brandt performing services for HDI "[a]t the direction of MIT only."); *see also* B433, though HDI assumed successor liability for MIT and ASC's liabilities at the time of the 1999 merger.