The 3/2/94 compensation letter contains no merger or integration clause. HDI 100082. Brandt's acknowledgement that it does not incorporate "all of the terms of their agreement," *id.*, simply makes that clear, reminding the parties that their agreement extended to other issues. Likewise, it is not true that Holley's signature on the 3/2/94 compensation letter cannot "reflect an unequivocal acceptance" because he added comments that "offered a *counter-proposal* to Brandt's offer." Br. 16. (emphasis original). Brandt knew that Holley's handwritten comments represented a counter-proposal, and the parties' agreement was formed later, when they spoke and resolved the questions raised by Holley's handwritten comments. B289 (agreement was formed through "a conversation, the notes, the questions that he [Holley] made, the responses and the understanding reached").

In particular, Holley's notes acknowledged that Brandt's letter represented "generally what we agreed, excepting" two things: (1) "if MIT failed to get offsetting management compensation from HDI MIT's exposure would be not more than $1,000 per month," and (2) the "$1.0M level we can adjust to 50% of over 60 d[ay] receivables, perhaps on a running basis." HDI 100082. Holley concluded by asking "What do you think"? *Id.* As explained above, Brandt responded orally to Holley's handwritten notes and their discussions resulted in an agreement on the approach to determining the liquidation value of MIT's HDI-related business. B228; *see also* B486-88 (Holley and Brandt spoke after Brandt received Holley's handwritten notes on 3/2/94 compensation letter; discussions formed part of agreement).[18]

In sum, "George [Holley] now felt we had reached agreement on and also represented that Bob [Salem] had felt that, as well, and that we can now get on - we can stop our discussions,

---

[18] *See also* B487 (explaining that phrase "[a]t this time" refers to general time period and encompasses telephone conversations between Holley and Brandt soon after fax receipt).

25

we have agreement, let's go forward." B153. Their minds having met on the issue of appropriate compensation for Brandt, the parties resumed working together closely without discussing compensation for many years. B154-55 (recalling no "further conversation" on compensation "until many years later"); B291 (testifying that his "primary recollection is once we reached this understanding, we actually didn't talk about any compensation terms thereafter").

**B.    There Are No "Missing" Terms That Void the Agreement.**

Defendants disregard the record again when they try to make the agreement disappear by arguing that "all the material terms are missing from the alleged contract." Br. 17-18. Their rhetoric notwithstanding, Defendants ultimately complain about the lack of only two terms: they say that Brandt can point to "no duration for the contract or time limit for the delivery of plaintiff's services" and has provided no "details about *what he was actually supposed to do.*" Br. 17-18 (emphasis original). Each complaint is wide of the mark.

The agreement's duration was marked by events, not years. The parties agreed that Brandt would provide services to MIT, Holley and Salem for as long as "the company [HDI] didn't have an active outside board, while it had very limited senior management experience in it, while [Holley] was CEO and in need of [Brandt's] guidance and counsel and discussion and efforts." B192. For example, the agreement would terminate in the event of "the turn-around and potential liquidation of the business; and that would be one instance in which my obligation would not transfer to whoever bought the business." B198. *See also* B195 ("We did not define

it [duration] in the . . . quantity of time passing.").[19]

Defendants seek to strengthen their "time limit" argument by asserting that "no jury would ever find . . . plausible" that Brandt could have negotiated an agreement by which he would receive 10% of any future increase in value that MIT, Salem or Holley received in connection with MIT's business with HDI. Br. 18. This contention ignores both the record evidence and a commonsense understanding of business behavior under extraordinarily difficult financial circumstances. Holley was the captain of two sinking ships, one pulling the other after it in a vortex of debt and failure. Left without other adequate board support, management help or sufficient capital, Holley turned to Brandt because of his considerable expertise in the health care industry, the world of private capital, financial and business restructuring, and the people and operations of HDI. Holley, Salem and MIT desperately needed help. But what did they have to offer Brandt? Not cash: there was barely enough to maintain current operations. Instead, Holley, Salem and MIT decided to trade a piece of the future for immediate expert assistance. The jury will readily understand that when the future is so uncertain, 10% of it is cheap.[20] There is simply no merit to the argument that "no jury would ever find this scenario plausible." Br. 18.

