state the obvious, denying a claim is one thing; establishing the absence of a genuine issue of material fact is another.

The cases that Defendants cite actually undermine their position that Brandt cannot maintain his prejudgment interest claim as a matter of law. Three of these decisions upheld prejudgment interest. *Smithfield Assocs., LLC v. Tolland Bank*, 86 Conn. App. 14, 25-27 (2004) (upholding prejudgment interest on breach of contract damages determined at trial); *Fitzpatrick v. Scalzi*, 72 Conn. App. 779, 787-88 (2002); *Northrop v. Allstate Ins. Co.*, 247 Conn. 242, 254-55 (1998). A fourth held that a trial court must submit the issue of prejudgment interest to the fact-finder. *Pilato v. Kapur*, 22 Conn. App. at 284. The other three are irrelevant, dealing with requests for prejudgment interest appended to personal injury claims that were brought under the guise of contract actions to avoid the bar on prejudgment interest in personal injury cases. *Foley v. Huntington Co.*, 42 Conn. App. at 742; *Tang v. Bou-Fakhreddine*, 75 Conn. App. 334, 346-50 (2003); *Ceci Bros., Inc. v. Five Twenty-One Corp.*, 81 Conn. App. 419, 427-29 (2004).

There is no legal bar to Brandt's claim for prejudgment interest, which rests on the centrally debated factual question of the case: whether Defendants' wrongfully withheld money due Brandt. *Accord Paulus,* 56 Conn. App. at 147 ("It is clear that Connecticut case law establishes that prejudgment interest is to be awarded if, in the discretion of the trier of fact, equitable considerations deem that it is warranted.").[33]

---

[33] Defendants also impermissibly seek a declaratory ruling whether prejudgment interest should be calculated on a compound or simple basis. This is an issue for jury instructions, not summary judgment. In any event, compound interest is permissible under § 37-3a. *See Spector v. Konover*, 2001 WL 1132664, at *5 (Conn. Super. Ct. Aug. 15, 2001) (compounding interest) (all unpublished cases are attached in the appendix, collected in a tab in alphabetical order); *see also Kuss v. Kuss*, 2000 WL 1170911, at *2 (Conn. Super. Ct. July 19, 2000) (exercising discretion not to compound interest); *cf. Loomis & Loomis, Inc. v. Stecker & Colavecchio Architects, Inc.*, 6 Conn. App. 88 (1986) (where contract specifies availability of prejudgment interest, interest is presumed to be simple).

41

## VI. Summary Judgment for Salem Is Not Appropriate On Any Count.

Salem asks this Court to rule as a matter of law that Holley did not act as Salem's agent. But agency is a fact question for the jury, especially where, as here, a plaintiff claims implied or apparent authority. The record unquestionably shows that there are avidly disputed issues of material fact on those claims. Further, neither collateral estoppel nor law of the case precludes consideration of the record support for agency, most of which is new. Even if this Court were to rule as a matter of law that Holley did not act as Salem's agent, moreover, Salem is still bound to the agreement under the doctrine of equitable ratification. Finally, the unjust enrichment claim against Salem survives even without either agency or ratification.[34]

### A. There Are Disputed Material Facts Regarding Agency.

There is considerable testamentary and documentary evidence that Holley acted as Salem's agent when he negotiated and reached an agreement with Brandt. That evidence makes quite clear that there is a genuine factual debate over the question of agency. And that is hardly unusual: "It is well settled that [t]he nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn." *Maharishi Schlotzsky's. of Vedic Sciences, Inc. (Conn.) v. Conn. Constitution Assocs. L.P.*, 260 Conn. 598, 606 (2002) (quotation omitted). Accordingly, grants of summary judgment on agency issues are often erroneous. *See Barasso v. Rear Still Hill Road, LLC*, 81 Conn. App. 798, 807, (2004) (holding that trial court erred in granting summary judgment on issue of agency where plaintiff offered affidavit providing facts in support of

---

[34] Brandt sued the estate of Salem, who died in 1999, D27. For convenience, this brief refers to the estate as "Salem."

42

agency relationship).

Under Connecticut law, "the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment." *Maharishi*, 260 Conn. 598 at 606 (citations omitted). Connecticut recognizes two types of agency – actual agency and agency that is merely "apparent." When the principal communicates the agent's authority directly to the agent, there is actual authority; when the principal communicates the agent's directly to a third party, there is apparent authority. *Tomlinson v. Bd. of Ed. of City Of Bristol*, 226 Conn. 704, 734 (1993) (citations omitted). Holley acted with both kinds of agency.

