UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

LEONARD BRANDT,                          CASE NUMBER: #01-5-RHK/SRK

           Plaintiff                     **AFFIDAVIT OF LEONARD BRANDT**

vs.

MIT DEVELOPMENT CORPORATION,
HOME DIAGNOSTICS, INC.,
GEORGE H. HOLLEY AND
THE ESTATE OF ROBERT J. SALEM

Leonard Brandt, being duly sworn, states and deposes as follows:

1. I am the plaintiff in the above referenced action. I submit this Affidavit in opposition to the motion of defendants MIT Development Corporation ("MIT"), Home Diagnostics, Inc. ("HDI"), and George H. Holley ("George Holley" or "Mr. Holley") to dismiss my complaint for lack of personal jurisdiction or, alternatively, to transfer venue. I have personal knowledge of the matters stated herein, and if called upon to testify regarding the same, I could do so competently.

2. I first met George Holley in the late 1980s while serving with him on the board of directors of HDI, a manufacturer and distributer of home testing systems for diabetes. At that time, I was a resident of Minneapolis, Minnesota, and employed at Northwest Growth Fund, Inc., a subsidiary of Norwest Corporation and Norwest Venture Capital, an affiliate of Norwest Corporation. During this time, we attended board

meetings at HDI's headquarters in New Jersey, and Mr. Holley became aware of my background in the areas of business and financial consulting.

3. In July 1993, Mr. Holley made several telephone calls to me at my Minnesota residence, soliciting me to provide business and financial consulting services and assistance to HDI, a research and development company of blood glucose monitoring systems and equipment, and its affiliate company, MIT. Mr. Holley told me that HDI was in dire financial circumstances and in need of leadership, strategic planning, shareholder management, as well as financial and managerial resources to continue in business. He had significant concerns about the counsel he was obtaining from executives within MIT and HDI, and he called me twice before this to ask if I might be available to help him determine what direction to take HDI and MIT's ownership position in HDI.

4. As a result of Mr. Holley's calls, on July 21, 1993 I traveled from Minnesota to New Jersey to meet with Mr. Holley at HDI's headquarters. During this trip, I met with Mr. Holley at HDI, as well as his apartment in New York, where we continued discussions on a wide range of business and strategic issues relating to HDI and MIT. Mr. Holley again requested that I provide business and strategic consulting services for MIT and HDI. We agreed that I would be reimbursed for the expenses I incurred on behalf of MIT and HDI, and that an agreement to compensate me for my services would be worked out shortly. This agreement came later.

5. George Holley and I had various discussions relating to the compensation I would receive for my consulting services on behalf of HDI/MIT. In addition to several

telephone conversations relating to this topic during which I participated from my Minnesota residence, various written communications were exchanged which were sent by me from Minnesota or received by me at my Minnesota address. For example, on November 10, 1993, I faxed a letter to Mr. Holley from my Minnesota residence addressing the issue of the financial arrangements between HDI and MIT and me. A true and correct copy of this letter is attached as Exhibit A.

6. On January 18, 1994, George Holley sent to me at my Minnesota address a letter setting forth a proposed compensation arrangement between HDI/MIT and me, a copy of which is attached as Exhibit B. Shortly thereafter, he sent to me at my Minnesota address another copy of the same letter which contained his handwritten statements relating to the proposed agreement. After sending this letter, we had telephone conversations in which I participated from my Minnesota address where we discussed the terms contained in his letter. Our discussions relating to the compensation issue continued via various telephone conversations involving me at my Minnesota address over the next month or so.

7. On March 2, 1994, I faxed a letter from my Minnesota address to Mr. Holley relating to my compensation. Mr. Holley made handwritten notations on the letter and faxed it back to me at my Minnesota address. A copy of this letter is attached as Exhibit C. At this time, an agreement was reached with Mr. Holley, Robert Salem, MIT, and HDI to compensate me for my services on behalf of MIT and HDI. Under this agreement, defendants agreed to pay me:

(a) A monthly consulting fee of $2,000, with the understanding that they would not be responsible for more than $1,000 per month if HDI did not pay MIT under a management contract with MIT then in existence or in the process of being formed, which would reimburse MIT for my services; and

(b) Incentive compensation equal to ten percent (10 %) of the value, interest, equity, collections, revenue and assets above $1,000,000 received from HDI by MIT; its affiliate company, Applied Sciences Corp. ("ASC"); and Messrs. Holley and Salem.

