UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

LEONARD BRANDT,                      CASE NUMBER: #01-5-RHK/SRK

         Plaintiff,                    **AFFIDAVIT OF LEONARD BRANDT**

vs.

MIT DEVELOPMENT CORPORATION,
HOME DIAGNOSTICS, INC.,
GEORGE H. HOLLEY AND
THE ESTATE OF ROBERT J. SALEM,

         Defendants.

Leonard Brandt, being duly sworn, states and deposes as follows:

1. I am the plaintiff in the above referenced action. I submit this Affidavit in opposition to the motion of defendant The Estate of Robert J. Salem to dismiss my complaint for lack of personal jurisdiction or, alternatively, to transfer venue. I have personal knowledge of the matters stated herein, and if called upon to testify regarding the same, I could do so competently.

2. In the late 1980s, I met Robert Salem while serving with him and defendant George Holley on the board of directors of Home Diagnostics, Inc. ("HDI"), a manufacturer and distributor of home testing systems for diabetes. Mr. Salem and Mr. Holley were the co-founders and majority shareholders of HDI. At that time, I was a resident of Minneapolis, Minnesota and employed at Norwest Venture Capital, a Minnesota-based venture capital management firm. Norwest Venture Capital

1

managed two investment funds: Norwest Growth Fund, a subsidiary of Norwest Corporation of Minnesota, and Norwest Equity Partners, a limited partnership whose largest limited partner was Norwest Corporation. Both funds became shareholders of HDI.

3. During the time that I served on the board of directors of HDI, George Holley was the chairman of the board and an active board participant, attending all (or virtually all) of the board meetings at HDI's headquarters in New Jersey. Robert Salem attended meetings less frequently. It was clear to me from Mr. Salem's actions at board meetings and from his communications to me that he stayed abreast with the happenings of the board via ongoing communications with Mr. Holley, and that he relied upon Mr. Holley's communications in determining how to vote at board meetings and to address key issues.

4. Before my involvement with HDI, Messrs. Holley and Salem aggressively solicited Minnesota-based investors to obtain the initial outside financing for HDI. Medical Innovation Capital, Inc., a Minnesota venture capital company operating in Minnesota, became one of the first outside investors in the company. During my involvement with HDI as a board member and thereafter as a business and financial consultant, HDI continued to pursue its strategy of infusing capital into HDI by soliciting and negotiating deals with many Minnesota-based investors.

5. In July 1993, Mr. Holley solicited me to provide business and financial consulting services and assistance to HDI and its affiliate company, MIT Development Corporation ("MIT"), a research and development company of blood glucose

monitoring systems and equipment. Mr. Holley informed me that he would be my primary contact person for HDI, MIT and Mr. Salem in our contract negotiations and in the work that I would do on behalf of HDI, MIT, Mr. Salem and himself. He explained that Mr. Salem had withdrawn from the same level of active involvement that he once had with HDI and MIT because of medical and other challenging issues he faced. Mr. Holley also said that he had ongoing communications with Mr. Salem to report to him about the status of the activities and happenings of HDI and MIT, and that Mr. Salem's input and approval would come through Mr. Holley. Based upon these circumstances and Mr. Holley's representations, it was my understanding that Mr. Holley was the agent of Mr. Salem, HDI, and MIT, and that he had the authority to represent and bind them in the negotiations relating to my compensation and my work on their behalf. This is consistent with my previous history with Mr. Holley and Mr. Salem as an investor and then as a director of HDI. During my entire negotiations with HDI, I never once had a conversation with Mr. Salem because it was understood that Mr. Holley negotiated on behalf of their mutual and equal interests.

6. In fact Mr. Holley, in all of the negotiations that I later had for my consulting services, did not differentiate between his and Mr. Salem's personal interests and the interests of their mutually-owned company until I inquired of these details. It was simply very clear that Mr. Holley represented the interests of Mr. Salem, whether by virtue of their co-ownership of MIT and HDI or their personal interests. Mr. Holley's clear and consistent combining of his interests, Mr. Salem's interests and HDI/MIT's

interests formed the basis of communication of Mr. Holley's authority to bind those parties.

7. As set forth in my previous Affidavit, George Holley and I had ongoing negotiations during this period of time relating to the compensation I would receive for my consulting services on behalf of HDI, MIT, and Messrs. Holley and Salem, including several telephone conversations during which I participated from my Minnesota residence and various written communications which were sent by me from Minnesota or received by me at my Minnesota address. It was clear during these negotiations that Mr. Salem was kept abreast of our communications and that he, in fact, participated in the process through Mr. Holley.

8. For example, on November 10, 1993, I sent to Mr. Holley from my Minnesota address the original proposal addressing the issue of the financial arrangements between HDI, MIT, Mr. Holley, Mr. Salem, and me. (A copy of this letter is attached as Exhibit A to my previous Affidavit). In this letter, I proposed that I would receive ten percent of the proceeds received by MIT, a five to ten percent interest in MIT, a small retainer from HDI, and an upside carried interest at the rate of 20-25 percent. Mr. Holley apparently then forwarded my letter to Mr. Salem. After this, Mr. Holley informed me that he had discussed my proposal with Mr. Salem, and that Mr. Salem objected to the proposal because he did not want me to participate with respect to all MIT interests, but rather to focus on HDI-related issues. Mr. Holley told me that he would send to me shortly thereafter a proposal on behalf of HDI, MIT, Mr. Salem and himself.

9. On January 18, 1994, George Holley sent to me at my Minnesota address another proposed compensation arrangement between HDI/MIT and me (a copy of which is attached as Exhibit B to my previous Affidavit). After his further discussions with Mr. Salem and me, he then sent to me at my Minnesota address another copy of the same letter, which contained his handwritten statements relating to the proposed agreement.

10. On March 2, 1994, I faxed a letter from my Minnesota address to Messrs. Holley and Salem setting forth the understood terms of my compensation. It is my understanding that Mr. Holley, consistent with his previous actions, discussed my letter with Mr. Salem, and then made handwritten notations on the letter and faxed it back to me at my Minnesota address. (A copy of this letter is attached as Exhibit C to my previous Affidavit). At this time, an agreement was reached with Mr. Holley, Robert Salem, MIT, and HDI to compensate me for my services on behalf of such defendants. Under this agreement, defendants agreed to pay me:

    (a)    A monthly consulting fee of $2,000, with the understanding that they would not be responsible for more than $1,000 per month if HDI did not pay MIT under a management contract with MIT then in existence or in the process of being formed; and

    (b)    Incentive compensation equal to ten percent (10%) of the value, interest, equity, collections, revenue and assets above $1,000,000 received from HDI by MIT; its

affiliate company, Applied Sciences Corp. ("ASC"); and Messrs. Holley and Salem.

11. From 1993 through 1997, I performed business and financial planning services on behalf of MIT and HDI. During this time period, Mr. Holley was my primary contact for MIT and HDI, and directed the projects and work that I did on behalf of these companies. Only in 1997, when I proposed that I receive direct equity of HDI instead of cash due to the tax consequences to me of the current structure of our deal in contemplation of a potential sale of HDI, did I learn from Mr. Holley that the compensation arrangement was then being questioned by Mr. Salem. Mr. Holley had indicated that he saw no problem in altering the arrangement to allow for more favorable tax treatment. He believed that Mr. Salem would find no problem with it either. At no time during this period in any other way did Mr. Salem indicate to me, through Mr. Holley or otherwise, that the agreed compensation to me was different than the terms set forth above.

_____
Leonard Brandt

Subscribed to and sworn to
before me this 28th day
of June, 2001.

_____
Notary Public