UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEONARD BRANDT | : | Civil Action No. 3:01-CV-01889 (SRU) |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| MIT DEVELOPMENT CORP., HOME | : | |
| DIAGNOSTICS, INC., GEORGE H. HOLLEY, | : | |
| and JUDY CHENG SALEM, EXECUTRIX | : | |
| OF THE ESTATE OF ROBERT J. SALEM | : | |
| | : | |
| Defendants | : | JANUARY 25, 2008 |

**PLAINTIFF, LEONARD BRANDT'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION FOR RELIEF FROM: (i) THE
COURT'S MARCH 15, 2007 ORDER; (ii) THE REPORT OF THE PARTIES'
AGREEMENT IN PRINCIPLE TO SETTLE ON MARCH 8, 2007;
AND (iii) THE COURT'S JULY 19 AND OCTOBER 31, 2007 RULINGS
REGARDING DISPUTED SETTLEMENT TERMS;
AND TO REOPEN THE CASE AND FOR A NEW TRIAL**

## I.    INTRODUCTION

Following five days of trial before a jury, Plaintiff Leonard Brandt ("Brandt") and

Defendants, Home Diagnostics, Inc. ("HDI"), George Holley (Holley"), and the Estate of

Robert J. Salem (the "Salem Estate"), with the encouragement of the Court, entered into serious

settlement discussions during the evening of March 7, 2007.  The following morning, with the

jury waiting, the parties put on the record what they described as "an agreement in principle to

settle."  While the parties admitted that they did not have an agreement worked out at the time,

they clearly agreed that Defendants would pay consideration of $3 million.

Immediately after the "agreement to settle in principle" was put on the record, the Court dismissed the jury, and on March 15, 2007 issued an Order reporting that the case had been settled and directing the Clerk to administratively close the file.

While the parties identified some of the issues to be addressed and agreed upon before there could be a final settlement, the parties did not even try to list them all for the Court on the record. Nonetheless, they represented to the Court that they believed they could and would be able to work through whatever the issues might be and convert their "agreement in principle to settle" into a final agreement. As evidenced by the months of negotiations between the parties that followed, their request for assistance from the Court as a binding mediator, and the events thereafter, it is clear that the parties mistakenly underestimated the number of issues to be addressed and resolved to achieve a final settlement, as well as the complexity of those issues and how they would impact the agreement in principle they had reported. And they were equally mistaken in their belief that they would be able to work through all the issues and come to a final settlement, even with the Court's assistance.

It is also clear now that the parties mistakenly considered their "agreement in principle to settle" a "settlement agreement." Indeed, they actually treated it as an opening offer in a series of offers and counter-offers exchanged between the parties. For while the "agreement in principle to settle" called for consideration totaling $3 million and made up of uncertain amounts of cash and HDI stock, over time, and before they ever turned to the Court for assistance, the parties, and particularly Brandt, retreated from that offer because of the many issues, complexities and uncertainties a restricted stock deal presented.

2

Moreover, the parties were mistaken in believing that they could vest the Court with authority as a "binding mediator" when there were, in fact, so many core issues still to be resolved. Thinking on March 8, 2007 that they would be able to quickly identify and resolve the remaining issues, the parties agreed that the Court should assist in resolving "details of the settlement," such as, for example, the terms of the general releases or details concerning the transfer of the stock. But the parties, and especially the plaintiff, never contemplated or agreed to the Court resolving more than "settlement details," and did not agree that the Court could or should resolve issues materially affecting the value of the consideration without holding hearings or securing expert testimony on how to properly value restricted stock.

To date, Plaintiff has not received any money or stock from Defendants, the Defendants have not received a release of all claims from the Plaintiff, and despite the best intentions of the parties and the Court, no settlement has been achieved. Although the Court issued informal rulings regarding disputed settlement terms on July 19 and October 31, 2007, those orders did not, and could not, deliver $3 million in consideration to Brandt. And since $3 million in consideration was the one settlement term unequivocally agreed to, it was beyond the authority of the Court, acting in its capacity as a binding mediator, to change.

During proceedings before the Court on December 6, 2007, and in its order on December 7, 2007, the Court instructed Brandt that he had two options: accept the terms and conditions of the Ruling Regarding Disputed Settlement Terms issued on October 31, 2007, or file a motion to reopen the case.[1] On December 12, 2007, Brandt advised the Court in writing that he had

---

[1] While the Court ordered Brandt to file his motion to have another jury trial if he so chose, it made no representations as to whether it would grant such a motion. Transcript ("TX") 12/6/07, p. 18 (copy attached as **Exh. C** to the Declaration of Thomas J. Rechen, filed herewith). All further citations shall be in the form "*See* **Exh. ___**", and shall refer to the Exhibits attached to the Declaration of Thomas J. Rechen.

3

elected to move to reopen the case and to seek a new trial. Brandt now brings the instant motion to effect that end.

## II.    SUMMARY OF RELIEF BEING SOUGHT

By the motion accompanying this Memorandum of Law, Brandt asks the Court to issue the following relief under Fed. R. Civ. P. 60(b)(6):

- To set aside the Court's March 15, Order, and its private orders as a "binding mediator" dated July 19, and October 31, 2007;

- To set aside the March 8, 2007 "agreement in principle to settle" that was put on the record;

- To reopen the case and restore it to the active case docket; and

- To assign this matter for jury selection and a trial of the claims set forth in Brandt's fourth Amended Complaint dated December 10, 2002.

## III.    RELEVANT PROCEDURAL BACKGROUND

On March 15, 2007, based on what was reported and agreed to on the record on March 8, 2007, the Court issued an Order (the "March 15 Order") stating:

> The parties have reported that this action has been settled in full, rather than continue to keep the case open on the docket, the Clerk is directed to administratively close the file without prejudice to reopening on or before April 16, 2007.

*See* **Exh. D**. The March 15, 2007 Order is the last docketed Order the Court issued in this matter. As there has been no judgment entered in this case, there is no judgment to set aside.

## IV.    RELEVANT FACTUAL BACKGROUND

### A.    The Claims Framed By Brandt's Complaint.

This action arises out of a contract for services between Brandt, Holley and HDI (the "Contract"). Brandt claims that pursuant to the Contract he was entitled to a $2,000 monthly

4

retainer fee (subject to a monthly cap of $1,000 if HDI did not pay MIT under a management

contract with MIT) plus a fee calculated at ten percent of any assets related to the HDI business

received by the collective group of MIT Development Corp., Applied Sciences Corporation,

Robert Salem, and Holley above a baseline amount of $1 million. Holley and HDI admit that

there was an agreement to pay the monthly retainer fee, but deny that the agreement included

any additional 10% fee. Brandt seeks damages for the defendants' breach of contract, failure to

pay him wages, broken promises, and unjust enrichment.

**B.    The March 8, 2007 Settlement In Principle.**

On March 8, 20007, at 9:35 am, counsel for the parties reported the following to the

Court:

> MR. DUNHAM:    Your Honor, last night, and actually this morning,
> we have reached what I will characterize, I think accurately, as *an*
> *agreement in principle to settle the case with the defendants paying*
> *consideration of $3 million.* And the reason I say in principle is that the
> substantial majority of the consideration, we don't know exactly how
> much, but the vast majority of consideration were in stock in Home
> Diagnostics. *And that raises a number of issues about how many*
> *shares, the value, whether there are any restrictions on the stock, that*
> *we need -- I don't want to lay them out right now because I'm not sure*
> *I know what all of them are.* But what we would like to do, Your
> Honor, since we have gotten this far, is try to take the time today and
> tomorrow to see if we can identify and work through those issues, so
> that we can get this agreement in principle to a final agreement. I don't
> have any reason to believe that we won't be able to conclude this but we
> can't do it in 10 minutes because of the nature of the consideration.
>
> MR. BROWN:    That's a fair statement.

