# EXHIBIT D

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEONARD BRANDT | : | |
|     Plaintiff, | : | |
| | : | |
|     v. | : | CIVIL NO. 3:01CV1889 (SRU) |
| | : | |
| HOME DIAGNOSTICS, INC. and | : | |
| GEORGE H. HOLLEY | | |
|     Defendants. | : | |

ORDER

The parties have reported that this action has been settled in full. Rather than continue to keep the case open on the docket, the Clerk is directed to administratively close the file without prejudice to reopening on or before April 16, 2007.

If the parties wish to file a stipulation of dismissal (for approval by the court or simply for inclusion in the court's file), they may do so on or before April 16, 2007.

The dates set forth in this order may be extended for good cause pursuant to a motion filed in accordance with Local Rule 7.

So ordered.

Dated at Hartford, Connecticut this 15th day of March, 2007.

                       /s/ Stefan R. Underhill
                       Stefan R. Underhill
                       United States District Judge

# EXHIBIT E

Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, Connecticut
06508-1832
www.wiggin.com

Edward Wood Dunham
203.498.4327
203.782.2889 fax
edunham@wiggin.com

WIGGIN AND DANA

*Counsellors at Law*

April 2, 2007

Paul Brown, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue
New York, New York 10169

Re:    Brandt v. HDI, Holley and the Salem Estate

Dear Paul:

It is obviously time to flesh out the details of our settlement. I apologize for the delay in sending this letter, but it took longer than I had hoped to explore the various securities law issues, I was then on vacation, you went on vacation right after I got back, and I saw no point in sending this while you were away.

The settlement that we placed on the record in court on March 8, 2007 requires Mr. Brandt to receive, in full settlement of all claims against HDI, George Holley and the Salem Estate, total compensation of $ 3 million, with at least $150,000 of the total in cash (as opposed to HDI stock), but the precise amount of cash not yet determined. The settlement also requires that the parties exchange mutual, general releases, and that the pending Second Circuit appeal be withdrawn with prejudice.

To determine where we should fairly go from here, a brief review of the settlement negotiations is in order. When you and I first began discussing settlement in February, you told me that the majority of consideration in any settlement would be in the form of HDI common stock. However, you also gave me the unequivocal assurance that there would be no restrictions on Mr. Brandt's rights to sell that stock whenever he chose to do so. Based on that representation, Mr. Brandt agreed to accept stock as a component of the settlement consideration. Throughout our pre-trial settlement negotiations, it remained Mr. Brandt's and my understanding that any HDI shares used to fund settlement would be unrestricted.

On March 7, 2007, Judge Underhill advised Mr. Brandt, Jonathan Freiman and me that defendants had increased their settlement offer to $ 3 million, in response to his request for their best and final offer, and he communicated his own belief that defendants would not pay more than that. He did not tell us anything about the form in which defendants were proposing to pay a settlement of this amount. I called you early on the morning of March 8, and you confirmed that defendants would pay no more than $ 3 million to settle. You also told me that most of this payment would be in the form of HDI stock, coming from Mr. Holley and the Salem Estate, and reiterated what you had consistently told me before trial: any stock that Mr. Brandt accepted in settlement would be unrestricted and freely tradable.

Paul Brown, Esq.
April 2, 2007
Page 2

**WIGGIN AND DANA**

*Counsellors at Law*

I called you back shortly thereafter to tell you that Mr. Brandt was accepting the $ 3 million offer. Only after we had agreed to that number did you communicate to me for the first time even the possibility that there might be any restrictions on Mr. Brandt's ability to trade stock received in settlement.

Let me be clear: I am not suggesting that you were intentionally misleading me about the status of the HDI shares that would potentially form part of the settlement consideration. I am confident that you were accurately communicating to me the information that you had received from one or more securities lawyers at your firm, and understand that that information changed at the last minute.

