# EXHIBIT J

Wiggin and Dana LLP          Edward Wood Dunham
One Century Tower            203.498.4327
P.O. Box 1832               203.782.2889 fax
New Haven, Connecticut       edunham@wiggin.com
06508-1832
www.wiggin.com

**WIGGIN AND DANA**

*Counsellors at Law*

VIA FAX AND REGULAR MAIL

May 29, 2007

The Honorable Stefan R. Underhill
United States District Judge
United States Courthouse
915 Lafayette Boulevard
Bridgeport, Connecticut 06604

Re:  *Brandt v. Home Diagnostics, Inc. et al. – Civil Action No. 3:01cv1889
     (SRU)*

Dear Judge Underhill:

This is plaintiff Leonard Brandt's submission pursuant to Your Honor's May 15,
2007 conference call with counsel and your May 16, 2007 Conference
Memorandum.

I have enclosed the transcript from March 8, 2007, when Mr. Brown and I placed
the settlement in principle on the record, and you reviewed the settlement terms
again for Mr. Brandt, who was participating in the proceedings by telephone.  The
agreement was that Mr. Brandt would receive, in full settlement of all claims against
HDI, George Holley and the Salem Estate, total compensation of $ 3 million, with
at least $150,000 of the total in cash (as opposed to HDI stock), but the precise
amount of cash not yet determined. The settlement also requires that the parties
exchange mutual, general releases, and that the pending Second Circuit appeal of
Your Honor's decision granting summary judgment to the Salem Estate be
withdrawn with prejudice.

As you know, notwithstanding extensive good faith attempts, the parties have not
been able to agree upon the further, essential details of the settlement.  Accordingly,
as Mr. Brandt understands the " 'baseball style' arbitration" that Your Honor is now
conducting, your task is to determine which side's current position most fairly  (1)
reflects the intent and essence of the settlement in principle, and (2) balances the
parties' respective, legitimate interests, in light of the securities law issues that have
been fleshed out since March 8.

*New Haven  Stamford  New York  Hartford  Philadelphia*

The Honorable Stefan R. Underhill
May 29, 2007
Page 2

WIGGIN AND DANA

*Counsellors at Law*

I believe that a brief review of the negotiations that culminated in the settlement in principle will aid your determination on these points, and therefore begin this submission with that review. This letter will next describe what we have subsequently learned about the status of HDI shares that defendants have proposed using as settlement consideration. I will then outline the aspects of the settlement to which all parties appear to agree (based upon my most recent communications with Mr. Brown), set forth Mr. Brandt's position on the terms still in dispute, and explain why that position forms the basis for a fair and sensible settlement in light of all the facts and circumstances.

### *The Negotiations that Culminated in the March 8, 2007 Proceedings*

Mr. Brown and I first began discussing settlement in earnest in February, 2007. At that time, he advised me that the majority of consideration in any settlement would be in the form of HDI common stock. However, he also gave me the unequivocal assurance that there would be no restrictions on Mr. Brandt's rights to sell that stock, after the end of a "black-out period" triggered by HDI's initial public offering. (I believe that this period ended sometime in late March, 2007). Based on that representation, Mr. Brandt said that he would be willing to accept stock as a component of the settlement consideration, and I so advised Mr. Brown. Throughout the pre-trial settlement negotiations, it remained Mr. Brandt's and my understanding that any HDI shares used to fund settlement would be unrestricted after the black-out period.

When we finished trial on March 7, 2007, Your Honor advised Mr. Brandt, Jonathan Freiman and me that defendants had increased their settlement offer to $ 3 million, in response to your request for their best and final offer. You also expressed your opinion that defendants would not pay more than that amount, and strongly urged Mr. Brandt to accept this offer. Mr. Brandt greatly respected Your Honor's conduct of the trial and your experience in assessing likely outcomes, so your views on settlement were very influential on Mr. Brandt's own consideration of that subject.

After extensive discussions with Mr. Brandt on the night of March 7, I telephoned Mr. Brown on the morning of March 8, and confirmed that defendants would pay no more than $ 3 million to settle. Mr. Brown also told me that most of this payment would be in the form of HDI stock, coming from Mr. Holley and the Salem Estate, and reiterated what he had consistently told me before trial: any stock that Mr. Brandt accepted in settlement would be unrestricted and freely tradable after the black-out period. After conferring with Mr. Brandt, I called Mr. Brown back shortly thereafter to tell him that Mr. Brandt was accepting the $ 3 million offer. Only *after we agreed to that number* did he communicate to me for the first

The Honorable Stefan R. Underhill
May 29, 2007
Page 3

WIGGIN AND DANA

*Counsellors at Law*

time even the possibility that there might be any continuing, long-term restrictions on Mr. Brandt's ability to trade stock received in settlement.

I clearly recall the sequence of events: when I called Mr. Brown to accept the offer, he advised me that defendants' expert Gilbert Matthews was with him. When Mr. Matthews heard Mr. Brown tell me that the stock was unrestricted, he interrupted Mr. Brown, they had a conversation that I could not hear, and Mr. Brown then said that he would have to call me back. Mr. Brown did call me back a few minutes later, and that was the first time he ever advised me that any stock to be used in settlement would be subject to any restrictions other than during the soon-to-end black-out period.

