# EXHIBIT P

BRANDT'S

*Carey, Ray, Elle, Karen & Len*
28911 Via Hacienda
San Juan Capistrano, CA 92675
(949) 218-6888


September 14, 2007


Honorable Stefan R. Underhill                         **By: US Mail and Fax**
United States District Judge
District of Connecticut
914 Lafayette Boulevard
Bridgeport, CT 06604

Re:     Leonard Brandt v. MIT Development Corp., et al.
        Docket No. 3:01 cv 1889 (SRU)


Dear Honorable Judge Underhill:

As I wrote to Your Honor earlier, Wiggins and Dana no longer represents me and I have
been without counsel for some time now.  While I am still seeking new counsel, I am
writing in response to Mr. Brown's letter of September 4, 2007 regarding the Court's
assistance in compelling me to sign a formal release agreement. It includes comments on
breaches of the ruling related to the release, elements of the agreement never agreed to and
elements not anticipated to have arisen but now covered by that agreement including: legal
ability of the defendants to circumvent securities laws, misleading information provided to
the Court and defendants' insider trading actions.


I Agreed To Accept $3 Million To Settle

At the outset I must say that though I am not a lawyer, it is plain to see that what has
happened in my case was not the intention of the parties on March 8, 2007.  On March 7, in
the middle of trial, I was told by my then counsel that defendants had offered $3 million in
cash and immediately tradable HDI stock to settle the case.  As I considered tradable HDI
stock a cash equivalent, I gave my attorneys the authority to accept the offer, provided I
was protected and received the full $3 million.

At about 11:00 am the following morning, I appeared in your court by telephone.  During
that call I agreed to settle my case for $3 million.  I understood from your summary that I
would get $3 million, made up of at least $150,000 in cash and remainder in HDI stock
from both Mr. Holley and the Salem estate.  I understood that I would be able to
immediately sell the stock for cash, or hold it as an investment to sell later.

I also understood that settlement details were to be worked out between the lawyers, and if we could not come to an agreement with the defendants, you would assist informally to finalize the settlement. If there were areas of dispute concerning the details of the settlement that could not be resolved informally, you would act as a binding mediator to resolve those disputes. While I certainly had no idea that I was waiving any of my legal rights and agreeing to a private proceeding, I agreed to the Court's proposal.

When my call to the Court ended, I thought the case was over and I was protected. I would get the $3 million as agreed, and if there was any problem the Court would be there to insure I got it. I called my wife and told her we would be getting the $3 million and that I was coming home.

### My Confusion: I Am Not Getting $3 Million And The Stock Shares Bear A Restriction That Neither I Nor The Court Had Ever Seen

While there are a number of significant problems with the proposed Settlement Agreement and its terms, the biggest problem is that I am not getting the $3 million I settled for. (In fact, I haven't gotten anything.) Assuming the 221,592 shares of restricted HDI stock identified in the proposed Agreement and Mutual Release *were instead unrestricted and tradable shares*, at the closing price of $9.07 on September 12, 2007, the total value of those shares if *tradable* would be $2,009,839.40. However, the shares that defendants propose to give me are *restricted shares*. They bear restrictive language which we had asked to review, but had never seen prior to receiving the proposed Agreement and Mutual Release. Based on that restrictive language, those 221,592 shares of "restricted HDI stock" may not be saleable at all. Clearly, they are not worth anywhere near the $2,009,839.40 value of unrestricted and tradable stock. In fact, if I took possession of this stock it appears that it could not be sold at all today. What the stock may be worth in the future, if I ever have the ability to sell the stock, is a complete unknown to everybody involved in this case.

What is very confusing to me, is why I am now going to get untradable restricted stock without guarantee of tradable value, when Mr. Dunham made it clear on March 8, that such an arrangement was unacceptable and was not an option? At the hearing he accurately stated my position, " *This is, as I said to Paul in our last conversation before I came down here, if we're settling for $3 million, Mr. Brandt is required to hold the stock for some period of time and then by the time he's able to sell it, the stock is tanked and isn't worth anything, we can't resolve it on that basis.*" (See transcript page 958, lines 6-20) I don't know how I could have made my position any clearer to the Defendants or the Court. Similarly, I also believe that I made it very clear that I would settle for $3 million, but nothing less. On these points, I understood that everyone was in agreement: $3 million was the amount I would receive in the settlement, and restricted stock that I would have to hold without guarantee of value, would not be part of the settlement. As those were "agreed to issues", and not "disputed issues", they should never have been subject to change in any mediation. So how could issues we "agreed on" be changed by the mediation? How can this possibly be happening?

The Court's July 19, 2007 Ruling begins by stating that: "…total $3 million settlement proceeds would be paid by the defendants to plaintiff." I agreed to settle based on the promise of that payment.

The Ruling then states: "Defendants shall immediately pay plaintiff $600,000 in cash and $2,400,000 in restricted HDI stock. The number of shares of stock to be transferred shall be calculated using a value of 94% of the average closing price for the five (5) trading days immediately prior to today, July 19, 2007." The problem is the restrictive language on the shares:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE"ACT"), OR STATE SECURITIES LAWS, BUT HAVE BEEN ISSUED OR TRANSFERRED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT. NO DISTRIBUTION, SALE, OFFER FOR SALE, TRANSFER, DELIVERY, PLEDGE, OR OTHER DISPOSITION OF THESE SECURITIES MAY BE EFFECTED EXCEPT IN COMPLIANCE WITH THE ACT, ANY APPLICABLE STATE LAWS, EXCHANGE COMMISSION AND STATE AGENCIES PROMULGATED THEREUNDER."

