# EXHIBIT S

SATTERLEE STEPHENS BURKE & BURKE LLP

230 PARK AVENUE

METROPARK
33 WOOD AVENUE SOUTH
ISELIN. NJ 08830
(732) 603-4966

NEW YORK, NY 10169-0079

(212) 818-9200

E-Mail: azeisler@ssbb.com
Direct Dial: (212) 404-8737

FAX (212) 818-9606. 9607
www.ssbb.com

November 16, 2007

**VIA FEDERAL EXPRESS**

Honorable Stefan R. Underhill
United States District Judge
915 Lafayette Boulevard
Bridgeport, Connecticut 06604

Re: Brandt v. Home Diagnostics, Inc., et al. - CV No. 3:01-1889 (SRU)

Dear Judge Underhill:

We seek the Court's intervention to put an end to Mr. Brandt's violations of Your Honor's October 31, 2007 ruling regarding disputed settlement terms and the related directions given at the October 30 telephonic conference (the "Ruling"). In short, the Defendants arranged for an escrow agent and placed in escrow signed releases, shares of stock, a registration rights agreement and cash, with interest, for Mr. Brandt's benefit, whereas Mr. Brandt has violated the Ruling by: (i) failing to dismiss the appeal against the Salem Estate, and (ii) failing to deliver a full release to the escrow agent for the benefit of Defendants.

As Your Honor directed, defense counsel drafted and sent Mr. Brandt and the Defendants: (i) mutual Releases, and (ii) a registration rights agreement (to effectuate Mr. Brandt's 12-months of piggy-back registration rights), along with instructions to forward them to the escrow agent, Cozen O'Connor. (Attached hereto as Exhibit A is a copy of the correspondence to Mr. Brandt enclosing the Releases, a Registration Rights Agreement and escrow agent instructions).

Under separate cover, counsel for the Salem Estate also sent Mr. Brandt the documents necessary to dismiss the appeal against the Estate – although he never accepted the certified mailing containing them (which counsel has now re-sent). See Ex. B.

Defendants then funded the escrow with the required $600,000 payment plus interest from July 20 to the date of payment. Defendants even funded $10,849.32 in interest (see Ex. C), which is more interest than Brandt himself claims he is owed. Compare Brandt's Nov. 15 Ltr. ($10,158.90).

Defendants also calculated the required HDI stock as 249,579 shares based upon Your Honor's Ruling. See Ex. D. In an abundance of caution, Defendants even performed the calculation so that Mr. Brandt would receive 99 more shares than he was owed so that he would not complain about rounding or decimal places. See id. ($2,400,000 divided by $9.62 equals

702614_2

SATTERLEE STEPHENS BURKE & BURKE llp

November 16, 2007
Page 2

only 249,480 shares, but Defendants used $9.616 as the price so that Mr. Brandt would receive 249,579 and, hopefully, not complain). Moreover, despite the fact that Mr. Brandt has ignored correspondence from defense counsel and has refused to provide his social security number so that Deutsche Bank could send HDI shares in Mr. Brandt's name to the escrow agent (see Ex. E), Defendants have managed to work around Mr. Brandt's intransigence by transferring shares through various steps (a time consuming and paperwork intensive process) so that they could be put in his name for the escrow.

Yet, no good deed by Defendants goes unpunished. First, Mr. Brandt writes Your Honor asking for assistance in getting paid when he has not satisfied his obligations, such as dismissing the appeal against the Estate (even though Mr. Roberts sent him the required documents on November 7, 2007). See Ex. B.

Second, Mr. Brandt has altered his Release of the Defendants so that it does not release all claims through the date of his signature -- November 2007 -- as Your Honor had directed. (Please compare his modified release to the mutual Releases attached hereto as Ex. A). Indeed, the Defendants raised the issue of the time-period of Mr. Brandt's release with Your Honor during the parties' October 30, 2007, telephonic conference -- especially given the specter of new fraud and misrepresentation claims raised by Mr. Brandt in his letter dated September 14, 2007. In fact, Your Honor told the Defendants that, even though they were obligated to give more shares to Mr. Brandt because the Court was altering the calculation of shares of stock (basing it on the average of the stock price on October 30, 2007 and the five July 2007 trading days), the Defendants were gaining a release from Mr. Brandt that would extend through November 2007 instead of only March 8, 2007. Yet, Mr. Brandt's proposed release falls far short of the Court's Ruling, as it only deigns to release claims arising from the lawsuit and his alleged consulting services.

For these reasons, we respectfully request that the Court: (i) compel Mr. Brandt to dismiss the appeal immediately as per the Court's Ruling; (ii) compel Mr. Brandt to execute the same, full Release that the Defendants have executed in favor of Mr. Brandt (Ex. A); and (iii) adjudge that Defendants have no liability to Mr. Brandt for "non-payment" of the settlement (the cash, stock and releases that are sitting in escrow for his benefit), until he delivers the requisite Release (Ex. A) to the escrow agent.

