UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LEONARD BRANDT | : Civil Action No. 3:01-CV-01889 (SRU) |
| Plaintiff | : |
| v. | : |
| MIT DEVELOPMENT CORP., HOME DIAGNOSTICS, INC., GEORGE H. HOLLEY, and JUDY CHENG SALEM, EXECUTRIX OF THE ESTATE OF ROBERT J. SALEM | : |
| Defendants | : MARCH 11, 2008 |

**PLAINTIFF, LEONARD BRANDT'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR RELIEF DATED JANUARY 25, 2008**

## I. INTRODUCTION

Plaintiff, Leonard Brandt ("Brandt") respectfully files this supplemental memorandum of law in further support of his Motion For Relief, dated January 25, 2008. On March 7, 2008, Brandt filed his Motion To Stay Ruling And To File A Supplemental Memorandum Of Law ("Motion To Stay"). Therein, Brandt sought a stay of the ruling on (i) Defendants' Motion to Enforce Settlement Agreement, dated January 17, 2008 and (ii) Plaintiff's Motion for Relief.[1] In addition, Brandt requested permission to file a supplemental memorandum of law in support of his Motion for Relief.[2]

---

[1] These motions were the subject of oral argument before the Court on February 28, 2008.
[2] Defendants have since filed Defendants' Reply Memorandum of Law in Further Support of a Finding of Contempt and Sanctions dated March 7, 2008. At the end of this brief Brandt addresses the points made in Defendants' Reply Memorandum as well.

**ORAL ARGUMENT REQUESTED**

The purpose of both the requested stay and this memorandum of law is to afford Brandt an opportunity to challenge (i) the Court's Article III authority to conduct a private arbitration or mediation and (ii) the Court's subject matter jurisdiction to conduct or hold any proceedings regarding the resulting award, to confirm that award, or to enforce that award. Alternatively, the Court should recuse itself from any further proceedings on the ground that it would be improper for the Court to entertain any motions seeking to confirm or enforce its own arbitration award.

In a nutshell, Brandt's position is as follows: The Court lacked authority under Article III or otherwise to conduct private, binding arbitration. Such conduct is "extrajudicial" and any resultant awards or orders are void. The Court now lacks subject matter jurisdiction over any proceedings regarding the resulting award, including motions to confirm or enforce that award. Alternatively, even if the Court has Article III authority to serve as a private arbitrator, it cannot issue an award and then preside over proceedings to enforce that award.

By filing this supplemental memorandum, Brandt seeks much the same relief under Fed. R. Civ. P. 60(b)(6) as requested in his Motion for Relief and initial Memorandum of Law ("Initial Memo of Law"). The basis for such relief, however, is even more fundamental. Because the Court lacked the legal authority to serve as a "binding mediator" or "binding arbitrator" it must now:

- Set aside its March 15, Order, and its private orders as a "binding mediator" dated July 19 and October 31, 2007;

- Set aside the March 8, 2007 "agreement in principle to settle" that was put on the record;

- Reopen the case and restore it to the active case docket; and

- Assign this matter for jury selection and a trial of the claims set forth in Brandt's fourth Amended Complaint dated December 10, 2002.

In the alternative, if the Court determines that it had the authority to conduct a binding private mediation or arbitration, it must nonetheless recuse itself from deciding the pending motions relating to such arbitration, including Defendants' Motion to Enforce Settlement Agreement and Plaintiff's Motion for Relief.

