# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LEONARD BRANDT,
      Plaintiff,

    v.

MIT DEVELOPMENT CORP., ET AL.,
      Defendants.

CIVIL ACTION NO.
3:01cv1889 (SRU)

## RULING AND ORDER

In 2001, Leonard Brandt sued George Holley, Robert Salem,[1] MIT Development

Corporation ("MIT"), and Home Diagnostics, Inc. ("HDI").  HDI manufactures and sells in-home

testing systems for people with diabetes.  In his lawsuit, Brandt claimed that he had entered into

an agreement with Holley, Salem, and MIT, a company that has since merged with HDI, to

provide consulting services to the defendants.  Brandt claimed that, under the agreement, he was

entitled to a small monthly retainer fee, plus ten percent of any assets certain parties received,

related to the HDI business, above a base line of $1 million.  He sought damages premised upon

various theories, including breach of contract, promissory estoppel, and unjust enrichment.

During a 2007 trial, Brandt and the defendants reported to me, on the record in open

court, that they had resolved their disputes and settled the matter.  As part of that settlement, the

parties agreed that, in the event they could not resolve certain details of their settlement

agreement, I would conduct a "baseball-style" mediation to resolve those details.  Each side

would provide me with its best proposal and argument for resolving those issues, and I would

choose one proposal, by which all parties would be bound.

---

[1] Following Salem's passing in 2001, his estate (along with his widow and executor of his estate, Judy Cheng Salem) was added as a party in 2002.

The parties were unable to resolve certain details of their settlement agreement, and I ultimately selected a proposal from the defendants wherein the settlement proceeds would be payable $600,000 in cash and $2.4 million in HDI stock.

Initially, following my ruling on the disputed settlement details, both sides waited for the other to comply with the settlement agreement.  After some discussion, the defendants placed Brandt's cash and shares in escrow, but Brandt failed to provide a general release as contemplated by the settlement agreement.[2]  I have repeatedly ordered Brandt's compliance in my capacity under the settlement agreement to resolve disputes, as well as my inherent capacity as a judge to enforce a settlement agreement entered into before me in open court.  As time has passed since the parties settled their dispute, the value of HDI stock has gone down, so that the number of shares of HDI stock that Brandt settled for (that is, the number of shares then equal to an agreed-upon dollar amount of the settlement) are now worth less than they were at the time of settlement.  Brandt has refused to accept those shares, despite having settled for a considerable amount of stock which, by its nature, fluctuates in value over time.

The defendants have moved to enforce the settlement agreement in this case.  Brandt, after retaining a different attorney from the attorney who represented him at the time of settlement, has in turn moved for relief from my various orders in this case, including my ruling selecting the defendants' proposed resolution of disputed settlement details, contemplated and

---

[2] As discussed below, after the defendants placed cash and shares in escrow for Brandt, he placed into escrow a signed document withdrawing his pending appeal.  That withdrawal was later filed, although it is not clear whether Brandt contemplated its filing prior to his receiving the cash and shares that the defendants had placed in escrow.

authorized by the parties' settlement agreement.[3]  In addition, Brandt has questioned my authority

to resolve those disputed details, and also my authority to enforce the settlement agreement that

he willingly entered into.  He also argues that he did not agree to a settlement, but instead only an

"agreement in principle to settle."  Because the clear language used by the parties on the record in

agreeing to settle this case, along with the actions of the parties since that agreement, support an

enforceable settlement agreement that includes my resolving disputed settlement details and

enforcing that settlement, Brandt's current arguments lack factual and legal merit.  Accordingly,

his motions for relief (**docs. #261, 270**) are denied, and the defendants' motion to enforce their

settlement (**doc. #249**) is granted.

## I.    Background

In February and March 2007, I presided over a jury trial in this case.  On March 8, 2007,

after five days of trial, the parties reported to me that they had reached a settlement.[4]  As the

parties reported – and I reiterated – on the record, the terms of the settlement included: (1) the

defendants would pay Brandt consideration worth $3 million, at least $150,000 of which would

be in cash with the remainder to be in the form of HDI stock; (2) Brandt would withdraw his

claims against the defendants and dismiss his pending appeal of my grant of summary judgment

---

[3] Brandt has moved for relief from: (1) my March 15, 2007 order dismissing this case because the parties reported it settled in full, (2) my July 19 and October 31, 2007 "private" rulings resolving disputed settlement terms, and (3) the parties' agreement to settle (which he characterizes as an "agreement in principle to settle" placed on the record in open court on March 8, 2007.

[4] At various times throughout this opinion, I refer to the transcript of that court proceeding.  Those references include the following citation form: "Date/Month/Year at Page: Beginning Line - Ending Line," *e.g.*, 3/8/07 at 960: 1-10.  Page numbers referenced are page numbers from the trial transcript in this matter.

in favor of the defendant Estate of Robert Salem; and (3) the parties would exchange mutual general releases releasing all claims through the date of those releases.  In addition, as a term of the settlement, the parties agreed that I would resolve certain details regarding the settlement, if they were unable to resolve those details themselves.[5]  At that time, Brandt stated that my summary of the terms of the settlement was "excellent," and his attorney stated that it was "an entirely accurate summary."  I released the jury after I made clear to the parties that I would not do so unless I was confident that the matter had actually been settled.

Following March 8, 2007, when the parties reported their settlement on the record, they exchanged a number of proposals but could not agree on details, including what portion of the $3 million settlement would be paid in cash.  On May 15, counsel reported to me that they were unable to finalize the details of their settlement agreement.  Consistent with the settlement agreement that the parties had placed on the record in court, I set forth a procedure to resolve those disputed details.[6]  The parties then did exactly what they had agreed as part of their settlement: each side submitted a "final proposal" or "best offer" to me, along with argument in

---

[5] If the parties' informal attempts at resolving those details of their settlement agreement were unsuccessful, I was to act as a "baseball-style" mediator and select a proposed resolution from proposals submitted by each side.

[6] First, counsel were to submit to me a list of all undisputed terms, that is, those aspects of the settlement to which all parties agreed.  Second, with respect to the disputed details of the settlement, we would conduct a "baseball-style" mediation.  Each side was to fax to my chambers a written letter setting forth its position and an explanation of that position.  Each side could submit two positions, but I encouraged counsel to limit its submission to one or two positions and instructed each side to submit the same number of positions.  I would then adopt one of the positions.  As I set forth in a memorandum detailing our May 15 conference, each side therefore had an incentive to set forth a position that was as reasonable as possible.

During the May 15 conference, I told counsel that I did not intend to docket their submissions, but rather would treat the process as a private proceeding.  There was no objection.

4

support of that offer, with the understanding that the parties would be bound by whichever proposal I selected. On July 19, 2007, I selected the defendants' proposal, under which Brandt was to receive $600,000 in cash as well as shares of HDI stock equal in value to $2.4 million as measured at 94% of that stock's average closing price for the five trading days prior to July 19, 2007.

On August 1, 2007, Brandt moved to extend his time to file a motion for reconsideration of my July 19 ruling.[7]  Because that ruling was a private event under the terms of the settlement agreement, rather than a court order, and because the settlement agreement did not contemplate such a motion to reconsider, I denied that motion on August 20.  In his August 1 filing, Brandt also indicated that he would retain new counsel to represent him moving forward in his case.

Brandt's counsel, Jack Dunham and Jonathan Freiman of Wiggin & Dana, moved to withdraw from representation of Brandt on September 7, 2007.  I granted that motion the next day.  Brandt represented himself for several months, until January 18, 2008, when Attorney Thomas Rechen filed an appearance on Brandt's behalf.