Like the contract's duration, Brandt's duties were sufficiently clear. Holley and Brandt agreed to those duties during several conversations from late 1993 through early 1994. B466; *see also* B185-86 (Brandt's duties outlined in conversations, not 3/2/94 compensation letter).

---

[19] Defendants wrongly imply that the parties overlooked the question of contractual duration. In his January 18, 1994 letter to Brandt, Holley counter-proposed terms very similar to those on which the parties eventually agreed (including 10% of increased asset value), but limited the contract to five years. Brandt rejected the five-year duration, and the term was crossed out of the letter. HDI 100265-266. Holley did not object to the elimination of the five-year term when he affixed his formal signature to the 3/2/94 compensation letter. HDI 100082.

[20] As HDI's outside accountant testified at his deposition, HDI had a liquidation value of $0 in September 1993. D148; *see* BRANDT 01724-26.

27

Testifying at his deposition, Holley described Brandt's role as "chief financial advisor." H21. As Brandt testified, and as the documentary evidence cited above makes clear, *see supra* at 16-21, those duties were not narrow: "we were about to be partners in turning around this venture . . . we were going to work at it in a relationship that was going to likely need my involvement and opinions and thoughts and counsel in any set of matters." B158-59. Brandt functioned with Holley as a de facto "executive committee" of MIT, B161, a term that Holley used to describe Brandt's behind-the-scenes role at HDI. BRANDT 1688-90; *see also* BRANDT 0423 (8/28/95 memo from Holley to Brandt asking him to serve as "ombudsman at regular monthly staff meetings.").[21]

The jury will thus *not* "have to engage in major speculation and sheer guesswork to understand the terms" or impermissibly "furnish material terms." Br. 18.[22] It will simply have to listen to Len Brandt's testimony, listen to Defendants' testimony, and then, in the context of exhibits documenting Brandt's voluminous actual work, decide what it believes.[23]

Defendants' argument that the agreement lacks essential terms lacks not just factual support, but legal support as well. There is no legal bar to an agreement's duration being marked

---

[21] There is of course no doctrine requiring contracts between companies and senior advisers to be more highly reticulated than other contracts. Small companies in transition are particularly likely to want flexibility in a consultant. Thus, Holley's request that Brandt serve as an "ombudsman" at meetings of senior staff, BRANDT 00423, was not an offer to enter a new contract, but a reflection of the parties' understanding that Brandt would provide whatever advice MIT needed to maximize the value of its HDI-related assets.

[22] It is not clear what Defendants mean when they complain about the lack of a contractual "time limit for the delivery of plaintiff's services," Br. 17, as they neither discuss the issue nor point to any case requiring that contracts contain such terms. In any event, Brandt was responsive to Holley's requests for assistance. B190-92.

[23] Defendants ask this Court to ignore Brandt's three days of deposition testimony because they deem it insufficiently detailed. Br.18-21. As the copious citations in text demonstrate, Brandt's testimony is amply detailed, and whether to credit that testimony will be a decision for the jury. In any event, ignoring three days of deposition testimony by the non-moving party does not constitute viewing the facts in the light most favorable to that party.

by events, rather than a term of years, and no bar to an agreement under which an individual provides broad advice on a company's business strategies and finances. Unsurprisingly, Defendants cannot point to a single case to support either proposition.

Connecticut has a very different rule. "[A] failure of total definition does not import intolerable ambiguity even into terms that are essential to the formation of an enforceable agreement." *Willow Funding Co. v. Grencom Assoc.*, 63 Conn. App. 832, 845-46 (2001). To the contrary, "if the parties so intend, they may reach a binding agreement even if some of the terms of that agreement are still indefinite." *Id.* at 844. Thus, a contract can be enforceable even if it is "missing" a term generally regarded as essential, such as price. As the Connecticut Supreme Court has made clear, it has "long" been the rule "that an agreement will not be rejected if the missing terms can be ascertained, either from its express terms or by fair implication." *Presidential Capital Corp. v. Reale*, 231 Conn. 500, 507-08 (1994).[24] "[I]f the trier of fact can find a reasonable basis for implying a missing term—such as price—the absence of the term is not fatal to the contract." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 749 (2d Cir. 1998) (applying Connecticut law).[25]

*Nora Beverages* illustrates the principles that govern here. The plaintiff sued to enforce a contract, and the defendant moved for summary judgment, claiming that a letter was no more than a prelude to a contract between the parties. *Id.* at 747. The district court agreed, finding as a matter of law that a contract could not have been formed because "significant terms such as

---

[24] In *Reale*, a broker sued an investor for breach of contract for failure to pay a commission. *Id.* at 501. The investor argued on appeal that there could be no contract as a matter of law because an essential term was missing: the amount of the broker's commission. The Supreme Court disagreed. *Id.* at 506-08.