### 1.    Holley Had Actual Implied Authority To Bind Salem.

Actual authority need not be express; it can be implied. As the Connecticut Supreme Court has explained, "[i]mplied authority is actual authority *circumstantially* proved." *Maharishi*, 260 Conn. at 607 (emphasis added) (quotation omitted). Thus, "[i]mplied authority is a fact to be proven by *deductions or inferences* from the manifestations of consent of the principal and from the acts of the principal and [the] agent." *Maharishi*, 260 Conn. at 607-08 (quotations omitted, emphasis added). In light of the central role played by inferences and circumstantial evidence, it is unsurprising that "implied agency is essentially a question of fact the proof of which is generally found in the acts and conduct of the parties." *Leary v. Johnson*, 159 Conn. 101, 105 (1970) (citation omitted). Defendants err when they paint the record as too thin to allow any reasonable person drawing "deductions or inferences" from the circumstantial evidence to conclude that Salem gave Holley authority to act as his agent.

### a. *Circumstantial evidence of actual agency at the time of negotiations.*

The record provides strong circumstantial proof from which reasonable jurors could deduce or infer Holley's agency for Salem during his formation of the agreement with Brandt. Salem and Holley communicated regularly, often blurred any distinctions between and among MIT, ASC, and themselves, and left Holley to make the regular business decisions (as opposed to scientific decisions) for any or all of them. Defendants' regular way of doing business was reflected in their negotiations with Brandt, and acknowledged after the fact by Salem's admissions that he considered himself bound by the agreement that Holley struck for both of them and their companies.

At deposition, Holley admitted that he and Salem had an informal style of conducting business – whether it was HDI business, MIT business, ASC business, or personal business. For example, Holley stated that he and Salem had not entered into a single written agreement, on any matter, since Salem became Holley's partner in MIT. H10. Salem and Holley did not hold formal MIT or ASC board or shareholder meetings; instead, they treated MIT "as a partnership, not as a corporation" by disbursing all MIT income as "either salary or dividends . . . . to avoid corporate tax." H55.

This informality encompassed a failure to distinguish among the various business entities. Thus, Holley had no "frame of reference" for determining whether he was acting as CEO of HDI or president of MIT when sending documents to Brandt, noting that he was "[w]earing both hats." (H450, H467, H502-03); *see also* H80 (stating that he did not have any concrete criteria

44

for using HDI versus MIT letterhead when sending out correspondence).[35] As with their inability to differentiate between business entities, Salem and Holley had difficulty differentiating between themselves and MIT: they were MIT. Salem and Holley "didn't differentiate much between what was MIT and what was Bob [Salem] or George [Holley]." B133-34, B139-40. Holley and Salem each owned half of MIT and did not have to account to other shareholders or directors, so it is not surprising that they treated the company as an extension of themselves.

Holley and Salem made all decisions affecting MIT. H62-63. They did so in the context of a close working relationship in which they communicated frequently:

> Q: [A]t least with respect to MIT, the two of you as the only owners and as the directors and the officers conferred with each other regularly about the operations of the business, correct?
> A: Yes.
> Q: You'd consult with him, he'd consult with you?
> A: Yes.
> Q: Generally speaking, both of you would be involved in making significant decisions on behalf of the company?
> A: Yes.
> Q: As I think you said earlier, given the size of the company and the nature of your relationship with Mr. Salem, your interactions with him were generally informal and undocumented, correct?

---

[35] Indeed, even at his deposition Holley continued to refuse to draw any distinctions between HDI on the one hand and MIT, Salem and himself on the other:

> Q. The concept under consideration as it related to Mr. Brandt was for HDI, the company, to retain Mr. Brandt as a consultant, correct?
>
> A. That's correct.
>
> Q. Later in 1993 and early in 1994, that concept changed such that you and Bob Salem and MIT were considering engaging Mr. Brandt as a consultant to do work related to HDI in hopes that Mr. Brandt by helping HDI
>
> could help MIT and help you and Mr. Salem, the owners of MIT, correct?
>
> . . .
>
> A. I don't see any distinction. What's the distinction?

H285-86.

45

A:  Yes.