8. From 1993 through 1997, I performed business and financial planning services on behalf of MIT and HDI -- much of it from my Minnesota address. During this time period, I was a citizen and resident of the State of Minnesota, with an address of 2215 Irving Ave. South, Minneapolis, MN 55405. During this time period, Mr. Holley served as the president of MIT and a director and officer of HDI. He was my primary contact for MIT and HDI, and directed the projects and work that I did on behalf of these companies. My services on behalf of MIT and HDI related to a wide range of activities, including, without limitation, strategic planning; contacting potential investors, investment bankers, and companies interested in entering into a relationship with HDI; providing advice on leadership and shareholder management issues; reviewing and commenting upon business plans and other financial documents; reviewing HDI/MIT contacts; providing assistance to Mr. Holley and other MIT/HDI executives regarding their presentations to potential investors; conducting executive searches; and providing

strategic competitive analysis as well as executive counsel and feedback.

9.  From 1993 through 1997, it is my best estimation that Mr. Holley and I had in excess of 100 telephone conversations in which I participated from my Minnesota residence. Mr. Holley consistently initiated telephone calls from New York and Connecticut to me at my Minnesota residence, and I initiated calls from my Minnesota residence to him as well. During the first few years (1993 - 1994), we had daily to weekly telephone conversations where we discussed various activities and strategies to achieve our primary objective, i.e., obtaining money to infuse into HDI. During the later years (1995 - 1997), we had monthly communications relating to HDI/MIT.

10. In addition to telephone calls to and from my Minnesota residence relating to MIT/HDI, there was a constant flow of mail, facsimile, and support materials from MIT/HDI to me at my Minnesota residence and from me at my Minnesota residence to MIT/HDI.

(a) Examples of some of the letters I faxed to Mr. Holley from my Minnesota address relating to my consulting services for HDI/MIT are attached as Exhibit D, and include my November 9, 1993 letter to him containing at page 2 a "to do" list relating to HDI/MIT activities; my November 9, 1993 letter to him concerning our discussions about a preferred HDI sale; my my November 10, 1993 letter to him regarding my financial arrangements with HDI and MIT; December 6, 1993 letter to him regarding AGEN as a potential investor; my February 10, 1994 memorandum to him regarding Minnesota-based Boris Maydanik and the potential overseas distribution of

HDI product; my March 2, 1994 letter to Mr. Holley regarding the agreed compensation for my services to HDI/MIT; my April 13, 1994 memorandum to him relating to management contract issues; my handwritten notes to Mr. Holley responding to his October 26, 1994 inquiry concerning Cascade acquisition/refinancing; my handwritten January 23, 1995 memorandum to Mr. Holley discussing a potential bankruptcy of HDI; my handwritten notes responding to Mr. Holley's October 19, 1995 memorandum to me regarding HDI's potential merger with Minnesota-based Chronimed; my handwritten notes responding to Mr. Holley's January 16, 1996 memorandum regarding investment issues; my April 9, 1996 memorandum to Mr. Holley providing advice concerning leadership issues and arrangements with Minnesota-based investor Rob Furst; my October 3, 1996 memorandum to Mr. Holley regarding the alternatives of asset-based lending or a venture buy-out; and my February 24, 1997 memorandum to Mr. Holley providing requested scripting for Mr. Holley to ask questions of potential investors.

(b) Examples of some of the correspondence sent by Mr. Holley to me at my Minnesota address are attached as Exhibit E, and include his December 6, 1993 memorandum to me, copying Robert Salem, apprizing me of developments at HDI and MIT; his handwritten memorandum to me on a December 7, 1993 letter he received from Ralph Lilore relating to my consulting work; his January 18, 1994 letter to me setting forth a proposed

compensation agreement for my services; his January 31, 1994 memorandum to me regarding a meeting in New York City; his January 31, 1994 memorandum to me discussing potential meetings with prospective investors; his February 10, 1994 memorandum to me concerning financial issues and attaching an HDI balance sheet; his handwritten notes to me on my March 2, 1994 letter concerning my compensation; his handwritten March 5, 1994 memorandum to me requesting that I conduct research concerning a competitive company; his handwritten March 13, 1994 memorandum to me concerning a potential buy-out or refinancing of HDI; his April 27, 1994 letter to me listing persons to whom HDI had sent investment packages (the list includes Rob Furst, a Minnesota resident); his October 26, 1994 memorandum to me inquiring about Cascade acquisition/refinancing; his October 19, 1995 memorandum to me regarding Minnesota-based Chronimed and its potential merger with HDI; his January 16, 1996 memorandum to me reflecting continuing discussions about prospective investors and acquisitions; his September 25, 1996 memorandum and notes regarding product ventures; his handwritten October 8, 1996 memorandum to me relating to a proposed buy-out; and and his April 2, 1998 letter to me relating to compensation issues.