*See* **Exh. A**,TX 3/8/07, p. 2 (emphasis supplied).

The parties made it very clear to the Court that there was no settlement agreement, only

an "agreement in principle to settle." Attorney Dunham, counsel for Plaintiff, explained that up

until that morning, the HDI stock being offered by Defendants to settle the case had been

represented as being immediately tradable, meaning Plaintiff could accept it and immediately sell

it as a near cash equivalent.  However, that morning, Attorney Dunham was advised that there

may be some restriction on the stock that might require Plaintiff to hold it for some period of

time.  Clearly, as evidenced by the record cited below, at the time the "agreement in principle to

settle" was reported to the Court, the nature of the restrictions on the stock, if any, were

unknown to Brandt, his counsel, the Court and even defense counsel.  As the parties 1) did not

know if there were any restrictions on the stock; 2) did not know the nature of the restrictions or

the restrictive language; 3) did not know the impact of any restrictions on Plaintiff's ability to

accept and then freely sell the shares; and 4) did not know the impact of any restrictions on the

"agreement in principle to settle," there was no meeting of the minds on March 8, 2007 upon

which to find an enforceable settlement agreement.  Those facts are clear from the following:

> MR. DUNHAM:                    * * *
>
>      We have, Mr. Brandt, authorized me at about 7:30 this morning to
> accept a settlement of $3 million with the understanding that a relatively
> small percentage of it, as yet undetermined, would be in cash.
>
>                              * * *
>
>      I think where the issues come is the nature of the stock, whether
> there are any trading restrictions on the stock that would pass to Mr.
> Brandt.  And Mr. Brown's initial information, and again I'm expressing
> no criticism of him at all in what I am about to say—that initially his
> understanding from other sources was that there were no restriction on the
> stock, that it would be immediately tradable. *He's now obtained some
> new information as of within the last hour that might not be the case,
> and there may be some required holding period.  We need to work
> through those issues.  This is, as I said to Paul in our last conversation
> before I came down here, if we're settling for $3 million, Mr. Brandt is
> required to hold the stock for some period of time and then by the time
> he's able to sell it, the stock is tanked and isn't worth anything, we can't*

*resolve it on that basis. So there's got to be some, if there's a holding period, there's got to be some protection on the value of it.*

And there are also—HDI's announcing its earnings this week which could have—and Mr. Holley obviously knows what those earnings would be, Mr. Brandt doesn't and can't. So when we would actually close, we would get the stock, issues of that sort, and since I'm not a securities' lawyer, there may well be other issues that I don't even know about.

*But we have a deal in principle that the consideration for the settlement would be $3 million and the rest of this is—I don't mean to dismiss it by saying its details, but it's the logistics and mechanics of figuring how we can affect that from Mr. Brandt's perspective so it is actually a $3 million settlement.*

MR. BROWN:      You Honor, let me just add this: I agree with what Mr. Dunham has said.

\* \* \*

MR. DUNHAM:      Yes. My concern, Judge, is—again, I'm meaning no criticism or disrespect to Paul at all by what I am about to say—*but is the stock restricted or is it not? Is there some required holding period or there is not, is a pretty material issue. And I've gotten different information about that at 7:00 o'clock this morning and then 8:00 o'clock.* And this isn't something we can—we obviously have to have reliable information about the nature of the shares, have to be able to talk to experienced securities' counsel about what all these issues are.

*See* **Exh. A**, TX 3/8/07, pp. 5-8 (emphasis supplied).

The record shows that the parties did not know if the HDI stock was restricted or not and were concerned about what the restrictions might be and their impact on the stock. However, they mistakenly believed that the unseen and unknown restriction language would not adversely affect their "agreement in principle to settle." Later that same morning, with the parties participating on the record, counsel for Brandt then repeated the terms of the "agreement":

MR. DUNHAM:            \* \* \*
We have agreed this morning that this case will be settled for a total payment of $3 millions. That consideration will be at least $150,000

7

in cash, and perhaps more than that. We haven't resolved the total amount. The balance of the consideration will be paid in stock in Home Diagnostics, Inc.; will be coming from some from Mr. Holley and some from the Estate of Robert Salem.

\* \* \*

And we have further agreed that in the event the parties are unable to come to a resolution on any issues related to this stock or features of the settlement, that we would come back to Your Honor, that Your Honor would initially attempt to facilitate a mutually agreeable resolution and, if that's not possible, both parties consent to Your Honor deciding what the final terms of settlement will be. It is with our agreement that Mr. Brandt is settling this case for a total consideration, total value of $3 million.

*See* **Exh. A**, TX 3/8/07, pp. 14-15.

Thereafter, the Court summarized the agreement at Brandt's request:

THE COURT:      Okay. In summary, as I understand it, the parties have agreed to settle this case in its entirety, including the pending appeal of my ruling concerning the Salem Estate. The terms of that settlement are in essence that the defendants are going to pay you, Mr. Brandt, a total of $3 million, which will consist of at least $150,000 in cash, the exact amount not having been set yet.

\* \* \*

Finally, if there are details of the settlement that cannot be resolved, for example, if the parties cannot agree on the terms of the general releases, if the parties cannot agree on the details concerning the transfer of stock, the parties will come here, I will attempt to resolve those disputes informally.

If that informal process does not work, the parties are all authorizing me to act as an, in effect, a binding mediator and to impose a decision on the areas of dispute concerning the details of this settlement.

*See* **Exh. A**, TX 3/8/07, pp. 17-18.

Clearly, the proceedings on March 8, 2007 revealed that the parties had reached

agreement on only one term—Defendants were to pay consideration of $3 million to Mr.

8

Brandt.[2] Indeed, the following is a list of issues and considerations the parties did not

understand and had not resolved, but which they would have to understand or resolve prior to a

settlement involving restricted HDI stock:

- The amount of cash

- The amount of stock

- The timing of the settlement

- The effective date of the settlement

- The effect of the passage of time on any settlement

- The type of stock to be transferred

- The number of shares to be transferred from Holley

- The number of shares to be transferred from the Salem Estate

- Whether the shares would be immediately tradable

- Whether a registration statement covered the shares to be traded

- If not immediately tradable, the nature and duration of any restrictions, and whether there were restrictions in addition to any statutory/regulatory restrictions under the 1933 Securities Act

- The language of any restriction appearing on the stock

- The effect, if any, of SEC Rule 144

- Whether Brandt's acceptance and immediate resale would violate SEC regulations

- Whether the issuer was current in its SEC reporting obligations

---

[2] Though the parties anticipated that the predominant consideration was expected to be stock, that was acknowledged to be dependent on a number of factors, many of which were unknown at the time. Indeed, the only point agreed to concerning the stock was that if it was to be held by Brandt, he would need protection on the value during the holding period. *See* **Exh. A**, TX 3/8/07, p. 6.