After we had arrived at court and before we advised the Judge about the settlement, you gave me additional information about the supposed restrictions on the stock. With all due respect, I had no idea what to make of this new information, since it was so dramatically different from what you had been telling me for several weeks. That was why I initially suggested to the Judge that he give us a few days to nail down the settlement details, before excusing the jury. He was unwilling to leave the jury hanging, and suggested instead that we put on the record the elements of the settlement, as far as we had determined them, and continue to work through the remaining issues, and that, in the event that we were unable to resolve any issues, he would act as a mediator and, if necessary, the ultimate arbiter of the final, detailed settlement terms. Mr. Brandt and your clients agreed to that approach.

Because of the uncertainty associated with defendants' shifting position on the status of the HDI stock to be used in settlement, and my obvious inability to ascertain the relevant facts on this issue before we put the settlement on the record, I was careful to make sure that the agreement we placed on the record did not depend upon any assumptions about the status of the stock, and left adequate flexibility to negotiate (or have Judge Underhill decide) detailed settlement terms fair to Mr. Brandt.

My partner Mark Kaduboski has fully reviewed the securities law issues, and discussed them with your partner Mr. Markham. I won't get into the details here, but in sum, Mark has confirmed that any HDI shares that Mr. Brandt were to receive from Mr. Holley or the Salem Estate would be restricted, and that Mr. Brandt would not be able to sell any such shares until after a one year holding period had passed, and then only in limited quantities for another year. It would, therefore, take two years for the shares to become fully unrestricted, assuming that as circumstances evolved Mr. Brandt did not become an affiliate of HDI within the meaning of the securities laws. Such a protracted delay in Mr. Brandt's ability to sell HDI shares would be manifestly unfair, and inconsistent with our negotiations. We understand from Mr. Markham that, in contrast, both Mr. Holley and the Salem Estate are able to sell shares of HDI stock subject to the volume limitations of Rule 144.

HDI may at some point also become eligible to register any settlement shares, by filing a Form S-3 with the SEC. However, HDI would not be able to do that – at the earliest – until about six months from now; there is no guarantee that HDI will be eligible to make that

Paul Brown, Esq.
April 2, 2007
Page 3

WIGGIN AND DANA

*Counsellors at Law*

filing then; and there is no way to predict how long it might take the SEC to process that filing or whether the Commission would ultimately accept it. Thus, there would be extended delay and substantial uncertainty even with a possible S-3 filing.

Mr. Brandt simply does not want to be locked into being an HDI shareholder. That was never a premise of our settlement discussions, and I frankly can't imagine that HDI, Mr. Holley or Mrs. Salem would have any interest in Mr. Brandt becoming an HDI shareholder for any extended period, given the history of his relationship with them. In light of that history, it is clearly in the interests of all parties to the case that a settlement not require them to have substantial, continuing dealings with each other, let alone a relationship that could extend so far into the future.

Accordingly, Mr. Brandt has the following proposal:

- Promptly upon execution of the settlement agreement, defendants will pay him $750,000 , by certified check or wire transfer (this amount reflects the $150,000 minimum cash component of the settlement, to which the parties already agreed, plus the $600,000 that, according to HDI's recent press release, the company and the other defendants have allocated as HDI's share of the settlement)

- The remainder of the settlement consideration will be paid in three additional installments, each in the amount of $750,000 plus interest at a rate to be agreed upon, and payable by certified check or wire transfer, on the 30 day, 60 day, and 90 day anniversaries of execution of the settlement agreement. Given that Mr. Holley and the Salem Estate are able to sell shares under Rule 144, this time period should allow them to generate substantial proceeds for these payments by making market sales.

Please give me a call after you have had the chance to review this letter and discuss Mr. Brandt's proposal with your clients.

Best regards,

*[signature]*

Edward Wood Dunham

cc:     Jonathan Freiman, Esq.
        Mark Kaduboski, Esq.
        Richard Roberts, Esq.