I want to be absolutely clear: I am not suggesting that Mr. Brown ever intentionally misled me about the status of the HDI shares that would potentially form part of the settlement consideration. I am confident that he was accurately communicating to me the information that he had received from one or more securities lawyers at his firm, and understand that that information changed at the last minute. Nevertheless, in determining the fair course from this point forward, I believe that it is important to remember that the offer made and accepted involved unrestricted stock that would be immediately saleable in the public market as soon as the IPO-related black-out period ended. I had never previously discussed with Mr. Brandt the idea of payment in restricted shares, and Your Honor did not communicate anything about that subject during our conversation on May 7.

After Mr. Brown and I arrived at court on March 8 and before we advised Your Honor about the settlement, he gave me additional information about the supposed restrictions on the stock. I frankly had no idea what to make of this new information, which was dramatically different from what Mr. Brown had been telling me for several weeks. That was why I initially requested a few days to nail down the settlement details, before Your Honor excused the jury. You were, for understandable reasons, unwilling to keep the jury in limbo, and suggested instead that we put on the record the elements of the settlement, as far as we had determined them, and continue to work through the remaining issues, and that, in the event that we were unable to resolve any issues, you would act as a mediator and, if necessary, the ultimate arbiter of the final, detailed settlement terms. The parties agreed to that approach. Not surprisingly, because of the uncertain status of the HDI stock to be used in settlement, and our obvious inability to ascertain the relevant facts and securities law answers before we put the settlement on the record, the agreement we placed on the record did not incorporate any assumptions about the status of the stock, and left adequate flexibility to negotiate (or have Your Honor decide) detailed settlement terms fair to all the parties.

The Honorable Stefan R. Underhill
May 29, 2007
Page 4

*The Restrictions on the HDI Shares with which Defendants Proposed to Fund the Settlement*

Thereafter, one of my partners who practices securities law consulted with a securities lawyer in Mr. Brown's firm, conducted a detailed review of the facts and the law, and concluded not only that any HDI shares that Mr. Brandt might receive in settlement from the Estate and Mr. Holley would be unregistered and trading-restricted during the IPO black-out period, but that Mr. Brandt would also not be able to sell *any* such shares on the public markets until after a one year holding period had passed, and then only in limited quantities for another year. It would, therefore, take two years for the shares to become fully unrestricted, assuming that as circumstances evolved Mr. Brandt did not become an affiliate of HDI within the meaning of the securities laws (which would in turn impose additional restrictions on his ability to sell the shares in public transactions).

We also learned that HDI might, in the interim, become eligible to register any settlement shares, by filing a Form S-3 with the SEC. However, HDI would not be able to do that -- at the earliest -- until the first anniversary of its IPO later this year. There is also no guarantee that HDI will be eligible to file a Form S-3 even then; and if it becomes eligible to do so, there is no way to predict whether the SEC would review and comment on the filing and thus no way to estimate reliably how long it would take for the registration to become effective. Moreover, Mr. Brown has repeatedly informed me that HDI is unwilling to undertake an S-3 registration of settlement shares, and that any registration of those shares would have to "piggyback" on a larger registration of new shares – a registration for which HDI apparently has no current plans, and which it has never in the course of settlement negotiations committed to undertake. (HDI is currently entitled to register any settlement shares by filing a Form S-1 with the SEC, but Mr. Brandt accepts that the burden on HDI of doing so would be substantial. A filing on Form S-3 is substantially less burdensome for the issuer).

The law would allow Mr. Brandt to sell the unregistered shares in one or more private transactions, but there is no assurance that he would be able to find a buyer(s), and the shares would almost certainly be sold at a discount. During our recent settlement negotiations, Mr. Brown communicated with JPMorganChase, the lead underwriter on HDI's 2006 initial public offering, and learned that, in any private sale of restricted HDI shares, the discount from the public trading price would probably be in the 7-10% range. JPMorganChase also advised Mr. Brown that it had been unable to identify any potential buyer(s) of unregistered HDI shares that Mr. Brandt might receive in settlement of this case.

If defendants were able to transfer to Mr. Brandt freely tradable HDI shares, he would remain willing to accept those shares in settlement. But as a matter of federal

The Honorable Stefan R. Underhill
May 29, 2007
Page 5

**WIGGIN AND DANA**

*Counsellors at Law*

securities law, that option is, as a practical matter, simply not available at this time. Since March 8, defendants have suggested several approaches that would entail Mr. Brandt receiving unregistered, restricted shares, but each scenario would leave him at risk of ultimately receiving significantly less than $3 million in total proceeds (because of changes in the stock price or the price discount involved in a private sale), facing as well a protracted delay in receiving those proceeds. Defendants have expressed a willingness to protect Mr. Brandt against a portion of the risk of a decline in the price of HDI's shares, but have never been willing to safeguard him against all that risk, and have also refused to pay any interest, no matter how long it might take for Mr. Brandt to convert restricted stock into cash.

*Those Aspects of the Settlement to Which All Parties Agree*

In sum, since March 8 it has become clear that there are significant complexities associated with using HDI stock as settlement consideration. The offering party did not timely describe, and perhaps even appreciate, those complexities, and the receiving party certainly could not take them into account, in negotiating the settlement in principle. As an alternative, Mr. Brandt has proposed to defendants that they pay the entire settlement amount in cash, and Mr. Brown has indicated that defendants would accept a cash settlement on certain terms. According to Mr. Brown, however, Mr. Holley and the Salem Estate would raise this cash by selling a portion of their HDI shares (which Mr. Brown has informed me they are now lawfully able to do in limited amounts, except during certain defined periods, e.g., near in time to a quarterly earnings announcement), and that they would prefer to make these sales in a series of small transactions over a period of time, to avoid having a materially adverse effect on the stock price. Mr. Brandt recognizes that this is an entirely legitimate goal and has therefore been willing, subject to other conditions being acceptable, to receive settlement payments over a period of months.