First, I had never seen an HDI share certificate with this restriction, nor the restriction language, when I agreed to settle on March 8, 2007. (I don't believe the court did either.) While my counsel subsequently asked Defendants in writing for a copy of the restriction language it was not provided until it was provided in the proposed Settlement and Mutual Release. I have still not seen an actual share, or copy, with the restriction.

Second, had I seen the restriction, I would have never agreed to accept any amount of restricted HDI stock in settlement. As the Court will note, I cannot even pledge the shares as security for a loan, let alone sell them. Further, even if defendants' were able to transfer this stock and I was able to receive for sale, there is no market, no salability known to anyone for stock that cannot be pledged.

Third, it appears that neither Mr. Holley nor the Salem estate may use their restricted shares to settle with me, as they cannot distribute, sell, offer to sell, transfer or deliver their shares. Mr. Holley, in particular, is a "control person," within HDI the meaning of which I am sure the Court understands far better than I. While I don't know how Mr. Holley and the Salem estate plan to deal with or report their sale or transfer of restricted stock in terms of applicable securities laws, I cannot, and will not, be put into a situation where I am in any way a party to a securities law violation, or in violation myself, as a result of the Ruling. Based on my limited knowledge, the transfers set out in the Ruling, cannot be done.

Fourth, the shares coming from Mr. Holley and the Salem estate, were coming from insiders at HDI, which mean that the shares are subject to insider trading restrictions.

And fifth, I understand that I am not legally allowed to acquire restricted shares if I have an intention to sell them. That is a real problem, because my whole motivation for accepting shares (originally tradable common stock) was to be able to immediately sell it. I have no interest in acquiring shares of HDI, tradable or restricted, for investment purposes. Nobody has ever presumed that to be the purpose of using HDI stock in settlement. As I fully intend to sell whatever shares I get, I do not believe that I qualify to acquire restricted HDI stock in this settlement. I won't be able to sell it. It has no value today and nobody has any idea what its value will be when the trading restrictions lapse.

As my attorney articulated my position to everyone in the Court on May 8, 2007, my receiving and holding restricted stock without a guarantee of $3 million when sold was known to not be acceptable. It was not a disputed issue to be debated or mediated. He made the point that such a settlement would be rejected, and we would go back to trial. That was my position on March 8 and it is my position today.

The Proposed Settlement and Release Agreement

I do not understand how Mr. Brown can write you a letter demanding that you compel me to execute a Settlement and Release Agreement, supposedly based on the Court's July 19, 2007 ruling? The ruling states: *"Defendants shall immediately pay plaintiff $600,000 in cash and $2,400,000 in restricted HDI stock...The parties are free to enter into a formal settlement agreement, if they wish, but the terms of the payment obligation will not be delayed or otherwise affected should they choose to do so."*

According to the ruling, Defendants were to pay me immediately, and I am under no obligation to enter into any formal settlement agreement. To date, I have received nothing. As Defendants have ignored the Ruling, they have no right to ask the Court to compel me to do anything.

The Court's Ruling contemplated an immediate payment, and transfer of the shares of stock, as evidenced by the fact that the valuation of the stock was based on the five (5) trading days before July 19, 2007, the date of the Ruling. In theory any mechanism of my resale could be effected without limited market risk if this was done in a timely way. Since Defendants have not made payment for 55 days since the Ruling, to be consistent with the Court's Ruling, any calculation of the number of shares based on closing price should now be ordered recalculated to the average closing price of HDIX for the five (5) trading days immediately prior to the day the stock certificate is delivered to me, whenever that occurs. Ignoring the problems I have with the valuation method used, and delivering restricted stock, this would be the fairest way to address, and correct, any valuation problem caused by the now 55 day delay in payment from the Defendants.

In addition, since it has been 55 days since the Court made its Ruling, aren't I now entitled to receive 55 days of interest on the $3 million settlement, as if it was a judgment? At 5%, the daily rate of interest on $3 million is $410.96, and total owed as of today, is $22,602.80. If the Court elects to enforce anything, it should adjust the valuation date as discussed above, and require the payment of interest until payment is made in full.

In the proposed Settlement and Release Agreement, the Defendants have inserted provisions and clauses that I never considered, nor agreed to:

- In 1.D, it states that the share certificate I am to receive will bear legend language that I never saw before and never agreed to, and makes the stock unsalable, and nearly valueless. The first line refers to, *"The common shares of HDI trading under the symbol HDIX..."* That is stock that is registered and can be freely traded at any time on the open market. It has no legend or restriction.

  In contrast, the share certificate that I am to receive will bear the legend language, which restricts the, *"DISTRIBUTION, SALE, OFFER FOR SALE, TRANSFER, DELIVERY, PLEDGE, OR OTHER DISPOSITION OF THESE SECURITIES..."* I will not be able to sell the shares. And, as discussed above, I don't believe I can legally acquire restricted stock for purpose of resale. That is why it makes no sense to value recently acquired "restricted stock" based on public trading prices for "unrestricted stock". It is like comparing apples and oranges. There is no logic to it and it shouldn't be done.