Respectfully,

Aaron M. Zeisler

AMZ:cag
Encl.

cc:    Leonard Brandt
       Richard Roberts, Esq.

702614_2

# EXHIBIT T

BRANDT'S

*Carey, Ray, Elle, Karen & Len*
28911 Via Hacienda
San Juan Capistrano, CA 92675
(949) 218-6888


December 5, 2007


Aaron Zeisler                                    **By: Fax**
Paul Brown
Satterlee Stephens Burke & Burke, LLP
230 Park Avenue
New York, NY 10189

Richard A. Roberts
Nuzzo & Roberts, LLC
P.O. Box 747
One Town Center
Cheshire, Connecticut 06410

Re:    Leonard Brandt v. MIT Development Corp., et al.
       Docket No. 3:01 cv 1889 (SRU)


Dear Mr. Zeisler:

As I stated in my November 21, 2007 letter, if I did not receive the cash and my stock by November 27, 2007, I would then more fully address the misrepresentations and misstatements in your letter.

As my signed paperwork to dismiss the appeal has now been received, and I believe you now understand that the only reason I had not dismissed the appeal was the fact that I had not received the dismissal papers, it is clear that I was not in violation of the Court's ruling as you claimed. As the appeal should have been dismissed by now, the issue of the dismissal has been resolved.

In the first paragraph of your letter you state: "… Defendants arranged for an escrow agent and placed in escrow signed releases, shares of stock, a registration rights agreement and cash, with interest…" Why did you do that? The first time an "escrow" was mentioned, was during our last telephonic conference with the Court, and it was merely as suggestion made by the judge in response to Defendant's concern I would not provide a General Release. As I sent my General Release directly to your office, there was never any need for an escrow.

More importantly, how can you open an escrow without my consent and without any agreed to escrow instructions? I was neither asked nor consulted about establishing an

"escrow", and I was never sent any instructions. To this day, I do not know what was sent to the "escrow". I have not received any copies of the documents that were delivered to the escrow, nor copies of any transmittals or conditions of deposit and release. And, as you have not told me where and how my money is being held, I don't know if it is in an interest bearing account. If it is not in an interest bearing account, I am losing one hundred dollars a day in interest! Who is going to compensate me for all that lost interest?

You have my signed General Release, my signed Registration Rights Agreement and I have dismissed the Appeal. I do not understand how you sending my cash and my stock to some third party, without my agreement or permission, allows you to represent to the Court that the Defendants have complied with the Court's order to pay me "immediately"!

With regard to the calculation of interest due, prior to my September 15, 2007 letter, your office made no attempt to calculate, let alone agree on the amount of interest that was owed. It was my understanding that interest was to be paid up until the date that I received payment. Not knowing when you would be making payment, I had no way of accurately calculating the amount of interest due. In order to minimize any further delay or debate, I calculated the amount of interest to a fixed date, and told you in my letter what payment I would accept. As a result, my number was less than the number you calculated. While I would have accepted the $10,158.90 set forth in my letter as the total interest owed if it had been paid, it wasn't. As a result, the amount of interest owed has increased, and is increasing every day. The total amount of interest to now be paid will again depend on when I receive payment.

When discussing the calculation of the number of share of stock that should have been delivered to me by now, you wrote the judge, "Yet, no good deed by Defendants goes unpunished." What "good deed" could you possibly be referring to? When you do the math using the correct trading figures, which I did in my letter, I should have received 249,676 shares. Instead, I have received nothing. You under calculated the number of shares I was to receive, and then you didn't give them to me. How is that a "good deed?"

Stupidly, I agreed to dismiss my case based on the promise I would get $3,000,000 in cash and fair value of stock of unknown restrictions. It is now December, and I have not received a cent. The fact of the matter is the value of the 249,579 shares the Defendants calculated they now owe me, accepting Judge Underhill's ruling to value that stock at 94% of the current trading value, is $1,800,963. Setting aside the fact that I have yet to receive anything, nearly $600,000 of value of the settlement that I agreed to in March of this year has been taken from me. Delaying payment to me for all these months has benefited the Defendants, not me. Defendants now stand to save nearly $600,000. Where is the fairness or equity in that? Clearly, the "good deed" you are referring to, is from the Defendant's point of view, not mine.

My signed General Release relates to the lawsuit, and the claims in that lawsuit, which was dismissed last March. At the urgings of all counsel and the court, I dismissed my lawsuit, and all the claims in it, based on the promise that I would receive $3,000,000 of value. Clearly, that was a mistake as we are now nine months later, I have received nothing

despite what seemed to be fairly blatant instructions from the court and somehow it seems that should there ever be a transfer of cash and stock it won't be worth $3,000,000, the basis of the settlement that I understood was being exchanged for dismissal of the case. In hindsight, my dismissal of the case should have been contingent on receiving the $3,000,000 in value. Payment and the dismissal of my case should have been done concurrently, along with the exchange of general releases.