## II.   RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

When presented with the parties' "agreement in principle to settle" on March 8, 2007, the Court made it clear that it was reluctant to release the jury without first obtaining the parties' agreement regarding the procedure to use in the event the parties could not work out final settlement terms on their own. As described by the Court, that procedure "would be in effect that if I can't convince people to reach an agreement [informally] . . . the parties would have delegated to me the authority to resolve it [formally]." *See* Declaration of Thomas J. Rechen, dated January 25, 2008, **Exhibit A**, TX 3/8/07, p 10.[3]  The Court further summarized the "agreement" and the Court's role in the settlement process as follows:

> THE COURT:    Okay. In summary, as I understand it, the parties have agreed to settle this case in its entirety. . . . The terms of that settlement are in essence that the defendants are going to pay you, Mr. Brandt, a total of $3 million, which will consist of at least $150,000 in cash, the exact amount not having been set yet.
>
> \* \* \*
>
> *Finally, if there are details of the settlement that cannot be resolved,* for example, if the parties cannot agree on the terms of the general releases, if the parties cannot agree on the details concerning the transfer of stock, *the parties will come here, I will attempt to resolve those disputes informally.*

---

[3] Unless otherwise noted, all further references to Exhibits shall be in the form "Exh. __" and, unless noted, shall refer to exhibits attached to the Declaration of Thomas J. Rechen, dated January 25, 2008.

3

> If that informal process does not work, the parties are all authorizing me *to act as an, in effect, a binding mediator and to impose a decision on the areas of dispute concerning the details of this settlement.*

*Id.* at pp. 17-18 (emphasis added).

Immediately after the "agreement" was put on the record, the Court dismissed the jury, and on March 15, 2007 issued an Order reporting that the case had been settled and directing the Clerk to administratively close the file. For several months after March 8, 2007, the parties entered further negotiations regarding the unresolved issues. *See* Initial Memo of Law at 11-12. When those independent efforts at concluding a settlement did not succeed, the parties turned to the Court for the agreed upon assistance.

The Court held a telephone conference on May 15, 2007, during which the parties informed the Court that they had failed to reach a settlement. The following day the Court issued a Conference Memorandum, stating that:

> Counsel have not been able to finalize the details of the settlement and have requested that I resolve the dispute pursuant to the terms of the settlement put on the record on March 8[th]. *I indicated that we would, in effect, conduct a binding mediation process.* All counsel agreed.
>
> I set the following requirements for the mediation:
>
> First, counsel should submit to me a list of all undisputed terms, that is, those aspects of the settlement to which all parties agree. Second, counsel should send me a copy of the March 8, 2007 transcript that sets forth the terms of the settlement in principle. Finally, *with respect to the disputed terms of the settlement, we will conduct a "baseball style" arbitration.* Each side should fax to my chambers a written letter setting forth its position and an explanation of its position. All relevant information (e.g., position, explanation, argument, etc.) must be included in a single submission.
>
> \* \* \*

> *I told counsel that I do not intend to docket their submissions, but rather will treat the process as a private [event].* [4]

See **Exh. H** (emphasis added). The parties' counsel filed their respective submissions with the Court on May 24 and 29, 2007, respectively. See **Exhs. I, J**.

The Court issued its private Ruling Regarding Disputed Settlement Terms on July 19, 2007 ("First Ruling"), in which it reiterated the task before it:

> The settlement . . . provided that, in the event that the parties could not resolve those remaining details and I could not mediate any differences informally, that *I would serve as a binding mediator and would impose a decision concerning the disputed terms of the settlement.* That contingency has come to pass, and this ruling serves as my decision regarding the final terms of the settlement among the parties.
>
> *We have proceeded by way of "baseball arbitration,"* with each side submitting their last, best settlement position. My task is to choose between the parties' positions and to impose on the parties as the final settlement terms the proposal that most fairly reflects the intent of the parties in reaching the settlement in principle.

See **Exh. K** (emphasis added). The Court selected the Defendants' proposal, established a formula for calculating the value of the HDI stock to be paid, and ordered Defendants to pay Plaintiff $600,000 in cash plus restricted stock. See *id*. In addition, the Court explained that:

> *It is not necessary to dismiss or withdraw claims made in this case, because the case has already been dismissed.* The parties are free to enter into a formal settlement agreement, if they wish, but the terms of the payment obligation will not be delayed or otherwise affected should they choose to do so.
>
> *Although captioned a "ruling," this decision shall be treated as a private event.* This decision will be sent to the parties, but will not be docketed unless a party requires docketing in a proceeding to enforce the settlement agreement. This court will retain jurisdiction to enforce the terms of the parties' settlement agreement, including those terms imposed by this ruling.