On October 31, 2007, I held a phone conference on the record with the parties to discuss whether they had given effect to their settlement agreement, including whether the parties had exchanged general releases and the defendants had paid Brandt the $600,000 in cash and $2.4 million in stock that they owed him.  At that point, neither side had performed under the settlement agreement.  Neither cash nor stock nor releases had been exchanged, and Brandt had

---

[7] Brandt based his motion on his changed understanding of the value of the shares that he was to receive under the settlement agreement.  Brandt did not at that point claim that I lacked authority to enforce the settlement agreement, including resolving disputed details pursuant to a "baseball-style" mediation.

5

not dropped his appeal.

Between July 19, when I ruled on the disputed settlement details including the relative amounts of cash and stock due Brandt, and October 31, HDI's stock price had fallen. Because the shares that Brandt was to receive under that July 19 ruling were worth significantly less several months later, he argued that he should receive a number of shares worth $2.4 million as of October 31, with the defendants effectively bearing the entire risk of the change of the stock's value between the time of settlement and the time of stock transfer. The defendants argued that they had complied with the settlement agreement but Brandt had not, so he should bear the entire risk of the change in stock price. I indicated to the parties that, because neither party had complied with and performed under the settlement agreement, it would be appropriate for the parties to share the risk of change of the stock's value. Accordingly, at that time, I ordered the parties to perform under the settlement agreement, and instructed that they calculate the number of HDI shares to be exchanged using a value of 94% of the average of that stock's valuation price set forth in the July 19 ruling (i.e., the average closing price for the five trading days prior to July 19, 2007) and the closing price on October 30, 2007.[8] I also ordered the defendants to pay Brandt 6% interest on the $600,000 cash for the time between July 19 and the eventual date of transfer. Following the October 31 ruling, the defendants were to place the stock and cash in escrow for Brandt, both sides were to place general releases in escrow as well, and Brandt was to withdraw his appeal.

As I learned during another phone conference on December 6, although the defendants

---

[8] Because the stock price had dropped since the parties settled their dispute, each share was worth less and thus Brandt would receive *more* shares under that new valuation than had the parties performed under the settlement agreement when they entered into it initially.

had in large part complied with my October 31 ruling, Brandt had not.  As of December 6, the

defendants had placed cash and HDI shares into escrow for Brandt.  Three days earlier, on

December 3, Brandt withdrew his appeal to the Second Circuit,[9] but as of December 6, Brandt

had not provided the defendants with an executed release through October 31.[10]

    During our December 6 phone conference, it became clear that Brandt was not happy

with the settlement agreement he had entered into and that he was reluctant to comply with my

private rulings that he honor that agreement.  Because his case had been closed following the

parties' agreeing to settle this matter, I instructed him to file a motion to reopen this case if he

refused to perform under the settlement agreement.  I indicated that I was not stating an intention

to grant such a motion should one be filed, but instead was advising Brandt of procedural options

available to him.[11]

---

[9] Brandt's appeal was withdrawn on December 3.  His recent briefing suggests that he placed that withdrawal into escrow, and did not anticipate that his appeal would be withdrawn until he received cash and shares that the defendants had placed into escrow.  Brandt argues that his withdrawal "should not have been filed while matters pertaining to the release or any other part of the settlement was [sic] unfinished."  Brandt Supp. Mem. at 17.  As discussed below, whether Brandt dismissed his appeal on December 3 is not material to either his being bound by the settlement he agreed to or his lack of compliance with that settlement agreement.

[10] In court on March 8, 2007, the parties agreed as part of their settlement to provide general releases, releasing all parties "from whatever claims they may have through the day of the release."  Brandt argues that, because the parties did not anticipate claims that might later arise, they did not agree to provide releases concerning claims arising after March 8, 2007, and his release of claims through that date satisfies the settlement agreement.  For reasons discussed below, Brandt's release through March 8, 2007 fails to satisfy his obligations under the settlement agreement.

[11] The defendants agreed to settle this case at least in part for the finality that accompanies settlement.  Because Brandt repeatedly refused to comply with the settlement agreement that he entered into, the defendants were deprived of that finality.  I instructed Brandt to comply with the settlement or else file a motion to reopen not because I encouraged a motion to reopen or intended to grant one absent an appropriate basis, but because such a motion – successful or not –

Shortly following that conference and my subsequent written ruling instructing Brandt to comply with the settlement agreement, he indicated his intention to move to reopen his case. Brandt retained new counsel, Thomas Rechen, who represents him presently. Brandt filed motions to reopen his case and for relief from my various orders affirming and setting forth details of that settlement agreement, principally asserting that a valid settlement agreement did not exist. The defendants filed a motion to enforce that settlement agreement, principally asserting that agreement's validity. I held a hearing with the parties concerning those motions on February 28, 2008. At that hearing, after argument from both sides, I indicated my intention to issue a ruling in the defendants' favor in the near future.

On March 7, in an apparent attempt to forestall my ruling on the defendants' behalf, Brandt filed a motion to stay my ruling on the parties' pending motions. One day short of a full year after Brandt and the defendants reported their settlement agreement, including those terms concerning resolution of disputed settlement details, on the record in open court, he argued for the first time that Article III of the Constitution prohibited me from acting as a mediator and resolving those details. Brandt also argued in the alternative that, even if I were authorized to resolve disputed settlement details, I nonetheless cannot enforce – as an Article III judge – a settlement agreement including details that I mediated in a "private capacity." Brandt filed his motion to stay without a memorandum in support of that motion; he filed that brief the next week, on March 11.[12]

---

would help resolve the apparent impasse preventing conclusion of this matter.

[12] Brandt's March 7 filing included a request until March 11 to file a memorandum in support of his motion. Although I did not rule on that request, I have accepted Brandt's March 11 supplemental memorandum in support of his motion to stay.

## II.    Discussion

### A.    Brandt's Motion to Stay

####          1.    *"Baseball-style" meditation to resolve disputed settlement details*

In his motion to stay, Brandt argues for the first time that, under Article III of the

Constitution of the United States, I lacked authority to resolve disputed settlement terms by

serving, in effect, as a binding mediator in the manner authorized by the parties' settlement

agreement.  He argues that, "by conducting a binding private mediation or arbitration in a case on

its own docket, the Court exceeded the outer bounds of its judicial power as an Article III court."

Brandt Supp. Mem. at 8.  Brandt's contentions are premised on case law and canons of judicial

ethics indicating that federal judges should rarely if ever act in an extra-judicial capacity as

arbitrators or binding mediators, and that doing so may undermine confidence in the federal

judiciary.  Although his general concern regarding the appropriateness of judges' involvement in

resolving disputes before them has some validity, Brandt mischaracterizes my role in resolving

disputed settlement details in this matter.

Brandt relies on cases that demonstrate the pitfalls inherent in a federal judge serving as

an arbitrator.  For instance, in *DDI Seamless Cylinder, Int'l, Inc. v. General Fire Extinguisher

Corp.*, 14 F.3d 1163, 1165 (7th Cir. 1994), Judge Posner concludes that if district court judges or

magistrates could serve as arbitrators, one judge "might issue an arbitration award and the winner

might take it to [another judge] for an order of confirmation," or, even more troublesome, one

judge might (as a judge) encourage the parties to arbitrate a matter, then (as an arbitrator)

arbitrate the parties' disputes, and finally (as a judge) confirm his own arbitration award.  *DDI*,

14 F.3d at 1165.  Those concerns are misplaced, however, where as here parties resolve disputes

and wilfully enter into a settlement agreement on their own. Brandt characterizes the settlement

agreement between the defendants and him as an "agreement in principle to settle," rather than a

settlement agreement including the terms that the parties agreed to, and suggests that I

improperly imposed settlement terms (in the form of an arbitration award) upon the parties.