[25] *Geary v. Wentworth Labs.*, 60 Conn. App. 622 (2000) in no way detracts from *Reale* and *Nora Beverages*, since it cites and follows *Reale*. *Cf.* Br. 17.

29

'[i]ndemnification, insurance, minimum quantities, price increases, quality control, choice of law, length of contract and confidentiality . . . remained unresolved in each of the proposed contracts." *Id.* at 742. The Second Circuit reversed, concluding that the plaintiff had demonstrated issues of fact on contract formation. Writing for a unanimous panel, Judge Pooler first looked to see if the letter expressly required execution of a formal contract. Finding that it did not, the court next examined whether there were issues of fact as to whether the parties intended a contract and defined the terms of their agreement sufficiently to create a contract. Noting the Connecticut common law standards, that "a contract be definite and certain as to its terms and requirements," and that "if the trier of fact can find a reasonable basis for implying a missing term—such as price—the absence of the term is not fatal to the contract," the Second Circuit concluded that the omissions documented by the district court did not preclude contract formation. *Id.* at 749.

Defendants' motion cannot overcome *Nora Beverages* and *Reale*.[26]

### C. There Are No "Incomprehensible" Terms That Void the Agreement.

Defendants argue that the phrase "value, interest, equity, collections, revenue and assets" used in the Amended Complaint is "too vague" to create an agreement. Br. 21-22. To support their argument, Defendants launch into a set of hypothetical conflicts among the words in that phrase. Br. 22. While this exercise might provide interesting fodder for a classroom discussion

---

[26] Defendants also seek to undermine the agreement by noting that Brandt and Holley had agreed to "discuss issues with their arrangement as they arose." Br. 19. They had such an agreement – but there is "no authority that precludes contracting parties from engaging in subsequent negotiations to clarify or to modify the agreement that they had earlier reached." *Willow Funding Co.*, 63 Conn. App. at 843. To the contrary, "[t]he fact that parties engage in further negotiations to clarify the essential terms of their mutual undertakings" in no way precludes finding the existence of an enforceable agreement. *Id.* at 843-44. There is simply "no authority" in Connecticut that "assigns so draconian a consequence to a continuing dialogue between parties that have agreed to work together." *Id.* at 844.

with first-year business school students, it has nothing to do with Connecticut law. As noted above, Connecticut law is clear that "a failure of total definition does not import intolerable ambiguity even into terms that are essential to the formation of an enforceable agreement." *Willow Funding Co.*, 63 Conn. App. at 845-46.

In any event, there is no "incomprehensibility." The 3/2/94 compensation letter specified "assets received." HDI 100082. Brandt and Holley's conversations about the meaning of that phrase gave it fuller meaning. B215-17 (conversations between Holley and Brandt on incentive compensation); *see also supra* Pt. II.A. (writing must be read alongside oral aspects of agreement where writing has no merger or integration clause). They agreed that Brandt was entitled to receive from MIT, ASC, Holley and Salem 10% of any "net benefit to the profit of the shareholders of MIT" related to MIT's business with HDI. B216.[27] Thus, "assets received" did not mean investments, Brandt was not automatically entitled to 10% of any capital infusion. B210.