H161. These regular communications continued when Holley started talking with Brandt about consulting and compensation:

> Q:  [A]s your standard operating procedure with Mr. Salem, when it came to the terms of compensation with Mr. Brandt, you talked about it with Bob Salem and reached an agreement with [Salem] about what you were going to do?
> . . .
> A:  Yes. In – in general terms. Not terribly specific at this–at this point in time.
> Q:  Well, you certainly weren't keeping Bob Salem in the dark–
> A:  No.
> Q:  --about your communications with Len Brandt concerning what Len's compensation might be for the work that he was doing, correct?
> A:  That's right, correct.
> A:  You did your best to keep Bob Salem fully informed and timely informed about your negotiations with Mr. Brandt, correct?
> A:  Yes.
> Q:  And that was consistent with your standard operating procedure?
> A:  Yes.
> Q:  Developed over many years?
> A:  Yes.
> Q:  With your partner and close personal friend, Mr. Salem, right?
> A:  Yes, correct.

H207-08. Likewise, Mr. Holley said:

> Q:  And what you're telling me is throughout this period, however long it lasted when you and Len were negotiating potential compensation terms, if you received a document from Len, you shared a copy of that document with Bob Salem?
> A:  Yes.
>     Mr. Roberts:  Objection.
> Q:  Asked him what he thought?
> A:  Yes.
> Q:  Wanted to make sure that you got his views and that you could accurately communicate his views back to Len Brandt?
> A:  Yes.
> Q:  Similarly, any time you generated a document and sent it to Len Brandt, you also made sure that Bob Salem got a copy of the document as well, correct?
> . . .
> A:  That was my practice.

46

H314-15. By serving as the deal-maker and go-between, Holley worked to craft an agreement that satisfied both sides:

> Q:  You wanted to come up with some compensation arrangement that fairly compensated Len Brandt for the work that he did?
> A:  Yes.
> Q.  You wanted it to be fair to him, you wanted it to be fair to HDI, to MIT and you and Mr. Salem?
> A:  Yeah.

H313.

Holley testified that he took Salem's concerns into account when drafting the terms of the agreement with Brandt. H320, H322-23. Thus, Holley testified that he "tried to put in writing what I thought I heard Len say, so that I could get response both from Len and from my constituents, the Bob Salems and the HDI folks of the world." H101. And Holley frequently showed correspondence from Brandt to Salem. *See, e.g.*, H98-99, H312 (discussing November 10, 1993 fax); H102 (discussing Holley's intent to talk to Salem about January 18, 1994 letter).

Holley did more than take Salem's concerns about the negotiations into account: he directly conveyed Salem's concerns to Brandt. *E.g.*, B137-38, B148-49 (in late 1993, Salem asked that negotiations focus on Brandt's work with MIT business related to HDI). Because Holley kept Salem informed of all key aspects of the negotiations, it is not surprising that Salem entrusted Holley to work out the consultancy details. B120.

In pertinent part, the 3/2/94 compensation letter stated:

> To review the understanding that I have with MIT and its subsidiary ASC *and Bob Salem* and yourself I will receive compensation equal to 10% of any assets received above $1,000,000 by the collective group of MIT, ASC, Bob Salem and yourself. . . . Please sign this letter to indicate your agreement with the changes outlined above and return a copy to me as soon as possible.

47

HDI 100082 (emphasis added). Holley signed the fax, expressing his agreement with these terms, HDI 100082, and handwrote "cc RJS" – Salem's initials – and had a copy sent to Salem. H355-56. There is no evidence that Salem ever told Brandt that he objected to any part of the 3/2/94 compensation letter, and Holley was unable to identify a single time in Defendants' "negotiations with Mr. Brandt up to and including [a] time in late May or early June of 1994 when [Holley] suggested the possibility of agreeing to something and Mr. Salem objected and said he wouldn't go along with that." H400. That is not surprising, as Salem regularly deferred to Holley on business matters.

The substantial evidence set forth in the last few pages is more than enough to allow reasonable people to infer that Salem gave Holley authority to act as his agent.

        **b.**    ***Circumstantial evidence of actual agency after completion of agreement.***

Even if none of the evidence above existed, there would still be sufficient circumstantial evidence after the agreement with Brandt was formed from which reasonable jurors could infer Holley's agency for Salem when the agreement with Brandt was formed.

When it became apparent that MIT and ASC had begun a robust recovery (and that Salem and Holley's fortunes had accordingly improved by considerable proportions), Brandt spoke to Holley about whether his compensation could be arranged so as to minimize taxes. B330-31. Holley agreed that they should work together to figure out a way to reduce taxes due, B331, and spoke with Salem about the matter. *Id.* Salem balked, seeking to backtrack on details of the compensation agreement reached three years earlier with Brandt.