11. After sending to and receiving from HDI/MIT various correspondence and other documents through facsimiles and mail, I would implement the strategies that had been devised and directed in my meetings and telephone conferences with Mr. Holley,

such as targeting potential investors, banks, and companies that might be interested in working with HDI/MIT; performing analysis on business and financial plans; targeting potential managerial candidates and making telephone contacts with them; among many other directed tasks.

12. During 1993 through 1997, I made numerous trips, at Mr. Holley's direction, from Minnesota to Connecticut, New York and Florida to meet face-to-face with Mr. Holley and other persons from HDI/MIT to discuss business and strategic planning issues. At Mr. Holley's direction, I also made dozens of trips from Minnesota to many different states to meet with potential investors, investment bankers, potential managerial executives, and companies interested in forming a relationship with HDI, including New York, Connecticut, New Jersey, Massachusetts, Florida, and others.

13. My efforts on behalf of defendants to obtain financing for HDI also included multiple contacts in Minnesota with Minnesota-based persons and companies. My contacts with Minnesota-based persons and companies included the following:

(a) I had several telephone calls and meetings with executives from Chronimed, a Minnesota-based company which was also a customer of HDI. Indeed, George Holley flew into Minnesota to attend one of my meetings with Maury Taylor, the chief executive officer of Chronimed, to discuss a potential merger between the two companies.

(b) I had several telephone communications and meetings in Minnesota with Rob Furst, a Minnesota resident and HDI shareholder. Our discussions related to his investment in HDI and his potential infusion of additional

capital into HDI.

(c) I had several discussions with investment bankers in Minneapolis, including Steve Barker and Dennis Nielsen of the brokerage firm R.J. Steichen, about their client's potential interests in HDI/MIT.

(d) In 1994, I had several contacts with Boris Maydanik, a Russian living in Minnesota, in an effort to obtain an overseas distributor for HDI product.. On February 10, 1994, I sent a memorandum from my Minnesota address to Mr. Holley concerning Mr. Maydanik, a copy of which is attached as Exhibit F. Mr. Holley then sent a letter to Mr. Maydanik at his Minnesota address, a copy of which is attached as Exhibit G. My understanding is that HDI did send product to Mr. Maydanik for distribution.

(e) I had several contacts with managers of Minnesota-based Express Scripts relating to HDI/MIT's investment needs.

14. My travel from Minnesota to various places on behalf of MIT and HDI was consistent and regular during the time period from 1993 through 1997. During this time, I sent numerous expense reimbursement requests from my Minnesota residence to Mr. Holley at HDI/MIT, including requests submitted on the following dates: September 3, 1993; September 21, 1993; October 1, 1993; November 11, 1993; February 10, 1994; March 2, 1994; March 17, 1994; April 2, 1994; April 31, 1994; June 21, 1994; August 15, 1994; September 3, 1994; September 30, 1994; March 23, 1995; December 23, 1995; March 26, 1997; and May 7, 1997. True and correct copies of these expense reports are attached as Exhibit H.

Doc# 1388797\1    9

15. From 1993 through 1997, I received multiple checks from HDI to reimburse me for my expenses. These checks were sent by HDI to my Minnesota address, including checks dated January 21, 1994; March 14, 1994; March 31, 1994; April 8, 1994; May 20, 1994; June 30, 1994; July 15, 1994; August 26, 1994; September 23, 1994; October 17, 1994; June 16, 1995; April 5, 1996; April 9, 1997; and May 21, 1997. True and correct copies of these checks are attached as Exhibit I.

16. I also sent via facsimile to Mr. Holley from my Minnesota address numerous letters requesting that HDI/MIT pay me the agreed monthly compensation for my services. Examples of these letters are attached as Exhibit J, and include letters dated April 1, 1994; May 18, 1994; June 18, 1994; July 18, 1994; August 10, 1994; December 12, 1994; April 9, 1995; and June 6, 1995. MIT sent to me at my Minnesota address some of the agreed monthly payments, as reflected in Exhibit K.

_____
Leonard Brandt
May 1, 2001

Subscribed to and sworn
before me this 24th day
of April, 2001.

_See Attached California Notarization_
Notary Public
_dated May 01, 2001._

Doc# 13887971          10

** TOTAL PAGE.02 **