- When Holley and the Salem Estate acquired their shares—not just the shares being sold to Brandt, but all of their shares

- How Holley and the Salem Estate acquired their shares

- The average weekly trading volume in the common stock of HDI

- Whether there was a market for the restricted HDI stock that Brandt was to receive

- How the shares would be valued

- The outstanding number of shares of HDI and whether Brandt would become an affiliate

- The impact that selling or transferring a large volume of HDI shares would have on the trading value of HDI shares

- How share value would be protected or ensured against any loss of value during any black-out or holding period

- What protections were required to ensure that Holley and the Estate did not incur debt or make other guarantees equal to or senior to any guarantees of the value of the stock

- How to structure the transfer of shares so as not to violate the securities laws

- How to structure the transaction to obtain the most favorable tax treatment for the Defendants

- How to structure the transaction to obtain the most favorable tax treatment for the Plaintiff

- The analyses and recommendations of securities counsel

- Who would bear the cost of any commission in liquidating the stock

- Whether the transaction would be considered an underwriting and, if so, whether there was any information required by law to be disclosed by the controlling shareholder

- What effect an expected announcement of HDI's earnings would have on the stock value

10

- The language of the releases

This long list of issues is not intended to be exhaustive or in any way complete. However, it demonstrates that the parties lacked sufficient information and understanding of the many critical issues necessary to achieve a meeting of the minds on March 8, 2007—a necessary precursor to creating an enforceable settlement agreement. Indeed, the only settlement term resolved with certainty was that Brandt would receive $3 million in consideration.

### C.    Subsequent Settlement Negotiations and Counteroffers.

After March 8, 2007, the parties entered into further negotiations and tried to reach a settlement. Offers and counter offers went back and forth between counsel for the parties. On April 2, 2007, Attorney Dunham, on behalf of Brandt, communicated the terms of an all cash offer to Attorney Brown. *See* **Exh. E.** On April 16, 2007, Attorney Brown made a counterproposal of a deal that still included $2.4 million in restricted stock. *See* **Exh. F.** Then, as reflected in an e-mail from Attorney Dunham on May 6, 2007, Defendants were willing to discuss an all cash settlement, albeit on terms involving lesser consideration:

> Paul:
>
> During our calls on Thursday and Friday, you suggested for the first time that the defendants would be willing to sell stock and pay Len Brandt entirely in cash, if we could agree on a schedule for the final pay-out and an adjustment to the total amount of the settlement.
>
> In our call Friday, you made a specific proposal: $600,000 paid upon execution of the settlement agreement, with the balance paid six months from the date of the settlement agreement, and the total settlement reduced by $100,000 (so that the second payment would be $2.3 million), to reflect transactional costs and adverse tax consequences that your clients would experience by proceeding in this fashion.

* * *

11

*See* **Exh. G**.  Attorney Brown then responded by e-mail on May 7, 2007:

> Jack:   Bear in mind this settlement was structured originally for a small amount of cash and the rest in restricted stock with certain terms to be attached regarding the salability of the stock *and giving your client some measure of protection against a significant decline in the value of the shares before he sold them*.
>
>     In order to address your client's evident change of view concerning the settlement structure and in an effort to achieve a final resolution, I made the proposal outlined generally in your email.  Some of the items sought in your email seem to go too far to be acceptable but I nevertheless will pass it on to defendants and their representatives and will get back to you shortly with their response.  George Holley has had to take another trip abroad so it might take a bit longer to respond. Regards Paul

*See* **Exh. G** (emphasis supplied).

These communications are significant because they demonstrate two important points:  1) Brandt was entitled to protection against a decline in value as part of the "agreement in principle to settle;" and 2) the parties were making offers and counter-offers that were not consistent with the March 8, 2007 "agreement in principle to settle," because delivering $3 million in consideration using restricted stock had become problematic.  Indeed, as to the second point, the deal under discussion no longer involved stock.  Instead, Defendants offered Mr. Brandt $600,000 with $2.3 million to follow in six months, for a total payment of only $2.9 million. As the Court can note in Attorney Brown's email, Brandt objected to Defendants reducing the amount of consideration from the agreed upon $3 million, as well as the fact that no interest would be paid on the $2.3 million balance during the six month payout schedule.  Moreover, as the Court will note below, at the time the parties submitted their "baseball arbitration" proposals to the Court, both proposals presented "all cash" options for the Court to choose.[3]

---

[3] Defendants' arbitration submission also included a stock-based proposal.

TJR/33764/2/839314v1
01/25/08-HRT/

**D.    The Restrictions On HDI Stock Were Still Undisclosed To The Plaintiff And The Court When The Court Became Involved As "Binding Mediator."**

When the parties' independent efforts to resolve all issues and come to a settlement did not succeed, they turned to the Court for assistance.  The Court held a telephone conference on May 15, 2007 and issued its Conference Memorandum on May 16, 2007, setting forth the "baseball style" arbitration procedure by which each party was to "set forth a position that is as reasonable as possible."  *See* **Exh. H**.

The Conference Memorandum stated:

> First, counsel should submit to me a list of all undisputed terms, that is, those aspects of the settlement to which all parties agree.  Second, counsel should send me a copy of the March 8, 2007 transcript that sets forth the terms of the settlement in principle.  Finally, with respect to the disputed terms of the settlement, we will conduct a "baseball style" arbitration. Each side should fax to my chambers a written letter setting forth its position and an explanation of its position.  All relevant information (e.g., position, explanation, argument, etc.) must be included in a single submission.

*See* **Exh. H**.

Counsel were to concurrently file their submissions with the Court on May 25, 2007, and thereafter serve each other on May 29, 2007.  There was no provision for the parties to object to or comment upon the submissions of the other parties.  *See* **Exh. H**.

Defendants' May 24, 2007 submission did not comply with the Court's Conference Memorandum as it made no attempt to list or identify those aspects of the settlement to which all parties agreed.  *See* **Exh. I**.  Instead, it recounted elements from its various offers and set forth two proposals.

The first proposal included $600,000 in cash and $2.4 million in restricted HDI stock, valuing the stock at 94% of the average closing price for shares traded over the five days

13

immediately prior to the effective date of the settlement. The proposal was supported by Defendants' interpretation of the stock restrictions, the application of Rule 144 requirements, and a discount valuation method that had never been agreed to by the parties. *See* **Exh. I.**

Without ever disclosing exactly what restrictions affected the stock, and without ever disclosing other important factors necessary for evaluation, Defendants simply asserted that Brandt could sell the shares privately or publicly. According to Attorney Brown, if he sold them privately, which would require him to ignore the as yet unpublished restriction language, he would have to discount the shares. If he sold them publicly, he would have to first hold them for a period of at least 12 months, and then sell no more than 180,000 shares during each 90-day period thereafter. Without any independent or expert evidence to support their position, Defendants justified the 6% discount they had proposed by summarily stating:

> This discount to the trading price of the shares reflects the reduced value of restricted stock as compared to freely tradable stock . . . The discount of six percent not only does away with the necessity of a collar at the end of the year and provides for an immediately complete settlement, but also roughly approximates the discount in the value of the stock Mr. Brandt would receive were he to sell the stock privately, *i.e.*, to a third party such as a broker-dealer or private investor and not on any exchange.

*See* **Exh. I.**

Without knowing what the restrictions actually were, Plaintiff and his counsel could not evaluate them or meaningfully respond to Defendants' proposal. Had Plaintiff been aware of the restrictions at the time of its submission in May of 2007, it would have been able to tell the Court what it now finally knows: the restrictions on the HDI stock preclude Plaintiff from accepting HDI stock as part of the $3 million in consideration. Plaintiff always intended to immediately sell any HDI shares he received and convert them to cash. However, if Plaintiff

14

complied with federal law and the restriction language on the HDI shares, he would have to hold them, as he could not sell them immediately. The restrictions were not known by the Plaintiff on March 8, 2007, and were still not known when Plaintiff made its submission to the Court.

Defendants' second proposal was the "all-cash proposal" discussed above: $600,000 in cash immediately payable and an additional $2.3 million resulting from sales by Holley and the Salem Estate of their stock holdings over a six-month period of time, for a total of $2.9 million. *See* **Exh. I**.