\16273\1\643921.1

# EXHIBIT F

# SATTERLEE STEPHENS BURKE & BURKE LLP
230 PARK AVENUE
NEW YORK, NY 10169-0079
(212) 818 9200

33 WOOD AVENUE S.
ISELIN, NJ 08830-2735
(732) 603-4966
FAX (732) 603-4977

FAX (212) 818-9606/7
www.ssbb.com

E-Mail: pbrown@ssbb.com
Direct Dial: (212) 404-8786

April 16, 2007

By Email

Edward Wood Dunham, Esq.
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832

> Re:    Brandt v. HDI
>        Defendants' Counter-Proposal for Settlement

Dear Jack:

This constitutes the defendants' settlement proposal as follows:

1) Total consideration $3,000,000.

2) Cash within five (5) business day of signing Settlement Agreement - $600,000.

3) Balance of $2,400,000 in restricted stock delivered to Len Brandt with the following conditions:

    a.    Shares will be valued as of the date of the Settlement Agreement or an average of the market price of a short agreed upon prior period of days. I will call the number of shares determined in this way the "Initial Shares."

    b.    Piggy-back registration rights for one year but no demand registration rights.

690703_3

SATTERLEE STEPHENS BURKE & BURKE LLP
Edward Wood Dunham, Esq.
April 16, 2007

    c.    During the holding period under Rule 144 of one year Brandt obviously could sell the HDI stock at any time he desired, privately or in a registered secondary offering.

    d.    If after one year the Initial Shares have an aggregate market value at least 15% less than $2,400,000 or $2,040,000 (i.e. 85% of $2,400,000), defendants will promptly transfer to plaintiff an additional number of shares equal to 15% of the Initial Shares (the "Additional Shares"). Conversely, if after one year the Initial Shares have a market value exceeding $2,760,000 (i.e. 115% of $2,400,000), he will transfer back to defendants a number of shares equal to 15% of the Initial Shares (the "Returned Shares"). The number of potential Returned Shares should equal the number of potential Additional Shares, i.e. 15% of the Initial Shares. In other words, Brandt is getting downside protection, but only to the extent of the shares being worth 15% less than $2,400,000. If the shares lose 50% of their value, he would still only receive a 15% makeup. Conversely, if the shares increase substantially in value over the one year, such that they are worth far in excess of $2,400,000, he would have to return only 15% of the Initial Shares.

    e.    At the time the settlement is concluded and the market price at the time of settlement is fixed, there will be put into escrow a number of shares equal to the potential Additional Shares and the potential Returned Shares.

    f.    After one year, Mr. Brandt would receive out of escrow either (i) none of the escrowed shares (in the event the (Initial Shares are worth more than $2,760,000); (ii) all of the escrowed shares if the Initial Shares are worth less than $2,040,000; (iii) one half of the escrowed shares (if the Initial Shares have a value between $2,760,000 and $2,040,000).

    g.    If any of the shares delivered to Brandt are sold by him during the first year, either in a private transaction or under a registration statement, the value of those shares at the end of the first year will, for the purpose of doing the calculations, be deemed to be the higher of the market value after one year or the actual sales price (if Len Brandt sells during the year, he will bear the risk of how this will affect this adjustment mechanism.)

    I believe this proposal is fair and reasonable, provides protection to your client and should be satisfactory. It provides for an enhanced amount of cash from $150,000 to $600,000; it permits Len Brandt to sell the securities in one or more private transactions; it gives him the right to participate in any registration statement filed within one year of the settlement; and it gives him down-side protection of 15% at the end of one year, provided that he gives equivalent up-side relief to the defendants. It allows him to obtain long term capital gains rates.

SATTERLEE STEPHENS BURKE & BURKE LLP
Edward Wood Dunham, Esq.
April 16, 2007


I look forward to your prompt response and hope that we can start working on a final agreement.