The parties made significant progress toward an agreement along these lines, but were unable to close the remaining gaps on a few issues. Based upon my most recent communications with Mr. Brown, I understand that the parties have agreed to these terms:

1. Defendants would pay Mr. Brandt $600,000 upon execution of the formal settlement agreement.

2. They would pay the balance of the settlement amount on or before the 180th day following execution of the settlement agreement.

3. Mr. Holley and the Salem Estate would sell shares of HDI stock to generate the balance of the proceeds, and as they made those sales, they would pay the

The Honorable Stefan R. Underhill
May 29, 2007
Page 6

WIGGIN AND DANA

*Counsellors at Law*

proceeds of the particular transaction to Mr. Brandt, thereby reducing the balance due.

Defendants further proposed, however, reducing the total settlement amount to $ 2.9 million, to reflect what they claim to be the transactional costs and adverse tax consequences for Mr. Holley and the Salem Estate arising from sales of HDI shares to generate the settlement proceeds. They also refused to pay any interest, which Mr. Brandt requested as compensation for the time value of money, in consideration for his willingness to wait as long as six months to receive payment in full of the settlement. Obviously, if defendants are not required to pay interest, they would have a powerful incentive to delay payment until the 180th day. But the purpose of delaying payment to Mr. Brandt has never been to accomplish a greater return for defendants (whether by earned interest or appreciation of equity). Rather, the parties have discussed this delay as a means of accommodating defendants' desire to avoid an excessive impact on HDI's stock price.

### *Mr. Brandt's Position*

Mr. Brandt requests that Your Honor require the following settlement terms:

1. A total settlement amount of $ 3 million.

2. Defendants will pay Mr. Brandt $600,000, by bank check or wire transfer payable to Wiggin and Dana, LLP Trustee, upon execution of the formal settlement agreement.

3. Defendants will pay Mr. Brandt the balance of $ 2.4 million on or before the 180th day following execution of the settlement agreement, by bank check or wire transfer payable to Leonard Brandt.

4. Defendants intend to generate the remaining $2.4 million in settlement proceeds by the sale of HDI stock by George Holley and the Estate of Robert Salem. As any sales occur, defendants will pay to Mr. Brandt the net proceeds of those sales, thereby reducing the balance due on the settlement.

5. Defendants will pay interest at the compound annual rate of 8% on any unpaid settlement proceeds, commencing on March 8, 2007 or on such other date as the Court deems just and appropriate.

6. Upon execution of the settlement agreement and payment of the first $600,000 in settlement proceeds, defendants will also provide Mr. Brandt with a Letter of Credit issued by JPMorganChase or a comparable financial institution,

The Honorable Stefan R. Underhill
May 29, 2007
Page 7

WIGGIN AND DANA

*Counsellors at Law*

securing the payment of the $2.4 million balance of the settlement proceeds, or will post such other security as the Court deems just and appropriate. Mr. Brandt would be amenable to other reasonable mechanisms of securing payment; Mr. Brandt simply requests that the security, whether a Letter of Credit or in some other form, be immediately available for Mr. Brandt to liquidate, for any amounts not paid by the 180th day, without any ability for defendants to interrupt this. I am obviously not in a position to negotiate the terms of a Letter of Credit for defendants, but I understand that they should be able to obtain a Letter of Credit, for this amount and short time period, for only several thousand dollars, if their existing credit facilities do not already contemplate the issuance of such instruments at HDI's request.

For several important reasons, Mr. Brandt's position is consistent with the essence of the settlement bargain, and fairly balances the parties' competing interests and concerns. First, in March the parties unquestionably agreed that Mr. Brandt would receive total settlement consideration of $ 3 million. This proposal ensures that Mr. Brandt will in fact receive that amount, whereas each of defendants' proposals in our recent negotiations either expressly required a reduced settlement amount, or exposed Mr. Brandt to a serious risk that he might ultimately receive significantly less than $ 3 million in value. There is no justification for reducing the total value of the settlement to $ 2.9 million, as defendants have proposed during my discussions with Mr. Brown. Mr. Brandt has asked me to point out that, by his calculation, defendants earn approximately $20,000 for each month that they have not paid the settlement amount; accordingly, delay in consummating the settlement is profitable to them, whereas that delay is costly to Mr. Brandt.

Second, Mr. Brandt understands that when defendants agreed to settle, they were expecting that the vast majority of the consideration would be in the form of HDI stock. He also understands that defendants either do not have, or do not wish to utilize cash currently on hand to fund the entire settlement now (although it is worth noting that, based upon its public financial reports, HDI would appear to have sufficient cash to pay the entire settlement now, if that were defendants' preference). And Mr. Brandt understands as well that defendants do not want the settlement to require any actions on their part that might disrupt the market for HDI stock or otherwise have a material adverse effect on the share price. Mr. Brandt's proposal addresses these concerns by giving defendants an extended period over which to generate the balance of the settlement proceeds, by selling HDI shares in a series of permissible and relatively undisruptive transactions. Third, if Mr. Brandt is willing to wait up to six months to receive as much as 80% of the settlement proceeds, he should in fairness be compensated for the time value of money, and be secure against the risk that defendants might be unable or unwilling to perform (e.g., if HDI must undertake a widespread product recall, comparable to the one about which Mr. Holley testified at trial, which causes it to incur substantial operating losses and also

The Honorable Stefan R. Underhill
May 29, 2007
Page 8

**WIGGIN AND DANA**

*Counsellors at Law*

ruins the stock price). That is why this proposal would require defendants to pay
interest and provide a Letter of Credit or other reasonable form of security.