- In 1.E, HDI supposedly gives me "piggyback" registration rights, which I never discussed or agreed to. However, those "rights" are granted, *"...on the terms and subject to the conditions set forth on Exhibit A hereto."* Exhibit A is a 6 page single spaced "Registration Rights Agreement" that I never saw before, never agreed to, and which contains restrictions (Company Rights to Withdraw Registration, Priority, etc) and obligations (Indemnification, Holder Obligations, etc.) I would have never agreed to.

- In 5, the release language is too broad, and is beyond what I can give. Further, it includes MIT Development Corp., who was not a party to the litigation, and which was never contemplated or discussed.

The Terms of the Court's Ruling

It is my hope that the Court will ultimately decide to re-visit the compensation portion of its Ruling to make it more fair in light of the previously undisclosed stock legend language restricting the shares, their salability and ultimately their value, or lack thereof, the legality of the transfer itself by Holley, a "control person" and the lack of disclosure of material adverse "inside information". Whether that happens or not, I provide the following responses to the non-payment provisions of the Court's Ruling:

- If the settlement is not set aside completely, or modified, (which I believe it should be) upon receipt of the full settlement proceeds and the interest due thereon, from Defendants, I will honor my agreement and voluntarily dismiss the appeal of the ruling granting summary judgment in favor of the Salem estate if it is still pending. Not being a lawyer, I will need the help of counsel to do that.

⊘  Upon receipt of the full settlement proceeds and the interest due thereon, from
Defendants, I will provide a general release to the Defendants for all claims that
were asserted, or could have been asserted by me against the Defendants up to
and through March 8, 2007. As that was the date we settled and the case was
dismissed, my release should track that date. I would expect to receive a similar
release from the Defendants.

I cannot provide a general release after March 8, 2007, as I now have new claims
against the Defendants, both actual and potential. The following new claims have nothing
to do with the claims asserted in my lawsuit, as they arose after my case was dismissed on
March 8, 2007:

1) Defendant's failure to immediately pay as set forth in the Ruling.

2) The mistake, and resulting Ruling, caused by Defendant's failure to make a full
disclosure of the restrictive language on the stock certificate to me and to the
Court, before the disputed settlement terms were submitted to the Court. I don't
know how Mr. Holley can legally transfer, and I can legally acquire stock which
expressly forbids in its legends any transfer/sale. I also do not know how he, a
"control persons," can make the transfer/sale to me. as.

3) Any shareholder rights I may have to make a claim against Mr. Holley, the
Salem estate and HDI for paying for personal debts with restricted stock, insider
trading and failing to disclose the very negative second quarter (ending June 30)
financial results which when announced on August 9, 2007, caused the stock to
drop from $11.34 to $8.52 (a copy of the announcement is attached). Mr.
Holley would not be allowed to take advantage of his knowledge on May 24, the
date of his proposal to the Court, of poor earnings, sales, gross margin, operating
earnings, earnings per share (EPS) and other unfavorable measures for the
quarter ending June 30 in selling his shares to the public. To the extent that he is
effectively "selling" (transferring for value) his restricted HDI stock to me, I
believe that he had an obligation to disclose his knowledge of HDI's poor
earnings and sales to me and to the Court. It is my understanding that if Mr.
Holley has possession of material adverse information on May 24 about sales
and earnings for the quarter ending June 30 that, if known, would negatively
affect the valuation of the stock, he had only two options: abstain from sale or
disclose the negative information to me, and in this case the Court, so it could be
considered. Mr. Holley did not disclose the poor second quarter earnings and
sales, or any other aspect of HDI.

4) I was never given the opportunity, as a prospective "investor" in HDI, to do any
investigation or due diligence as to the restricted stock or the company before
the Court's ruling was made. In considering the value of the HDI stock being
offered, there should have been full disclosure on the part of the owners, George
Holley and the Salem trust at the same level as if HDI was making sale of
unregistered stock. I would have required due diligence and full disclosure. I

would have made an investigation into how such securities were valued in the marketplace. I would have been able to respond to the misleading and unsupported statement: *"roughly approximates the discount in the value of the stock Mr. Brandt would receive were he to sell the stock privately, i.e. to a third party such as a broker-dealer or private investor and not on any exchange."* That statement was certainly not true when unaccompanied by full disclosure that the earnings and sales of HDI were poor for the quarter ending June 30, 2007.

5) The settlement proposal made by Defendants represented that the restricted stock proposed as payment would be saleable for 94% of the value of unrestricted and tradable stock. The proposal stated that this *"roughly approximates the discount in the value of the stock Mr. Brandt would receive were he to sell the stock privately, i.e. to a third party such as a broker-dealer or private investor and not on any exchange."* I don't know the basis for such a misleading statement and never had the opportunity before this to challenge it, but the statement is patently untrue. A 6% discount might be appropriate for a US Government security, but not for restricted and non-tradable stock of a small and volatile medical company. I learned from one of the underwriters of HDI's IPO (Initial Public Offering) the amount of discount of restricted <u>but privately salable</u> stock is dependent on the restriction. As the restriction on the HDI certificate that I would get does not allow for pledging the stock, salability of the stock would be difficult at best even if I were allowed to resell it. If a sale could take place, it would only take place at a substantial discount (30 to 70%). As we did not have a copy of the restriction language, and didn't know that settling with restricted stock was going to be proposed, we never had the opportunity to address the issue before he matter was submitted to the Court.