When I agreed to settle on March 8, 2007, my case was dismissed, and the Defendants got the immediate benefit. My signed General Release reflects the fact that when I finally get paid what I was promised, I release all of the claims I asserted, or could have asserted in the lawsuit that I have already dismissed: nothing more and nothing less.

In your letter, you argue that Defendants should get a general release of all claims up through November 2007. Why should the Defendants delay in paying me warrant them getting a broader release than if they had paid promptly in accordance with the Court's order?

I am not a lawyer. I do not know whether or not I have any claims against the Defendants that have arisen after I dismissed my lawsuit. You assert that Defendants have done nothing wrong, and that I have no possible claim. I have been advised by some people knowledgeable in these matters, that I may have some claims. Judge Underhill in our last conference call, in response to my concerns about subsequent claims, advised that I should "get a lawyer", as any new claims were not part of the matter tried before him. If, as you assert, I have no claims against the Defendants, then Defendants have no risk, and there is no reason why Defendants should not be satisfied with the General Release I signed. However, your insistence on Defendants receiving a release of all claims through the date of my signature on my General Release makes me believe I do have claims.

Clearly, Defendants are not paying me anything to settle or resolve any claims I have that arose after I dismissed my lawsuit. And, as I do not know what claims I have that arose after our settlement, I will not give Defendants a general release up through the date I signed my release in November. While I do not understand Judge Underhill's role, or legal authority over my lawsuit after it was dismissed, or over me now, I understand that he has no authority over me and claims I may have against the Defendants, that arose after my case before him was dismissed. The only agreement I made was to dismiss my lawsuit. I do not believe I can be forced to dismiss or release anything else. Indeed, it would be unreasonable to expect that either party would release the other for claims that arose after the dismissal. For example, if Mr. Holley or the Salem estate didn't have clear, rightful and unencumbered title to the stock being transferred, if the was an assertion of wrong doing by which he came to possess the stock or even stole the shares of HDI stock that he ultimately transfers to me, and the rightful owner makes a demand on me to get them back, I must be able to pursue Mr. Holley for indemnity. The release you are seeking, would not allow me to seek that relief.

You have again delayed payment to me creating further exposure to erosion of value. We now have to go back before Judge Underhill , because: 1) you have not yet paid me, and, 2)

you are demanding a general release that goes well beyond the date my case was dismissed, and to what you are entitled. To be fair and equitable, Judge Underhill will again have to determine the following: the amount of interest that must be paid, a new closing date for the calculation of share value, and the number of shares to be transferred. This time, I will suggest that the Court set a "closing" date in the future. This will allow agreement of the exact formula by which interest calculation and share to be transferred will be determined. I believe the court should acknowledge that no transfer of any cash or stock has occurred. I understand that you will make arguments about how this is my fault and for some reason I should be penalized. I will of course, argue that point of view is ridiculous and the fault is blatantly defendants who have also benefitted at my cost. I will ask Judge Underhill to set a date in the future, follow the original formula that he ruled to be applicable for determining transfer of $3,000,000 of value, have the parties agree exactly to the formula for calculation and have that value transferred on that date, for better or worse of what the stock price is on the date of actual transfer. In this way by the formula that he has chosen there will be a calculable value of $3,000,000 which, by the way, should also satisfy the defendant of their concerns that I might have further claims against the defendants for their actions after the case was dismissed.

You already have my General Release and my dismissal of the Salem Appeal so there is no reason, or excuse for the Defendants to delay payment any further. If Defendants refuse to pay me now, I will obviously have to bring some kind of legal action to enforce the terms of the March 8, 2007 settlement agreement we put on the record in court. While Defendants may ask Judge Underhill to order me to extend my General Release through the date of my signature, I do not believe Judge Underhill has the authority to force me to do that over my objections. I understand that I cannot be forced to release claims I have yet to assert, and that were not before The Court in the trial. The only way I would even consider giving Defendants a release of all claims through the date of my signature, would be if Defendants transferred to me the value agreed to, $3,000,000 in the manner the defendants proposed and Judge Underhill elected in what has been termed "baseball arbitration". In that order, value at transfer was to be $3,000,000 on the date of transfer. In this way, everything would be calculated and exchanged as of the same date, and we would all be taking and sharing in the future risk how that value might change based on stock price. But on the day of transfer all parties the original formula would be applied. Though that would be the fairest thing to do under the circumstances, I am sure your goals and interpretations are otherwise.