See **Exh. K** (emphasis added).

---

[4] The actual text of the Court's Conference Memorandum states that the Court "will treat the process as a private objection." This appears to be a typographical error.

Thereafter, Plaintiff moved for an extension of time to file a motion for reconsideration of the Court's First Ruling. *See* **Exh. M**. The Court denied that motion. *See* **Exh. N**.

Then, after receiving letters from the parties addressing their continued inability to conclude the settlement, the Court conducted a telephonic conference on October 31, 2007, during which it expressed its intention to "*continue the binding mediation*" in order to resolve the continued impasse. *See* **Exh. B**, TX 10/31/07 at 22 (emphasis added). On the same day, the Court issued its second Ruling Regarding Disputed Settlement Terms ("Second Ruling") (*see* **Exh. Q**), which the Court described to the parties as "a continuation of my authority under the settlement agreement to resolve disputes concerning the settlement." *See* **Exh. B**, TX 10/31/07, at 22. The Second Ruling stated that:

> On March 8, 2007, the parties settled this case. Under the terms of the settlement, which was placed on the record, I would serve as a binding mediator and impose a decision concerning the disputed terms of the settlement in the event that the parties could not otherwise resolve those disputed terms.
>
> Following a process of "baseball arbitration," I issued a ruling regarding the disputed settlement terms on July 19, 2007.
>
> \* \* \*
>
> As of today, none of the parties have complied with the July 19, 2007 ruling. . . . *I discussed the status of the settlement with the parties in my continued capacity as a binding mediator in this matter. In that capacity, I now order [the parties' compliance].*
> \* \* \*
>
> *Although captioned a "ruling," this decision shall be treated as a private event.* This decision will be sent to the parties, but will not be docketed unless a party requires docketing in a proceeding to enforce the settlement agreement. This court will retain jurisdiction to enforce the terms of the parties' settlement agreement, including those terms imposed by this ruling.

*See* **Exh. Q** (emphasis added).

Following an impasse regarding the scope of the general release that Brandt was to provide the Defendants, and further letters from the parties to the Court setting forth their respective positions, (*see* Initial Memo of Law, at 19-20), the Court held a telephonic hearing on December 6, 2007. The next day, the Court issued its Third Ruling Regarding Disputed Settlement Terms (the "Third Ruling"), in which the Court instructed Plaintiff to comply with the settlement terms and the Court's prior rulings, including providing a general release through October 31, 2007, *or* file a motion to reopen the case. *See* **Exh. U.** Therein, the Court reiterated that (i) it was serving as a "binding mediator," (ii) it had conducted a process of "baseball arbitration," (iii) its decision, although captioned a "ruling" "shall be treated as a private event," and (iv) it would "retain jurisdiction to enforce the terms of the parties' settlement agreement, including those terms imposed by this ruling." *See id.*

On January 17, 2008, Defendants filed their Motion to Enforce Settlement Agreement. Plaintiff, following through on his choice of the alternatives presented by the Court, filed a motion to reopen the case. *See* Motion For Relief dated January 25, 2008. The Court heard oral argument on those motions on February 28, 2008. Thereafter, Plaintiff's counsel discovered that this Court lacked legal authority to conduct a binding mediation or arbitration in the first instance.

## III. ARGUMENT

In addition to the reasons set forth in Plaintiff's Initial Memo of Law (pp. 21, 24-36), this Court should set aside the March 15 Order and its subsequent First and Second Rulings because it lacked legal authority to conduct private binding arbitration. Moreover, that lack of legal authority renders the Court without subject matter jurisdiction to conduct or hold any

7

proceedings regarding the resulting award, to confirm that award, or to enforce that award. In the alternative, should the Court determine that it had the authority to conduct a binding private mediation or arbitration, and that it has subject matter jurisdiction, it should nonetheless recuse itself from deciding the pending motions relating to such arbitration, including Defendants' Motion to Enforce Settlement Agreement and Plaintiff's Motion for Relief.