Those characterizations are factually and legally frivolous. The transcript of March 8, 2007 court

proceedings (captioned "Settlement") makes clear both that: (1) the parties settled this case, and

(2) that settlement expressly included a term that established a process for me to resolve disputed

settlement details in the event that the parties could not do so on their own.

The existence of a complete settlement rather than a settlement in principle becomes

apparent from a review of the trial transcript. On March 8, 2007, at 9:35 a.m., Brandt's attorney

reported on the record that the parties had reached an "agreement in principle to settle." 3/8/07

954: 5. At 9:45 a.m., we took a recess, to provide the parties the opportunity to reach a complete

settlement. *Id.* at 964: 14 - 965: 15. Before recessing, I suggested that the parties consider

appointing me or another neutral to resolve any unresolved details under the settlement

agreement, and that "[i]n the event you cannot work it out, the case *is still settled* and that neutral

will resolve whatever differences you have." *Id*. at 956: 13-15 (emphasis added).[13] Brandt's

attorney responded, "I understand, Your Honor." *Id*. at 956: 19. Then, at 11:00 a.m., after

further negotiation, the parties reported – first off the record and then on the record after

returning from recess – that the case had indeed settled. *Id*. at 966: 12 - 968: 4. I discussed the

terms of the agreement with counsel for both sides, with the attorneys and myself all indicating

---

[13] As the parties confirmed on the record on February 28, 2008, the paragraph of the
transcript beginning at page 956, line 5, should indicate that it is a statement of the Court.

on the record that a settlement had been reached among the parties.  At that time, I emphasized

that I would not dismiss the jury unless an agreement had actually been reached.  Counsel

assured me that dismissing the jury was appropriate, and Brandt's counsel expressed more than

once his agreement that, as a term of the settlement, I would decide any disputed settlement

details:

| | |
|---|---|
| THE COURT: | What I'd like to do then, if it's okay with everybody, is get your clients in here and let's put on the record the terms in effect of an enforceable settlement so that I have some comfort that the case has settled and we're not in a mistrial situation where it's going to fall apart and we've got to start all over again or whatever.<br><br>I'd like to, these jurors have been here for a while, they've been pretty patient, and I'd like to let them know that they are free to go.  It sounds to me like these, although they are not insignificant issues, they sound to me like resolvable issues and certainly you can write around these problems – |
| MR. BROWN:[14] | I think so, Judge. |

*Id.* at 961: 10-23.

* * *

| | |
|---|---|
| THE COURT: | My contemplation would be in effect that if I can't convince people to reach an agreement, that in effect the parties would have delegated to me the authority to resolve it. |
| MR. DUNHAM: | Okay, that's what I thought.  That's fine. |
| THE COURT: | What I have done in the past quite frankly is I've gotten two settlement agreements, plaintiff's settlement agreement, defendant's settlement agreement, and they are consistent with respect to everything except these two paragraphs, Judge, and we want you to pick or we want you to reformulate a new one, and that's really the kind of thing I'm anticipating – |
| MR. DUNHAM: | That's fine. |

---

[14] Paul Brown, counsel for defendants.

MR. BROWN:            That's acceptable, Judge.

*Id.* at 962: 23 - 963: 12.

In addition, Brandt's counsel himself placed the terms of the parties' settlement

agreement on the record, first stating that "I'm going to describe . . . a summary of the *settlement*

*terms.*" *Id.* at 966: 13-14 (emphasis added).  His description did not indicate that the settlement

was contingent or "in principle" or in any other respect was not actually a settlement.  His

recitation of the settlement terms was thorough and precise:

> *We have agreed* this morning that this case *will be settled* for a total payment of $3
> millions [sic].  That consideration will be at least $150,000 in cash, and perhaps more
> than that.  We haven't resolved the total amount.  The balance of the consideration will be
> paid in stock in Home Diagnostics Inc. . . . . That in consideration for this total payment
> of $3 millions [sic], Mr. Brandt will withdraw the claims against Mr. Holley and Home
> Diagnostics.  He will also withdraw the appeal of Your Honor's ruling granting summary
> judgment against the estate of Robert Salem.  So that *this settlement* will result in a
> complete resolution of all the claims that were originally brought in this case.  There will
> be complete general releases exchanged by Mr. Brandt with all of the defendants and
> reciprocal general releases back to Mr. Brandt.
>
> That the parties are going to, forthwith, work to negotiate the *details of the*
> *settlement agreement* as they relate to the stock.  And note, I'm not going to go into those
> *details*.  We talked with Your Honor off the record and counsel have continued to have
> discussions.
>
> And we have further *agreed* that in the event the parties are unable to come to a
> resolution on any *issues* related to this stock or *features of the settlement*, that we would
> come back to Your Honor, that Your Honor would initially attempt to facilitate a
> mutually agreeable resolution and, if that's not possible, both parties consent to Your
> Honor deciding what the final terms of settlement will be.  *It is with our agreement that*
> *Mr. Brandt is settling this case* for a total consideration, total value of $3 million.

*Id.* at 966: 15 - 967: 23 (emphasis added).  Brandt himself then confirmed that "I think I heard it

all and I think it was accurate . . . everything I heard I think was accurate," and Dunham stated

that "Len, I'll just tell you that what I just reported on the record was entirely consistent with

12

several conversations that you and I had earlier this morning by phone." *Id.* at 968: 2-8. [5][1]

Brandt, who was participating via phone,[16] then asked me to summarize the agreement

that was reached.  I reiterated:

> [T]he parties *have agreed to settle this case in its entirety*, including the pending appeal of my ruling concerning the Salem estate.  The terms of that settlement are in essence that the defendants are going to pay you, Mr. Brandt, a total of $3 million, which will consist of at least $150,000 in cash, the exact amount not having been set yet.
>
> The balance of the settlement amount will be paid to you in the form of HDI stock.  That stock will be coming both from Mr. Holley and the Salem estate.
>
> You agree in exchange for that total payment of $3 million to withdraw claims against HDI, Mr. Holley, as well as the pending appeal concerning the Salem estate.
>
> All parties . . . will exchange mutual general releases, meaning everybody's releasing everybody else from whatever claims they may have *through the day of the release*.
>
> There are various *details to work out* concerning the stock that's going to be transferred as part of the settlement amount.  Those *issues* were not detailed just now in any great detail but they include issues such as the ability to sell the stock, what restrictions there may be on that stock, et cetera.
>
> Finally, if there are details of the settlement that cannot be resolved, for example, if the parties cannot agree on the terms of the general releases, if the parties cannot agree on the details concerning the transfer of stock, the parties will come here, I will attempt to resolve those disputes informally.
>
> If that informal process does not work, the parties are all authorizing me to act as an, in effect a binding mediator and to impose a decision on the areas of dispute concerning the details of the settlement.

*Id.* at 969:24 - 971: 6.  Brandt's counsel stated that he believed my summary was "entirely

---

[15] At the February 28, 2008 hearing on his motion to reopen, I suggested to Brandt and his present attorney, Rechen, that an affidavit from his prior attorney, Dunham, would be valuable in supporting the contention that Brandt did not knowingly and voluntarily agree to the settlement agreement as described herein or that I in any way imposed settlement terms upon Brandt.  He has failed to produce any such affidavit that might demonstrate Brandt's unwillingness or reluctance to enter into, or ignorance of the terms of, his settlement with the defendants.