Even if the compensation agreement would have been ambiguous under some imaginary circumstances, there is no ambiguity in the circumstances that actually occurred. Holley and Salem, the "shareholders of MIT," received more than $55,000,000 from the MIT-HDI merger,

---

[27] The parties agreed that Brandt would not receive compensation for any increase in value of MIT or ASC or distribution to Holley or Salem that was unrelated to HDI's business (e.g., if it related to MIT's business developing and manufacturing meters measuring weight, rather than blood glucose). B209. That is not to say that the agreement was "dependent on the existence of HDI," B705, as the parties knew that there were "various" possible "sales, mergers, investments," some of which would lead to the disappearance of HDI. B705. Brandt's entitlement to compensation was tied to HDI's business, not its corporate form. "MIT was in the production of blood glucose meters. They also had involvement with strain gauge meters of some sort. I would not have any entitlement on their strain gauge meter and technology, and I would have an entitlement, even if HDI went out of business and we started using that technology for somebody else -- blood glucose technology for somebody else. So it's a little broader than just HDI, sir, but it is not meant to include technology outside of blood glucose

31

S83-84, S91-93, nearly every penny of which was related to MIT's business with HDI. S32. Setting aside the initial MIT liquidation value of $1,000,000, that leaves more than $54,000,000. The numbers come out the same way whether one calls that $54,000,000 assets received, net benefit, value, interest, equity, collections, or revenue. Holley and Salem had promised 10% of that money to Brandt, but when their payday finally came, they pocketed all the proceeds. *See also* Expert Report and Supplemental Expert Report of John Wills (expert reports calculating Brandt's damages).

At bottom, Brandt and Defendants have different recollections of what was meant by that phrase "assets received" in the 3/2/94 compensation letter. There is nothing surprising about the existence of different recollections. They are at the core of many contract disputes. What is surprising is that Defendants would try to turn an ordinary dispute over the meaning of an ordinary term into an extraordinary argument for keeping the dispute from the fact finder designated to resolve it. Yet again, they have forgotten their fundamentals: "What the intention of the parties was is a question of fact." *Jarvis*, 140 Conn. at 299.

### D. The May 1994 Attorney's Draft Contract Does Not Undermine the Agreement.

Defendants claim that because the parties later spoke about preparing a formal written contract but never did so, they never had an agreement. Br. 22-23. Again, they are wrong on the law and wrong on the facts.

Under Connecticut common law, it is a "question of fact whether the parties intended the agreement in a certain memorandum to constitute a contract or intended that there should be no

---

meters . . . that MIT had at that time." B700-01. The agreement covered all "technologies that [Brandt] was working and [Holley] had asked [Brandt] to work on." B703.

32

contract until the execution of a formal written contract." *Nora Beverages, Inc.*, 164 F.3d at 749 (citation omitted). A court cannot award summary judgment to a party that claims no contract was formed if a question of fact exists on the parties' intent. *Id.*

Not only do Defendants ignore this binding precedent, they also avoid any citation to record facts. Like their evasions of legal authority, their aversion to the record is understandable, given what it shows. The agreement had already been reached before any effort "to prepare a formal written agreement" was undertaken. B37 (spoke to lawyer to "try and memorialize this agreement *that we had reached*") (emphasis added). Brandt looked into "formalizing or memorializing, perhaps is a better word, an agreement that we had reached." B35. As set forth in detail above, Holley told Brandt that the defendants could not afford a lawyer, so Brandt called his lawyer and asked him to put together a draft, but both Holley and Brandt thought the draft inaccurate and decided not to invest the time and money that would be required to formalize the agreement they already had. *See generally supra* at 14-15; *e.g.*, B779-80 ("we felt we had a good understanding between us and because we had been working with each other pretty intensively up until that point, that we had good communication, good dialogue, so we had comfort in each other and our understanding."). In sum, there is at the very least a legitimate dispute whether the parties "intended that there should be no contract until the execution of a formal written contract," *Nora Beverages, Inc.*, 164 F.3d at 749,[28] which means that summary judgment based on Defendants' theory would be inappropriate.

---

[28] Defendants claim that "Connecticut law" establishes a "strong presumption against finding an agreement" where the parties have left some terms open, called for future approvals, and anticipated the future preparation of documents. Br. 15-16. Yet the only cases they cite are two district court cases applying *New York* law. As *Willow Springs*, *Reale*, and *Nora Beverages* make clear, Connecticut law makes no such presumption. *See supra* Pt. II. Even if such a presumption did apply, it would be the subject of a jury instruction, not an invitation to enter summary judgment.