Holley and Salem then exchanged correspondence in what Holley described as an "attempt to clarify things." Holley sent Salem a hypothetical letter to Brandt, in which he wrote

48

that, "Believe it or not, we actually did have something in writing regarding our consulting, and Bob and I have discussed it." HDI 100088. Attempting to quantify the dramatic turnaround at MIT and HDI during the period of Brandt's consultancy, Holley thought it fair to "assume that the increase in *our* fortunes, and HDI's fortunes have improved (not MIT's), and further assume this evolved jointly through 50/50 effort of yourself [Brandt] and myself/MIT (and MIT's cash) . . . ." HDI 100089 (emphasis added). Salem responded to the hypothetical letter to Brandt with an undated handwritten letter back to Holley. HDI 100117. Salem described what he called "[m]y understanding of *our* agreement with Len." *Id.* (emphasis added). And yet again reinforcing the long-term partners' usual course of business, Salem spoke of Holley's unsent letter to Brandt as "*our* Feb 11 letter." *Id.* (emphasis added). Holley made handwritten notations on Salem's handwritten note, disagreeing with Salem's suggestions, *id.*, and provoking Salem to write directly to Brandt for one of the only times in their years-long relationship. In his May 21, 1997 letter to Brandt, Salem directly acknowledged the existence of an agreement with Brandt – defining it as "*our* arrangement." HDI 100048. There can be no doubt that Salem saw himself as bound by an agreement reached around the time of the 3/2/94 compensation letter:

> I understood our arrangement to be simple. You would receive compensation of $2,000 per month, plus expenses from HDI for general financial counseling. *George and I further agreed* that . . . we would give 10% of the net gain from *George Holley and Robert Salem's* share of HDI's holdings to you once we cashed in . . . .

*Id.* (emphasis added). To be sure, Salem now backpedaled on his arrangement with Brandt, claiming that Brandt was owed 10% of any value increase only if his money-raising efforts had directly contributed to the value increase. *Id.*[36] But whatever the precise details of "our

---

[36] A short time later, Holley and Salem backpedaled even further. Holley wrote Brandt on April 2, 1998, offering to pay Brandt more than a million dollars – $1,200,000 – in back compensation but falsely (and circularly) stating that "[t]he terms of an agreement with you that should be part

49

arrangement," Salem unquestionably acknowledged that Holley had acted as his agent when it was formed, since Salem had no direct communications with Brandt that could possibly have resulted in an agreement. *See also* H581 (Holley testifying that "Bob [Salem] understood and – and accepted that we had an agreement on a monthly fee with Len . . . ."). A reasonable jury could surely infer from this post-agreement evidence, as it could from the evidence at the time of the agreement, that Salem gave Holley authority to act as his agent.

### 2. Holley Also Had Apparent Authority to Bind Salem.

In addition to implied actual authority, Holley acted for Salem with apparent authority.[37] "Apparent authority is that semblance of authority that a principal, through its own acts or inadvertences, causes or allows third persons to believe the principal's agent possesses." *Maharishi*, 260 Conn. at 607 (citation omitted). *See also Edart Truck Rental Corp. v. B. Swirsky & Co., Inc.*, 23 Conn. App. 137, 141 (1990) ("A principal cannot be justified in willfully closing his eyes to knowledge.") (quotation omitted). Apparent authority requires a finding of two elements:

> First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party

---

of any agreement were never completed, fully discussed, or agreed." HDI 100006 (indicating willingness to pay more than the offered $1,200,000 in back compensation by writing "I really believe that the offer that was proposed is responsive to your claim, but let's discuss it further.").

[37] Holley also acted as agent for MIT and ASC, legal entities of which he was the President and 50% owner. Defendants assert in a footnote that if Holley could not bind Salem, then as a matter of law he could not bind MIT or ASC. They provide no support for their assertion and are obviously wrong. The president of a company nearly always exercises apparent authority to bind the company, even if (unlike here) corporate bylaws vest the relevant power in someone else. *See Tomlinson*, 226 Conn. at 732-37 (upholding apparent authority where president of company routinely negotiates and enters into contracts and when opposing party, acting in good faith, reasonably believed president had authority ); *Edart Truck Rental Corp.*, 23 Conn. App. at 140 ("Apparent authority may be derived from a course of dealing.") (citation omitted); *New London Housing Auth. v. State Bd. of Labor Relations*, 47 Conn. Supp. 624, 635-37, (2001) (even where bylaws allowed only Chairman to bind entity, Executive Director had apparent authority).