On May 29, 2007, Brandt made his submission in accordance with the Court's Conference Memorandum. *See* **Exh. J**. In it Plaintiff identified what he believed were the undisputed terms and summarized the settlement negotiations that had taken place to that point. Armed now with enough information to know that he would have to hold the stock for at least a year, Plaintiff then set forth his belief that, legally, receiving and then immediately selling restricted stock was simply not an option open to him under federal securities laws. Brandt said that he would accept freely tradable HDI shares as part of a settlement, but could not accept restricted shares because of "the risk of ultimately receiving less than $3 million in total proceeds." *See* **Exh. J**. Attorney Dunham concluded:

> *In sum, since March 8 it has become clear that there are significant complexities associated with using HDI stock as settlement consideration. The offering party did not timely describe, and perhaps even appreciate, those complexities, and the receiving party certainly could not take them into account, in negotiating the settlement in principle.* As an alternative, Mr. Brandt has proposed to defendants that they pay the entire settlement amount in cash, and Mr. Brown has indicated that defendants would accept a cash settlement on certain terms.

*See* **Exh. J** (emphasis supplied).

In terms of Brandt's "proposal," Attorney Dunham only addressed the "all cash proposal" because of the problems associated with the restriction. Attorney Dunham asked the Court to restore the consideration to the agreed upon $3 million, require Holley and the Salem Estate to pay Brandt the proceeds from their stock sales as they were received, and to create an incentive to getting the stock sold by having interest accrue at 8% per annum on the unpaid settlement balance. *See* Exh. J. Thus, as Mr. Dunham pointed out:

> . . . in March the parties unquestionably agreed that Mr. Brandt would receive total settlement consideration of $3 million. This proposal ensures that Mr. Brandt will in fact receive that amount, whereas each of Defendants' proposals in our recent negotiations either expressly required a reduced settlement amount, *or exposed Mr. Brandt to a serious risk that he might ultimately receive significantly less than $3 million in value*.

*See* Exh. J (emphasis supplied).

E.   **Without A Counter Stock Proposal From Plaintiff, And Unaware Of The Restriction Language On HDI Stock, The Court, In An Informal Decision, Selected Defendants' Proposal.**

The Court issued its private Ruling Regarding Disputed Settlement Terms on July 19, 2007 selecting Defendants' proposal. The Court's ruling ordered Defendants to immediately pay Plaintiff $600,000 in cash and $2.4 million in restricted stock, using the formula in the Ruling to determine the number of shares. *See* Exh. K.

F.   **Defendants Did Not Disclose The Stock Restriction Language To Plaintiff Until July 27, 2007, Approximately One Week After The Court's July 19, 2007 Ruling.**

By e-mail on July 26, 2007, Attorney Brown, on behalf of the Defendants, forwarded an Agreement and Mutual Release containing the stock restriction language to Attorney Dunham. *See* Exh. L. Paragraph 1, D. set forth the legend language on the HDI shares that Plaintiff was to receive:

16

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE
> NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF
> 1933, AS AMENDED (THE "ACT"), OR STATE SECURITIES
> LAWS, BUT HAVE BEEN ISSUED OR TRANSFERRED
> PURSUANT TO AN EXEMPTION FROM THE REGISTRATION
> REQUIREMENTS OF THE ACT.  NO DISTRIBUTION, SALE,
> OFFER FOR SALE, TRANSFER, DELIVERY, PLEDGE, OR OTHER
> DISPOSITION OF THESE SECURITIES MAY BE AFFECTED
> EXCEPT IN COMPLIANCE WITH THE ACT, ANY APPLICABLE
> STATE LAWS, AND THE RULES AND REGULATIONS OF THE
> SECURITIES AND EXCHANGE COMMISSION AND STATE
> AGENCIES PROMULGATED THEREUNDER.

On its face, the legend prohibits Holley and the Salem Estate from transferring their HDI stock to Brandt, and clearly prohibits Brandt from selling the shares once he received them.  Moreover, for the first time Brandt learned that there was a prohibition on pledging the stock, a restriction that would further dramatically diminish the value of the shares.  Based on the restriction, it appeared as though Brandt would be a party to a violation of applicable SEC rules and regulations if he accepted the restricted shares in the settlement, or subsequently tried to sell or pledge them.

### G.    The Defendants Refused To Make Payment To Plaintiff, And Plaintiff Was Unwilling To Comply With The Court's Informal Ruling.

Once the restricted language was disclosed, Plaintiff was unwilling to risk running afoul of applicable SEC rules and regulations and he was unwilling to take a long term position in HDI without adequate protection against a decline in value.  Not wanting to in any way be involved in a transaction that might violate securities laws, never intending to hold a stock position in HDI or to speculate in HDI stock, and never intending to accept less than $3 million in consideration, Brandt was unwilling to go forward with the Court's Ruling.  Accordingly, he moved for an extension of time to file a motion for reconsideration of the Court's July 19, 2007 Ruling

17

Regarding Disputed Settlement Terms based upon newly acquired evidence of the actual economic value of the settlement.[4]  *See* **Exh. M**.  The Court denied that motion.  *See* **Exh. N**.

Thereafter, on September 4, 2007, Attorney Brown wrote the Court asking that Brandt be compelled to accept the Court's ruling, and to sign the Settlement Agreement prepared by Defendants.  *See* **Exh. O**.  On September 14, 2007, Brandt wrote a letter in response to the Court setting out his concerns and why he was unwilling to proceed with the Court's proposed settlement.  *See* **Exh. P**.  In that letter, Brandt advised the Court:

> Second, had I seen the restriction, I would have never agreed to accept any amount of restricted HDI stock in settlement.  As the Court will note, I cannot even pledge the shares as security for a loan, let alone sell them . . . .  Third, it appears that neither Mr. Holley nor the Salem estate may use their restricted shares to settle with me, as they cannot distribute, sell, offer to sell, transfer or deliver their shares.  Mr. Holley, in particular, is a "control person," within HDI the meaning of which I am sure the Court understands far better than I.  While I don't know how Mr. Holley and the Salem estate plan to deal with or report their sale or transfer of restricted stock in terms of applicable securities laws, I cannot, and will not, be put into a situation where I am in any way a party to a securities law violation, or in violation myself, as a result of the Ruling.  Based on my limited knowledge, the transfers set out in the Ruling, cannot be done.

*See* **Exh. P**.

After receiving the letters from the parties, the Court conducted a telephonic conference on October 31, 2007, *see* **Exh. B**, TX 10/31/07, and issued an informal second Ruling Regarding Disputed Settlement Terms on the same day (the "Second Ruling").  *See* **Exh. Q**.  In its ruling, the Court concluded that "none of the parties have complied with the July 19, 2007 ruling" and modified the Court's ruling so that the number of shares transferred would be

---

[4] The inability to pledge the stock meant that even if Brandt could theoretically sell the stock, he could not do so except at a steep discount.

TJR/33764/2/839314v1
01/25/08-HRT/

calculated using 94% of the average of the stock's valuation price set forth in the July 19

Ruling and the closing price on October 30, 2007. The Second Ruling further required that the

$600,000 cash payment and the stock be immediately delivered to escrow, along with the

required releases. *See* **Exh. Q**. Significantly, and problematically, the Court required the

releases to be dated as of October 31, 2007. *See* **Exh. B**, TX 10/31/07, p. 27.

### H.    On November 15, 2007, Brandt Sent His General Release To Defendants Along With A Demand For Payment.

On November 15, 2007, Brandt sent his general release to the Defendants releasing them

from all claims and causes of action set forth in his complaint when the case settled on March 8,

2007. Brandt would not give the Defendants a general release through October 31, 2007

because any claims that had arisen after March 8, 2007 were not part of the "agreement in

principle to settle," and he had not received any consideration to settle or release additional

claims. *See* **Exh. R**.[5] On November 16, 2007, he signed the paperwork to have the appeal

dismissed as ordered by the Court.