Sincerely,

Paul M. Brown

PMB:kms

Cc:    Rick Roberts (via e-mail)
       Jonathan Freiman (via e-mail)
       Todd Mayover, Esq. (via e-mail)
       George Holley (via e-mail)
       Edwin Markham, Esq. (via e-mail)

690703_3

# EXHIBIT G

## Hanrahan, Cathy

**From:** Paul M. Brown [pbrown@ssbb.com]

**Sent:** Monday, May 07, 2007 9:56 AM

**To:** Dunham, Edward W.

**Subject:** RE: Brandt Settlement Options

Jack: Bear in mind this settlement was structured originally for a small amount of cash and the rest in restricted stock with certain terms to be attached regarding the salability of the stock and giving your client some measure of protection against a significant decline in the value of the shares before he sold them.
In order to address your client's evident change of view concerning the settlement structure and in an effort to achieve a final resolution, I made the proposal outlined generally in your email.Some of the items sought in your email seem to go too far to be acceptable but I nevertheless will pass it on to defendants and their representatives and will get back to you shortly with their response.George Holley has had to take another trip abroad so it might take a bit longer to respond. Regards Paul

-----Original Message-----
**From:** Dunham, Edward W. [mailto:edunham@wiggin.com]
**Sent:** Sunday, May 06, 2007 11:35 AM
**To:** Paul M. Brown
**Cc:** Freiman, Jonathan; Celano, Rachel L.; Kaduboski, Mark
**Subject:** Brandt Settlement Options

Paul:

During our calls on Thursday and Friday, you suggested for the first time that the defendants would be willing to sell stock and pay Len Brandt entirely in cash, if we could agree on a schedule for the final pay-out and an adjustment to the total amount of the settlement.

In our call Friday, you made a specific proposal: $600,000 paid upon execution of the settlement agrement, with the balance paid six months from the date of the settlement agreement, and the total settlement reduced by $100,000 (so that the second payment would be $2.3 million), to reflect transactional costs and adverse tax consequences that your clients would experience by proceeding in this fashion.

I have reviewed this proposal with Len. We are making progress, but for several reasons certain aspects of this proposal are unacceptable:

1. If we can agree on everything else, Len can accept waiting 180 days from execution of the settlement agreement to be paid in full. As you will recall, I had already proposed (in my 4/2/07 letter to you) a period of 90 days from execution of the settlement agreement for payment in full.

2. However, while we understand that your clients may need time to sell stock to generate these proceeds, it is our further understanding, based upon my recent conversations with you, that they would be selling shares in mulitple transactions over the 180 day period. Accordingly, Len should receive the proceeds of the sales as they occur, not wait until the end of the period.

3. Also, the settlement was for $ 3 million, and Len is entitled to receive $ 3 million. He will not agree to your proposed $100,000 adjustment in the settlement amount.

4. And Len continues to believe that, if he is going to accept this long delay in receiving the settlement proceeds , he is entitled to interest.

Rather than keep dealing with multiple options, I think we should focus on this structure for the settlement, because we have now made real progress in agreeing on the structure. Please let me know your clients' position on the open items, and if we are unable to come to a final agreement in the next few days, let's go back to the Judge with the basic framework, and ask him to decide those items.

Regards,

Jack

*******************************************************************
This transmittal is intended for a particular addressee(s). It may constitute a confidential attorney-client communication. If it is not clear that you are the intended recipient, you are hereby notified that you have received this transmittal in error; any review, copying or distribution or dissemination is strictly prohibited. If you suspect that you have received this transmittal in error, please notify Wiggin and Dana immediately at 203-498-4400, or by email, reply to the sender and delete the transmittal and any attachments.
Neither this message nor the documents attached to this message are encrypted.
*******************************************************************

# EXHIBIT H

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LEONARD BRANDT,
    Plaintiff,

                                   Civil Action. No.
   v.                                3:01cv1889 (SRU)

MIT DEV. CORP., et al.,
    Defendants.

### CONFERENCE MEMORANDUM

On May 15, 2007, I held a phone conference off the record with Edward Dunham,

representing the plaintiff, and Paul Brown representing the defendants. Richard Roberts, counsel

for the Estate of Robert Salem, also participated. The purpose of the conference was to discuss

whether counsel have been able to finalize the details of the settlement agreement entered into in

principle on the record on March 8, 2007 (doc. #220).