In an effort to expedite this arbitration process, I have prepared and sent to Mr.
Brown proposed releases and other standard settlement agreement provisions (e.g.,
choice of law, dispute resolution). I have not included that draft agreement in this
submission, but if Your Honor would prefer to resolve all provisions of the
settlement agreement now, I will of course provide you with a copy.

Respectfully yours,

Edward Wood Dunham/gm

Edward Wood Dunham

Enclosure

\16273\1\653845.1

# EXHIBIT K

09/04/2007 16:17 FAX  212 818 9606          SATTERLEE STEPHENS B&B                    ☑005/026

07/19/07  14:39 FAX 203 579 5704          Chambers-Judge Underhill                   ☑002/004

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LEONARD BRANDT | : |
| | : |
| v. | :  Civ. Action No. |
| | :  3:01 CV 1889 (SRU) |
| MIT DEVELOPMENT CORP., ET AL. | : |

### RULING REGARDING DISPUTED SETTLEMENT TERMS

On March 8, 2007, the parties settled this case. The settlement, which was placed on the record, provided that the parties would continue to negotiate the details of the terms on which the total $3 million settlement proceeds would be paid by the defendants to plaintiff. The settlement also provided that, in the event that the parties could not resolve those remaining details and I could not mediate any differences informally, that I would serve as a binding mediator and would impose a decision concerning the disputed terms of the settlement. That contingency has come to pass, and this ruling serves as my decision regarding the final terms of the settlement among the parties.

We have proceeded by way of "baseball arbitration," with each side submitting their last, best settlement position. My task is to choose between the parties' positions and to impose on the parties as the final settlement terms the proposal that most fairly reflects the intent of the parties in reaching the settlement in principle. In doing so, I have carefully reviewed the transcript of the proceedings in which the parties stated the terms of their settlement in principle. I have also considered the arguments made in the parties' submissions.

The defendants' proposal best reflects the terms of the settlement in principle and the intent of the parties at the time they agreed to settle this case. That proposal includes the payment of four times as much cash as was discussed at that time, with the balance of the $3

09/04/2007 16:17 FAX  212 818 9606    SATTERLEE STEPHENS B&B                     ☑006/026

07/19/07  14:39 FAX 203 579 5704        Chambers-Judge Underhill                ☑003/004

million payable in HDI stock, as originally intended. The use of a value reflecting a discount of the recent trading price of the stock minimizes the risk to plaintiff from the possibility that the stock price will fall during the period of the stock sale restrictions. Providing plaintiff with "piggyback" rights under any registration statement filed by HDI over the next twelve months will also reduce the risk to plaintiff and may allow him to liquidate his stock more quickly. I am modifying the defendants' proposal in one respect: The effective date of the settlement will be today, and the valuation of the HDI stock will be based on 94% of the average closing price for the five trading days immediately prior to today, July 19, 2007.

Accordingly, the following are the terms of the payment obligation under the settlement reached by the parties in this case: Defendants shall immediately pay plaintiff $600,000 in cash and $2,400,000 in restricted HDI stock. The number of shares of stock to be transferred shall be calculated using a value of 94% of the average closing price for the five (5) trading days immediately prior to today, July 19, 2007. Plaintiff shall be accorded piggyback rights to sell his HDI shares under any registration statement filed by HDI within twelve months from today.

As previously agreed, the appeal of the ruling granting summary judgment in favor of the Salem estate, if it is still pending, shall be voluntarily dismissed immediately. The parties shall immediately exchange mutual general releases. It is not necessary to dismiss or withdraw claims made in this case, because the case has already been dismissed. The parties are free to enter into a formal settlement agreement, if they wish, but the terms of the payment obligation will not be delayed or otherwise affected should they choose to do so.

Although captioned a "ruling," this decision shall be treated as a private event. This decision will be sent to the parties, but will not be docketed unless a party requires docketing in a proceeding to enforce the settlement agreement. This court will retain jurisdiction to enforce the

09/04/2007 16:17 FAX 212 818 9606     SATTERLEE STEPHENS B&B     ☑007/026

07/19/07   14:40 FAX 203 579 5704     Chambers-Judge Underhill     ☑004/004

terms of the parties' settlement agreement, including those terms imposed by this ruling.

It is so ordered.

Issued this 19th day of July 2007 at Bridgeport, Connecticut.

Stefan R. Underhill
United States District Judge

# EXHIBIT L

-----Original Message-----
From: Paul M. Brown <pbrown@ssbb.com>
To: Dunham, Edward W.
CC: Edwin Markham <emarkham@ssbb.com>; Todd Mayover <tmayover@hdidiabetes.com>
Sent: Thu Jul 26 15:05:12 2007
Subject: FW: Agreement and Release: Brandt v. HDI

Jack: I am forwarding you a revised settlement agreement containing the terms found by Judge Underhill in his Ruling.Please review and let me have your comments so we can get this in final and close this out.As soon as we have a final agreement we will immediately arrange for a transfer of shares to Len Brandt working through HDI's transfer agent and can have the check issued promptly or ,if preferred,a wire transfer arranged.