(Note: I don't know if it appropriate to present this information in this letter, but I believe the Court should be aware of how restricted shares are dealt with. I contacted a broker-dealer in a firm that has particular expertise in private placement of public securities, such as HDI. Their chief analyst was named by both the Wall Street Journal and Yahoo Finance as the number one biotechnology analyst this past year. In response to my questions, I received a letter from their Managing Director opining that if they were able to sell the HDI stock, the estimated discount that I would have to give to sell would be at least 35% and possibly quite a bit more in light of HDI's recent negative performance disclosures. That is substantially greater than the 6% discount set forth by Defendants. A copy of his letter is attached. Of course, this presumes that the defendants could sell or transfer restricted stock to me and that I could buy or receive it in lieu of cash settlement. No aspect of this topic had been previously investigated as both parties had agreed in settlement discussion, and acknowledged in your requested "List of Undisputed Items" and "Baseball-like Arbitration" Proposals that the best course would be to settle with cash after allowing time for the defendants to sell their own stock over six months.)

<u>This isn't what was told to me; this isn't what I told my wife.</u>

On March 7, 2007, I discussed the Defendants' settlement offer with my wife. I told her that we could take $3 million and settle, or we could continue pursuit of the $20 million we were rightfully owed. The $3 million was represented as cash and primarily stock that I could sell the next day. In the end, on the advice of all the legal experts, including my attorneys and Your Honor, we agreed to take the "sure thing". That was last March. Here I am in September, and not one dollar has been paid, and if I am paid, it will be in an amount much less than I ever agreed to.

I may also be facing a substantial tax impact that will further diminish the reduced settlement funds I receive. Tax wise, I may be compelled to recognize this as a $3 million settlement; that may mean I will have to pay $1.4 million in taxes now, while I am forced to wait a year or more to sell because of restrictions. I can't even pledge the stock to raise this money. Obviously any further drop in the value of the market shares will erode my settlement value further. As stated above, I believe that critical information was not disclosed to me or to the Court by the Defendants. As a result, the Court's Ruling did not reflect what I had agreed to and had the unintended result of being unfair. If the Ruling is not revised, or at least shifted to the other proposal offered by the Defendants in the arbitration, I will recover substantially less than I agreed to and quite possibly nothing.

So now, instead of depositing $3 million in our accounts, I will have to find money to pay taxes on money I have not received, and may never receive. What was a "sure thing" $3 million settlement, is more of a gamble of my family's assets and potentially a "lose-lose" situation that just keeps getting worse.

What I really don't want, is to be in violation of any law as a result of the Ruling, and being forced to take restricted stock, when I clearly do not qualify to acquire it. I am very concerned at how things are going, and this potential scenario may be the "Perfect Storm" for my family. I cannot believe that the current situation is what the Court intended. Certainly it was not what I thought would happen when I gave up my jury, and my case was dismissed.

If you have any questions, or require any additional information, please let me know. If you would like to schedule a hearing to go over the contents of this letter, or any of the issues I have raised, either in Court or on the phone, just let me know, as I will make myself available either way. Thank you for your consideration and indulgence.

Respectfully submitted,


Leonard J. Brandt


Cc: Paul Brown, Richard Roberts

# EXHIBIT Q

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LEONARD BRANDT,
    Plaintiff,

    v.

MIT DEVELOPMENT CORP., ET AL.,
    Defendants.

CIVIL ACTION NO.
3:01cv1889 (SRU)

## RULING REGARDING DISPUTED SETTLEMENT TERMS

On March 8, 2007, the parties settled this case. Under the terms of the settlement, which was placed on the record, I would serve as a binding mediator and impose a decision concerning the disputed terms of the settlement in the event that the parties could not otherwise resolve those disputed terms.

Following a process of "baseball arbitration," I issued a ruling regarding the disputed settlement terms on July 19, 2007. That ruling provided that the defendants would immediately pay the plaintiff $600,000 in cash and $2,400,000 in restricted HDI stock, calculated using a value of 94% of the average closing price for the five trading days immediately prior to July 19, 2007. The plaintiff would immediately voluntarily dismiss his appeal of the ruling granting summary judgment in favor of the Salem estate, and all parties would immediately exchange mutual general releases. I indicated that, although the parties were free to enter into a formal settlement agreement, the terms of the payment obligation would not be delayed or otherwise affected by any such agreement.

As of today, none of the parties have complied with the July 19, 2007 ruling. On a telephone conference today, held on the record with the plaintiff and counsel for the defendants, I discussed the status of the settlement with the parties in my continued capacity as a binding

11/01/07   17:08 FAX 203 579 3704          Chambers-Judge Underhill                    ☒003

mediator in this matter.  In that capacity, I now order the defendants to immediately pay

$600,000 cash, plus 6% interest calculated from July 20, 2007 until the date of payment, to an

escrow agent to be held in escrow for the benefit of the plaintiff.  In addition, the defendants will

pay $2,400,000 in restricted HDI stock into escrow.  The number of shares of HDI stock to be

transferred shall be calculated using a value of 94% of the average of that stock's valuation price

set forth in the July 19 ruling (i.e., the average closing price for the five trading days prior to July

19, 2007) and the closing price on October 30, 2007.  Plaintiff shall be accorded piggyback rights

to sell his HDI shares under any registration filed by HDI within twelve months from today.