Sincerely,


Leonard Brandt



Cc: Honorable Judge Stephen Underhill

# EXHIBIT U

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LEONARD BRANDT,
    Plaintiff,

v.

MIT DEVELOPMENT CORP., ET AL.,
    Defendants.

CIVIL ACTION NO.
3:01cv1889 (SRU)

## THIRD RULING REGARDING DISPUTED SETTLEMENT TERMS

On March 8, 2007, the parties settled this case. Under the terms of the settlement, which was placed on the record, I would serve as a binding mediator and impose a decision concerning the disputed terms of the settlement in the event that the parties could not otherwise resolve those disputed terms.

Following a process of "baseball arbitration," I issued a ruling regarding the disputed settlement terms on July 19, 2007. That ruling provided that the defendants would immediately pay the plaintiff $600,000 in cash and $2,400,000 in restricted HDI stock, calculated using a value of 94% of the average closing price for the five trading days immediately prior to July 19, 2007. The plaintiff would immediately voluntarily dismiss his appeal of the ruling granting summary judgment in favor of the Salem estate, and all parties would immediately exchange mutual general releases. I indicated that, although the parties were free to enter into a formal settlement agreement, the terms of the payment obligation would not be delayed or otherwise affected by any such agreement.

As of October 31, 2007, none of the parties had complied with the July 19, 2007 ruling. On that day, I ordered the defendants to immediately pay $600,000 cash, plus 6% interest calculated from July 20, 2007 until the date of payment, to an escrow agent to be held in escrow

for the benefit of the plaintiff. In addition, the defendants were ordered to pay $2,400,000 in restricted HDI stock into escrow. The number of shares of HDI stock to be transferred was to be calculated using a value of 94% of the average of that stock's valuation price set forth in the July 19 ruling (i.e., the average closing price for the five trading days prior to July 19, 2007) and the closing price on October 30, 2007. Plaintiff was to be accorded piggyback rights to sell his HDI shares under any registration filed by HDI within twelve months of October 31, 2007.

I ordered the plaintiff to immediately voluntarily dismiss his appeal of the ruling granting summary judgment in favor of the Salem estate. I ordered the parties to immediately exchange mutual general releases. I stressed that the terms of the parties' obligations set forth above will not be delayed or otherwise affected should the parties choose to do so.

As of today, the defendants have placed cash and HDI shares into escrow for Brandt in accordance with the October 31 ruling. Brandt has not provided the defendants with an executed release through October 31, as per that ruling. Because Brandt has not complied with my earlier order, I again order his compliance. I instructed Brandt to comply with the settlement terms and my prior ruling by signing the defendants' release and returning it to defense counsel or instead to the escrow agent. In the event that Brandt chooses not to comply with the terms of the settlement, he may file a motion to reopen this case. Brandt should file such a motion, or send my chambers a letter indicating that he intends to do so, by Thursday, December 13.

Although captioned a "ruling," this decision shall be treated as a private event. This decision will be sent to the parties, but will not be docketed unless a party requires docketing in a proceeding to enforce the settlement agreement. This court will retain jurisdiction to enforce the terms of the parties' settlement agreement, including those terms imposed by this ruling.

2

It is so ordered.

Issued this 7th day of December 2007 at Bridgeport, Connecticut.

Stefan R. Underhill
United States District Judge

3

# EXHIBIT V

BRANDT'S

*Carey, Ray, Elle, Karen & Len*
28911 Via Hacienda
San Juan Capistrano, CA 92675
(949) 218-6888

December 12, 2007

Honorable Stefan R. Underhill                    **By: US Mail and Fax**
United States District Judge
District of Connecticut
914 Lafayette Boulevard
Bridgeport, CT 06604

Re:    Leonard Brandt v. MIT Development Corp., et al.
       Docket No. 3:01 cv 1889 (SRU)

Dear Honorable Judge Underhill:

Based on the conference call of December 6, 2007 I am to decide by December 13th
whether I will (1) accept the cash and stock currently in escrow, totaling approximating
$2.4 million in value and provide defendants with complete general release through
October 31, 2007 or (2) make a motion to reopen the case with a new trial and jury.

Since the conference call last week, I have spent a great amount of time considering the
pros and cons of both options and the opinions expressed by the Court during that call
regarding what I should do. I wanted this matter settled and behind me last March, and I
realize that my making a motion to reopen the case with a new trial and jury will extend the
matter further, and might offend the Court. However, leading up to March 8, 2007, I made
it clear that I would not settle for anything less than $3 million. And, as I am unwilling to
now accept $600,000 less than the $3 million I was promised on March 8, 2007, I have no
choice but to file a motion to reopen the case with a new trial and jury.

Having made the decision to make a motion to reopen the case with a new trial and jury, I
have just started the process of retaining counsel to do that. However, I am finding my
efforts hampered by the upcoming holiday season, and it appears it will take me a bit longer
to retain counsel to prepare and file the motion than I initially thought.