### A.  The Court Lacked Authority Under Article III To Conduct A Binding Private Arbitration And Its Resulting Orders and Rulings Are Therefore Void.

By conducting a binding private mediation or arbitration in a case on its own docket, the Court exceeded the outer bounds of its judicial power as an Article III court. By its terms, Article III of the United States Constitution limits the judicial power to "Cases" and "Controversies." *Mistretta v. United States*, 488 U.S. 361, 102 L. Ed. 2d 714, 109 S. Ct. 647 (1989) (citing *Muskrat v. United States*, 219 U.S. 346, 356 (1911)).[5] Thus, the essence of the judicial function under Article III is resolving actual controversies by finding facts and applying the law to the facts as found, subject to appellate review. As Chief Judge Posner explained in *DDI Seamless Cylinder, Int'l, Inc. v. General Fire Extinguisher Corp.*, 14 F.3d 1163, 1165 (7th Cir. 1994), "arbitration is not in the job description of a federal judge. . . ." By any reasonable measure, arbitration is not a judicial function; it is an "extrajudicial" function.

---

[5] The *Mistretta* case involved the constitutionality of the Congressional act establishing the U.S. Sentencing Guidelines Commission. Although recent Supreme Court authority has held that the guidelines are merely advisory, less they violate the Sixth Amendment, *see United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court has expressly stated that its holding in *Booker* "does not call into question any aspect of our decision in *Mistretta*." *Id.* at 242.

Although Article III does not constitute a *per se* ban against federal judges performing extrajudicial functions, it imposes significant constraints on such functions. *Mistretta*, 488 U.S. at 404. "*Mistretta* expressly states that federal judges may participate in extrajudicial activities as long as two requirements are met. First, the judge must be acting 'in an individual, not judicial, capacity.'" *Mistretta,* 488 U.S. at 404.[6] Second, "a particular extrajudicial assignment [must not] undermine[] the integrity of the Judicial Branch.' *Id.*" *Paolo Lo Dua v. U.S.*, 1996 U.S. App. LEXIS 28746, at *28 (2d Cir. 1996).

As to the first requirement, Judge Posner's decision in *DDI Seamless Cylinder, supra,* vividly illustrates the dangers of allowing a judge to wear "arbitrator" and "judge" hats in the same case. The matter involved a magistrate judge who, after being assigned the matter for trial, agreed to the parties' request to arbitrate their contract dispute. *Id.* at 1164. The magistrate judge issued an order, drafted by the parties, establishing the agreed procedure for settling the case. *Id.* The order provided that an independent auditor would determine the losses sustained by the parties and that "the Court will retain jurisdiction to act as the arbitrator if any impasse arises as to any of the elements of the loss, and shall make a decision binding upon the parties regarding such issue." *Id.* The order also provided that the parties would enter a stipulation to dismiss the lawsuit following the agreed upon process. *Id.* at 1164-65.

From that context arose the appellate issue of whether a judge has authority to conduct a binding mediation or arbitration. Judge Posner concluded that **neither district court judges, nor magistrate judges may "double as arbitrators."** *Id.* at 1165 (emphasis supplied).

> [If they could, one judge] might issue an arbitration award and the winner might take it to [another judge] for an order of confirmation. It's an ingenious idea

---

[6] In *Mistretta*, the Court described this requirement this way: "[T]he Constitution, at least as a *per se* matter, does not forbid judges to wear two hats; it merely forbids them to wear both hats at the same time." 488 U.S. at 404.