[16] Brandt participated on March 8 via phone because he was in New Haven, preparing to return home to California.  He had been present in court throughout the trial, but his attorney represented to me that morning that he chose to return home – in the middle of trial – because the case was settled and he did not feel his presence was necessary any longer.

accurate," defense counsel agreed, and Brandt himself said, "That was an excellent summary . . . I understood every word." *Id.* at 971: 11-17.  I asked him if he agreed to those settlement terms, and he said, "Yes." *Id.* at 971: 18-20.  He confirmed for his own benefit that no further conversations were needed for that settlement, to which he had just agreed, to take effect. *Id.* at 972: 16 - 973: 2.

Because the parties settled their dispute by way of the settlement terms (including my resolving disputed details or issues) laid out above in detail, Brandt's present attempt to characterize my role as that of a private, binding arbitrator is misguided.  He is correct that I have described my role as "in effect, a binding mediator" and the process of resolving disputed settlement details as "in effect, a binding mediation process," and that I have indicated that process would be treated as a "private event," i.e., not one in which submissions or rulings would be publicly docketed.[17]  But mediation of disputed details of an already agreed upon settlement is quite different from binding arbitration that resolves disputes by deciding the merits of such disputes.  In this case, I did not decide the merits of the parties' dispute and none of my actions was extra-judicial – this case was, and still is, on my docket.

Brandt is also mistaken when he argues that "this Court insisted upon . . . a procedure by which the Court would decide disputed issues and that the Court's decision would be binding." Brandt Supp. Mem. at 11.  Brandt does not point to any evidence to support his proposition, and there is none.  The March 8 transcript indicates that I suggested a procedure that was amenable to all involved.  Brandt's attorney stated that "I would be favorably inclined to a mechanism like

---

[17] As a result of the filing of the present motions, all materials initially treated as private matters have been publicly docketed.

what Your Honor suggested," and defense counsel agreed.  3/8/07 at 960: 24 - 961: 4.  I did not

impose any settlement terms.  I did suggest a dispute resolution mechanism for settlement details,

which the parties voluntarily adopted and which was wholly appropriate and lawful.

Rule 16(a)(5) of the Federal Rules of Civil Procedure indicates that judges properly take

an active role in facilitating settlement prior to trial.[18]  District courts within the Second Circuit,

as well as other Courts of Appeals, have reinforced that rule.  *See, e.g., Johnson v. Trueblood*,

629 F.2d 287, 291 (3d Cir. 1980) ("feelings about a case are not necessarily 'extra-judicial'

solely because they are made during settlement negotiations"); *Bilello v. Abbott Laboratories*,

825 F. Supp. 475, 479 (E.D.N.Y. 1993) (Rule 16 "encourages judges to take an active role in the

settlement of civil suits").  *DDI*, a case discussing when a magistrate's involvement in helping

decide a dispute between two parties is impermissible and on which Brandt relies for the

proposition that my conduct was extra-judicial in nature, condones both judicial involvement in

dispute resolution as well as parties' ability to agree to streamlined or alternative methods of

dispute resolution.  In *DDI*, Judge Posner writes that "[p]arties are free within broad limits to

agree on simplified procedures for the decision of their case. . . . Of course the parties should

have avoided reference to 'arbitration,' a mode of dispute settlement distinct from adjudication.

They should simply have said that this was the procedure they had agreed upon."  14 F.3d at

1176.  Parties can, under certain circumstances, agree to judicial involvement in resolving their

disputes.  The record here, however, fails to support the contention that I in any way imposed

settlement or any particular settlement terms on the parties, or that I interfered with their

---

[18] Here, my only role in facilitating settlement was to tell Brandt's counsel, off the record, that I did not think the jury was responding well to Brandt's testimony and, therefore, he should consider settling the case if he hoped to obtain a meaningful recovery.

adjudicating their dispute.

The role I performed in mediating certain disputed settlement issues was both proper and relatively common.  The Federal Judicial Center, in a handbook regarding judicial involvement in settlements in federal district court, describes a remarkably similar approach taken by Judge Robert Keeton of the District of Massachusetts:

> Judge Keeton makes this option available only if litigants are willing to bind themselves to certain consequences should the minitrial fail to produce a settlement.  One agreement stipulated that if the case failed to settle after minitrial, each side would propose what the judgment should be, and Judge Keeton would pick whichever proposal seemed closer to his own view of the proper resolution of the case.  Stipulations like this help conserve public and private resources, Judge Keeton feels, because they ensure that "things will not be the same day after tomorrow as it is today when we start this summary trial."

D.M. Provine, Settlement Strategies for Federal District Judges at p. 78 (Federal Judicial Center 1986).  Facilitating settlement in cases on a judge's docket is a judicial function; there is nothing extra-judicial about it.

Of course, if I were to serve as an arbitrator or mediator in a case on another court's docket, or otherwise outside of the cases and controversies before me, that would be improper.  Under the judicial codes of conduct, "Federal judges, . . . may not serve as arbitrators in cases *not on the docket of that judge's court* or a court upon which the judge is designated to sit unless expressly authorized by law.  Similarly, judges should not sit as settlement judges in state court."  Codes of Conduct for United States Judges, Chapter 5: Compendium of Selected Opinions, § 5.5(1)(a) (2007).  Canon 5.1 of the Judicial Code of Conduct describes those extra-judicial activities that a judge should regulate to minimize the risk of conflict with judicial duties.  Those extra-judicial activities include avocational activities such as writing and lecturing, civic and charitable activities, financial or business dealings, fiduciary dealings, or extra-judicial

16

appointments (i.e., to governmental committees or commissions). Canon 5.1(E) states that "A judge should not act as an arbitrator or mediator or otherwise perform judicial functions in a private capacity unless expressly authorized by law," but that caution does not apply here. My rulings on the disputed settlement details were referred to as "private events" in order to promote the settlement process. *Cf.* Fed. R. Evid. 408. Those rulings made it clear that I was acting in a judicial, not extra-judicial, capacity, and that those rulings would be docketed if and when it became necessary to enforce the public, on-the-record settlement to which the parties agreed. Each ruling states that "[a]lthough captioned a 'ruling,' this decision shall be treated as a private event. This decision will be sent to the parties, but will not be docketed unless a party requires docketing in a proceeding to enforce the settlement agreement. This court will retain jurisdiction to enforce the terms of the parties' settlement agreement, including those terms imposed by this ruling." 7/19/07 Ruling Regarding Disputed Settlement Terms at 2-3; 10/31/07 Ruling Regarding Disputed Settlement Terms at 2; 12/7/07 Third Ruling Regarding Disputed Settlement Terms at 2. Throughout the process of resolving and clarifying disputed settlement details (including ordering the parties' compliance), it was clear that those rulings would not be docketed initially, but that they would be docketed (as they now are) if a court order were needed to enforce the settlement agreement.

Because Brandt and the defendants, along with their respective counsel, agreed to the settlement terms on the record in open court, and because those terms included my resolving any disputed and unresolvable settlement details, Brandt's argument that I exceeded my judicial authority when I resolved those details lacks merit.

> 2.     *Authority to enforce the parties' settlement agreement*

Brandt argues in the alternative that, even if I properly resolved disputed settlement details and did not act in an extra-judicial manner, my ruling resolving those details was an arbitration award and that, under both the Federal Arbitration Act ("FAA") and standards of judicial disqualification, I am barred from confirming or enforcing my own award. His premise – that an arbitration occurred and that the FAA governs any resulting "arbitration award" – is flawed.