33

### III. Summary Judgment on Unjust Enrichment and Estoppel Would Also Be Improper.

A. According to Defendants, Brandt cannot maintain his unjust enrichment cause of action because such claims lie only in the absence of a contract. That matters here, they say, because Holley and MIT contracted with Brandt to pay him a monthly fee for consulting. Br. 23 ("he [Brandt] and Holley already had an agreement to pay a monthly consulting fee."); S. Br. at 19 ("Defendants do not dispute the Monthly Fee arrangement to the extent it may have bound MIT (and/or HDI), but it was never meant to bind Salem personally."). Because Holley and MIT had a contract with Brandt, they argue, none of the Defendants can be liable under unjust enrichment.

This is an odd argument for Defendants to advance. Notwithstanding their strenuous contentions that no agreement exists, Defendants now say that there really *is* an agreement. It is just that *their* agreement happens to contain only one of the sorts of compensation contemplated by the 3/2/94 compensation letter.

Defendants cite no case allowing a defendant to strip a contract of its core, then claim immunity from a plaintiff's unjust enrichment claims on the basis of some small part of the contract that the defendant chooses to abide by. Nor could they. Whether there is a contract is a jury question. *See supra* Pt. II. If the jury concludes that there is no agreement, it will then decide, consistent with the Court's instructions, whether Brandt's considerable efforts unjustly enriched Defendants. "[W]hether a particular failure to pay was unjust and whether the defendant was benefited are *essentially factual findings* . . . ." *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* 231 Conn. 276, 283 (1994) (emphasis added).[29]

---

[29] Defendants also claim that the unjust enrichment claim fails as a matter of law because Holley was not Salem's agent and because Brandt already got enough money. Brandt rebuts those claims *infra* at Pt. VI.

34

**B.** Defendants' position on the promissory estoppel claim is no stronger. They suggest that a promise of 10% of increased firm value as compensation is insufficiently "clear and definite" because they think that such compensation is "absurd" and "defies logic." Br. 23-24 (*quoting D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.*, 202 Conn. 206, 213 (1987) (jury must find promise sufficiently "clear and definite")). Yet as Defendants surely know, the contours and consequences of a remembered promise are "a question of fact, to be determined in light of the circumstances under which the representation was made." *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 106 (2003) (citation omitted).[30] There is nothing absurd or illogical about the owners of a "crippled" company offering the man they want as their "chief financial advisor" 10% of their very uncertain future in exchange for his current expertise. HDI 100048 (Salem calling company "crippled"); H21 (Holley describing Brandt as "chief financial advisor"). *See Wellington Sys., Inc. v. Redding Group, Inc.*, 49 Conn. App. 152, 163-64 (1998) (overturning trial court grant of summary judgment on promissory estoppel claim where material facts were disputed); *see also* W90 (expert witness testifies that it is not uncommon for management of troubled companies to pay turnaround experts 10%).

**IV.   Summary Judgment on Fraud Would Be Improper.**

Holley said he was Salem's agent. B152, B154. Holley thus either was Salem's agent, *see infra* Pt.VI, or Holley fraudulently induced Brandt into the agreement by claiming that he represented Salem. Defendants move for summary judgment on this alternative claim of fraudulent inducement because they think Brandt's evidence of fraud is not good enough to go to

---

[30] *See also id.* at 105 ("Although the promise must be clear and definite, it need not be the equivalent of an offer to enter into a contract"; i.e., promissory estoppel recognizes that "all promises are not offers.") (citations omitted).

35

trial. They are incorrect. It is true that fraud "requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." *Cadle Co. v. D'Addario*, 268 Conn. 441, 455 (2004) (citation omitted). But that standard does not require the victim to have a photographic memory. *Contra* Br. 24-27.

Defendants underscore Brandt's candid acknowledgments that he cannot remember the specific words that Holley spoke in conversations a decade earlier. *E.g.* Br. 26 ("*I can't tell you exactly what he said.*") (emphasis added by Defendants). Yet acknowledgment of a lack of verbatim recall has no legal meaning. As with any standard of proof, the existence or non-existence of "clear and convincing" evidence is a fact question for the fact finder. *See Somers v. Statewide Grievance Comm.*, 245 Conn. 277, 296-97 (1998). In *Somers*, as here, determining whether the standard has been met will require "careful consideration of circumstantial evidence." *Id.* at 297 (describing fact finder's duty in case requiring "clear and convincing" evidence) (citation omitted). The law does not bar the courthouse door to fraud plaintiffs because they lack total recall of conversations that took place over a decade ago.