50

dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action.

*Gordon v. Tobias*, 262 Conn. 844, 851 (2003) (quoting *Tomlinson*, 226 Conn. at 734-35). Evidence supporting the first element often also supports the second. *New London Housing Auth. v. State Bd. of Labor Relations,*, 47 Conn. Supp. 624, 636 (2001).

Here, Salem knowingly let Holley act like he had authority to bind Salem, and Brandt reasonably and in good faith thought that Holley could bind Salem. Strong circumstantial evidence suggests that Salem knowingly permitted Holley to act as if he had authority to bind Salem. As discussed *supra*, Brandt testified that in late 1993, after beginning negotiations with Holley, Brandt learned that Salem opposed the parameters of the consulting agreement and, as a result, the agreement was altered. B137-138, B148-49. Because of this incident of intervention by Salem, Brandt "had come to understand that Mr. Salem was involved in the dialogue. . . ." B138, B150 ("I had a sense that Bob was more visibly active in this discussion than I recalled George implying up until that point."); B145. Brandt further testified that once he and Holley had finalized the agreement in the spring of 1994, they stopped discussing the terms of the agreement. B149-50, B155; H403-06 (confirming a cessation of negotiations from spring 1994 until the settlement talks in 1997). Based on all the evidence reviewed above, a reasonable jury could surely infer that by not objecting to the compensation agreement, in light of the fact that his objections had previously been taken into account, Salem knowingly permitted Holley to act as if he had authority to bind him.

Brandt's testimony also reveals a reasonable and good faith basis for believing that Holley had authority to bind Salem. Brandt testified that he believed Mr. Holley's signature of the March 2, 1994 fax, given the fax's explicit mentioning of an agreement with "MIT, ASC,

*Bob Salem* and yourself," meant that Holley was acting for Salem. B152-53, B206-07. Brandt added that he did not think it was necessary to "have something memorialized whereby George either had a power of attorney or was specifically authorized in writing by Salem to act for him," B208. As a result, Brandt believed he had an agreement with all four of the persons listed on the 3/2/94 compensation letter, including Salem. B37.

This belief was both reasonable and in good faith. Holley had told Brandt that Salem would not be actively involved in the negotiations due to poor health B138 ("[Holley] explained to me that Bob's health wasn't perfect, that was why he wasn't involved in the conversation, as well; and that he, George, would be the only one that would be talking to me about this and that; you know, Bob pretty well went along with [Holley's] thoughts on matters as he generally did in business.") B112. Moreover, Holley had told Brandt that Salem "would be passive" and "would kind of go along with George." B145-46, B152 (stating that Holley told Brandt that Salem "was on board" and "that George was now speaking for [Salem]"). This accorded with Brandt's experience from his time as an HDI director, when Salem rarely attended board meetings, leaving matters to Holley. B112. Finally, Brandt knew of no serious disagreements between Salem and Holley that might cause him to question whether Holley truly was acting for Salem. B142.

In sum, ample evidence exists in the record from which a reasonable jury could find that Salem knowingly held Holley out as Salem's agent and that Brandt had a reasonable, good faith basis for believing that Holley was so empowered.

### B. Neither Law Of The Case Nor Collateral Estoppel Requires This Court to Ignore Evidence Uncovered After the Minnesota Jurisdiction Decision.

Defendants claim that this Court should ignore the evidence set forth above in order to conform with the preliminary conclusion of the District of Minnesota that Holley did not act as Salem's agent. Neither the "law of the case" doctrine nor collateral estoppel permits such a result. Collateral estoppel does not apply, but even if it did, collateral estoppel is, like law of the case, a flexible doctrine ensuring that facts and findings are settled only after a record has been fully developed and litigated. That did not happen here.