On November 16, 2007, Attorney Zeisler, counsel for the Defendants wrote to the Court

seeking the Court's intervention to put an end to "Mr. Brandt's violations." *See* **Exh. S**.

Defendants disagreed with Brandt's stock and interest calculations, and the fact that Brandt's

release did not waive all claims against Defendants up through November of 2007.

When he received neither money nor stock from the Defendants, Brandt sent a final letter

---

[5] Indeed, Brandt believed—and had good grounds to believe—that Defendant Holley had material non-public information concerning HDI's second quarter performance which, if made public at the time Attorney Brown provided Defendants' settlement proposal to the Court on May 24, 2007, would have materially affected the price of HDI stock. In fact, when that information became public on August 9, 2007, the trading price of HDI dropped precipitously. Brandt was unwilling to release those claims as that was not part of the "agreement in principle to settle" reported on March 8, 2007.

to Attorney Zeisler on December 5, 2007. *See* **Exh. T**. In that letter, Brandt explained that he

could not give the Defendants a complete release through the date of payment, as he was

unwilling to release claims he had against them that were never part of his lawsuit and never

before the Court. He did offer to give a complete release through the date of payment, provided

the Defendants paid him cash and stock totaling $3 million. *See* **Exh. T**.

I.    **The Court's Third Ruling Gave Brandt The Option To Reopen His Case.**

Based on the letters received by counsel, the Court held a telephonic hearing on

December 6, 2007. *See* **Exh. C**. Brandt explained that he was unwilling to give a release that

would cover claims arising after March 8, 2007, when he was receiving less than the $3 million

in consideration he had agreed to. *See* **Exh. C**, TX 12/6/07, pp. 6, 7-10, 13-14. As set forth in

his December 5, 2007 letter to Attorney Zeisler, Brandt stated that he would provide a complete

release as of the date of payment, provided he received $3 million in consideration.

During the hearing the Court stated:

> THE COURT:       All right, let me just cut to the chase. Mr. Brandt,
> you've got really two choices. You can either go through with the
> settlement as I've ordered you to or, you know, we can come back and we
> can reopen the case. We can pick a jury and we can find out what they
> think this case is worth. Because, to be completely frank, this is an
> extremely generous settlement and you would be, in my view, quite
> foolish if you don't close this deal out and take the money and run. But
> I'm happy to reopen this thing, get another jury and get back and try this
> case because, frankly, it would be simpler from my point of view to try it
> than to be haggling month after month after month in what seems to be just
> a circular argument over and over and over again. So, do you want to
> come back, you want to come back and start again?

*See* **Exh. C**, TX 12/6/07, p. 16.

On December 7, 2007, the Court issued its Third Ruling Regarding Disputed Settlement

Terms (the "Third Ruling"), in which the Court instructed Brandt to comply with the settlement

terms and the Court's prior rulings. "In the event that Brandt chooses not to comply with the terms of the settlement, he may file a motion to reopen this case. Brandt should file such a motion, or send my chambers a letter indicating that he intends to do so, by Thursday, December 13." *See* **Exh. U.**

On December 12, 2007, Brandt advised the Court in writing of his decision to move to reopen the case and requested until January 22, 2008 to retain counsel, obtain the necessary files from Wiggin & Dana and file this motion.[6] *See* **Exh. V.**

## V.    SUMMARY OF ARGUMENT

This Court should set aside the March 15 Order and the First and Second Rulings because:

- No enforceable settlement agreement was reached on March 8, 2007. Indeed, contrary to the parties' best intentions, mutual mistakes and numerous unknown complexities made any meeting of the minds impossible and prevented the formation of any enforceable agreement, despite the "agreement in principle to settle."

- The Court's authority to act as a private binding mediator, and the scope of that authority was defined and limited by the agreement of the parties. As there was never an enforceable settlement agreement between the parties, the Court acting privately as a binding mediator did not have the authority to create a settlement agreement where one did not exist in the first place.

- The restrictions on the HDI stock intended as consideration, and the governing securities laws, prohibit Brandt from selling the stock for a period of one year, a consequence never intended by the "agreement in principle to settle."

- The parties' belief that $3 million could be delivered to Brandt using restricted HDI stock was the product of a mutual mistake of fact.

- Brandt never agreed, as part of the "agreement in principle to settle," to release claims outside of the complaint he brought before this Court, or that arose after March 8, 2007.

---

[6] On motion by Brandt, this Court extended the time to file this motion until January 25, 2007.

TJR/33764/2/839314v1
01/25/08-HRT/

## VI.    ARGUMENT

### A.    Relief From A Judgment Or Other Order Is Available Under Fed. R. Civ. P. 60(b)(6) When Equity And Justice So Require.

Whether to set aside a judgment or order pursuant to Rule 60(b) rests in the sound discretion of the court. 12 Moore's Federal Practice § 60.22[1] (3d ed. 2007); *see also National Petrochemical Co. v. M/T Stolt Sheaf,* 930 F.2d 240, 244 (2d Cir. 1991) ("A motion to vacate a judgment under [FRCP 60(b)] is addressed to the sound discretion of the trial court, whose disposition of the motion will not be disturbed on appeal absent an abuse of that discretion.").

Rule 60(b) contains six numbered clauses that list grounds on which a court may relieve a party from an otherwise final judgment or order. These include the following:

(1)    mistake, inadvertence, surprise, or excusable neglect;

(2)    newly discovered evidence;

(3)    fraud, misrepresentation, or other misconduct of an adverse party;

(4)    the judgment is void;

(5)    the judgment has been satisfied, released, or discharged or a prior judgment upon which it is based has been reversed or vacated; or

(6)    any other reason justifying relief from the operation of the judgment.

Brandt seeks relief under Rule 60(b) based on the mutual mistakes of the parties. Rule 60(b)(6)—the catch-all provision—has been called a "grand reservoir of equitable power to do justice in a particular case." *See* 12 Moore's Federal Practice § 60.48[1] (3d ed. 2007) (citing cases). The provision "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Id.*

Indeed, "[r]elief from a judgment should be available in those rare situations in which a settlement fails, not because of one party's refusal to perform, but for reasons beyond the control of the parties that leave the settlement meaningless." *Id.* at 60-194, 195 (citing *Vincent v. Reynolds Memorial Hospital,* 728 F.2d 250, 251 (4th Cir. 1984) involving settlement agreement that became worthless when a state court subsequently held that it was unenforceable as contrary to public policy).

There are numerous cases in which courts have reiterated the general proposition that Rule 60(b)(6) may be used to provide relief where a settlement agreement has failed for various reasons. *See United States v. Baus*, 834 F.2d 1114, 1124 (1st Cir. 1987) ("As a legal matter it is well-accepted that the material breach of a settlement agreement which has been incorporated into the judgment of a court entitles the nonbreaching party to relief from judgment under Rule 60(b)(6); *Fairfax Countywide Ass'n v. County of Fairfax*, 571 F.2d 1299, 1302-03 (4th Cir. 1978) ("Upon repudiation of a settlement agreement which had terminated litigation pending before it, a district court has authority under Rule 60(b)(6) to vacate its prior dismissal order and restore the case to its docket."); *Keeling v. Sheet Metal Workers Int'l Ass'n,* 937 F.2d 408, 410 (9th Cir. 1991) (affirming decision to vacate dismissal and stating that "[r]epudiation of a settlement agreement that terminated litigation pending before a court constitutes an extraordinary circumstance, and it justifies vacating the court's prior dismissal order."); *L.M. Leathers' Sons v. Goldman*, 252 F.2d 188, 190 (6th Cir. 1958 (consent judgment in patent case reopened pursuant to Rule 60(b)(6) because party refused to grant a free license as it had promised and justified court taking action to restore parties to their status quo prior to the execution of the agreement); *Van Leeuwen v. Farm Credit Admin.*, 600 F. Supp. 1161, 1164 (D.