Counsel have not been able to finalize the details of the settlement and have requested

that I resolve the dispute pursuant to the terms of the settlement put on the record on March 8th. I

indicated that we would, in effect, conduct a binding mediation process. All counsel agreed.

I set the following requirements for the mediation:

First, counsel should submit to me a list of all undisputed terms, that is, those aspects of

the settlement to which all parties agree. Second, counsel should send me a copy of the March 8,

2007 transcript that sets forth the terms of the settlement in principle. Finally, with respect to the

disputed terms of the settlement, we will conduct a "baseball style" arbitration. Each side should

fax to my chambers a written letter setting forth its position and an explanation of its position.

All relevant information (e.g., position, explanation, argument, etc.) must be included in a single

submission. Each side may submit two positions, but I encourage counsel to limit its submission

to one or two positions; each side should submit the same number of positions. I will then choose and adopt one of the positions, that is, either the plaintiff's position or the defendants' position. Thus, each side has an incentive to set forth a position that is as reasonable as possible. Counsel shall fax simultaneous ex parte letters to me on **Friday, May 25, 2007** setting forth their positions. Counsel will then provide a copy to opposing counsel on the following business day, Tuesday, **May 29, 2007.**

I told counsel that I do not intend to docket their submissions, but rather will treat the process as a private objection. There was no objection.

Dated at Bridgeport, Connecticut, this 16th day of May 2007.

Stefan R. Underhill
United States District Judge

-2-

# EXHIBIT I

SATTERLEE STEPHENS BURKE & BURKE LLP
230 PARK AVENUE
NEW YORK, NY 10169-0079
(212) 818 9200

33 WOOD AVENUE S.
ISELIN, NJ 08830-2735
(732) 603-4966
FAX (732) 603-4977

FAX (212) 818-9606/7
www.ssbb.com

E-Mail: pbrown@ssbb.com
Direct Dial: (212) 404-8786

May 24, 2007

BY FAX (203-579-5704)

Phone 203-579-5714
Honorable Stefan R. Underhill
United States District Judge
District of Connecticut
914 Lafayette Boulevard
Bridgeport, CT 06604

Re:    *Leonard Brandt v. Home Diagnostics, Inc. et al.*
       Docket No. 3:01 cv 1889 (SRU)

Dear Judge Underhill:

This submission is being made pursuant to your directions and recommendations set forth during the course of our telephone conference on May 15, 2007 and in your confirmatory letter, faxed on May 16 to counsel.

I submit this settlement proposal on behalf of the defendants, including the Estate of Robert Salem, Deceased. The defendants submit two alternate positions as the appropriate standard for settling this matter in accordance with the format agreed to by the Court and the parties.

First, in accordance with your recommendation that we make our positions as fair and reasonable as possible, we have decided to significantly improve upon the original proposal made. The settlement entered on the record was "at least" $150,000 in cash, plus $2,850,000 in restricted stock. Thereafter, the initial proposal made by defendants raised the cash portion to $600,000, added piggy-back registration rights on the next available registration statement, and provided a 15% "collar" at the end of one year.

Now, defendants have instead decided to offer Mr. Brandt the following improved settlement terms: $600,000 in cash and $2,400,000 in restricted stock immediately upon signing a settlement agreement and release. The shares, however, are to be valued at 94% of the average closing price for the five (5) trading days immediately prior to the effective date of the settlement. This discount to the trading price of the shares reflects the reduced value of restricted stock, as compared to freely tradable stock. He will also be afforded piggyback rights, for a period of twelve months from the effective date of the settlement, to sell his shares under any registration statement

694212_2

SATTERLEE STEPHENS BURKE & BURKE LLP
    Honorable Stefan R. Underhill
    May 24, 2007
    Page 2

filed by HDI. The discount of six percent not only does away with the necessity of a collar at the end of the year and provides for an immediate complete settlement, but also roughly approximates the discount in the value of the stock Mr. Brandt would receive were he to sell the stock privately, *i.e.*, to a third party such as a broker-dealer or private investor and not on any exchange.