A few comments about the draft.(1) The shares were computed in a straightforward manner although a few dollars were rounded off.(2) MIT was added as a release even though it was merged into HDI and is no longer in existence although it had been a part in the case.(3) We necessarily added a very standard and customary form of registration rights agreement which will be required if there is any registration of Brandt's shares over the next 12 months.

I trust you will find things both satisfactory and fair. Paul

-----Original Message-----
From:  Kathleen Sullivan

8/31/2007

2

## AGREEMENT AND MUTUAL RELEASE

THIS AGREEMENT is made this ____ day of July 2007 by and between Leonard Brandt ("Brandt"), on the one hand, and Home Diagnostics, Inc. ("HDI"), the Estate of Robert J. Salem ("Salem"), and George Holley ("Holley"). HDI, Salem and Holley are together known herein as "the defendants," and Brandt and the defendants are collectively known herein as "the parties."

WHEREAS, Brandt sued HDI, Salem, and Holley in an action maintained in the United States District Court for the District of Connecticut, designated by the Clerk of the Court as Case No. 3:01-CV-1889 (SRU) (the "Suit"), and assigned to the Honorable Stefan J. Underhill (the "Court");

WHEREAS, the Court granted in part the defendants' motion for summary judgment, dismissing, inter alia, all claims against Salem and certifying the dismissal of all claims against Salem as a final judgment; Brandt appealed the dismissal of the claims against Salem to the United States Court of Appeals for the Second Circuit (the "Circuit"), an appeal designated by the Clerk of the Circuit as No. 06-3482-CV (the "Appeal"), and the Appeal is fully briefed and awaiting oral argument;

WHEREAS, the remainder of the Case, involving claims against HDI and Holley, proceeded to jury selection, opening arguments, and the presentation of Brandt's case in chief;

WHEREAS, during the course of the trials the Court mediated discussions between the parties in order to encourage their settlement of the Suit, and on March 8, 2007 the parties reached a settlement in principle, the terms of which were read into the official record of proceedings that day;

WHEREAS, the Court thereafter conducted, in accordance with the parties' agreement, an arbitration, by which the detailed, financial terms of settlement were determined; and

700968_4

3

WHEREAS, the parties have been represented by counsel of their choosing, and fully advised by their attorneys of their respective rights and liabilities, each to the other; and

WHEREAS, On July 19, 2007, the Court rendering a Ruling Regarding Disputed Settlement Terms and adopted defendants' proposal; and

WHEREAS, the parties wish to memorialize all the terms of their settlement, and thereby resolve any and all claims either may have against the other, so as to achieve certainty and finality and to avoid the time, expense and uncertainty of continued litigation of any such claims;

NOW, THEREFORE, in consideration of the mutual covenants and promises hereinafter set forth, the parties hereto agree as follows:

1.  In full and complete satisfaction and settlement of this action and Brandt's claims against defendants, defendants shall pay and deliver to Brandt the following:

> A.  Upon execution of this agreement, $600,000 in cash by certified check or wire transfer, pursuant to Brandt's instructions.
>
> B.  A share certificate or certificates of Home Diagnostic's Inc.'s common stock having a value of $2,400,000 as determined in accordance with a formula hereinafter set forth in C and D below.
>
> C.  The number of shares to be delivered by Defendants to Brandt shall be calculated by using a value equal to 94% of the average closing price for the five (5) trading days immediately prior to July 19, 2007.
>
> D.  The common shares of HDI trading under the symbol HDIX, had closing prices of $11.64 on Thursday, July 12, $11.55 on Friday, July 13, $11.56 on Monday, July 16, $11.50 on Tuesday, July 17 and $11.36 on Wednesday, July 18. The average closing price of those five (5) dates is $11.52. Ninety-four percent (94%) of such average price equals $10.83. Accordingly, simultaneously with the execution of this agreement, defendants shall deliver to plaintiff a share certificate in the name of Leonard Brandt representing 221,592 shares of common stock of HDI (the "Settlement Shares") and bearing the following legend:
>
> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR STATE SECURITIES LAWS, BUT HAVE BEEN ISSUED OR TRANSFERRED PURSUANT TO AN

EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT. NO DISTRIBUTION, SALE, OFFER FOR SALE, TRANSFER, DELIVERY, PLEDGE, OR OTHER DISPOSITION OF THESE SECURITIES MAY BE EFFECTED EXCEPT IN COMPLAINCE WITH THE ACT, ANY APPLICABLE STATE LAWS, AND THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION AND STATE AGENCIES PROMULGATED THEREUNDER.

E.    HDI hereby grants to Brandt "piggyback" registration rights to sell the Settlement Shares under any registration statement filed by HDI within twelve (12) months of July 19, 2007, on the terms and subject to the conditions set forth on Exhibit A hereto.

2.    Promptly upon execution of this Agreement, Brandt shall cause to be filed, in the form attached hereto as Exhibits A and B respectively, the papers necessary to effectuate the withdrawal with prejudice or dismissal with prejudice of the Suit and the Appeal.

3.    The parties each expressly acknowledge that payment of the consideration of this Agreement reflects a compromise of possible claims; and that the payment is made solely to avoid the time, expense and uncertainty of litigating claims.