The plaintiff shall immediately voluntarily dismiss the appeal of the ruling granting

summary judgment in favor of the Salem estate.  The parties shall immediately exchange mutual

general releases.  As I indicated earlier, the parties are free to enter into a formal settlement

agreement if they wish.  I stress that the terms of the parties' obligations set forth above will not

be delayed or otherwise affected should the parties choose to do so.

Although captioned a "ruling," this decision shall be treated as a private event.  This

decision will be sent to the parties, but will not be docketed unless a party requires docketing in a

proceeding to enforce the settlement agreement.  This court will retain jurisdiction to enforce the

terms of the parties' settlement agreement, including those terms imposed by this ruling.


It is so ordered.

Issued this _3/st_ day of October 2007 at Bridgeport, Connecticut.


                                        Stefan R. Underhill
                                        United States District Judge

# EXHIBIT R

BRANDT'S

*Carey, Ray, Elle, Karen & Len*
28911 Via Hacienda
San Juan Capistrano, CA 92675
(949) 218-6888

November 15, 2007

Paul Brown                                    **By: Fax and FedEx w/ originals**
Satterlee Stephens Burke & Burke, LLP
230 Park Avenue
New York, NY 10189

Richard A. Roberts                            **BY: Fax only with copies**
Nuzzo & Roberts, LLC
P.O. Box 747
One Town Center
Cheshire, Connecticut 06410

Re:    Leonard Brandt v. MIT Development Corp., et al.
       Docket No. 3:01 cv 1889 (SRU)

Dear Mr. Brown and Mr. Roberts:

I have not received the $600,000 payment, plus interest I am supposed to receive. Similarly, I have not received the HDI stock either.

The following are my calculations of what I am to receive according to Judge Underhill's ruling on October 31, 2007. As to the revised calculation of the number of shares of stock I am now to receive in accordance with the Court's October 31, 2007 ruling, I am relying on the following calculations: The average closing value of traded HDI stock on the 5 trading days before July 20, 2007 was $11.522 per share. On October 30, 2007, the day before the October 31, 2007 conference call, HDI stock closed at $8.93 per share. Judge Underhill instructed that 94% of the average of those two closing prices be used in calculating a settlement share value of $9.61244. Dividing the settlement share value of $ 9.61244 into the $2,400,000 stock settlement value, means that I am to receive 249,676 shares.

As for the cash, I am to receive $600,000 plus 6% per annum interest from July 20, 2007 to the anticipated immediate payment on October 31, 2007. 103 days of a 365 day year at a non-compounded 6% annual interest on $600,000 is $10,158.90

Enclosed is my fully executed General Release which I agreed to provide as part of the Settlement that was put on the record on March 8, 2007. In my General Release, I release all of my claims and causes of action that were in my complaint when we settled on March 8, 2007. To be fair, my General Release also includes any claims I had that could have been asserted in the lawsuit, even if they weren't. Even though I am signing my General Release today, more than eight months after my complaint was dismissed, it is my intention to release today, all claims and causes of action that

were asserted in my complaint, or could have been asserted in my complaint, before we settled on March 8, 2007. I am sending my release directly to you so there is no excuse for any more delay.

As I am sure you will note, my General Release is not as broad as the draft release you sent me to sign a week ago. While you apparently want me to release any claims I may have that arose after the Settlement on March 8, 2007, to the extent that any such claims exist, I am unwilling to release such new claims without additional compensation. As I have not been offered, nor have I received any additional compensation beyond the amount of the Settlement, I believe the enclosed General Release is all I am required to provide.

The Registration Rights Agreement you sent me, is very onerous and burdensome. It contains restrictions and indemnity obligations that were never discussed, nor agreed to. More importantly, much of the Agreement you are asking me to sign, is very unfair. At the time we settled, I never agreed to sign a seven (7) page, single spaced Registration Rights Agreement I had never seen, or to be bound by its terms and conditions. Having no way to now challenge the Registration Rights Agreement, or better secure my "piggyback rights" I have signed the Agreement, but I hereby reserve all my rights.

Accordingly, my signed HDI Registration Rights Agreement is enclosed. (Please note that that the calculation of the number of shares to be provided, 249,579, is wrong. As calculated above, the number is 249,676. I signed the Registration Rights Agreement after correcting the number of shares, and initialing the change.)

The Court ordered me to withdraw my appeal against the Salem estate as I agreed to do as part of the Settlement put on the record on March 8, 2007. During the October 31, 2007 telephonic conference, Mr. Roberts graciously offered to follow Judge Underhill's suggestion of sending me a draft pleading that I could then sign and have filed to dismiss the appeal. As soon as Mr. Roberts can get me those documents, I will get them signed and filed. Mr. Roberts, your assistance in this regard is appreciated.

And using your language, be advised that I do not agree with Judge Underhill's October 31, 2007 ruling, the amount of additional interest and stock calculation, or the Court's July 19, 2007 ruling; However, I will comply with it. If, however, defendants do not comply with the ruling by failing to immediately deliver the cash and stock as ordered, or by challenging the scope of my General Release I have provided, I will seek sanctions and attorneys' fees, and hereby reserve all of my rights, at law and in equity.