I will do my best to have the motion filed as soon as possible, as it is in my best interest to
do so. While I believe it can be done within the next thirty days, I will have to deal with
my new counsel's availability and calendar during the upcoming holidays. Looking at the
calendar, and taking the holidays into account, I respectfully ask the Court to allow me until
January 22, 2008 to file the motion. If the motion can be filed sooner, it will be.

In making my estimate of the time it will take to prepare and file the motion, I have
assumed that my case file, which is currently with Wiggin & Dana, can and will be turned

over promptly to my new counsel. I do not anticipate that there will be any problem getting my file, but if there is, I may have to ask for your assistance.

Please let me know if my requested deadline of January 22, 2008, is acceptable.

Respectfully submitted,

Leonard J. Brandt

Cc: Paul Brown, Richard Roberts

# EXHIBIT W

LexisNexis® *Total Research System*                    Switch Client ¦ Preferences ¦ Sign Off ¦ ☷ Help

Search ¦ Research Tasks ¦ Get a Document ¦ *Shepard's®* ¦ Alerts ¦ Total Litigator ¦ Counsel Selector ¦ Dossier ¦ His

Service: **Get by LEXSEE®**
Citation: **1994 U.S. App. LEXIS 34354**

*1994 U.S. App. LEXIS 34354, \**

OMAR STRATMAN, Plaintiff-Appellant, v. BRUCE BABBITT, Secretary of the Interior, LEISNOI INC., KONIAG INC., Defendants-Appellees.

No. 93-36006

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

1994 U.S. App. LEXIS 34354

October 31, 1994, Argued, Submitted, Seattle Washington
December 5, 1994, FILED

**NOTICE: [\*1]** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION AND MAY NOT BE CITED TO OR BY THE COURTS OF THIS CIRCUIT EXCEPT AS PROVIDED BY THE 9TH CIR. R. 36-3.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 42 F.3d 1402, 1994 U.S. App. LEXIS 39533. Certiorari Denied October 2, 1995, Reported at: 1995 U.S. LEXIS 5493.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Alaska. D.C. No. CV-76-0132-A-JAV. James A. von der Heydt, District Judge, Presiding.

**DISPOSITION:** REVERSED AND REMANDED

### CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant landowner challenged the decision of the United States District Court for the District of Alaska, which denied his motion to vacate a judgment of dismissal, and declined to alter that ruling after granting his motion for reconsideration.

**OVERVIEW:** The district court denied appellant landowner's motion to vacate a judgment of dismissal that had been entered upon appellant's motion, brought in accordance with the terms of a settlement agreement signed by appellant and appellee corporation. The dismissal was to appellee and co-appellee corporation. Appellant sought review of this decision as well as the district court's declination to alter that ruling after granting his motion for reconsideration. The court reversed the judgment and held that the district court abused its discretion in failing to set aside the dismissal. The court noted that there was a basic defect in the very inception and at the very core of the settlement agreement upon which the dismissal of the case was based. The court ruled that the settlement agreement was not enforceable because appellant did not bear the risk of the mistake, and, therefore, Fed. R. Civ. P. 60(b)(6) relief was warranted. The court found that the district court abused its discretion in finding that appellant made a deliberate choice to ignore the risk that co-appellee one day would not be bound to make the conveyance.

**OUTCOME:** The court reversed the district court's denial of appellant landowner's motion to vacate a judgment of denial, holding that the district court abused its discretion in declining to reopen appellant's action upon a finding of extraordinary circumstances

associated with a complete frustration of the settlement agreement.

**CORE TERMS:** settlement agreement, deliberate choice, conveyance, extraordinary circumstance, mistake of fact, indispensable party, negotiated, demerger, vacate, reopen, quitclaim deed, void ab initio, reasonable time, settlement, mutual, citation omitted, harm suffered, moving party, usual course, contracting, frustration, frustrated, reopening, feasible, declare, joinder, merger, abused, joined, specific performance

**LEXISNEXIS® HEADNOTES**                                               ⊟ **Hide**

Civil Procedure > Judgments > Relief From Judgment > Excusable Neglect & Mistakes > General Overview 🔗
*HN1*⚓ The court will not reverse a district court's refusal of relief under Fed. R. Civ. P. 60 (b)(6) in the absence of an abuse of discretion.  More Like This Headnote

Civil Procedure > Judgments > Relief From Judgment > Excusable Neglect & Mistakes > General Overview 🔗
*HN2*⚓ Relief under Fed. R. Civ. P. 60(b)(6) is extraordinary, especially where the judgment was rendered by consent. Even so, when an agreement fails of its purpose in its entirety, that does raise an extraordinary circumstance.  More Like This Headnote