9

> and since 'alternative dispute resolution' is all the rage . . . the day may not be distant when federal judges will be recommissioned . . . as arbitrators. But it has not arrived.
>
> Even more curious, ingenious, and economical would be a procedure by which a judge or magistrate judge would on day 1, wearing his judge's hat, encourage the parties to submit their dispute to arbitration; would on day 2, wearing his arbitrator's hat, arbitrate the parties' dispute; and on day 3, wearing his judge's hat once more, would confirm the arbitration award. . . . [T]he procedure we have sketched is so remote from the procedures that federal judicial officers are authorized to use that the final order emanating from it might well be void. . . .

*Id.*

The court of appeals in *DDI Seamless Cylinder* was able to avoid the clear constitutional problems inherent in Judge Posner's remarkably prescient hypothetical by "suppos[ing] that the parties and the magistrate judge were agreeing to an [authorized] abbreviated judicial procedure rather than an unauthorized arbitral one." *Id.* at 1168. Thus, the court of appeals "avoided the knotty question of declaring the acts of the magistrate judge ultra vires by characterizing [them] . . . as based upon the consent of the parties to simplify the procedures for adjudication of the dispute between the parties with a waiver of appeal." *Ovadiah v. New York Assoc. For New Americans,* 1997 WL 342411 at * 10 (S.D.N.Y. June 23, 1997) (discussing *DDI Seamless Cylinder, Int'l*). In other words, although the Seventh Circuit did "not pretend that [its] characterization [was] inevitable" it avoided reversing the matter by finding that the parties had merely agreed to an abbreviated, informal procedure by which the magistrate judge would adjudicate the case. *See DDI Seamless Cylinder, Int'l, Inc.,* 14 F.3d at 1166.

JJC/33764/2/844411v1
03/11/08-HRT/

In the present case, however, no such recharacterization of this Court's conduct is plausible, particularly given the Court's clear and repeated description of the process as a "***binding mediation***" conducted as a "***private event***." See *supra*, pp. 3-7.

Moreover, although the circumstances in this case may be unlike those that result in a typical arbitration or binding mediation proceeding, there is no question that the "settlement" reported on March 8, 2007 lacked finality in at least one important respect, and the Court's role was to decide any unresolved "details" and impose the finality that the parties could not achieve on their own. Whether that process is described as arbitration, binding mediation, or otherwise, it was functionally a private, binding, alternate dispute resolution procedure outside of the Court's responsibility to take evidence in a public forum and issue a public decision.

Finally, the agreed upon procedure set forth in *DDI Seamless Cylinder* included an order that the parties would "enter a stipulation and order for payment of the losses and following payment a stipulation to dismiss the lawsuit." *Id.* at 1166. No such simplified procedures for "adjudication" existed here. Rather, this Court insisted upon, and the parties agreed to, a procedure by which the Court would decide disputed issues and that the Court's decision would be binding.

In short, the conduct of this Court in serving as both judge and arbitrator in the same case violated the prohibition in *Mistretta* against wearing judicial and extrajudicial hats in the same case. And that is so regardless of the parties' consent to the procedure. Just as parties cannot vest subject matter jurisdiction in a court by agreement, parties also cannot authorize a federal judge to exercise power exceeding the boundaries of Article III.

The Court's role as arbitrator in this case also conflicts with the second *Mistretta* requirement, to wit, that the extrajudicial conduct not undermine public confidence in the integrity of the Judicial Branch. As the Supreme Court explained in *Mistretta*:

> [t]he effect of extrajudicial service on the functioning of the Judicial Branch is not solely a constitutional concern. The Code of Conduct for United States Judges, approved by the Judicial Conference of the United States, is intended to ensure that a judge does not accept extrajudicial service incompatible with the performance of judicial duties or that might compromise the integrity of the Branch as a whole.

*Mistretta*, 488 U.S. at 404.