First, as discussed above, the parties resolved their disputes and reached a settlement agreement on their own. To the extent that I resolved disputed settlement details or outstanding issues, nothing changed the agreement that the parties reached when settling their case. To characterize my role as an arbitrator, and my ruling as an arbitration award, is to ignore the substantive agreement that the parties entered into. The only times that I referred to the process that took place in this case as "arbitration" were in comparing the process for resolving disputed settlement details to the "baseball arbitration" process, wherein a player and his club each make salary proposals and arguments to a neutral, who then selects one proposal by which the parties are bound. 5/16/07 Conference Memorandum at 1; 7/19/07 Ruling Regarding Disputed Settlement Terms at 1; 10/31/07 Ruling Regarding Disputed Settlement Terms at 1; 12/7/07 Third Ruling Regarding Disputed Settlement Terms at 1. Like the magistrate judge in *DDI*, I may have erred in using words like "arbitration" and "mediation" in describing my role in resolving disputed settlement details, but that arguably poor word choice does not transform my ruling into an arbitration award under the FAA.

Arbitration awards under the FAA or under Local Rule 16(h)(6) are the result of specific processes that include the parties filing jointly, for a judge's endorsement, a "Stipulation for

Reference to [Alternative Dispute Resolution]" specifying *inter alia* dates for the filing of progress reports by the ADR provider, and attendance at ADR sessions. At a basic level, arbitration is a form of *alternative* dispute resolution. Brandt and the defendants resolved their dispute by the traditional method of settling it without my help or the help of any other arbitrator. Such resolution is, in my experience, the norm rather than an alternative.

Second, because the parties settled their case before me and because their settlement agreement stated that "[t]his court will retain jurisdiction to enforce the terms of the parties' settlement agreement," my enforcement of that agreement – including the term authorizing me to resolve disputed settlement details – is appropriate. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381 (1994) (a provision retaining jurisdiction over a settlement agreement gives a federal court jurisdiction to enforce that agreement); *see also Roberson v. Giuliani*, 346 F.3d 75, 83 (2d Cir. 2003); *Collins v. Ford Motor Co.*, No. 3:97cv757(PCD), 2007 WL 911896 at *4 n.6 (D. Conn. Mar. 22, 2007).

Brandt suggests that a reasonable person might question my impartiality in this matter and that I should therefore recuse myself. He argues that my continuing to preside over the case "would be akin to the Court reviewing its own decision on appeal."[19] Brandt Supp. Mem. at 15. Brandt agreed to settle his case and he agreed to the terms of that settlement. Under that settlement, I resolved disputed and unresolved issues. My enforcement of that settlement, agreed to by the parties, involves ensuring compliance. Enforcement of the settlement agreement does not involve the sort of legal or substantive review that an appeals court undertakes. Although my

---

[19] To the contrary, by suggesting to Brandt, then pro se, the possibility of a motion to reopen, I made Brandt aware of a procedural vehicle that provides him a way to appeal this case, an option that he otherwise lost by entering into the settlement agreement.

impartiality might be questioned if I were to review the substance of the parties' settlement, that is not what has happened here.  I am enforcing terms that they themselves agreed to; that Brandt appears now to be unhappy with his settlement does not call my impartiality into question nor does it provide a basis for recusal.

Because I properly exercised authority under Article III and under the parties' settlement agreement when I resolved certain issues pertaining to their settlement, and because that settlement provided for my jurisdiction over settlement enforcement, Brandt's motion to stay lacks merit.  That motion (**doc. #270**) is DENIED.

B.    Brandt's Motion to Vacate Orders and Reopen the Case

Brandt makes a number of arguments in support of his motion to reopen this case and to vacate my various orders and rulings dismissing this case in light of the parties' reported settlement agreement and resolving disputed settlement details under that agreement.  Each of those arguments fails.

*1.    Enforceability of the parties' settlement agreement*

According to Brandt, because his trial counsel initially described the status of the parties' settlement negotiations as an "agreement in principle to settle," he did not enter into an enforceable settlement agreement.  Brandt's argument is factually and legally frivolous.  Once the parties progressed beyond a settlement in principle and reported an actual settlement at about 11:00 a.m. on March 8, 2007, not one of the parties or lawyers characterized the agreement as merely a settlement in principle.  To the contrary, all parties expressly agreed to the terms of the settlement agreement in open court and on the record.  That agreement is enforceable.

Brandt's present lawyer, Rechen, acknowledged at the February 28, 2008 hearing in this

matter that the parties did in fact settle their disputes on March 8, 2007.  He stated that

> my starting point, Your Honor, is is there in fact a settlement.  Even though I recognize
> completely everything that Your Honor has just said, that there were two segments to the
> proceedings on March 8, that in the latter segment of those proceedings the parties
> reported they had in fact achieved a settlement and there was a collquy between Your
> Honor and the parties, including Mr. Brandt, in which there was an acknowledgment that a
> settlement had been achieved.  But in hindsight, Your Honor, it is the case that that
> settlement was predicated upon a mutual mistake . . . .

2/28/08 at 6: 14-24.  Rechen went on to state that "The settlement that was reported to the court

could not be achieved," *id*. at 8: 19-21, and that "yes, Your Honor, there was a settlement

agreement.  And there was further an understanding that to the extent that there were any

settlement details beyond those two terms that were stated with certainty that needed to be

sorted out, Your Honor's good offices would be available as private mediator or arbitrator to

resolve those if the parties could not resolve them amongst themselves," *id*. at 9: 9-16.

According to Rechen, those two terms that the parties agreed to with certainty were that Brandt

would receive $3 million in value, and that Brandt would be protected against any restrictions

requiring a holding period on the HDI stock he was to receive.  *Id*. at 8: 23 - 9: 8.

Although Rechen's account of agreed-upon settlement terms is incomplete, he is correct

that the parties agreed to settle the case for $3 million in consideration and that I would resolve

any settlement details that the parties could not resolve.  Although the parties did not agree to

protect Brandt in the event that the HDI stock was restricted, he received significant protection

against any required holding period or decline in share price.  Under the settlement terms

recently recited by Rechen – terms that were agreed upon on March 8, 2007 and given effect in

that settlement agreement and my July 19 ruling resolving settlement details – Brandt would

receive four times as much cash as the minimum to which he agreed, and a six percent discount

21

on HDI's stock price, bringing the actual total value of his settlement to over $3 million.

Brandt's argument that there was only an agreement in principle to settle is not supported by

facts, or by Rechen's representations in court on February 28.  It is also not supported by the

law.

Under Connecticut law, the enforceability of a settlement agreement is determined using

general principles of contract law.  *Omega Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 443

(2d Cir. 2005).  A contract is binding if the parties have mutually assented to the terms, *id.*, and

where the terms of the agreement are "clear and unambiguous."  *Audubon Parking Assoc. Ltd.*

*P'ship v. Barclay & Stubbs, Inc.*, 225 Conn. 804, 811 (1993).  So long as there is mutual assent,

it is irrelevant whether the parties have actually signed an agreement.  *Omega Engineering*, 493

F.3d at 443 (citing *Schwarzschild v. Martin*, 191 Conn. 316, 321-22 (1983)).  Where a

settlement agreement has not been signed, Connecticut courts determine whether there has been

mutual assent using a three-part test.  *Id.* "The parties' intent is determined from the (1)

language used, (2) circumstances surrounding the transaction, including the motives of the

parties, and (3) purposes which they sought to accomplish."  *Id.*  (citing *Klein v. Chatfield*, 166

Conn. 76, 80 (1974)).  "The intention of the parties manifested by their words and acts is

essential to determin[ing]" whether the parties entered into a settlement agreement.  *Hess v.*

*Dumouchel Paper* Co., 154 Conn. 343, 347 (1966).