In criminal cases, juries routinely consider non-verbatim evidence to determine whether prosecutors have satisfied the even higher standard of proof beyond a reasonable doubt. That standard can be met by non-verbatim testimony, including purely circumstantial evidence. In fact, "[o]rdinarily, intent can only be inferred by circumstantial evidence; it may be and usually is inferred from [a person's] conduct." *State v. Diaz*, 237 Conn. 518, 541 (1996) (quotation omitted). Just as non-verbatim testimony and circumstantial evidence are enough to satisfy the standard of proof beyond a reasonable doubt, they are enough to satisfy a clear and compelling evidentiary standard.

36

Whether the particular evidence presented meets the standard is of course the classic jury question. To discover evidence of fraud, one need go no further than the precise deposition excerpts that Defendants quote:

> Q: Did [Holley] ever tell you in words or substance, I am the authorized agent for Bob Salem?
> A: In substance.
> . . .
> Q: Are you saying it was your impression – you understand I'm trying to understand – is it your impression that he was on board with the agreement?
> A: It is.
> Q: And when I've asked you to tell me what the basis of that impression was, you can't recall; is that correct?
> A: No. What I told you is I can't tell you the specific details of the conversations. The basis was communication from George Holley.
> Q: To what effect?
> . . .
> A: That he was on board.
> Q: That Bob Salem was in agreement with what he [Holley] was agreeable to?
> A: Yes.

B151-52. Evidence of this sort is more than enough to present to the jury, which can then determine whether Holley acted as Salem's agent, fraudulently represented that he was so acting, or did neither.[31]

---

[31] Defendants mistake things entirely when they hearken back to the District of Minnesota's decision dismissing an earlier action between the parties. Br. 27. That court concluded on the partial record then before it that there was insufficient evidence of Holley's serving as Salem's agent to find the minimum contacts necessary to exert personal jurisdiction over Salem. *Brandt v. MIT Dev. Corp.*, Mem. Op. and Order, 12-13 (D. Minn. Sept. 20, 2001) ("Minnesota Decision"). The court said nothing, however, about whether Holley had fraudulently pretended to serve as Salem's agent in order to induce Brandt to enter the agreement. In any event, the

V.  **Summary Judgment on the Prejudgment Interest Claim is Not Appropriate.**

Connecticut law authorizes courts to award prejudgment interest pursuant to contract or statute. *Paulus v. LaSala*, 56 Conn. App. 139, 147 (1999) ("interest on a disputed demand" available where "a contract or a statute so provides."). Section 37–3a of the Connecticut General Statutes provides in relevant part that "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable . . . ." *Id.* at 141 n.3; *Flynn v. Kaumeyer*, 67 Conn. App. 100, 104 (2001) ("If . . . it is determined that a defendant has breached a contract, the detention of money that became due as a result of the breach, plus interest thereon, may be awarded at the discretion of the trier of fact.").

The purpose of § 37–3a is to compensate the prevailing party "for a delay in obtaining money that rightfully belongs to him." *Foley v. Huntington Co.*, 42 Conn. App. 712, 740 n.11 (1996) (internal quotation marks omitted.); *Flynn v. Kaumeyer*, 67 Conn. App. at 104 ("Prejudgment interest for money detained after it becomes due is compensatory because it compensates or reimburses plaintiffs for the interest they could have earned on the money that was rightfully theirs, but that was not paid when it became due.").

Because § 37–3a is designed to compensate parties who have been wrongfully deprived of the ability to receive interest on their money, it does not apply when no money was withheld, as in negligence actions seeking damages for personal injury. *See, e.g., Foley*, 42 Conn. App. 741-42. Rather, § 37–3a governs when an identifiable sum of money (referred to as a "liquidated sum") has been wrongfully withheld. "An amount claimed to be due is a liquidated sum when it

---

District of Minnesota decision was based on a partial record and has no current consequence even as to agency. *See infra* Pt. VI.B.

is susceptible of being made certain in amount by mathematical calculations from factors which are or ought to be in the possession or knowledge of the party to be charged. " *Costello v. Hartford Inst. of Accounting, Inc.*, 193 Conn. 160, 165 (1984) (quotation omitted); *see also Chris Constr. Co. v. May Ctrs, Inc.*, 23 Conn. App. 453, 458 (1990) (citing *Costello*).