The District of Minnesota "dismissed without prejudice" Brandt's complaint against Salem, and granted HDI and MIT's motion to transfer. Minnesota Decision at 21. It is axiomatic that collateral estoppel is inappropriate on the basis of a previous decision that was issued "without prejudice." *See* Moore's Fed. Practice § 132.03[2][l][i] ("Dismissal without prejudice . . . is not entitled to issue preclusive effect."); *Kuriakose v. City of Mount Vernon*, 41 F. Supp. 2d 460, 470 (S.D.N.Y. 1999) ("As a dismissal without prejudice does not operate as an adjudication on the merits, the doctrines of res judicata and collateral estoppel do not apply here."); *see also Satsky v. Paramount Communications, Inc.*, 7 F.3d 1464, 1468 (10th Cir. 1993); *Matter of Hallahan*, 936 F.2d 1496, 1499 n.2 (7th Cir. 1991). Moreover, the doctrine applies to attempts to re-litigate the same issue in a subsequent case, not in later stages of the same case. *See, e.g., Montana v. United States*, 440 U.S. 147, 153 (1979) (stating rule as one under which a "right, question or fact distinctly put in issue and directly determined . . . cannot be disputed in a *subsequent suit* between the same parties or their privies") (quotation omitted; emphasis added). Accordingly, the Minnesota Decision precludes no issues.

As for law of the case, that doctrine "is not written in stone but is a flexible principle of many facets adaptable to the exigencies of the different situations in which it may be invoked."

53

*Breen v. Phelps*, 186 Conn. 86, 99 (1982) (citation omitted). Thus, a "judge is not bound to follow the decisions of another judge made at an earlier stage of the proceedings, and if the point is again raised he has the same right to reconsider the question as if he had himself made the original decision." *Id.* at 98 (quotation omitted).[38]

It is clear that the question of Holley's acting as actual or apparent agent for Salem was not fully vetted before the District of Minnesota. That court, asked to decide the threshold question of personal jurisdiction, necessarily proceeded without the advantage of a full discovery record. Indeed, the court noted the necessarily provisional nature of its conclusion: "The Court concludes that, *from the record presently before it*, no reasonable jury could infer that Holley acted as Salem's agent." Minnesota Decision at 13 (emphasis added).

Defendants assert that "[t]here has been no meaningful change to the essential facts or evidence," S.Br. 10, but discovery in the intervening years has produced thousands of new pages of deposition testimony and hundreds of new documents. None of this material was part of "the record presently before" the District of Minnesota.[39] Much of it is cited above. Defendants

---

[38] Defendants' cases do not support their argument. In *Wagner v. Clark Equip. Co., Inc.*, 259 Conn. 114, 130-31 (2002), the court quoted *Breen* and rejected defendants' argument that the law of the case doctrine should have been applied, noting that "[a] judge is not bound to follow the decisions of another judge made at an earlier stage of the proceedings . . . ." *Royal Ins. Co. of Am. v. Zygo Corp.*, 349 F. Supp. 2d 295, 307-08 (D. Conn. 2004) denied the defendant's summary judgment motion on the issue of apparent authority, applying *Gordon v. Tobias, supra*, because there were disputed issues of material fact. Finally, the court in *Royal Ins. Co.* made clear that "the law of the case doctrine is a discretionary rule . . . ." *Id.* at 304. *See also Lillbask v. State of Conn. Dep't of Ed.*, 397 F.3d 77, 92-94 (2d Cir. 2005) (upholding discretionary application of law of the case by hearing officer where previous hearing officer conducted hearing one month earlier).

[39] In reaching its agency determination, the District of Minnesota relied only on Brandt's two affidavits and a handful of attached exhibits. *See* Minnesota Decision at 13. Instead of explaining their counter-factual assertion that no new evidence has emerged, Defendants cite to a self-serving affidavit by co-defendant Holley. *See* S.Br. 10 ("The Affidavit of Mr. Holley confirms it."). Holley is no better positioned than this Court (or anyone else) to compare the

54

improperly ask this Court to disregard that evidence.[40]

### C.    Salem is Bound to the Agreement Through Equitable Ratification.

Even if the Court were to hold that Holley was not Salem's agent as a matter of law, Salem would still to be bound to the agreement and promises because of his later ratification of the agreement with Brandt. "Ratification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account." *Russell v. Dean Witter Reynolds, Inc.*, 200 Conn. 172, 185 (1986) (quoting Restatement (Second), 1 Agency § 82 (1958)). "Ratification requires acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances." *Id.* (quotation and emphasis omitted). "Silence, as well as affirmative acts, may imply an intent to ratify." *Hartford Accident & Ind. Co. v. S. Windsor Bank & Trust Co.*, 171 Conn. 63, 72 (1976); *see also Driscoll v. City of New Haven*, 75 Conn. 92, 97 (1902) (describing ratification as equitable doctrine).