Or. 1984) (district court concluded that it had authority under Rule 60(b)(6) to vacate its prior dismissal where there had been a repudiation of a settlement agreement which terminated the litigation).

**B.     The Relevant Securities Act Provisions and SEC Regulations Prohibit Brandt From Making Any Public Sale Of The Stock For a Period Of One Year, And Further Restricts The Number Of Shares He May Sell Within Any Three Month Period.**

The Securities Act of 1933 requires registration of all offers and sales of securities in interstate commerce unless an exemption from the registration requirement is available.  15 U.S.C. § 77e.  Section 4(1) of the Act provides such an exemption for transactions by any person other than an issuer, underwriter, or dealer.  15 U.S.C. § 77d(1).  Section 4(1) was intended to exempt trading transactions between individual investors with respect to securities already issued and not to exempt distributions by those deemed to be underwriters.[7]

Rule 144, 17 C.F.R. § 230.144, promulgated under the Securities Act of 1933, creates a safe harbor in certain situations for the sale of restricted securities[8] and securities held by affiliates.  A seller can avoid becoming an "underwriter" and avail itself of the Section 4(1) exemption to the registration requirements by satisfying the Rule 144 terms and conditions. Under Rule 144 an affiliate or nonaffiliate who sells restricted securities for his own account is not deemed to be engaged in a distribution of securities, and therefore is not an underwriter as

---

[7] The definition of "underwriter" is key to the operation of the Section 4(1) exemption.  Section 2(a)(11) of the Securities Act defines an underwriter as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking."  15 U.S.C. § 77b(a)(11).  Accordingly, the definition includes not only underwriters under underwriting agreements, but potentially anyone acquiring stock from the issuer in a private offering.

[8] "Restricted securities" is defined to include securities "acquired directly or indirectly from the issuer, or from an affiliate of the issuer" in a nonpublic transaction.  17 C.F.R. § 230.144(a)(3)(i).  In turn, an "affiliate" of the issuer is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer.  *See* 17 C.F.R. § 230.144(a)(1).

24

defined by Section 2(a)(11) of the 1933 Act, if the securities are sold in compliance with certain conditions including: (1) the Rule 144(d) holding period requirement; and (2) the 144(e) limitation on the amount of securities sold within any three-month period.

### 1. Any Acquisition Of Restricted HDI Stock Was Subject To The Rule 144(d) One Year Holding Period.

The purpose of the holding period requirement set forth in Rule 144(d), 17 C.F.R. § 230.144(d), is to safeguard against public sales without registration by a person acting as a mere conduit for an issuer or affiliate. To accomplish this, Rule 144(d) imposes a mandatory one year holding period for restricted securities acquired in a nonpublic transaction to insure that the seller is subject to the full economic risks of investment, and did not acquire the securities for immediate sale or distribution.[9] The one year period is measured from the date the restricted securities are acquired from the issuer or from any affiliate of the issuer. Rule 144(d).

Thus, there is no question that Brandt could not engage in any public sale of HDI restricted stock for a period of one year from the date he received it. Moreover, assuming that he could arrange a private sale, he could not do so within the Rule 144 safe harbor. And even if such a sale were possible (*e.g.* under the so-called § 4 (1½) exemption) the securities would remain restricted in Brandt's hands, negatively impacting their value and seriously hampering any realistic possibility of finding a buyer.

---

[9] An important revision to Rule 144(d)(1) will *decrease* the required holding period from one year to six months effective February 15, 2008 for securities of issuers subject to certain reporting requirements. *See* Securities and Exchange Commission, Release No. 33-8869.

25

2.    **Any Resale Of Restricted HDI Stock Was Subject To The Rule 144(e) Volume Limitation On Amount Of Securities Sold.**

The purpose of the limitations set forth in Rule 144(e) on the amount of securities that may be sold in any three-month period is to provide objective criteria to ensure that a person is engaged in "ordinary trading" rather than distribution. The restrictions require that a person selling securities do so in such limited quantities and in such a manner so as not to disrupt the trading markets. J. Williams Hicks, Resale of Restricted Securities, § 4:180, p. 329 (2007) (quoting SEC Release No. 5223 at 81,054).

Rule 144(e)(2) is applicable to sales by nonaffiliates. It specifies the amount of restricted securities that can be sold by a nonaffiliate within any three-month period. That amount is determined by the greater of either:

(1) the average weekly trading volume, 17 C.F.R. § 230.144(e)(1)(ii), *or*

(2) one percent of the outstanding securities of the class. 17 C.F.R. § 230.144(e)(1)(i).

In this case, even after expiration of the one year holding period, Brandt could only have made a partial sale of his HDI holdings because he would have received more than one percent of outstanding HDI stock. Thus, he would have been an investor/speculator in HDI shares for at least fifteen months—a consequence never intended by the "agreement in principle to settle."

3.    **As Brandt And The Court Were Unaware Of The Restrictions On HDI Stock On March 8, 2007, Including The Legend On The Shares, The Court Had No Authority To Order Brandt To Accept Such Shares In Settlement, Especially After Brandt Determined He Could Not Legally Sell Them.**

On March 8, 2007, the nature of any restrictions on HDI stock to be used as consideration were unknown. Indeed, Brandt had insufficient information concerning the restriction up to and through the date this Court issued its Ruling Regarding Disputed Settlement

26

Terms on July 19, 2007. Moreover, it is well known that Brandt intended to immediately sell any HDI stock he received as part of the settlement to convert it to cash, and required that his settlement value be protected if he could not do so. And it is now clear that he cannot do so without running afoul of SEC rules and regulations.

Clearly, the Court's authority as a private binding mediator is limited by what the parties agreed to submit to the Court, and the Court cannot direct Brandt to do anything that might cause him to violate SEC rules and regulations. Moreover, once Brandt determined that he could not accept restricted HDI stock due to applicable law, and so advised the Court as he did in his May 29, 2007 submission, the Court cannot ignore those concerns and order Brandt to accept HDI shares anyway. That is especially true now that both Brandt and the Court are aware of the restrictive legend on the HDI shares.

**C.    The Relief Plaintiff Seeks Is Fair And Just And Must Be Granted For The Following Reasons.**

**1.    There Was No Enforceable Settlement Agreement Entered on March 8, 2007.**

As with any contract, a settlement agreement is formed when there is a meeting of the minds on all material terms. In this case, as evidenced by what has transpired between the parties over the last ten months, there was never a meeting of the minds. There was no enforceable settlement agreement on March 8, 2007, and there is no enforceable agreement now. As discussed above, the only "agreement" reached on March 8, 2007 was an agreement to stop litigating and start settling. If the parties had agreed on the amount and make up of the consideration, the duties and obligations of each of the parties, and had specified a date for performance, there would have been an enforceable agreement. Unfortunately, there was no

agreement as to the make up of the consideration, and no agreement concerning duties and obligations. And most telling, there was no date set for performance. Without these core terms agreed upon, there was nothing to enforce.