If Mr. Brandt determines not to sell his shares privately, he would, after holding them for the one-year waiting period[1] in accordance with Rule 144, be free to sell his shares publicly. Under the appropriate formula permitting the sale of "144" stock,[2] a holder of HDI shares such as Mr. Brandt could sell up to approximately 180,000 shares over a three-month period, and the small number of shares remaining could be sold immediately after the three-month period. For example, if on the date of settlement HDI had a five-day average closing price of $12.00, Mr. Brandt would receive 212,765 shares of stock ($2,400,000 / ($12.00 X .94)), of which 180,000 could be sold in the first 90 days following the twelve-month holding period.

It is absolutely clear beyond any doubt that the sole reason this matter was settled for an amount in the magnitude of $3,000,000 was that only a small portion of such sum would be in cash and the majority of the consideration would be represented by shares of stock coming from the Salem Estate and George Holley. Initially, counsel for defendants mistakenly believed that there was an applicable exception to the one-year holding requirement for unregistered stock under Rule 144. That turned out to be incorrect, and, consequently, in advance of the actual settlement, Mr. Dunham was duly advised by defendants' counsel that Mr. Brandt could only be given restricted stock under Rule 144. Mr. Dunham was told that not only was a settlement funded by stock the preferred form of settlement, but there were personal financial planning and liquidity reasons for defendants to structure the transaction in that manner. Consequently, when the settlement was placed on the record before Your Honor on March 8, all parties were fully aware that the bulk of the consideration for the settlement was to be in the form of <u>restricted stock</u>. A copy of the transcript is enclosed for Your Honor's convenience.

The fact that the shares were to be restricted and the type of conditions designed to mitigate any potential significant declines in value of the stock constituted major aspects of the settlement discussions. On March 8, Mr. Dunham stated as follows:

> This morning . . . we have reached what I will categorize . . . as an agreement in principle to settle this case with the defendants paying consideration of $3 million. And the reason I say in principle is that the substantial majority of the consideration, . . . the vast majority of consideration were to be in stock in Home Diagnostics. And that raises a number of issues about how many shares, the value, whether there are any restrictions on the stock . . . .

---

[1] The SEC had recently proposed that the 12 month holding period be reduced to 6 months under certain circumstances.

[2] At least one percent (1%) of the total number of outstanding shares every three months. As of the date hereof, HDI has approximately 17,965,000 shares outstanding.

SATTERLEE STEPHENS BURKE & BURKE LLP
        Honorable Stefan R. Underhill
        May 24, 2007
        Page 3

                                    *    *    *    *    *

                ... Mr. Brandt authorized me at about 7:30 this morning to accept a
        settlement of $3 million with the understanding that a relatively small
        percentage of it, as yet undetermined, would be in cash. The number
        that Mr. Brown and I have talked about, but not holding to this, is
        somewhere in the neighborhood of $150,000, that the rest of it would
        be in stock in HDI that would be coming from Mr. Holley and from
        the Estate of Salem. . . . I think where the issues come in is the nature
        of the stock, whether there are any trading restrictions on the stock
        passed to Mr. Brandt . . . Mr. Brown has ... obtained some new
        information as of within the last hour that . . . there may be some
        required holding period. We need to work through those issues . . . so
        if there's a holding period there's got to be some protection on the
        value of it.

        I stated during that hearing that:

                ... I think probably the stock would have to be sold under Rule 144 .
        . . , the details of which I need to be certain about. . . . I also know
        that he could sell shares off-market at something of a discount . . .
        because there are restrictions, probably under Rule 144 rather than the
        restriction from the underwriters. . . . So that has to be worked out in
        some way, and I think we do have a wrap.

                Later Mr. Dunham stated, "The parties are going to, forthwith, work to negotiate the
        details of the settlement agreement as they relate to the stock."