4.    For and in consideration of the promises, covenants, and undertakings in this Agreement, the defendants, for themselves and for each and all of their heirs, assigns, executors, administrators, affiliates, agents, officers, directors, trustees, partners, employees, shareholders, attorneys, predecessors, successors, affiliates, parent entities, subsidiary entities, and any other representatives or persons acting on their behalf (their "Related Parties"), hereby release and discharge Brandt and each and all of his Related Parties, from any and all claims, demands, rights, causes of action, judgments, executions, damages, liabilities, accounts, debts, reckonings, costs and expenses (including but not limited to attorneys' fees and court costs), known or unknown, in law or equity (collectively, the "Liabilities"), which they ever had or have, or that any of their Related Parties ever had or have.  The releases and discharges set forth in this Paragraph shall be irrevocable.

700968_4

5.      For and in consideration of the promises, covenants, and undertakings in this
Agreement, Brandt for himself and for each and all of his Related Parties, hereby releases and
discharges the defendants and each and all of their Related Parties, including without limitation
MIT Development Corp. from any and all claims, demands, rights, causes of action, judgments,
executions, damages, liabilities, accounts, debts, reckonings, costs and expenses (including but
not limited to attorneys' fees and court costs), known or unknown, in law or equity (collectively,
the "Liabilities"), which he ever had or has, or that any of his Related Parties ever had or has.
The releases and discharges set forth in this Paragraph shall be irrevocable.

6.      This Agreement:

(a) constitutes the entire agreement among the parties concerning the subject
matter hereof, and supersedes all other and prior agreements, writings, or understandings, oral or
written, with respect thereto;

(b) is contractual, not merely a recital;

(c) shall be binding upon the parties and their respective Related Parties;

(d) may be amended only by a writing signed by both parties;

(e) shall be governed by Connecticut law, without regard to its conflict of laws
principles;

(f) has been reviewed and negotiated by both parties and their counsel, and shall
be construed without regard to any presumption or other rule requiring construction against the
party drafting the provision to be interpreted, and

(g) may be executed in separate counterparts, each of which when so executed
shall constitute an original, but all of which together shall constitute one and the same
instrument.

700968_4

7.    Each of the parties represents that it has the full power and authority to enter into, have executed, and deliver this Agreement and to perform its obligations hereunder, and that this Agreement constitutes the valid and legally binding obligation of each such party, enforceable in accordance with its terms. Each person executing this Agreement represents that he or she has full right, authority and capacity to act on behalf of the party for which the Agreement is executed.

8.    The latest date set forth on the signature lines below shall be inserted in the first line of this Agreement:

9.    Before commencing any suit arising out of a claim of breach of this Agreement, the aggrieved party shall give at least thirty (30) days' written notice to the other party and its counsel of such party's intent to bring suit, unless the statute of limitations would cause any such claim to be time-barred within such thirty-day period, in which case the aggrieved party will provide as much notice as possible under the circumstances. The parties shall consult with one another in a good faith effort to resolve their differences and to avoid litigation. Counsel designated to receive such notice as of the execution date of this Agreement are as follows:

Leonard Brandt's Designated Agent:

Edward Wood Dunham, Esq.
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832;

HDI's Designated Agent:

Paul Brown, Esq.
Edward Markham, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue
New York, NY 10169

700968_4

George Holley's Designated Agent:

Paul Brown, Esq.
Edward Markham, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue
New York, NY 10169

Estate of Robert Salem, Deceased's Designated Agent:

Richard Roberts, Esq.
Nuzzo & Roberts, LLC
P.O. Box 747
Cheshire, CT 06410

10.    Any dispute arising out of or related to this Agreement shall be adjudicated in the United States District Court for the District of Connecticut; or, if the United States District Court does not have subject matter jurisdiction, by the Superior Court of the State of Connecticut, Judicial District of New Haven; or, if and only if neither of the two aforementioned courts shall have jurisdiction to hear such a dispute, in whatever court has jurisdiction.

09/04/2007 16:18 FAX  212 818 9606       SATTERLEE STEPHENS B&B              ☒015/026

**HOME DIAGNOSTICS INC.**

Date:_____        By:_____
                                  J. Richard Damron, Jr., Its C.E.O., Duly
                                  Authorized

**THE ESTATE OF ROBERT J. SALEM**

Date:_____        By:_____
                                  Judy Cheng Salem, Executrix, Duly Authorized

**GEORGE HOLLEY**

Date:_____        By:_____
                                  George Holley

**LEONARD BRANDT**

Date: _____       By:_____
                                  Leonard Brandt

\16273\1\652460.1

700968_4

09/04/2007 16:18 FAX  212 818 9606        SATTERLEE STEPHENS B&B                        ☑016/026

Exhibit A

# REGISTRATION RIGHTS AGREEMENT

By and Between

## Leonard Brandt

and

## Home Diagnostics, Inc.

09/04/2007 TUE 16:18 [TX/RX NO 5348] ☑016

09/04/2007 16:18 FAX  212 818 9606        SATTERLEE STEPHENS B&B                    ☒017/025

# TABLE OF CONTENTS

                                                                                          Page

1.      Registration Under Securities Act, etc. ....................................................................... 1

    1.1     Piggy-Back Registration. ..................................................................................... 1
    1.2     Registration Procedures. ...................................................................................... 2
    1.3     Underwritten Offerings. ....................................................................................... 3
    1.4     Stop Orders. ......................................................................................................... 3
    1.5     Indemnification. ................................................................................................... 3

2.      Holder' Obligations. ................................................................................................... 4

3.      Termination. ................................................................................................................ 5

4.      Amendment and Waiver. ............................................................................................. 5

5.      Notices. ....................................................................................................................... 5

6.      Assignment. ................................................................................................................ 5

7.      Severability. ............................................................................................................... 5

8.      Entire Agreement. ....................................................................................................... 5

9.      Descriptive Headings. ................................................................................................. 6

10.     Governing Law. .......................................................................................................... 6

700968_4

REGISTRATION RIGHTS AGREEMENT, dated as of July 19, 2007 (this "Agreement"), between Home Diagnostics, Inc., a Delaware corporation (the "Company"), and Leonard Brandt ("Holder").