You have asked for my social security number. It is ███████   Now that you have my signed General Release, my signed Registration Rights Agreement, and my social security number, please have the cash and stock delivered to me immediately.

Sincerely,

Len Brandt

cc: Honorable Stefan R. Underhill w/ enclosures



## GENERAL RELEASE

**TO ALL WHOM THESE PRESENTS SHALL COME OR MAY CONCERN, KNOW THAT,** Leonard J. Brandt ("Brandt"), for himself and for any of his heirs, spouses, dependents, executors, administrators, legal representatives, attorneys, employees, agents, fiduciaries, trustees, successors and/or assigns, as **Releasor**, upon receipt of the amount of cash and HDI stock set forth in Judge Underhill's Ruling Regarding Disputed Settlement Terms, issued October 31, 2007, releases, waives and discharges Home Diagnostics, Inc. ("HDI"), George Holley ("Holley"), and the Estate of Robert J. Salem (the "Estate"), as **Releasees**, and the **Releasees'** past, present and/or future heirs, spouses, dependents, executors (including, by way of example and not limitation, Judy Cheng Salem, Executrix of the Estate), administrators, legal representatives, attorneys, employees, agents, fiduciaries, trustees, directors, officers, shareholders, subsidiaries, parents, owners, affiliates (including, by way of example and not limitation, MIT Development Corp.), successors and/or assigns, from all actions, causes of action, claims, counterclaims, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, liens, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, extents, executions, liabilities, attorney's fees, costs, damages, profits, value, interest, equity, collections, revenue, assets and/or demands whatsoever, in law, admiralty or equity (hereinafter, "Claims"), which: (i) arose out of or was in any way connected with any consulting services or similar services provided to HDI, MIT Development Corp., ASC, Inc., Holley and/or the Estate; and/or (ii) and all that were asserted, or could have been asserted, in the action captioned *Leonard Brandt v. MIT Development Corp., et al.* (Civ. Action No. 3:01cv1889).

The words **"Releasor"** and **"Releasees"** include all releasors and all releasees under this **Release**. This **Release** may not be changed orally and is irrevocable.

The **Releasor** represents that he executes this **Release** freely and voluntarily, and that he has had an opportunity to consult with an attorney to his satisfaction prior to signing this **Release**.

**IN WITNESS WHEREOF**, the RELEASOR has caused this RELEASE to be executed on November 15, 2007.

LEONARD J. BRANDT

By: Leonard J. Brandt

**Uniform Form of Acknowledgment Within the State of California**

State of California        )
                          )    ss.:
County of Orange           )
_____

    On the 15th day of November, in the year 2007, before me the undersigned, a Notary Public in and for said State, personally appeared Leonard J. Brandt, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within General Release and acknowledged to me that he executed the same, and that by his signature on the instrument, the individual executed the instrument.

DANIEL R. PEREZ
Commission # 1461764
Notary Public - California
Orange County
My Comm. Expires Jan 10, 2008

Notary Public

Daniel R. Perez

# REGISTRATION RIGHTS AGREEMENT

By and Between

Leonard Brandt

and

Home Diagnostics, Inc.

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| 1. | Registration Under Securities Act, etc. | | 1 |
|  | 1.1 | Piggy-Back Registration. | 1 |
|  | 1.2 | Registration Procedures. | 2 |
|  | 1.3 | Underwritten Offerings. | 3 |
|  | 1.4 | Stop Orders. | 3 |
|  | 1.5 | Indemnification. | 3 |
| 2. | Holder' Obligations. | | 4 |
| 3. | Termination | | 5 |
| 4. | Amendment and Waiver. | | 5 |
| 5. | Notices. | | 5 |
| 6. | Assignment. | | 6 |
| 7. | Severability. | | 6 |
| 8. | Entire Agreement. | | 6 |
| 9. | Descriptive Headings. | | 6 |
| 10. | Governing Law. | | 6 |
| 11. | Signatures. | | 6 |

REGISTRATION RIGHTS AGREEMENT, dated as of October 31, 2007 (this "Agreement"), between Home Diagnostics, Inc., a Delaware corporation (the "Company"), and Leonard Brandt ("Holder" or "Brandt").

This Agreement is being entered into to provide Brandt "piggyback" registration rights to sell shares of HDI stock (which Brandt receives in settlement as per the Court's rulings dated July 19, 2007 and October 31, 2007) under any registration statement filed by HDI within twelve (12) months of October 31, 2007, and to transfer to Brandt an aggregate of ~~249,579~~ 249,676 *LB* shares (the "Shares") of the common stock, par value $0.01 per share (the "Common Stock"), of the Company as per the Court's above-mentioned settlement rulings. For the purposes of this Agreement, the Shares shall be deemed to include any shares of Common Stock issued with respect to the Shares by way of a stock split, reverse stock split or combination, or stock dividend.