Civil Procedure > Settlements > Settlement Agreements > General Overview 🔗
Contracts Law > Types of Contracts > Settlement Agreements 🔗
*HN3*⚓ The interpretation of a settlement agreement is subject to state law.  More Like This Headnote

Civil Procedure > Settlements > Settlement Agreements > General Overview 🔗
Contracts Law > Contract Interpretation > General Overview 🔗
Contracts Law > Types of Contracts > Settlement Agreements 🔗
*HN4*⚓ In Alaska, settlement agreements are interpreted according to the general principles of contract law.  More Like This Headnote

Contracts Law > Defenses > Ambiguity & Mistake > Mutual Mistake 🔗
Real Property Law > Deeds > Covenants of Title 🔗
Real Property Law > Deeds > Types > Quit Claim Deeds 🔗
*HN5*⚓ A contract for a quitclaim deed can be rescinded if the parties who negotiated for the deed were operating under a material mutual mistake of fact.  More Like This Headnote

Civil Procedure > Judgments > Relief From Judgment > Excusable Neglect & Mistakes > General Overview 🔗
Contracts Law > Defenses > Ambiguity & Mistake > Mutual Mistake 🔗
Contracts Law > Formation > Ambiguity & Mistake > Mutual Mistake 🔗
*HN6*⚓ A material mutual mistake of fact occurs when there was a mistake of both parties at the time of contracting as to a basic assumption on which the contract was made; the mistake had a material effect on the agreed exchange of performances, and the party seeking relief did not bear the risk of the mistake.  More Like This Headnote

Civil Procedure > Judgments > Relief From Judgment > Excusable Neglect & Mistakes >

neral Overview

**HN7** Fed. R. Civ. P. 60(b)(6) relief is not available to remedy harm suffered as a result of a truly deliberate choice or strategy on the part of the moving party.  More Like This Headnote

Civil Procedure > Parties > Joinder > Indispensable Parties
Civil Procedure > Parties > Joinder > Necessary Parties
Civil Procedure > Settlements > General Overview

**HN8** Fed. R. Civ. P. 19 dictates only that indispensable parties be joined in an action.  More Like This Headnote

Civil Procedure > Parties > Joinder > Indispensable Parties
Civil Procedure > Parties > Joinder > Necessary Parties

**HN9** Nothing prevents an indispensable-party defendant, once joined, from settling with the plaintiff.  More Like This Headnote

Civil Procedure > Parties > Joinder > Necessary Parties

**HN10** By its very terms, Fed. R. Civ. P. 19(b)'s considerations of equity and good conscience as to whether an action should go forward absent an indispensable party come into play only whenever joinder is not feasible.  More Like This Headnote

Civil Procedure > Dismissals > General Overview
Civil Procedure > Judgments > Relief From Judgment > Excusable Neglect & Mistakes > General Overview

**HN11** A Fed. R. Civ. P. 60(b)(6) motion must be brought within a reasonable time. What constitutes a reasonable time depends on the facts of each case. The primary considerations in determining whether a motion to vacate a dismissal was brought within a reasonable time are whether the moving party had good reason for not acting sooner and whether the adverse party was prejudiced by the delay.  More Like This Headnote

Civil Procedure > Dismissals > General Overview
Civil Procedure > Settlements > General Overview
Contracts Law > Types of Contracts > Settlement Agreements

**HN12** In the usual course upon repudiation of a settlement agreement, the frustrated party may sue anew for breach of the agreement and may not reopen the underlying litigation after dismissal.  More Like This Headnote


**JUDGES:** Before: WRIGHT, BEEZER and FERNANDEZ, Circuit Judges

**OPINION**


**MEMORANDUM** *

**FOOTNOTES**

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

Omar Stratman appeals the district court's denial of his motion to vacate a judgment of dismissal that had been entered upon Stratman's motion, brought in accordance with the terms of a settlement agreement signed by Stratman and Koniag, Inc. The dismissal was as to all defendants. Stratman also appeals the court's declination to alter that ruling after granting his motion for reconsideration. We reverse.

*HN1* We will not reverse a district court's refusal of relief under Federal **[\*2]** Rule of Civil Procedure 60(b)(6) in the absence of an abuse of discretion. _United States v. RG&B Contractors, Inc.,_ 21 F.3d 952, 954 (9th Cir. 1994). Moreover, as we have said, *HN2* "relief under Rule 60(b)(6) is extraordinary, especially where the judgment was rendered on consent." _Washington v. Penwell,_ 700 F.2d 570, 574 (9th Cir. 1983); see also _Jeff D. v. Andrus,_ 899 F.2d 753, 759 (9th Cir. 1989) (resolution of litigation through settlement is favored). Even so, when an agreement fails of its purpose in its entirety, that does raise an extraordinary circumstance. Cf. _Keeling v. Sheet Metal Workers Int'l Ass'n, Local Union 162,_ 937 F.2d 408, 410 (9th Cir. 1991) (where party repudiated a settlement, the situation was extraordinary and setting aside dismissal _was_ proper). This is just such a case.