Although the Supreme Court cited Canon 5(G)[7] to illustrate its point, Canon 5(E) is more apt in this case. It provides that a ***"judge should not act as an arbitrator or mediator or otherwise perform judicial functions in a private capacity unless expressly authorized by law."*** Administrative Office of U.S. Courts, Code of Judicial Conduct for United States Judges (1987). The underlying purpose of Canon 5(E) is to minimize the inherent risk of conflict with judicial duties where a judge is not expressly authorized by law to act as an arbitrator or mediator. If no such express authority exists, "the judge . . . would violate the Code were he to arbitrate [the] dispute." *Diagnostic Radiology Assocs., P.C. v. Jeffrey M. Brown, Inc.*, 193 F.R.D. 193, 195 (S.D.N.Y. 2000).

Moreover, the very prospect of an Article III court issuing "decisions" in private, whether agreed to by the parties or not, has the effect of undermining public confidence in the judiciary.

---

[7] Canon 5(G) states: "A judge should not accept appointment to a governmental committee, commission, or other position that is concerned with issues of fact or policy on matters other than the improvement of the law, the legal system, or the administration of justice, unless appointment of a judge is required by Act of Congress. A judge should not, in any event, accept such an appointment if the judge's governmental duties would interfere with the performance of judicial duties or tend to undermine the public confidence in the integrity, impartiality, or

12

In sum, the text of Article III, the Supreme Court's decision in *Mistretta*, and the Seventh Circuit's decision in *DDI Seamless Cylinder* compel two conclusions: (i) a judge can not conduct a private arbitration in a case before him; and (ii) any arbitration award or order emanating from such a process is void. *See also Diagnostic Radiology Assocs., P.C. v. Jeffrey M. Brown, Inc.*, 193 F.R.D. 193 (S.D.N.Y. 2000) (provision within arbitration agreement selecting a certain judge as arbitrator of potential disputes was unenforceable due to Canon 5(E) of the Code of Conduct for United States Judges); *Ovadiah v. New York Assn. for New Americans*, 1997 WL 342411 (S.D.N.Y. June 23, 1997) (copy attached as **Exh. 1**) (noting that arbitrations by magistrate judges should be avoided despite the broad language describing their duties); *Hameli v. Nazario*, 930 F. Supp. 171 (D. Del. 1996) (discussing *DDI Seamless Cylinder* and concluding that although magistrate judges assume a variety of roles in the course of aiding the district court, including mediator and adjudicator, neither judges nor magistrate judges may be appointed as arbitrators). Thus, the Court lacks subject matter jurisdiction over proceedings concerning the arbitration award.

> B. **Alternatively, Even If This Court Determines That It Had Legal Authority To Conduct The Binding Private Mediation Or Arbitration, It May Not Confirm Or Enforce Its Own Award.**
>
>> 1. **The Federal Arbitration Act Does Not Permit This Court To Confirm Or Enforce Its Own Arbitration Award.**

Even if this Court determines that it had authority under Article III to conduct the binding private arbitration, it nonetheless cannot enforce or confirm its own award. The Federal Arbitration Act ("FAA") sets forth procedures by which an arbitration award may be

---

independence of the judiciary . . . ." Administrative Office of U.S. Courts, Code of Judicial Conduct for United States Judges (1987).

confirmed, modified, or vacated. *See* 9 U.S.C. §§ 9-12. Those procedures demonstrate that an arbitration award may only be confirmed, modified, or vacated upon a motion presented to a person (a court), *other than the person or entity that made the award*. *See e.g.*, 9 U.S.C. § 9 ("after the award is made any party to the arbitration may apply to the court . . . for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected"). In other words, only someone other than the arbitrator who made the award may transform it, through confirmation, into an enforceable judgment.

Indeed, the Local Rules of Civil Procedure for the United States District Court are consistent with the FAA. Specifically, Rule 16(h)(6) clearly demonstrates that the "ADR provider" must be a different person from the judge: "At the conclusion of the voluntary ADR session(s), the ADR provider's report to the judge shall . . . indicate 'case settled or not settled'. . . . If a case settles, the parties shall agree upon the appropriate moving papers to be filed for the trial judge's endorsement (Judgment, Stipulation for Dismissal, etc.)."