In *Omega Engineering*, the parties represented to the court on the day before trial was to

begin that a settlement agreement had been reached.  432 F.3d at 441.  The parties appeared

before Judge Alfred V. Covello with a written document containing all the terms and conditions

of the settlement and represented that the matter was closed.  *Id.*  The only thing left to be done

22

was to get the client's signature in Switzerland.  *Id.*  The Second Circuit found there was mutual

assent between the parties so as to make the agreement binding and enforceable because the

parties were motivated to avoid trial the following day, they anticipated an immediate signing of

the document, and because counsel for both parties represented to Judge Covello in court that

the case was settled.  *Id.* at 445.  Indeed, in most cases where a settlement agreement has been

enforced, it was reported to the court that the case had settled and all parties consented.  *See*

*EEOC v. Beauty Enter. Inc.*, 2007 WL 3231692, at *7 n.13 (D. Conn. Oct. 31, 2007) (citing

cases).

       The facts of this case satisfy all three of the *Omega Engineering* factors for determining

whether an enforceable settlement agreement exists – (1) the language used, (2) the

circumstances surrounding the transaction, and (3) the purposes that the parties sought to

accomplish.  With regard to the first factor, I have detailed above the exchanges on March 8,

2007 between the parties, their attorneys, and myself, confirming that they had indeed settled

their case.  After I described the case as settled in its entirety, and described the terms of that

settlement, Brandt said, "That was an excellent summary . . . I understood every word," 3/8/07

at 971: 11-17, he agreed to those settlement terms, *id.* at 971: 18-20, and he confirmed that no

further conversations were needed for that settlement, to which he had just agreed, to take effect,

*id.* at 972: 16 - 973: 2.

       With regard to the second *Omega Engineering* factor, the circumstances surrounding the

parties' settlement included bringing to a halt, mid-trial, a case that took almost six years to

bring to trial.  I discharged a jury that had heard evidence in the case (after the parties assured

me that their disputes had been settled), at a time when both sides faced the uncertainty of a

verdict and decided to resolve their differences.  "Of course, [avoiding the uncertainty of trial] is the motive for almost every party that negotiates a settlement agreement.  In *Omega*, however, this was especially relevant because the parties prepared the settlement agreement literally on the eve of trial. . . . The settlement agreement allowed the parties to avoid being under the gun of imminent trial."  *EEOC v. Beauty Enter. Inc.*, 2007 WL 3231692, at *8 (internal citation and quotation marks omitted).  That the settlement was reported on the record in the midst of trial is important, because the court's power to enforce settlement agreements "is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceeding."  *Audubon Parking*, 225 Conn. at 811.

As for the third *Omega* factor, both sides had objectives that their settlement agreement helped accomplish.  Brandt gained the certainty of a settlement worth $3 million in cash and stock, rather than taking his chances with the jury's verdict.[20]  The defendants, for their part, thought they were securing a final resolution to this litigation.  For $3 million in cash and stock, the defendants believed they were buying finality, ending expensive litigation and obtaining a release from potential liability to Brandt through the date of his signed release.  In short, Brandt was getting more economic consideration than a jury might have awarded him and the defendants were getting this case over with.  Both sides had good reasons to settle.

    2.       *Meeting of the minds or mutual mistake of fact*

---

[20] The evening of March 7, I indicated off the record to Brandt's attorney my belief that the jury would find for the defendants and, even if the jury were to find for Brandt, I did not believe that he would receive a significant jury award.  I suggested that he revisit settlement discussions in the hope of securing a monetary award for Brandt.  Faced with the prospect of leaving trial empty-handed, Brandt made the sensible choice to take the defendants' generous offer of $3 million in cash and stock.

Brandt argues that the settlement agreement in this case is not enforceable because there was no meeting of the minds regarding the terms of that settlement. The March 8 transcript demonstrates a meeting of the minds on all material terms: Brandt would receive consideration of $3 million, at least $150,000 of which would be in cash with the rest in HDI stock, the parties would exchange mutual general releases, and I would resolve any disputed and unresolvable settlement details. *See, e.g.*, 3/8/07 at 966: 15 - 967: 23.

Brandt ignores his agreement on the record and contends that no meeting of the minds occurred by contrasting each side's proposal to me regarding resolution of disputed settlement details. Brandt complains that the defendants introduced two proposals, one of which included the 94% discount valuation method that had never been agreed to by the parties. He argues that had he been aware of the restrictions on the HDI stock he was to receive, he could not have accepted that stock as part of a settlement because of the risk that he would not ultimately receive $3 million in value; he also argues that a second "all cash" proposal from the defendants totaling $2.9 million was insufficient and that uncertainty regarding the nature of any restrictions left him unable to respond to the defendants' proposals. Brandt's proposal was that the defendants pay him $3 million in cash.

Brandt's argument is flawed. Under the procedures set forth in the settlement to which Brandt agreed, each side would submit one or two proposals to me regarding unresolved settlement details, and I would decide between those proposals. Because I would choose one proposal after considering each submission, and that choice would then be binding, each side had an incentive to submit reasonable proposals. Brandt had no opportunity to respond to the defendants' proposals and they had no opportunity to respond to his; had the parties agreed on

procedures that allowed for such responses, they would have had that opportunity. They did not

so agree. He might receive stock that was not ultimately worth $3 million in value at a later

point in time,[21] but as detailed elsewhere, he settled for stock and that risk inheres in any stock

transfer. By the same token, stock provides an opportunity for an upside windfall.

I chose the defendants' proposal because it protected Brandt by awarding him

significantly more cash than the minimum for which he settled, protected the value of the HDI

stock he would receive by valuing it at a discounted rate, and was closer to the agreed upon

settlement – because it included a mix of cash and stock – than either all-cash proposal. In open

court, on the record, Brandt agreed to a settlement in which the $3 million settlement proceeds

were payable almost entirely in restricted stock. That he later proposed he receive $3 million in

cash does not demonstrate a lack of a meeting of the minds between the parties, but rather his

displeasure that HDI's stock price dropped and that restrictions (which he was generally aware

would be present) prevented his immediate sale of the stock he would receive.

To the extent that Brandt argues for relief under Rule 60(b) based on mutual mistake of

fact, that argument fails. Brandt contends that he settled with the defendants for $3 million, and

that, because the HDI stock was restricted and the share value has since gone down, he is not

receiving $3 million in value.[22] Brandt settled for at least $150,000 in cash, with the rest of the

---

[21] The valuation formula used gave Brandt a 6% cushion against a drop in the value of the HDI stock.

[22] Brandt has also argued that restrictions on HDI stock were especially important because he intended to sell the HDI shares that he would receive immediately upon receiving them. Because Brandt knew that there might be a required holding period, that argument fails. In addition, Brandt's plans for his HDI stock in the future are of no concern to the defendants, or to the Court. For the same reason, Brandt's concerns regarding his exposure to liability if he were to immediately sell his HDI shares are misplaced: he settled for those shares, and it is of no

$3 million due in HDI shares. Of course, stock by its nature fluctuates in value. Brandt, as a businessman who had been involved in public offerings himself, must have understood the risk that HDI's stock price would drop and that stock bringing the total value of his settlement to $3 million at the time of settlement might be worth less, bringing the total settlement value down, at a later point in time. Likewise, Brandt would not be litigating this matter today had the HDI stock price gone up after March 8, 2007.

In addition, and importantly, everyone understood on March 8, 2007 that the HDI shares Brandt was to receive would be restricted. Although the exact nature of those restrictions might not have been clear to the parties, all understood that restrictions might exist that would prevent Brandt's immediate resale of his HDI shares. The restrictions were discussed off the record and briefly on the record. At the very beginning of court proceedings when he reported the matter settled, Brandt's attorney stated that there might be restrictions on the stock. *Id.* at 954: 12. He went on to say that he had recently learned that "there may be some required holding period." *Id.* at 958: 4-5. In my recitation of the terms of the settlement, I indicated that issues to be resolved included "what restrictions there may be on that stock," *id.* at 970: 21-22. When Brandt assented to the settlement agreement, he agreed to receive HDI stock that everybody in court knew would be restricted. He entered into that settlement agreement knowingly and willingly. That certain facts were unknown or undetermined, however, does not demonstrate mistake, but rather uncertainty. If Brandt did not accept the uncertainty of those possible restrictions, he did not have to agree to that settlement.