An allowance of prejudgment interest under § 37-3a "turns on whether the detention of the money is or is not wrongful under the circumstances." *Associated Catalog Merchandisers, Inc. v. Chagnon*, 210 Conn. 734, 748 (1989) (quotation omitted). "[I]n the context of the statute, 'wrongful' is not synonymous with bad faith conduct. Rather, wrongful means simply that the act is performed without the legal right to do so." *Ferrato v. Webster Bank*, 67 Conn. App. 588, 596 (2002) (citation omitted).

In this case, the money due Brandt became payable, and was wrongfully withheld, in two parts – the monthly fee was payable monthly, and the 10% of increased value was payable no later than November 12, 1999, when the MIT-HDI merger enabled Defendants to garner "assets received above $1,000,000." HDI 100082.

Defendants have two arguments for summary judgment on this issue. First, they assert that Brandt's claim does not fall within the scope of § 37–3a because Brandt does not seek a "liquidated sum." Second, they contend that the Court should rule as a matter of law that Defendants did not wrongfully withhold Brandt's money. Both arguments are wrong as a matter of fact and law, and both fall well short of meeting Defendants' burden of establishing the absence of a genuine issue of material fact.

According to Defendants, a claimant must establish "precisely how much he is allegedly owed" before trial in order to avail himself of § 37–3a. But they cite no authority for their position. This is because Connecticut courts have consistently affirmed § 37–3a interest on

damages that were not specifically ascertained until trial. *See, e.g., Advanced Fin. Servs., Inc. v. Associated Appraisal Servs., Inc.*, 79 Conn. App. 22 (2003); *Fontaine v. Colt's Mfg. Co., Inc.*, 74 Conn. App. 730 (2003) (per curiam); *Paulus v. LaSala*, 56 Conn. App. 139 (1999); *Atlas v. Miller*, 20 Conn. App. 680 (1990). In each of these cases, the specific value of the wrongful withholding was determined at trial, long after the damages were first sustained.[32] For a sum to be "liquidated" for purposes of § 37–3a, it need only be "susceptible of being made certain in amount by mathematical calculations from factors which are or ought to be in the possession or knowledge of the party to be charged." *Costello*, 193 Conn. at 165 (quotation omitted). Thus, the need to prove the specific value of the wrongful withholding at trial is not a bar to recovery of interest under § 37–3a. As *Paulus* observed, "[u]ntil a trial is over and judgment is rendered for a plaintiff, a plaintiff cannot be sure of any recovery. The money may have been wrongfully detained prior to judgment, and it is deemed as such when judgment finally is rendered, in effect awarding interest retroactively. . . ." *Paulus*, 56 Conn. App. at 150-51.

Whether Defendants wrongfully withheld Brandt's money is a question for the fact finder. *Pilato v. Kapur*, 22 Conn. App. 282, 283-84 (1990) (citation omitted). Yet Defendants argue that they are entitled to summary judgment merely because "there is a dispute as to whether plaintiff is owed any money at all"; i.e., they claim not to have wrongfully withhold Brandt's money. To

---

[32] In *Advanced Fin. Servs.*, the court affirmed § 37–3a interest on damages incurred by a bank after the defendant, an appraisal company, misrepresented the value of property used as collateral for a loan. *Advanced Fin. Servs., Inc.*, 79 Conn. App. at 30-33. In *Fontaine*, the court affirmed § 37–3a interest for the wrongful withholding of personal property that was later assigned a specific monetary value. *Fontaine*, 74 Conn. App. 730. In *Paulus*, the court affirmed § 37–3a interest on damages that homeowners incurred for the defendant's failure to construct a home in a timely manner. *Paulus*, 56 Conn. App. at 141. And in *Atlas*, the court affirmed § 37–3a interest for expenses that the plaintiff incurred in hiring a substitute contractor after the defendant wrongfully refused to complete a construction contract. *Atlas*, 20 Conn. App. at 684-85.