Here, Salem accepted the results of Brandt's consulting agreement, with an intent to ratify the agreement: initially through his knowledge of (and failure to object to) Brandt's consulting efforts from 1994 through the Jim Julian investment, *see supra* Pt. VI.A., and later in his May 21, 1997 letter to Brandt. HDI 100048. Salem had full knowledge of the material circumstances surrounding the negotiation of the agreement through his frequent

---

dates on which particular pieces of cited evidence were produced to the date of the Minnesota decision and determine what is new.

[40] Application of collateral estoppel principles would lead to the same result. Issue preclusion requires a showing that the issues are identical and that they were fully and fairly litigated in the first action. *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 108 (2d Cir. 2001). Neither is true here, for the same reasons set forth in the text above: the Minnesota court worked on a preliminary basis from a partial record to resolve a jurisdictional issue; this Court is asked to resolve a merits question from a full record on a final basis.

communications with Holley, *see, e.g.*, H207-08, H313-15, and he had full knowledge of the material circumstances surrounding the work Brandt performed for him. *See supra* VI.A. *Accord Cohen v. Holloways', Inc.*, 158 Conn. 395, 409 (1969) (holding that accepting or retaining "the benefits of an unauthorized contract or other transaction by its . . . agents, as where it . . . accepts the benefit of services," constitutes ratification of the contract or estoppel to deny ratification).[41]

### D.   The Unjust Enrichment Claim Does Not Depend On Agency

Though Salem's liability in contract and promissory estoppel ultimately requires the jury to find agency, his liability in unjust enrichment does not. Accordingly, even if this Court were to conclude (contrary to the clear case law and voluminous evidence) that Holley could not bind Salem to his contracts or promises, there would still be no reason at law to enter summary judgment for Salem on the unjust enrichment claim.

Salem correctly points to *Hartford Whalers*, for the unjust enrichment test under Connecticut law. To establish unjust enrichment, Brandt will have to prove to the fact finder that:

>   (1) Salem received a benefit;
>   (2) Salem unjustly did not pay Brandt for the benefit; and
>   (3) the failure of payment was to Mr. Brandt's *detriment*.[42]

*Id.* at 283 (emphasis added). Naturally, Salem could have received a benefit (Brandt's work) and unjustly not paid Brandt for that work to Brandt's detriment, with or without Holley serving as

---

[41] The Minnesota court did not address the application of the equitable doctrine of ratification, making the law of the case strictly inapplicable.

[42] Salem incorrectly states that the third element requires "that the failure of payment was to Plaintiff's *benefit*." S.Br. 19 (emphasis added).

56

his agent. That much is clear from *Hartford Whalers*, the only case that Salem cites on this issue.

In *Hartford Whalers*, the Whalers sued for money allegedly owed by Uniroyal under an advertising agreement signed by a Uniroyal dealer, Brass City. Though the trial court found that Brass City was not Uniroyal's agent and could not bind it to a contract, the Connecticut Supreme Court affirmed a finding of unjust enrichment against Uniroyal. *Hartford Whalers*, 231 Conn. at 283-84.[43] Plainly, a defendant can be liable for unjust enrichment even where an intermediary to enrichment did not act as a defendant's legal agent.

Salem argues that the Defendants' occasional small monthly payment to Brandt "bellies [sic] Plaintiff's claim for unjust enrichment." S.Br. 19. We disagree that these infrequent, modest payments prevented injustice. But whether Salem was unjustly enriched – whether the sporadic (and ultimately terminated) payment of a small monthly retainer fee represented just compensation for Brandt's role in Salem's ultimately gargantuan gains – is a quintessential question of fact. As *Hartford Whalers* explained, "whether a particular failure to pay was unjust and whether the defendant was benefited are *essentially factual findings* . . . ." 231 Conn. at 283 (emphasis added).[44] That is the jury's job.

Nor can Salem point to any case suggesting that a plaintiff who has received some payment, no matter how small, is barred, as a matter of law, from maintaining an unjust enrichment claim. Since "unjust enrichment" is an equitable doctrine, that is not in the least surprising. Salem and Brandt received assets worth more than $55,000,000. S111; *see also*

---

[43] An inability to recover under a contract theory "is a precondition for recovery based upon unjust enrichment." *Hartford Whalers*, 231 Conn. at 284. In *Hartford Whalers*, the plaintiff could not recover in contract because of a lack of apparent agency. *Id.* at 281.