Defendants may argue otherwise, but unless there was an enforceable settlement agreement on March 8, 2007 when the parties left the courthouse, there was not one thereafter. Indeed, the many issues left unresolved on March 8, 2007, and detailed above, *see supra* pp. 9-11, show that had one of the parties attempted to enforce their "agreement in principle to settle" at that time, they could not have done so. While the parties agreed that Brandt would receive $3 million in consideration, that was all they agreed upon and that consideration has never been delivered. Without a date for performance, the value of that $3 million began to diminish immediately due to the loss of use of funds. That loss of use continues to erode the value of the consideration so long as the consideration remains in the hands of the Defendants, who have a financial interest in delaying payment. To put it in perspective, at 8% interest, the loss of use of the $3 million has cost Brandt approximately $200,000 over a period of ten months. As there is no settlement agreement to enforce against either party, the Court has no alternative but to return this case to the active civil docket, and allow Plaintiff to proceed to trial.

> **2.    The Numerous Mutual Mistakes By The Parties Prevented Any Meeting Of The Minds And Provided Good Cause For The Relief Being Sought By Brandt.**

The belief of all parties that they could stop the trial and quickly negotiate a settlement, was the first mutual mistake the parties made. While it did not result in a settlement agreement, it did result in the "agreement in principle to settle" that was put on the record. Subsequently, the parties mistakenly believed that they had entered into an enforceable settlement agreement.

TJR/33764/2/839314v1
01/25/08-HRT/

But there were so many issues unresolved, they did not have—and could not have had—a meeting of the minds. Indeed, they mistakenly believed that they had sufficient information on March 8, 2007 to make the agreement they reported to the Court.

Other mutual mistakes made by the parties included: (i) their failure to recognize all the information and missing elements they needed to address to settle this case; (ii) their misunderstanding of the impact of SEC rules and regulations; (iii) their assumption that $3 million in consideration could be achieved using restricted stock; (iv) their assumption that they understood the HDI stock sufficiently to discuss it on March 8, 2007, and include it as consideration; and (v) their failure to investigate HDI and the status of the stock, which would have disclosed the restrictive legend and its affect on the settlement they were only beginning to structure. Again, what has happened over the last ten months underscores the fact that many mistakes were made by the parties as they tried to cobble together a settlement. In light of their mistakes, this Court must, in equity and fairness, return the case to the active civil docket, and re-set the matter for trial.

> **3.     The Court, In Its Capacity As A Private Binding Mediator, Never Had The Authority To Dictate Terms And Create An Enforceable Settlement Agreement.**

Defendants may argue that the Court, in its capacity as binding mediator, had the power to dictate, create and impose a settlement agreement on the parties. Under the circumstances of this case, that is not true.

The Court, as a private binding mediator, derives its authority and power to act from the parties by contract. The Court is empowered to decide only those issues and disputes that the

29

parties *agree in advance* should be decided.  The Court itself spelled out its authority on March

8, 2007:

> Finally, if there are details of the settlement that cannot be
> resolved, for example, if the parties cannot agree on the terms of the
> general releases, if the parties cannot agree on the details concerning the
> transfer of stock, the parties will come here, I will attempt to resolve those
> disputes informally.
>
> If that informal process does not work, the parties are all
> authorizing me to act as an, in effect, a binding mediator and to impose a
> decision on the areas of dispute concerning the details of this settlement.

*See* **Exh. A**, TX 3/8/07, pp. 969-701.

It is clear that the parties, on the record, empowered the Court to: "...impose a decision

on the areas of dispute concerning the details of this settlement."  Setting aside for the moment

that there was never an enforceable settlement agreement, the Court's authority was limited to

making decisions regarding "details of the settlement".  The Court was never authorized in its

private capacity as a binding mediator to "create a settlement".  And while an argument could

be made that the Court exceeded its authority when it adopted Defendant's baseball arbitration

proposal because it made decisions on issues that were not in dispute, the fact that there was

never an enforceable agreement between the parties on March 8, 2007 controls.

As there was never any enforceable settlement agreement entered into between the

parties, technically there were never any "details of the settlement" for the Court to decide.  As

discussed above, the Court, as a private binding mediator, had limited authority that was clearly

spelled out.  The Court never had the authority to create or impose a settlement on the parties.

The authority the Court has now is to recognize that, for the reasons set forth herein, the

parties never entered into an enforceable agreement, and there is no settlement agreement to

enforce. As a result, fairness and equity require that Brandt's case be restored to the active civil docket, and set for trial.

**D.    The Parties To The March 8 Agreement In Principle To Settle Were Mistaken In Believing That They Could Achieve $3 Million In Consideration Using Restricted Stock of HDI.**

Clearly Brandt settled for $3 million. Any combination of cash and stock that failed to deliver $3 million in consideration was unacceptable, not agreed to, and outside of the parties' "agreement in principle to settle" on March 8, 2007. Thus, no party had the right to submit to the Court, acting in its role as binding mediator, a settlement proposal that did not deliver $3 million in consideration, nor did the Court have the authority or jurisdiction to choose a submission that failed to deliver $3 million in consideration.

On March 8, 2007, the parties lacked sufficient information about the HDI stock, and the nature of the restrictions that governed it, to understand whether the required consideration could be achieved using that stock. Clearly, Attorney Dunham did not have the information and he said so, on the record. Nor did Attorney Brown have the information. Indeed, he agreed with what Attorney Dunham had stated for the record and, as Attorney Dunham pointed out, Attorney Brown had only learned of the restrictions one hour before the settlement in principle was reported to the Court. Thus, the notion that the consideration could be achieved using stock that was restricted—without understanding the nature of the restriction, its duration, and its impact on value—was, unfortunately and unintentionally, fundamentally flawed. And the events that have followed prove the point.

Both parties recognized the problem in the negotiations that followed leading to the alternate potential solution of an all cash deal. But they could not agree on those terms—Brandt

31

wanted $3 million in cash plus interest on any sums not paid up front; Holley and HDI wanted to

pay only $2.9 million, with $600,000 paid up front and the balance over six moths without

interest.

Both parties recognized the problem in their baseball arbitration submissions, even

though to that date the language of the restriction had not yet been provided. Brandt presented

an all cash deal as his sole proposal; Holley and HDI presented an all cash deal as one of two

options.[10] And, failing through no fault of its own to appreciate—let alone understand—the

problem, and itself lacking the language of the restriction, the Court chose the only option that

appeared to mirror the deal structure placed on the record on March 8, 2007.[11]

In this case, the failure to recognize that $3 million could not be delivered to Brandt using

restricted HDI stock as consideration represents a mutual mistake of the parties. "Mutual

mistake may justify rescission of a contract 'in a proper case where the mistake is common to

both parties and by reason of it each has done what neither intended.'" *Buol Machine Co. v.

Buckens*, 146 Conn. 639, 153 A.2d 826 (1959); *see* also Restatement (Second) Contracts §

152(1) (stating that "where a mistake of both parties at the time a contract was made as to a basic

assumption on which the contract was made has a material effect on the agreed exchange of

performances, the contract is voidable by the adversely affected party unless he bears the risk of

the mistake"). *BTEC Turbines, LP v. Conn. Light & Power Co.*, 2007 U.S. Dist. LEXIS 77038

---

[10] Although Holley suggested a 6% discount to account for the fact that the stock was unregistered and trading restricted, that figure was completely arbitrary and, with all due respect to the Court, should not have been adopted without some evidentiary support—expert or otherwise—establishing that such a discount in fact represented a fair reflection of the effect on value of being unable to liquidate or pledge the stock for a period of at least one year.