                Without further belaboring the point, it is conceded that the vast bulk of the
        settlement consideration was to be in the form of stock, and at the time the settlement was read into
        the record, it was also known the stock would be subject to restrictions, primarily a holding period.
        Never at any time from the start of initial settlement conversations, initiated well before the trial, was
        this to be an all-cash settlement. Moreover, there neither was nor is any reason why Mr. Brandt
        should be placed in a better position than Mr. Holley or the Salem Estate. Mr. Holley and the Salem
        Estate are each permitted to sell up to approximately 180,000 of their own shares during three-month
        increments, but each would be severely limited in doing so if the bulk of the shares had to be sold
        and converted to cash to pay Mr. Brandt. Further, the entire background of Mr. Brandt's claim was
        rooted in getting a percentage of what Mr. Holley and Mr. Salem got out of MIT. In fact, the Court
        may remember Mr. Brandt testifying that he considered he was a 10% "partner" with Holley and
        Salem.

                Accordingly, we thus believe that the settlement outlined above is fair and
        reasonable. Instead of $150,000 in cash, Mr. Brandt will receive $600,000 immediately upon signing
        the settlement agreement, and $2,400,000 in HDI shares, valued at a 6% discount to protect him
        against any downside related to the restricted nature of the shares. If a registration statement is

SATTERLEE STEPHENS BURKE & BURKE LLP
Honorable Stefan R. Underhill
May 24, 2007
Page 4

effective before the end of one year, Mr. Brandt can sell his shares. He also, as noted, can sell his shares privately. To suggest that he should not have any risk regarding the price of the shares would be unfair and totally contrary to the intent and tenor of the settlement negotiation and the clear statements in the March 8 transcript.

Defendants' second position was, in my view, also an extremely generous offer, as follows: $600,000 in cash immediately upon execution of the settlement, and Mr. Holley and the Salem Estate would then sell their own shares of stock over a six-month period of time and remit proceeds to Mr. Brandt periodically. Mr. Brandt would receive an additional $2,300,000 from these sales movements, for a total of $2,900,000, all of which would be paid to him within the six-month period. This would take any risk in the price of the stock out of Mr. Brandt's hands and transfer it to the Salem Estate and Mr. Holley. Moreover, they would be required to absorb transaction costs, would be subject to fluctuations in the price of the stock, would themselves be blocked from selling the full permissible Rule 144 allotment of approximately 180,000 shares each during the three-month period, and would be required to sell the shares more slowly because of the thin market in HDI stock and their understandable unwillingness to have these sales adversely affect the market price. This position amounts to virtually an all-cash offer, something that was never agreed to by the parties, as can be noted from the history of settlement discussions and the transcript of the settlement dated March 8, 2007.

Mr. Brandt has taken the position that he not only wants interest during the six-month period, but also wants a total of $3 million in cash. That is not the deal that was struck, and those are unfair, impermissible conditions, which would completely change the nature of the settlement effected before this Court and should not be accepted.

Accordingly, defendants believe the Court should adopt the first position of $600,000 in cash plus $2,400,000 of restricted stock, valued at a 6% discount to the average closing market price for five (5) trading days prior to settlement, plus piggy-back registration rights, or, alternatively, the second position of $600,000 in cash on the date of the settlement plus an additional $2,300,000 to be paid periodically within the period of six months following the settlement through the sales of stock by the Salem Estate and Mr. Holley.

Respectfully submitted,

Paul M. Brown

PMB:paf
cc:    Edward W. Dunham, Esq. (via email: edunham@wiggin.com)
       Richard Roberts, Esq. (via email: rroberts@nuzzo-roberts.com)
       Todd Mayover (via email: tmayover@hdidiabetes.com)
       Wayne Winters (via email: dwwinters@winters-forte.com)
       George Holley (via email: gholley@hdidiabetes.com)
       Gilbert Matthews (via email: gil@suttersf.com)

694212_2