This Agreement is being entered into in connection with and as part of the Agreement and Mutual Release dated as of July    , 2007 (the "Settlement Agreement"), among, *inter alia*, the Company and Holder, providing for, among other things, the transfer to Holder of an aggregate of 221,592 shares (the "Shares") of the common stock, par value $0.01 per share (the "Common Stock"), of the Company. For the purposes of this Agreement, the Shares shall be deemed to include any shares of Common Stock issued with respect to the Shares by way of a stock split, reverse stock split or combination, or stock dividend.

      1.    Registration Under Securities Act, etc.

      1.1    Piggy-Back Registration.

      (a)    Right to Include Shares. If the Company at any time proposes to file a registration statement to register shares of Common Stock under the Securities Act (other than a registration (A) on Form S-8 or S-4 or any successor or similar forms or (B) relating to Common Stock issuable upon exercise of employee share options or in connection with any employee benefit or similar plan of the Company), for sale by any of its shareholders, it will each such time give prompt written notice (the "Company Notice") to Holder of its intention to do so and of Holder's rights under this Section 1.1. Subject to Section 0 below, upon the written request of Holder (which request shall specify the amount of Shares intended to be disposed of by Holder) made as promptly as practicable and in any event within 20 days after the receipt of any such notice, the Company will use its best efforts to effect the registration under the Securities Act of all Shares which the Company has been so requested to register by Holder.

      (b)    Company Right to Withdraw Registration. Notwithstanding anything to the contrary set forth herein, (A) if the registration involves an underwritten public offering, Holder must sell his Shares to the underwriters on the same terms and conditions as apply to the other selling shareholders and (B) if, at any time after giving written notice of its intention to register any Common Stock pursuant to Section 1.1, the Company shall determine in its sole and arbitrary discretion for any reason not to register, or to withdraw such registration of, such Common Stock, the Company shall give written notice of such determination to Holder and, thereupon, may withdraw or cease to pursue such registration and shall be relieved of its obligation hereunder to register, or maintain the registration of, any Shares in connection with such withdrawn or otherwise terminated registration.

      (c)    Priority. If the Company in its sole discretion shall determine that the total amount of Shares requested to be included in a registration pursuant to Section 1.1 would have a material adverse effect on such offering, then the Company shall include in such registration, first, all securities proposed by the Company to be sold for its own account and second, all securities being offered for the account of Holder.

      (d)    Expenses. The Company will pay all registration expenses in connection with any registration effected pursuant to this Section 1.1, except that Holder shall

pay all brokerage and underwriting fees, discounts and commissions with respect to the Shares offered for sale by Holder in such registration and all fees and expenses of Holder's own counsel or advisors with respect to such registration, if any.

      1.2    Registration Procedures.(a)    Subject to Section 1.1(b), if and whenever the Company is required to effect the registration of any Shares under the Securities Act as provided in Section 1.1, the Company will, as expeditiously as possible use its best efforts to:

          (i)    furnish to Holder such number of conformed copies of such registration statement and of each such amendment and supplement thereto (in each case including all exhibits), such number of copies of the prospectus contained in such registration statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, as Holder may reasonably request; and

          (ii)    notify Holder at any time when a prospectus relating to such registration statement is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, in the light of the circumstances under which they were made, and at the request of Holder promptly prepare and furnish to Holder a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made.

      (b)    Notwithstanding the foregoing provisions of Section 1.2(a), the Company may, during the registration period, suspend the use of the prospectus included in the registration statement for an unlimited period of time if, for any reason, the Company determines in its sole discretion that it is in the best interests of the Company to suspend such use, and prior to or contemporaneously with suspending such use, the Company provides Holder with written notice of such suspension, which notice need not specify the reason for such suspension. At the end of any such suspension period, the Company shall provide Holder with written notice of the termination of such suspension.

      (c)    Holder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in subdivision (ii) of Section 1.2(a), Holder will forthwith discontinue Holder's disposition of Shares pursuant to the registration statement relating to such Shares until Holder's receipt of the copies of the supplemented or amended prospectus contemplated by subdivision (ii) of Section 1.2(a) and, if so directed by the Company, will deliver to the Company (at the Company's expense) all copies, other than permanent file copies, then in Holder's possession of the prospectus relating to such Shares current at the time of receipt of such notice.

2

(d)   Holder agrees that upon receipt of any notice from the Company of a suspension of the use of the prospectus described in Section 1.2(b), or a withdrawal of the registration statement described in Section 1.2(b), or the issuance of a stop order described in Section 1.4, Holder shall forthwith discontinue Holder's disposition of shares pursuant to such suspended or withdrawn registration statement until Holder's receipt of written notice from the Company that either such suspension has been terminated or such stop order has been withdrawn.

1.3    Underwritten Offerings. If the Company proposes to register any of its securities under the Securities Act as contemplated by Section 1.1 and such securities are to be distributed by or through one or more underwriters, at the Company's request, Holder shall be a party to the underwriting agreement between the Company and such underwriters. Holder shall not be required to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding Holder, Holder's Shares and Holder's intended method of distribution of the Shares or any other representations required by applicable law.