1.      Registration Under Securities Act, etc.

1.1     Piggy-Back Registration

(a)     Right to Include Shares. If the Company at any time proposes to file a registration statement to register shares of Common Stock under the Securities Act (other than a registration (A) on Form S-8 or S-4 or any successor or similar forms or (B) relating to Common Stock issuable upon exercise of employee share options or in connection with any employee benefit or similar plan of the Company), for sale by any of its shareholders, it will each such time give prompt written notice (the "Company Notice") to Holder of its intention to do so and of Holder's rights under this Section 1.1. Subject to Section 0 below, upon the written request of Holder (which request shall specify the amount of Shares intended to be disposed of by Holder) made as promptly as practicable and in any event within 20 days after the receipt of any such notice, the Company will use its best efforts to effect the registration under the Securities Act of all Shares which the Company has been so requested to register by Holder.

(b)     Company Right to Withdraw Registration. Notwithstanding anything to the contrary set forth herein, (A) if the registration involves an underwritten public offering, Holder must sell his Shares to the underwriters on the same terms and conditions as apply to the other selling shareholders and (B) if, at any time after giving written notice of its intention to register any Common Stock pursuant to Section 1.1, the Company shall determine in its sole and arbitrary discretion for any reason not to register, or to withdraw such registration of, such Common Stock, the Company shall give written notice of such determination to Holder and, thereupon, may withdraw or cease to pursue such registration and shall be relieved of its obligation hereunder to register, or maintain the registration of, any Shares in connection with such withdrawn or otherwise terminated registration.

(c)     Priority. If the Company in its sole discretion shall determine that the total amount of Shares requested to be included in a registration pursuant to Section 1.1 would have a material adverse effect on such offering, then the Company shall include in such registration, first, all securities proposed by the Company to be sold for its own account and second, all securities being offered for the account of Holder.

(d)    Expenses.  The Company will pay all registration expenses in connection with any registration effected pursuant to this Section 1.1, except that Holder shall pay all brokerage and underwriting fees, discounts and commissions with respect to the Shares offered for sale by Holder in such registration and all fees and expenses of Holder's own counsel or advisors with respect to such registration, if any.

1.2    Registration Procedures.  (a) Subject to Section 1.1(b),  if and whenever the Company is required to effect the registration of any Shares under the Securities Act as provided in Section 1.1, the Company will, as expeditiously as possible use its best efforts to:

(i)    furnish to Holder such number of conformed copies of such registration statement and of each such amendment and supplement thereto (in each case including all exhibits), such number of copies of the prospectus contained in such registration statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, as Holder may reasonably request; and

(ii)    notify Holder at any time when a prospectus relating to such registration statement is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, in the light of the circumstances under which they were made, and at the request of Holder promptly prepare and furnish to Holder a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made.

(b)    Notwithstanding the foregoing provisions of Section 1.2(a), the Company may, during the registration period, suspend the use of the prospectus included in the registration statement for an unlimited period of time if, for any reason, the Company determines in its sole discretion that it is in the best interests of the Company to suspend such use, and prior to or contemporaneously with suspending such use, the Company provides Holder with written notice of such suspension, which notice need not specify the reason for such suspension.  At the end of any such suspensio n period, the Company shall provide Holder with written notice of the termination of such suspension.

(c)    Holder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in subdivision (ii) of Section 1.2(a), Holder will forthwith discontinue Holder's disposition of Shares pursuant to the registration statement relating to such Shares until Holder's receipt of the copies of the supplemented or amended prospectus contemplated by subdivision (ii) of Section 1.2(a) and, if so directed by the Company, will deliver to the Company (at the Company's expense) all copies, other than permanent file

711642_3

copies, then in Holder's possession of the prospectus relating to such Shares current at the time of receipt of such notice.

(d)    Holder agrees that upon receipt of any notice from the Company of a suspension of the use of the prospectus described in Section 1.2(b), or a withdrawal of the registration statement described in Section 1.2(b), or the issuance of a stop order described in Section 1.4, Holder shall forthwith discontinue Holder's disposition of shares pursuant to such suspended or withdrawn registration statement until Holder's receipt of written notice from the Company that either such suspension has been terminated or such stop order has been withdrawn.

1.3    <u>Underwritten Offerings</u>.  If the Company proposes to register any of its securities under the Securities Act as contemplated by Section 1.1 and such securities are to be distributed by or through one or more underwriters, at the Company's request, Holder shall be a party to the underwriting agreement between the Company and such underwriters.  Holder shall not be required to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding Holder, Holder's Shares and Holder's intended method of distribution of the Shares or any other representations required by applicable law.

1.4    <u>Stop Orders</u>.  The Company shall promptly notify Holder of any stop order issued or threatened by the Commission relating to a registration statement registering any Shares.

1.5    <u>Indemnification</u>.

(a)    <u>Indemnification by the Company</u>.  The Company will, and hereby does, indemnify and hold harmless Holder, in the case of any registration statement filed pursuant to Section 1.1, against any losses, claims, damages or liabilities to which Holder may become subject under the Securities Act or otherwise, including, without limitation, the reasonable fees and expenses of legal counsel, insofar as such losses, claims, damages or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of or are based upon any untrue statement of any material fact contained in any registration statement under which Shares were registered under the Securities Act, any preliminary prospectus, final prospectus or summary prospectus contained therein, or any amendment or supplement thereto, or any omission to state therein a material fact required to be stated therein or necessary to make the statements therein in light of the circumstances in which they were made not misleading; <u>provided</u>, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such registration statement, any such preliminary prospectus, final prospectus, summary prospectus, amendment or supplement in reliance upon and in conformity with information furnished to the Company by or on behalf of Holder.