Here, there was, as it turned out, a basic defect in the very inception and at the very core of the settlement agreement upon which the dismissal of this case was based. Unless Stratman made a deliberate choice to accept the risk of that defect, his agreement should **[\*3]** not bind him and the dismissal of this action should be set aside. When the district court failed to set aside the dismissal it did, in this extraordinary circumstance, abuse its discretion. Thus, we will first refer to the effect that the defect had upon the settlement agreement itself and will then discuss the deliberate choice issue.

A. _The Agreement_

*HN3* The interpretation of the settlement agreement is subject to Alaska state law. _Jeff D.,_ 899 F.2d at 759. *HN4* In Alaska, settlement agreements are interpreted according to the general principles of contract law. See _Hayes v. Xerox Corp.,_ 718 P.2d 929, 937 (Alaska 1986). Even *HN5* a contract for a quitclaim deed can be rescinded if the parties who negotiated for the deed were operating under a material mutual mistake of fact. See _Matanuska Valley Bank v. Abernathy,_ 445 P.2d 235, 237-38 (Alaska 1968). *HN6* A material mutual mistake of fact occurs when "'there was a mistake of both parties at the time of contracting as to a basic assumption on which the contract was made; the mistake had a material effect on the agreed exchange of performances, and the **[\*4]** party seeking relief did not bear the risk of the mistake.'" _Alaska Div. of Agric. v. Carpenter,_ 869 P.2d 1181, 1183 (Alaska 1994) (citation omitted).

It cannot be gainsaid that the first two requirements are met. It is clear that the settlement agreement negotiated by Koniag and Stratman contemplated that the surface rights to the subject land would be included, and that this was the contracting parties' intention. Koniag and Stratman believed at the time they entered into the settlement agreement that Leisnoi did not exist and that Koniag held all of the former Leisnoi's interests. If, in practical effect, Leisnoi _did_ exist, both parties were operating under a material mistake of fact that went to the heart of the contract they signed. Both parties believed that Koniag had the authority to represent Leisnoi's interests because Leisnoi was Koniag's predecessor. Leisnoi's interests in the disputed lands were the primary subject matter of the agreement; had the parties known that _at that time_ it was impossible for them to negotiate a deal concerning those interests, they almost certainly never would have entered into the agreement.

The only remaining **[\*5]** requirement is that Stratman did not bear the risk of the mistake. For the reasons discussed below, he did not. Accordingly, the settlement agreement was not enforceable. It is in just such extraordinary circumstances that Rule 60(b)(6) relief is warranted. See _In re Pacific Far E. Lines Inc.,_ 889 F.2d 242, 248, 250 (9th Cir. 1989); see

also *Keeling,* 937 F.2d at 410.

The result we reach is not foreclosed by issue preclusion because the Alaska Supreme Court did not consider whether the settlement agreement was invalid. It merely held that on account of the doctrine of lis pendens, the agreement was not binding on Leisnoi. *See Leisnoi, Inc. v. Stratman,* 835 P.2d 1202, 1208-10 (Alaska 1992). The Alaska Supreme Court had no occasion to consider whether frustration of the settlement agreement warranted reopening Stratman's district court case.

B. *Deliberate Choice*

[HN7] Rule 60(b)(6) relief is not available to remedy harm suffered as a result of a truly deliberate choice or strategy on the part of the moving party. *Ackermann v. United States,* 340 U.S. 193, 198, 71 S. Ct. 209, 211-12, 95 L. Ed. 207 (1950); **[*6]** *Plotkin v. Pacific Tel. & Tel. Co.,* 688 F.2d 1291, 1293 (9th Cir. 1982).

In its 1982 settlement agreement with Stratman, Koniag warranted that "it will pursue its best efforts to achieve conveyance and patent of the lands, and that it will take no action to prevent conveyance." Stratman could not have anticipated that Koniag would enter into a settlement agreement in the demerger litigation that would declare the merger "void ab initio." That agreement jeopardized the surface-estate conveyance. Despite the agreement it had negotiated with Stratman, Koniag acquiesced in the use of the "void ab initio" language at the request of the shareholder in the demerger litigation. Thus, Koniag helped create the very circumstance that frustrated the 1982 settlement agreement.