The fact that neither the FAA, nor the Local Rules permit a court (i) to conduct a binding mediation or arbitration, or (2) to confirm, modify, or vacate its own arbitration award, is consistent with both Canon 5(E) and the reasoning set forth in *DDI Seamless Cylinder* expressing disfavor over such procedures.

2. **The Judicial Disqualification Standard Does Not Permit This Court To Confirm Or Enforce Its Own Arbitration Award.**

In addition to the above, the standard applicable to judicial disqualifications does not permit this Court to confirm or enforce its own arbitration award. "The substantive standard for recusal is whether a reasonable person, knowing all the facts, would conclude that the court's impartiality might reasonably be questioned." *Apple v. Jewish Hosp. & Med. Ctr.*, 829

14

F.2d 326, 333 (2d Cir. 1987); *see also*, 28. U.S.C § 455. Here, conducting further proceedings related to its own arbitration award would be akin to the Court reviewing its own decision on appeal. It is axiomatic that under such circumstances the Court's "impartiality might reasonably be questioned." Accordingly, this Court cannot properly act as both the arbitrator and the judicial authority that confirms or enforces the resulting award. At a minimum, any such proceedings must be referred to another court.

  **C. Defendants' Claims That Brandt Has Mischaracterized The Record, As Set Forth In Their March 7, 2008 Reply Memorandum, Are Unfounded.**

Finally, although unrelated to the primary purpose of this memorandum, Brandt and his counsel are compelled to respond to the charges levied by Defendants and their counsel as set forth in their Reply Memorandum of Law in Further Support of a Finding of Contempt and Sanctions dated March 7, 2008 ("Defendants' Reply"). At pages 1-2 Defendants state that "Plaintiff and his counsel outrageously state as a matter of fact that 'it was only *after* Brandt had accepted a settlement of $3 million, including at least $150,000 in cash and the balance in *freely tradable HDI stock*, that Defendants advised that the stock might be restricted.'" Defendants then go on to call Brandt's statement a "false and willful misrepresentation of the record," and chastise Brandt and the undersigned counsel for taking positions that are not supported by the record. To be clear—if it was not clear already—Brandt initially accepted an offer of at least $150,000 in cash and the balance in freely tradable HDI stock. Indeed, Attorney Dunham's May 29, 2007 letter to be Court makes this plain:

> After extensive discussions with Mr. Brandt on the night of March 7, I telephoned Mr. Brown on the morning of March 8, and confirmed that Defendants would pay no more than $3 million to settle. Mr. Brown also told me that most of this payment would be in the form of HDI stock, coming from Mr. Holley and the Salem Estate, and reiterated

15

>what he had consistently told me before trial: any stock that Mr. Brandt accepted in settlement would be unrestricted and freely tradable after the black out period. After conferring with Mr. Brandt, I called Mr. Brown back shortly thereafter to tell him that Mr. Brandt was accepting the $3 million offer. Only *after we agreed to that number* did he communicate to me for the first time even the possibility that there might be any continuing, long term restrictions on Mr. Brandt's ability to trade stock received in settlement.

See **Exh. J**, P.2-3 (emphasis in original).

The March 8, 2007 transcript further supports what Attorney Dunham made clear in his May 29, 2007 letter:

>MR. DUNHAM: Your Honor, let me, and Mr. Brown will obviously chime in if he thinks I am going astray here, just to outline where we are and my understanding of what the issues are. We have, Mr. Brandt authorized me at about 7:30 this morning to accept the settlement of $3 million with the understanding that a relatively small percentage of it, as yet undetermined, would be in cash. The number that Mr. Brown and I have talked about, but not holding to this, would be somewhere in the neighborhood of $150,000, but the rest would be in stock in HDI that would be coming from Mr. Holley and from the Estate of Salem.
>
>* * *
>
>I think where the issues come in is the nature of the stock, whether there are any trading restrictions on the stock that would pass to Mr. Brandt. In Mr. Brown's initial information, and again I'm expressing no criticism of him at all in what I am about to say—that initially his understanding from other sources was that there were no restriction on the stock, that it would be immediately tradable. He's now obtained some new information *as of within the last hour* that might not be the case and there may be some required holding period.