Brandt is correct that his attorney stated on March 8 that if the HDI stock were restricted,

_____

concern to the defendants or the Court whether Brandt keeps those shares or sells them.

"there's got to be some protection on the value of it." *Id.* at 958: 6-13.  Ultimately, when I

selected the defendants' proposal to resolve disputed settlement details (which granted Brandt

$600,000 in cash with the remainder in HDI stock), I did so in response to the restricted nature

of that stock.  Because the stock was restricted, any sale of that stock would probably be at a

discounted rate and would not occur until after a holding period of some months, during which

the stock price might decline.  The proposal I accepted granted Brandt four times as much cash

as the minimum for which he settled, and also provided that the stock would be valued at 94%

of its average closing price for the five days preceding my ruling, effectively awarding more

shares to Brandt to reflect the discount at which he might have to sell his shares.

Brandt's present regrets at settling for a large quantity of HDI stock that has since

declined in value do not affect the enforceability of his settlement.  A test of whether an

agreement existed between the parties "must be applied . . . at the time they entered into the

alleged settlement," even if "the plaintiff now regrets having agreed to the settlement."  *DAP*

*Financial Management Co. v. Mor-Fam Electric, Inc.*, 59 Conn. App. 92, 97-98 (Conn. App.

2000).  "When a party makes a deliberate, strategic choice to settle, a court cannot relieve him

of that choice simply because his assessment of the consequences was incorrect."  *Powell v.*

*Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007) (citing *United States v. Bank of N.Y.*, 14 F.3d 756,

759 (2d Cir. 1994)).

Even if Brandt were truly mistaken regarding the possibility of restrictions on the HDI

stock he was to acquire, rather than uncertain about the effect of those restrictions, his argument

that mutual mistake of fact provides a basis for relief in this case under Rule 60(b) of the

Federal Rules of Civil Procedure is misguided.  Brandt argues that my order dismissing the case,

and ensuing private rulings, should be voided because the parties were mistaken about restrictions on the HDI stock, but there is no indication that the defendants were mistaken.  If the defendants were not mistaken, there cannot have been *mutual* mistake.

In addition, under section 152(1) of the Restatement (2d) of Contracts, "[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154."  Section 154 in turn states that:

> A party bears the risk of a mistake when
>
> (a) the risk is allocated to him by agreement of the parties, or
>
> (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
>
> (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

Even if Brandt and the defendants were all mistaken (despite all indications that everyone was aware that there were restrictions on the HDI stock), under subsections 154(a) and 154(b) of the Restatement, Brandt bore the risk of mistake and cannot now void the parties' settlement agreement.  Here, the "risk of a mistake," if there were such a mistake, is that the stock would be worth less at a later point in time than it was at the time of settlement.  The parties' agreement, which awarded Brandt as much as $2.85 million worth of HDI stock (in addition to at least $150,000 cash), allocated to Brandt the risk that HDI's stock value would drop or that due to possible restrictions, that stock might be worth less to Brandt when he eventually sold it.

In addition, Brandt stated on March 8 that he understood and agreed with my recitation of the terms of the parties' settlement agreement, including my indication that one issue still to be resolved was the restricted nature of the HDI shares he would receive.  Under subsection 154(b), "[h]e [was] aware, at the time the contract [was] made, that he ha[d] only limited knowledge with respect to the" restrictions on that HDI stock, "but treat[ed] his limited knowledge as sufficient" when he agreed to settle his case.  The March 8 transcript indicates that the parties were not mistaken about the nature of the HDI stock that Brandt would receive when they settled the case, but even if they were, Brandt bore the risk of that mistake and cannot now seek relief.

Because Brandt and the defendants entered into an enforceable settlement agreement, and because there is no reason why that agreement is voidable, Brandt's motion for relief from my order and rulings closing this case and resolving disputed settlement details (**doc. #261**) is DENIED.

C.     The Defendants' Motion to Enforce the Settlement Agreement

At the time that I heard argument regarding Brandt's motion to vacate and reopen, I also heard argument on the defendants' motion to enforce the parties' settlement agreement.  To a large extent, each side's motion presents the same factual and legal issues and questions, and my analysis and ruling on either motion applies to both.  I have not yet addressed questions of Brandt's compliance with the parties' settlement agreement, and I will do so now.

1.     *Brandt's compliance with my October 31, 2007 ruling*

On October 31, 2007, I held a phone conference on the record with the parties, and thereafter issued a written private ruling ordering compliance with the settlement agreement

30

under the authority the parties granted me in that agreement.[23]  That written ruling stated:

> As of today, none of the parties have complied with the July 19, 2007 ruling.  On a telephone conference today, held on the record with the plaintiff and counsel for the defendants, I discussed the status of the settlement with the parties in my continued capacity as a binding mediator in this matter.  In that capacity, I now order the defendants to immediately pay $600,000 cash, plus 6% interest calculated from July 20, 2007 until the date of payment, to an escrow agent to be held in escrow for the benefit of the plaintiff.  In addition, the defendants will pay $2,400,000 in restricted HDI stock into escrow.  The number of shares of HDI stock to be transferred shall be calculated using a value of 94% of the average of that stock's valuation price set forth in the July 19 ruling (i.e., the average closing price for the five trading days prior to July 19, 2007) and the closing price on October 30, 2007.  Plaintiff shall be accorded piggyback rights to sell his HDI shares under any registration filed by HDI within twelve months from today.
>
> The plaintiff shall immediately voluntarily dismiss the appeal of the ruling granting summary judgment in favor of the Salem estate.  The parties shall immediately exchange mutual general releases.  As I indicated earlier, the parties are free to enter into a formal settlement agreement if they wish.  I stress that the terms of the parties' obligations set forth above will not be delayed or otherwise affected should the parties choose to do so.

Because neither party had performed under the settlement agreement as of October 31, I ordered both to perform.  Also because neither party had performed, I ordered that they share the risk of the decline that had occurred in the value of HDI stock by averaging the number of shares Brandt would have received if the parties had performed immediately following my July 19 ruling and the number of shares Brandt would receive using HDI's stock price as of October 30, 2007.  The only difference between the parties' consideration after my July 19 ruling and my October 31 ruling is that, under the October 31 ruling, Brandt would receive *more* shares of stock and more cash in the form of interest.  All other terms and details – exchange of mutual general releases, dismissal of Brandt's appeal, the principal sum of $600,000 cash – remained the same.

---

[23] As discussed more fully above, the parties indicated that I would retain jurisdiction to enforce the settlement agreement, including that settlement term authorizing me to resolve disputed settlement details.

On November 15, 2007, Brandt sent the defendants a general release releasing them from all claims and causes of action set forth in his complaint through the date when the case settled, March 8, 2007.  On March 8, however, Brandt agreed that the parties would provide each other with releases "from whatever claims they may have through the day of the release." 3/8/07 at 970:12-16.  He did not agree to release the defendants only from claims set forth in his complaint arising up to March 8.  His binding settlement agreement alone indicates that a release through March 8, 2007 is inappropriate.  A release waiving claims through the date of that release is also warranted because he received additional benefits under my October 31 ruling, namely the extra HDI shares and payment of interest, that he would not have received had the parties initially timely performed.