[44] The measure of relief for an unjust enrichment claim generally focuses on "the benefit to the defendant," not the loss to the plaintiff. *Hartford Whalers*, 231 Conn. at 285.

57

BRANDT 03425. Brandt joined Salem and Holley as what Holley called their "chief financial advisor," H21, at a time when their business was, in Salem's word, "crippled." HDI 100048. Brandt worked hard to help effect this striking turnaround, and Salem knew it – in detail.[45] Whether it was unjust to pay Brandt only $5,000, S73-74, for his part in that dramatic turnaround is, like all the other issues that Defendants raise, a jury question.

---

[45] Holley made sure Salem knew how hard Brandt was working. For example, on November 3, 1993, Holley sent a memo regarding "vials of strips" to Brandt, Salem, and Lilore. BRANDT 00551. On December 6, 1993, Holley sent a memo detaining "[r]ecent developments" to Brandt, copying Salem. HDI 100189. On March 11, 1994, Holley sent Brandt a memo, copying Salem, seeking Brandt's advice regarding a potential acquisition. BRANDT 0801. On June 16, 1994, Holley copied Brandt and Salem on a memo regarding potential business for MIT, HDI, and ASC with a new company marketing "PC-based diagnostic systems." BRANDT 0602. On August 25, 1994, Holley sent a memo to Brandt, copying Salem, describing a conversation "with Transworld's Bob Fine." BRANDT 01065. On October 3, 1994, Holley wrote a memo to Brandt, Salem, and Martin describing "Bergen Agreement Issues Re: Draft" and requesting additional comments. BRANDT 02360. On March 2, 1995, Holley wrote a memo, copying Brandt, Salem, and Dudas, discussing a Chapter 11 analysis of HDI. BRANDT 01794. On October 5, 1995, Holley sent Brandt, Salem, and Lilore a copy of and sought comments about a letter from Fred Barnett to Holley stating disapproval of James Wiegley as HDI President/CEO. BRANDT 01108. On March 26, 1996, Holley copied Brandt and Salem on a memo containing a summary of and notes from Holley's meeting with Gabriel Medical. BRANDT 01639-42. On April 9, 1996, Holley sent Brandt and Salem a memo describing and seeking comment on terms of business with a potential buyer named Simplex Systems and describing and seeking comment on an "assignment/test period" for Jim Wiegley. BRANDT 01121. On April 15, 1996, Holley sent Brandt, Salem, and Lilore a memo with an accompanying letter from an attorney, stating that "the VC stock conversions to debt" were illegal due to HDI's insolvency. BRANDT 01411-13. On April 30, 1996, Holley sent Brandt and Salem a memo requesting comments on a potential deal among HDI, MIT, and Immunomatrix. BRANDT 01512. On May 2, 1996, Holley sent Brandt a memo with a copy to Salem, requesting comment on the service approach of a Healthware. BRANDT 00926. On December 10, 1996, Holley sent Brandt and Salem a memo summarizing a 1997 budget review and attaching a preliminary budget. BRANDT 02847-50. On February 3, 1997, Holley sent a copy of a memo to Brandt and Salem regarding meetings with Doug Metz and stating "Len Brandt and I will discuss this at length . . . ." BRANDT 02872. On March 17, 1997, Holley sent Brandt a fax, copying Salem, discussing the "Dominion Proposal." BRANDT 00179-85. Also on March 26, 1997, Holley copied Brandt and Salem on a facsimile discussing two options for a proposed MIT refinancing of HDI. BRANDT 0206. On April 21, 1997, Holley sent a fax to Brandt, copying Salem, re a potential investment in HDI by Express Med. BRANDT 00220.

## CONCLUSION

The motions should be denied.

PLAINTIFF
LEONARD BRANDT

By: _____
Edward Wood Dunham (ct05429)
Jonathan M. Freiman (ct24248)
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 fax
edunham@wiggin.com
jfreiman@wiggin.com

His Attorneys

59

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, via first class mail, postage prepaid, on this first day of July, 2005 to:

Paul M. Brown
Satterlee, Stephens, Burke & Burke
230 Park Ave.
New York, NY  10169

Frederick L. Murolo
Richard A. Roberts
Thomas J. Lengyel
Nuzzo & Roberts
One Town Center
P.O. Box 747
Cheshire, CT  06410

_____
Jonathan M. Freiman