[11] Indeed, once the true impact of the restriction was understood, one or both of the parties should have advised the Court that the parties' agreement to transfer $3 million in consideration to Brandt could not be accomplished under the originally contemplated settlement structure of cash and stock. Brandt attempted to so advise the Court when he made his motion for extension of time to file a motion for reconsideration of the Court's July 19, 2007 Ruling Regarding Disputed Settlement Terms. *See* **Exh. M.**

at * 21 (D. Conn. 2007). The concept that a contract will not be enforced due to mistake "rests

on the equitable theory that the instrument sought to be reformed does not conform to the real

contract agreed upon and does not express the intention of the parties and that it was executed as

the result of mutual mistake. . . ." *Lopinto v. Haines*, 185 Conn. 527, 531, 441 A.2d 151

(1981). In short, a mutual mistake involves a "mistake being common to both parties, effects a

result which neither intended." *Id.* at 532.

As *Stratman v. Babbitt*, 1994 U.S. App. LEXIS 34354 (9th Cir. 1994) (unpublished

decision) (copy attached as **Exh. W**) makes clear, where a settlement agreement fails of its

purpose in its entirety, that event presents extraordinary circumstance requiring a court to issue

relief under Fed. R. Civ. P. 60(b)(6). As in the case at bar, *Stratman* involved "a basic defect

in the very inception and at the very core of the settlement agreement upon which the dismissal

of this case was based." And, as in *Stratman*, Brandt should not bear the risk of that mistake.

Indeed, under such extraordinary circumstances Rule 60(b)(6) relief is warranted. *Stratman*,

1994 U.S. App. LEXIS 34354 (9th Cir. 1994) (Where a mutual mistake of fact is the basis for a

settlement agreement resulting in dismissal, it is abuse of discretion for court to refuse relief

under Fed. R. Civ. P. 60(b)(6).)

  E.  **Brandt Never Agreed To Release Claims That Had Not Matured As Of March 8, 2007.**

In its Second ruling, the Court ordered that the parties "immediately exchange mutual

general releases." *See* **Exh. Q**. As set forth in the transcript of proceedings on the same day,

those releases were to be dated as of October 31, 2007. *See* **Exh. B**, TX, 10/31/07, p. 27. But

a release by Brandt running through October 31, 2007 was never contemplated on March 8,

2007 and was not part of the "agreement in principle to settle." Indeed, the parties were settling

33

only the claims that were set forth in Brandt's Amended Complaint dated December 10, 2002

and which were being tried to the jury. If claims arose after March 8, 2007 related to the

"agreement in principle to settle" or the transfer of HDI shares, Brandt never agreed to release

those claims. In fact, on March 8, 2007 he could not have released those claims because they

were unknown and had not matured. But Brandt believes that were he forced to accept restricted

HDI stock under the "agreement in principle to settle" reported on March 8, 2007, he would

have claims against the transferors of that stock because they had material non-public

information that Brandt did not have that would have affected the market value of the shares.

A Rule 10b-5 violation occurs "when a corporate insider trades in the securities of his

corporation on the basis of material, nonpublic information. Trading on such information

qualifies as a 'deceptive device'" under 10b. *United States v. O'Hagan*, 521 U.S. 642, 652

(1997).

The relevant language of the 1934 Act provides that it shall be unlawful to use "any

manipulative or deceptive device or contrivance. . . ." 15 U.S.C. § 78j. In turn, Rule 10b-5

provides that it is unlawful "(a) To employ any device, scheme, or artifice to defraud . . . or (c)

to engage in any act, practice, or course of business which operates or would operate as a fraud

or deceit upon any person, in connection with the purchase or sale of any security."

Although Rule 10b-5 does not use the term "insider trading," courts have concluded that

trading by a corporate insider based on material, nonpublic information qualifies as a "deceptive

device" under 10b and violates the insiders duty to disclose or abstain from trading.

The duty to disclose or abstain derives from Rule 10b-5 and is framed as follows:

"Anyone in possession of material inside information must either disclose it to the investing

public, or, if he is disabled from disclosing it . . ., or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." *Wilson v. Comtech Telecommunications Corp.,* 648 F. 2d 88, 94 (2d Cir. 1981).

"Directors, officers and principal shareholders all qualify as corporate insiders under section 10(b), as long as they have 'obtained confidential information by reason of their position with that corporation.'" *In re Compaq Sec. Litig.,* 848 F. Supp. 1307, 1310 n.7. (S.D. Tex. 1993), citing *In re Cady Roberts & Co.,* 40 S.E.C. 907 (1961). As Chief Executive Officer of HDI, Defendant Holley is unquestionably just such a "corporate insider."

By May 24, 2007, when Holley made his arbitration submission to the Court, HDI had completed nearly two-thirds of the second quarter of 2007. Holley therefore had to know that HDI was not performing up to projections or expectations and, indeed, was having a poor second quarter. Armed with that information—information that would clearly affect the value of HDI stock—Holley was obliged under Rule 10b-5 to make the information public, or to abstain from making a stock-based proposal to the Court and a sale of HDI securities to Brandt He did neither.

Nor can there be any doubt that a transfer of HDI securities to settle this case would constitute an offer to sell or a sale within the meaning of the securities laws. The Securities Exchange Act of 1934 defines the term "sale" to include "every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(3). Courts apply the statutory definitions broadly and do not limit the language to transactions ordinarily governed by the commercial law of sales. *See e.g. Dasho v. Susquehanna Corp.,* 380 F.2d 262 (7th Cir. 1967), *cert. denied* 389 U.S. 977, 19 L.Ed. 2d 470, 88 S. Ct. 480 (noting that legislative purpose of

broad language "is evidently to make control of securities transactions reasonably complete and effective to accomplish the purposes of the legislation.")

On August 9, 2007, when the information concerning HDI's previously undisclosed second quarter performance became public, the trading price of HDI stock dropped precipitously, as the following chart shows:



Brandt never agreed to release claims arising after March 8, 2007, and since Defendants refused to close the "agreement in principle to settle" without a release of those claims, or, alternatively, to protect Brandt against that price drop and any others occurring during any holding period, no settlement of the parties' disputes could be achieved.

TJR/33764/2/839314v1
01/25/08-HRT/

## VII.   CONCLUSION

For the foregoing reasons, this Court must grant relief from its Orders of March 15, July 19 and October 31, 2007, and from the parties' report on March 8, 2007 of an "agreement in principle to settle" and, further, must reopen this case, restore it to the active case docket, and assign it for a trial by jury of the claims set forth in Plaintiff Leonard Brandt's fourth Amended Complaint dated December 10, 2002.

PLAINTIFF:  LEONARD BRANDT

By_____
Thomas J. Rechen
Federal Bar No. ct03385
Pepe & Hazard LLP
His Attorneys
225 Asylum Street
Hartford, CT  06103-4302
Tel. 860-522-5175
Fax 860-522-2796
trechen@pepehazard.com

## CERTIFICATION

I hereby certify that on January 25, 2008, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**COUNSEL FOR HOME DIAGNOSTICS, INC.**
**and GEORGE H. HOLLEY**
Aaron M. Zeisler, Esq.
Paul M. Brown, Esq.
Satterlee Stephens Burke & Burke, LLP
230 Park Avenue
New York, NY 10169
Tel.: 212.404.8737
Fax: 212.818.9606
Email: azeisler@ssbb.com
Email: pbrown@ssbb.com   (sent via e-mail)

Frederick L. Murolo, Esq.
Murolo & Murolo LLC
288 Highland Avenue
Cheshire, CT 06410
Tel: 203.272.2099
Fax: 203.272.2659
Email: fmurolo@murololaw.com

Richard A. Roberts, Esq.
Nuzzo & Roberts
One Town Center
P. O. Box 747
Cheshire, CT 06410
Tel: 203.250.2000
Fax: 203.250.3131
Email: rroberts@nuzzo-roberts.com

Thomas J. Rechen

38