1.4    Stop Orders. The Company shall promptly notify Holder of any stop order issued or threatened by the Commission relating to a registration statement registering any Shares.

1.5    Indemnification.

(a)    Indemnification by the Company. The Company will, and hereby does, indemnify and hold harmless Holder, in the case of any registration statement filed pursuant to Section 1.1, against any losses, claims, damages or liabilities to which Holder may become subject under the Securities Act or otherwise, including, without limitation, the reasonable fees and expenses of legal counsel, insofar as such losses, claims, damages or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of or are based upon any untrue statement of any material fact contained in any registration statement under which Shares were registered under the Securities Act, any preliminary prospectus, final prospectus or summary prospectus contained therein, or any amendment or supplement thereto, or any omission to state therein a material fact required to be stated therein or necessary to make the statements therein in light of the circumstances in which they were made not misleading; provided, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such registration statement, any such preliminary prospectus, final prospectus, summary prospectus, amendment or supplement in reliance upon and in conformity with information furnished to the Company by or on behalf of Holder.

(b)    Indemnification by Holder. As a condition to including any Shares in any registration statement, the Company shall have received an undertaking satisfactory to it from Holder, to indemnify and hold harmless (in the same manner and to the same extent as set forth in subdivision (a) of this Section 1.5) the Company, and each director of the Company, each officer of the Company and each other person, if any, who participates as an underwriter in the offering or sale of such securities and each other person who controls the Company or any

700968_4

3

such underwriter within the meaning of the Securities Act, with respect to any statement in or omission from such registration statement, any preliminary prospectus, final prospectus or summary prospectus contained therein, or any amendment or supplement thereto, if such statement or omission was made in reliance upon and in conformity with information furnished to the Company by Holder; provided, however, that the liability of Holder shall not in any event to exceed the net proceeds received by Holder from the sale of Shares covered by such registration statement.

(c)    Notices of Claims, etc. Promptly after receipt by an indemnified party of notice of the commencement of any action or proceeding involving a claim referred to in the preceding subdivisions of this Section 1.5, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party, give written notice to the latter of the commencement of such action; provided, however, that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its obligations under the preceding subdivisions of this Section 1.5, except to the extent that the indemnifying party is actually prejudiced by such failure to give notice. In case any such action is brought against an indemnified party, the indemnifying party shall be entitled to participate in and to assume the defense thereof, to the extent that it may wish, and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof. No indemnifying party shall be liable for any settlement of any action or proceeding effected without its written consent. No indemnifying party shall, without the consent of the indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation or which requires action other than the payment of money by the indemnifying party.

2.    Holder' Obligations. Holder's right to have Shares included in a registration statement pursuant to the provisions of Section 1.1 above shall be subject to the following further conditions:

(a)    Holder shall have promptly furnished to the Company in writing any and all such information, agreements and documents regarding Holder and any distribution of Shares proposed by Holder as the Company, the managing underwriter(s) of any proposed issuance of securities by or on behalf of the Company, if any, and its counsel may reasonably request; and

(b)    Holder shall have executed and delivered to the Company such written undertakings as the Company and its counsel may reasonably require in order to assure full compliance with applicable provisions of the Securities Act and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which may include, without limitation, undertakings not to buy any securities of the same class as the Shares or to solicit such purchases by others until Holder's distribution of Shares is completed and otherwise to comply with the Commission's anti-manipulation rules, and to inform any exchange upon which the Company's common stock may be traded and the managing underwriter(s) or broker(s) participating in

09/04/2007 16:19 FAX 212 818 9606        SATTERLEE STEPHENS B&B                    ☑ 022/026

Holder's distribution of Shares of the substance of the foregoing undertakings and of any restrictions on Holder's right to sell Shares contained in the Purchase Agreement.

      3.     Termination.This Agreement and the rights granted under Section 1.1 hereof shall terminate on July 19, 2008.

      4.     Amendment and Waiver.Any provision of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and Holder. Any amendment or waiver effected in accordance with this Section 4 shall be binding upon Holder and the Company.

      5.     Notices.All notices, demands and other communications provided for or permitted hereunder shall be made in writing and shall be by registered or certified first-class mail, return receipt requested, telex, telegram, telecopier, reputable courier service or personal delivery:

      (a)     if to Holder, addressed to Holder in the manner set forth in the Settlement Agreement, or at such other address as he shall have furnished to the Company in writing; or

      (b)     if to the Company, addressed to it in the manner set forth in the Settlement Agreement, or at such other address as the Company shall have furnished to Holder in writing.

      All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; one business day after being sent by reputable courier service; three business days after being deposited in the mail, postage prepaid, if mailed; when answered back, if telexed; and when receipt is acknowledged, if telecopied.

      6.     Assignment.This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and, with respect to the Company, its respective successors and assigns. Holder may not assign this Agreement or any of his rights or obligations hereunder without the prior written consent of the Company.

      7.     Severability.In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein shall not be in any way impaired thereby.

      8.     Entire Agreement.This Agreement is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein and therein. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

700969_4

5

9.    Descriptive Headings.The descriptive headings of the several sections and paragraphs of this Agreement are inserted for reference only and shall not limit or otherwise affect the meaning hereof.

10.    Governing Law.This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of Florida applicable to agreements made and to be performed entirely within such State.