(b)    <u>Indemnification by Holder</u>.  As a condition to including any Shares in any registration statement, the Company shall have received an undertaking satisfactory to it from Holder, to indemnify and hold harmless (in the same manner and to the same extent as set

3

forth in subdivision (a) of this Section 1.5) the Company, and each director of the Company, each officer of the Company and each other person, if any, who participates as an underwriter in the offering or sale of such securities and each other person who controls the Company or any such underwriter within the meaning of the Securities Act, with respect to any statement in or omission from such registration statement, any preliminary prospectus, final prospectus or summary prospectus contained therein, or any amendment or supplement thereto, if such statement or omission was made in reliance upon and in conformity with information furnished to the Company by Holder; provided, however, that the liability of Holder shall not in any event to exceed the net proceeds received by Holder from the sale of Shares covered by such registration statement.

      (c)    <u>Notices of Claims, etc</u>.  Promptly after receipt by an indemnified party of notice of the commencement of any action or proceeding involving a claim referred to in the preceding subdivisions of this Section 1.5, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party, give written notice to the latter of the commencement of such action; <u>provided</u>, <u>however</u>, that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its obligations under the preceding subdivisions of this Section 1.5, except to the extent that the indemnifying party is actually prejudiced by such failure to give notice.  In case any such action is brought against an indemnified party, the indemnifying party shall be entitled to participate in and to assume the defense thereof, to the extent that it may wish, and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof.  No indemnifying party shall be liable for any settlement of any action or proceeding affected without its written consent.  No indemnifying party shall, without the consent of the indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation or which requires action other than the payment of money by the indemnifying party.

      2.    <u>Holder' Obligations</u>.  Holder's right to have Shares included in a registration statement pursuant to the provisions of Section 1.1 above shall be subject to the following further conditions:

      (a)    Holder shall have promptly furnished to the Company in writing any and all such information, agreements and documents regarding Holder and any distribution of Shares proposed by Holder as the Company, the managing underwriter(s) of any proposed issuance of securities by or on behalf of the Company, if any, and its counsel may reasonably request; and

      (b)    Holder shall have executed and delivered to the Company such written undertakings as the Company and its counsel may reasonably require in order to assure full compliance with applicable provisions of the Securities Act and the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which may include, without limitation, undertakings not to buy any securities of the same class as the Shares or to solicit such purchases by others until Holder's distribution of Shares is completed and otherwise to comply with the

4

Commission's anti-manipulation rules, and to inform any exchange upon which the Company's common stock may be traded and the managing underwriter(s) or broker(s) participating in Holder's distribution of Shares of the substance of the foregoing undertakings and of any restrictions on Holder's right to sell Shares contained in the Purchase Agreement.

      3.    <u>Termination</u>. This Agreement and the rights granted under Section 1.1 hereof shall terminate on October 31, 2008.

      4.    <u>Amendment and Waiver</u>. Any provision of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and Holder. Any amendment or waiver effected in accordance with this Section 4 shall be binding upon Holder and the Company.

      5.    <u>Notices</u>. All notices, demands and other communications provided for or permitted hereunder shall be made in writing and shall be by registered or certified first-class mail, return receipt requested, telex, telegram, telecopier, reputable courier service or personal delivery:

      (a)    if to Holder, addressed in the manner set forth below, or at such other address as he shall have furnished to the Company in writing:

> Leonard Brandt
> CNS Response
> 2755 Bristol Street, Suite 285
> Costa Mesa, CA 92626-5985
>
> Fax: (714) 545-2994

      (b)    if to the Company, addressed in the manner set forth below, or at such other address as the Company has furnished to the Holder in writing:

> Paul Brown, Esq.
> Edward Markham, Esq.
> Satterlee Stephens Burke & Burke LLP
> 230 Park Avenue
> New York, NY 10169-0079
>
> Fax: (212) 818-9606

All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; one business day after being sent by reputable courier service; three business days after being deposited in the mail, postage prepaid, if mailed; when answered back, if telexed; and when receipt is acknowledged, if telecopied.

711642_3

6.    <u>Assignment</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and, with respect to the Company, its respective successors and assigns. Holder may not assign this Agreement or any of his rights or obligations hereunder without the prior written consent of the Company.

7.    <u>Severability</u>. In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein shall not be in any way impaired thereby.

8.    <u>Entire Agreement</u>. This Agreement is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein and therein. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

9.    <u>Descriptive Headings</u>. The descriptive headings of the several sections and paragraphs of this Agreement are inserted for reference only and shall not limit or otherwise affect the meaning hereof.

10.    <u>Governing Law</u>. This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of Florida applicable to agreements made and to be performed entirely within such State.

11.    <u>Signatures</u>. The parties hereby signify their agreement to the above terms by their signatures below. The authorized representative of the Company represents that he is authorized to execute this Agreement on behalf of the corporate entity. Brandt represents that he executes this Agreement on his own behalf, freely and voluntarily, and that he has had an opportunity to consult with an attorney to his satisfaction prior to signing this Agreement.

HOME DIAGNOSTICS, INC.

Date:_____    By:_____
                                                    J. Richard Damron, Jr., Its C.E.O., Duly
                                                    Authorized

**LEONARD BRANDT**

Date: _November 15, 2002_    By: _Leonard J Brandt_
                                                    Leonard Brandt

6

711642_3