It is not significant for the purposes of "deliberate choice" analysis that Stratman agreed to accept a quitclaim deed. The agreement clearly contemplated that the surface estate was part of the deal. Koniag's attorney insisted on the use of a quitclaim deed because "he did not want Koniag to be obligated to convey a greater interest in the land than it received from the U.S. government." The **[*7]** record does not indicate that the attorney's concern stemmed from any worry that Koniag might have only subsurface rights to convey as a result of a demerger, but rather from a concern that Leisnoi might not have taken all of the necessary procedural steps to allow the United States to perfect the conveyance, or that some other procedural problems might arise. If the attorney did have the former concern, nothing suggests that he made it known to Stratman.

On balance, the district court abused its discretion in finding that Stratman made a deliberate choice to ignore the risk that Leisnoi one day might not be bound to make the conveyance. Although the record shows that Stratman knew of the pending demerger litigation, he could not have known that Koniag would agree to declare the merger "void ab initio" and that that would enable Leisnoi to claim the benefits but eschew the burdens of the settlement agreement. As it is, Leisnoi's position depends upon a much later opinion of the Alaska Supreme Court. That, in turn, elicited a vigorous dissent which asserted that the court had greatly changed the law itself. *See Leisnoi,* 835 P.2d at 1211 (Moore, J., dissenting). **[*8]** Thus, no deliberate choice was made.

C. *Indispensable Party*

Assuming arguendo that Koniag is an indispensable party to this action, its settlement agreement with Stratman, which would apparently require Koniag's dismissal as a defendant were this case to proceed, does not affect the reopening of the action under Federal Rule of Civil Procedure 19. [HN8] Rule 19 dictates only that indispensable parties be *joined* in an action. Koniag has been a defendant in this suit since January 1977. [HN9] Nothing prevents an indispensable-party defendant, once joined, from settling with the plaintiff.

*HN10*By its very terms, Rule 19(b)'s considerations of "equity and good conscience" as to whether an action should go forward absent an indispensable party come into play only "whenever joinder [is] not feasible." Here, joinder is not only feasible, it was accomplished seventeen years ago.

### D. *Timeliness of the Rule 60(b)(6) Motion*

*HN11*A Rule 60(b)(6) motion must be brought "within a reasonable time." "What constitutes a reasonable time 'depends on the facts of each case.'" *Pacific Far East,* 889 F.2d at 249 (citation omitted). The primary considerations in determining whether **[*9]** a motion to vacate a dismissal was brought within a reasonable time are whether the moving party had good reason for not acting sooner and whether the adverse party was prejudiced by the delay. *Id.* The district court, without discussion, found that the motion to vacate the dismissal was timely made. We agree.

*HN12*"In the usual course upon repudiation of a settlement agreement, the frustrated party may sue anew for breach of the agreement and may not, as here, reopen the underlying litigation after dismissal." *Keeling,* 937 F.2d at 410.

Stratman chose to follow the "usual course" and seek specific performance of the settlement agreement in state court. By not also seeking to reopen the district court litigation at that time, Stratman avoided expending judicial as well as his own resources on litigation that might later prove unnecessary--or even, depending on its outcome, incompatible with the relief he sought in the specific performance action. ¹

### FOOTNOTES

1 At oral argument appellees conceded that the seven and a half months between the decision in *Leisnoi* and the bringing of the Rule 60(b)(6) motion was not an unreasonable delay.

**[*10]** Leisnoi and the Secretary claim that there will be prejudice to Leisnoi's shareholders if the dismissal is set aside. We fail to discern that. Any harm suffered by Leisnoi will occur either because it seeks to enjoy the settlement agreement's benefits without paying for them or because its claim to the land was seriously defective in the first place.

### CONCLUSION

After Stratman brought this action against appellees, the attorney defending it believed that Stratman had an excellent (90%) chance of success. Stratman, however, did what we encourage parties to do: he settled the action with the only entity that could then negotiate a settlement with him--Koniag. Now Leisnoi seeks to secure a Panglossian result for itself. In its best of all possible worlds everything will be for the best as far as it is concerned. Stratman will be held to his agreement with Koniag, but Leisnoi will have no obligations. We understand the desire, but the law does not allow for its gratification.

A material mutual mistake of fact existed at the time Stratman and Koniag negotiated the 1982 settlement agreement. Rule 60(b)(6) relief is warranted when there has been complete frustration of a settlement agreement, **[*11]** and the district court abused its discretion in declining to reopen Stratman's action under these extraordinary circumstances. We therefore reverse the district court's order denying Stratman's motion for Rule 60(b)(6) relief and remand to the district court with instructions that it vacate the judgment of dismissal and reopen Stratman's decertification litigation. ²

**FOOTNOTES**

2 We deny the Secretary's motion to strike the reply brief or parts thereof.

REVERSED AND REMANDED.

Service: **Get by LEXSEE®**
Citation: **1994 U.S. App. LEXIS 34354**
View: Full
Date/Time: Friday, January 25, 2008 - 2:21 PM EST

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 **LexisNexis®**    About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.