See **Exh. A**, pp. 4-5 (emphasis added).

The point of the argument set forth at pages 3 and 4 of Brandt's supplemental memorandum dated March 7, 2008 was **not** to suggest that the parties reported the "freely tradable" stock deal on the record. Indeed, if they had, the parties would be in very different

positions today. The point was simply to state the circumstances immediately preceding what was reported on the record, which gave rise to the parties' present situation, and which, together with other points already set forth, make a finding of contempt and sanctions inappropriate here. Defendants continual characterization of Mr. Brandt's presentation of the facts as "outrageous" and a "false and willful misrepresentation" are simply unwarranted and should not be condoned because the record—which includes letters and e-mails now before the Court—has not been misrepresented and Defendants' strident attacks do not establish otherwise.

With respect to the dismissal of the appeal, and whether it was to be held in escrow, Attorney Zeisler told Brandt via telephone that the dismissal of the appeal would be placed in escrow. Based on that conversation, Brandt understood that the dismissal papers would not be filed until the money and restricted stock – which were also in escrow – were released. *See* Declaration of Leonard Brandt, dated March 11, 2008 (filed herewith and attached as **Exhibit 2**). Indeed, the dismissal of the appeal was not independent of other aspects of the "settlement." Defendants had transferred stock and cash to escrow pending delivery of the release they wanted. And since dismissal of the appeal was not intended to be separable from the rest of the settlement, it should not have been filed while matters pertaining to the release or any other part of the settlement was unfinished.

Third, with respect to the release, while the record clearly states that the release would be a "general release," releasing the Defendants "from whatever claims they may have through the day of the release," that statement was made by the Court on March 8, 2007 at a time when none of the parties—and certainly not Brandt—anticipated that completely new and

17

separate claims might arise during the months that followed. Those separate claims were never part of the settlement.

V.   **CONCLUSION**

For the foregoing reasons, and for those set forth in his Memorandum of Law In Support of Its Motion for Relief dated January 25, 2007, Plaintiff Leonard Brandt respectfully submits that this Court must grant relief from its Orders of March 15, July 19 and October 31, 2007, and from the parties' report on March 8, 2007 of an "agreement in principle to settle" and, further, must reopen this case, restore it to the active case docket, and assign it for a trial by jury of the claims set forth in Leonard Brandt's fourth Amended Complaint dated December 10, 2002.

> RESPECTFULLY SUBMITTED,
> PLAINTIFF:
> LEONARD BRANDT
>
> By /s/ Thomas J. Rechen
> Thomas J. Rechen
> Federal Bar No. ct03385
> Pepe & Hazard LLP
> His Attorneys
> 225 Asylum Street
> Hartford, CT 06103-4302
> Tel. 860-522-5175
> Fax 860-522-2796
> trechen@pepehazard.com

## CERTIFICATION

I hereby certify that on March 11, 2008, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**COUNSEL FOR HOME DIAGNOSTICS, INC.**
**and GEORGE H. HOLLEY**
Aaron M. Zeisler, Esq.
Paul M. Brown, Esq.
Satterlee Stephens Burke & Burke, LLP
230 Park Avenue
New York, NY   10169
Tel.:  212.404.8737
Fax:  212.818.9606
Email:  azeisler@ssbb.com
Email:  pbrown@ssbb.com (sent via e-mail)


Richard A. Roberts, Esq.
Nuzzo & Roberts
One Town Center
P. O. Box 747
Cheshire, CT   06410
Tel: 203.250.2000
Fax: 203.250.3131
Email:  rroberts@nuzzo-roberts.com

Thomas J. Rechen