It is important to note that, if Brandt had immediately performed under the settlement agreement and timely provided a release, he would not have forfeited any claims arising after that date.  If Brandt had tendered his release on March 8, for instance, or on July 19, he would have released the defendants from claims through March 8 or July 19, and would be free to sue them on any grounds arising after that date.  Even if the defendants did not perform and pay Brandt the cash and stock he was due until a later time, Brandt's release would have covered claims arising up to the day it was provided and nothing more.  By not providing his release immediately, Brandt retained the benefit of his potential claims, while obtaining consideration from the defendants based on the delay in performing the settlement.  Brandt cannot have it both ways. He argues that by releasing claims arising between March 8, 2007 and the date of his eventual release, he forfeits a insider trading claim he could otherwise against the defendants.  Without evaluating in any way the merits of such a claim, if Brandt wanted to preserve that claim or

others that might have come up, he should have provided his release at the time he settled his disputes with the defendants.  He did not.

Brandt has withdrawn his appeal to the Second Circuit.  Stipulated Mandate Ordering Dismissal of Appeal, Dec. 4, 2007.  He has not, however, provided the defendants with a release from claims through the date of that release, which was part of the peace of mind that the defendants bargained for in exchange for $3 million in cash and stock.  Because he has not provided that release, Brandt is in breach of the parties' settlement agreement.

### 2.     *Brandt's compliance with my December 6, 2007 ruling*

During our December 6 phone conference, it became clear that Brandt was not happy with the settlement agreement he had entered into and that he was reluctant to comply with my private rulings that he honor that agreement.  In part, the written ruling I issued following that conference stated:

> As of today, the defendants have placed cash and HDI shares into escrow for Brandt in accordance with the October 31 ruling.  Brandt has not provided the defendants with an executed release through October 31, as per that ruling.  Because Brandt has not complied with my earlier order, I again order his compliance.  I instructed Brandt to comply with the settlement terms and my prior ruling by signing the defendants' release and returning it to defense counsel or instead to the escrow agent.  In the event that Brandt chooses not to comply with the terms of the settlement, he may file a motion to reopen this case.  Brandt should file such a motion, or send my chambers a letter indicating that he intends to do so, by Thursday, December 13.

During our phone conference, I indicated that I was not stating an intention to grant such a motion should one be filed, but instead was advising Brandt of procedural options available to him.

The defendants agreed to settle this case at least in part for the finality that accompanies settlement.  Because Brandt repeatedly refused to comply with the settlement agreement that he

entered into, the defendants were deprived of that finality. I instructed Brandt to comply with the settlement or else file a motion to reopen because such a motion – successful or not – would help resolve the apparent impasse preventing conclusion of this matter. Brandt now argues that, although he has not provided the defendants with a release of claims arising through the date of that release, he complied with my December 6 ruling when he filed his motion to reopen. As a technical matter, Brandt is correct. He has complied with my December 6 ruling.

Brandt has not, however, complied with the parties' settlement agreement. As I ruled on December 6, Brandt had the choice *either* to comply with the settlement agreement *or* to file a motion to reopen. By choosing the latter, he has eschewed the former.

Although Brandt has technically complied with my December 6 ruling, because he has still not provided the defendants with a general release from claims through the date of that release, he is in breach of the parties' settlement agreement. The defendants' motion to enforce my settlement agreement (**doc. #249**) is GRANTED. Brandt shall comply with the terms of the settlement within ten days of the entry of this ruling and order.

D.     The Defendants' Motions for Contempt and Sanctions

When the defendants moved to enforce the parties' settlement agreement, they also asked that I hold Brandt in civil contempt, and award the defendants attorneys' fees and expenses they have incurred while attempting to enforce the settlement agreement. In addition, the defendants rely on the inherent power of federal courts to sanction bad-faith misconduct by parties or counsel, along with sanctions that federal courts may impose on counsel under 28 U.S.C. § 1927. They have also moved for attorneys' costs and fees incurred while responding to Brandt's motion to stay. The defendants argue that Brandt lacks both factual and legal support for his assertion

34

that he did not agree to settle this matter, as well as his motion to stay my ruling regarding enforcement of that settlement.

With regard to civil contempt, case law indicates that a finding of civil contempt is appropriate to ensure (future) obedience with a court's orders, or as punishment for failing to comply with a court's orders. *International Union, United Mine Workers of America v. Bagwell,* 512 U.S. 821 (1994). "'[W]hen a court imposes fines and punishments on a contemnor, it is not only vindicating its legal authority to enter the initial court order, but it also is seeking to give effect to the law's purpose of modifying the contemnor's behavior to conform to the terms required in the order.'" 512 U.S. at 828 (quoting *Hicks v. Feiock,* 485 U.S. 624, 635 (1988)). Here, my rulings regarding disputed settlement details and compliance with that settlement were issued consistent with my authority under the settlement agreement to decide disputed settlement terms. Those rulings were not initially docketed as court orders, and (prior to this ruling enforcing the settlement) Brandt has not violated a court order by failing to perform under the parties' settlement agreement.

Each ruling regarding disputed settlement details states that "[a]lthough captioned a 'ruling,' this decision shall be treated as a private event. This decision will be sent to the parties, but will not be docketed unless a party requires docketing in a proceeding to enforce the settlement agreement. This court will retain jurisdiction to enforce the terms of the parties' settlement agreement, including those terms imposed by this ruling." 7/19/07 Ruling Regarding Disputed Settlement Terms at 2-3; 10/31/07 Ruling Regarding Disputed Settlement Terms at 2; 12/7/07 Third Ruling Regarding Disputed Settlement Terms at 2. At this point, those rulings have been docketed as court orders and Brandt must comply with the October 31, 2007 and

December 7, 2007 orders within ten days of this ruling and order. In addition, this ruling orders

compliance with the settlement to which Brandt and the defendants agreed. Because Brandt is

not yet in violation of a court order, a finding of civil contempt is not appropriate here. If Brandt

does not comply with that settlement within ten days of this order, a finding of civil contempt

would be appropriate

Although civil contempt is not yet warranted, it may nevertheless be appropriate to

exercise the court's "inherent power" to sanction Brandt or his attorney Rechen "A federal court

may . . . exercise inherent power to sanction bad-faith misconduct even if procedural rules exist

which sanction the same conduct." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 62-63 (1991)

(internal citations and quotation marks omitted). Federal courts are inherently empowered to

"protect the administration of justice by levying sanctions in response to abusive litigation

practices." *Penthouse International, Ltd. v. Playboy Enterprises*, 663 F.3d 371, 386 (2d Cir.

1981), and that power is "governed not by rule or statute but by the control necessarily vested in

courts to manage their own affairs so as to achieve the orderly and expeditious disposition of

cases." *Link v. Wabash R.R.*, 370 U.S. 626, 630-31 (1962).

At this point, I deny without prejudice the defendants' motion for sanctions against

Brandt or Rechen. By June 12, 2008, the defendants shall file any renewed motion for contempt

or for sanctions, supported by a brief detailing arguments for imposing such sanctions. That brief

should be accompanied by affidavits supporting those arguments, including contemporaneous

time sheets and any other evidence to show the amount of the fees and costs sought from Brandt

or his counsel. Brandt and/or Rechen should file any response by June 26, 2008.

36

**III.    Conclusion**

For the reasons discussed above, Brandt's motions for relief (**docs. #261, 270**) are denied, and the defendants' motion to enforce their settlement (**doc. #249**) is granted.  The parties shall file briefs, consistent with the schedule set forth in this ruling, on the question of sanctions and attorneys' fees and costs.

It is so ordered.

Dated at Bridgeport, Connecticut, this 13th day of May 2008.


                              /s/ Stefan R. Underhill
                              Stefan R. Underhill
                              United States District Judge